# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **HYPERQUEST, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) **Case No. 08 C 485** |
| | ) |
| **v.** | ) **Judge Charles R. Norgle** |
| | ) **Magistrate Judge Cole** |
| **NUGEN I.T., INC., and DAYLE PHILLIPS** | ) |
| | ) **JURY DEMAND** |
| **Defendants.** | ) |
| | ) |

**HYPERQUEST'S OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**
**AND TO PHILLIPS' MOTION FOR JUDGMENT ON THE PLEADINGS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

I.   INTRODUCTION ................................................................................... 1

II.  FACTS ................................................................................................... 2

  A.   The Initial Development Of The eDoc Express Software By Phillips And Quivox. ................................................................................... 2

  B.   The eDoc Express Software. ....................................................... 3

  C.   Safelite's Acquisition Of The eDoc Express Software. ............... 4

  D.   HyperQuest. ................................................................................ 5

  E.   Initial Negotiations Between HQ And Safelite And HQ's Introduction To Phillips. ............................................................. 5

  F.   Phillips' Initial Communications With HQ About A Potential Business Relationship. .................................................................. 6

  G.   Phillips' In-Person Visits To Chicago And Phillips' Continued Pursuit Of A Potential Business Relationship With HQ Through May 2004. ...................................................................................... 8

  H.   Phillips And Tagliapietra Have Been Doing Business As "NuGen" Since 2004. ................................................................... 12

  I.   Phillips And NuGen Are Marketing Infringing Software To Nationwide Insurance Companies That They Know Will Use The Software All Over The Country, Including In Illinois. ................. 13

  J.   NuGen Transacts Business All Over The Country, Including Illinois, Via The Internet. ............................................................ 15

III. ARGUMENT ....................................................................................... 16

  A.   Legal Standards Applicable To Personal Jurisdiction Analysis. ............. 16

     1.   Personal Jurisdiction Over Out-Of-State Defendants. ........................ 16

     2.   Personal Jurisdiction And The Internet. ............................................. 18

**B.** **Jurisdiction Exists Under The Illinois Long-Arm Statute Because Both Defendants Have Committed Tortious Acts In Illinois And Because NuGen Transacts Business In Illinois Via The Internet.** ......................... 19

    1.    Defendants Have Committed Tortious Acts In Illinois. ..................... 19

    2.    NuGen Transacts Business In Illinois................................................ 21

**C.** **Phillips Has The Requisite Minimum Contacts With Illinois.** ................ 22

    1.    Phillips Committed Tortious Acts In Illinois. .................................... 22

    2.    Phillips Visited HQ In Illinois On Numerous Occasions And Phillips Directed Numerous Email, Fax, And Telephone Communications To HQ In Illinois. ............................................................................. 23

**D.** **NuGen Has The Requisite Minimum Contacts With Illinois.** ................. 24

    1.    NuGen Committed Tortious Acts In Illinois. .................................... 25

    2.    Phillips' Contacts With HQ In Illinois In 2003 And 2004 Are Attributable To NuGen. ................................................................. 25

    3.    NuGen Also Has Minimum Contacts With Illinois Because It Transacts Business With Illinois Residents Over The Internet. ......... 26

**E.** **The Exercise Of Specific Jurisdiction Over Defendants Is Reasonable.** . 27

**F.** **Defendants Have "Continuous And Systematic" Contacts With Illinois That Make The Exercise Of General Jurisdiction Appropriate.** ............. 28

**G.** **The Fiduciary Shield Doctrine Does Not Protect Phillips.** ........................ 29

**H.** **Phillips' Motion For Judgment On The Pleadings Should Also Be Denied.** ................................................................................................. 30

**IV.** **CONCLUSION** ...................................................................................... 33

# TABLE OF AUTHORITIES

Page

**Cases**

*Abbott Labs, Inc. v. Biovalve Techs., Inc.*, No. 07 C 2094, 2008 WL 373220
    (N.D. Ill. Feb. 12, 2008) ............................................................................................... 23

*Alexander v. City of Chicago*, 994 F.2d 333 (7th Cir. 1993) ......................................................... 30

*Brujis v. Shaw,* 876 F. Supp. 975 (N.D. Ill. 1995) ......................................................................... 29

*Burger King Corp. v. Rudzewicz,* 471 U.S. 462 (1985) ........................................................... 17, 27

*Chicago Architecture Foundation v. Domain Magic LLC*, No. 07 C 764,
    2007 WL 3046124 (N.D. Ill. Oct. 12, 2007) .................................................................. passim

*Coburn Group, LLC v. Whitecap Advisors, LLC*, No. 07 C 2448, 2007 WL 2948367
    (N.D. Ill. October 03, 2007) ....................................................................................... 28

*Cooper Industries, Inc. v. Juno Lighting, Inc.,* 1 U.S.P.Q. 1313 (N.D. Ill. 1986) ....................... 31

*Dangler v. Imperial Mach., Co*., 11 F.2d 945 (7th Cir. 1926) ...................................................... 31

*Deluxe Ice Cream Co. v. R.C.H. Tool Corp.*, 726 F.2d 1209 (7th Cir. 1984) ................. 17, 25, 27

*Flenner v. Sheahan*, 107 F.3d 459 (7th Cir. 1997) ................................................................. 30, 31

*George S. May Int'l Co. v.  Xcentric Ventures, LLC*, 409 F. Supp. 2d 1052
    (N.D. Ill. 2006) ................................................................................... 16, 17, 18, 23

*GMAC Real Estate, LLC v. Canyonside Realty, Inc.*, No. 05 C 0572, 2005 WL 1463498
    (N.D. Ill. June 15, 2005) ............................................................................................. 28

*Graehling v. Village of Lombard, Ill.*, 58 F.3d 295 (7th Cir. 1995) ............................................ 31

*Habitat Wallpaper and Blinds, Inc. v. K.T. Scott Ltd. Partnership*, 807 F. Supp. 470
    (N.D. Ill. 1992) ............................................................................................................ 16

*Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408 (1984) ........................... 18, 28

*Hyatt Int'l Corp. v. Coco,* 302 F.3d 707 (7th Cir. 2002) ........................................................ 16, 18

*Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Limited Partnership*,
    34 F.3d 410 (7th Cir. 1994) ............................................................................. 19, 20, 22

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945) ...................................................... 17

*Janmark, Inc. v. Reidy*, 132 F.3d 1200 (7th Cir. 1997) ............................................. 19, 20, 22, 23

*Jennings v. AC Hydraulic A/S*, 383 F.3d 546 (7th Cir. 2004) ........................................ 16

*Lucini Italia Co. v. Grappolini*, No. 01 C 6405, 2002 WL 206471 (N.D. Ill. Feb. 11, 2002) ...... 28

*Michael J. Neuman & Assoc., Ltd. v. Florabelle Flowers, Inc.,* 15 F.3d 721 (7th Cir. 1994) ...... 16

*Mid-Am. Tablewares v. Mogi Trading Co.*, 100 F.3d 1353 (7th Cir. 1996) ................................ 24

*Netzky v. Fiedler*, No. 00 C 4652, 2001 WL 521396 (N.D. Ill. May 15, 2001) ........................... 29

*Nordstrom Consulting, Inc. v. M & S Techs., Inc.*, No. 06 C 3234, 2006 WL 2931677
    (N.D. Ill. Oct. 12, 2006) ................................................................................................... 32

*Peaceable Planet Inc. v. Ty, Inc.*, 185 F. Supp. 2d 893 (N.D. Ill. 2002) ..................................... 31

*Peterson v. Baloun*, 715 F. Supp. 212 (N.D. Ill. 1989) .................................................................. 26

*RAR, Inc. v. Turner Diesel, Ltd.,* 107 F.3d 1272 (7th Cir.1997) .................................................. 16

*Shaffer v. Heitner*, 433 U.S. 186 (1977) ...................................................................................... 17

*Syscon, Inc. v. Vehicle Valuation Services, Inc.,* 274 F. Supp.2d 975
    (N.D. Ill. 2003) ................................................................................................... 31, 32, 33

*Turnock v. Cope*, 816 F.2d 332 (7th Cir. 1987) ........................................................................... 16

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) .............................................. 17

*Zippo Mfg. Co. v. Zippo Dot Com. Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997) ....................... 18, 19

**Statutes**

735 ILCS 5/2-209(a)(1) ................................................................................................ 17
735 ILCS 5/2-209(a)(2) ................................................................................................ 17

**Rules**

Fed. R. Civ. P. 12(b)(2).................................................................................................... 1, 30
Fed. R. Civ. P. 12(c) ...................................................................................................... 1, 30

**Treatises**

8 W.M. Fletcher, Cyclopedia of the Law of Private Corporations, §§ 3930-3932
   (1982 Revised Edition) .......................................................................................... 26

### HYPERQUEST'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND TO PHILLIPS' MOTION FOR JUDGMENT ON THE PLEADINGS

Plaintiff, HyperQuest, Inc. ("HQ"), by and through its undersigned counsel, hereby respectfully submits its brief in opposition to the motion of Defendants NuGen I.T., Inc. ("NuGen") and Dayle Phillips ("Phillips") (collectively "Defendants") requesting that this Court dismiss this action pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction, and further requesting that this Court grant judgment on the pleadings in favor of Phillips pursuant to Fed. R. Civ. P. 12(c).

## I.    INTRODUCTION

NuGen and Phillips assert that this Court does not have personal jurisdiction to adjudicate the claims that HQ has brought against them. Defendants, however, have not provided this Court with an accurate picture of the relevant facts.

In reality, Phillips and NuGen's copyright infringement was tortious conduct specifically targeted at HQ, a corporation that Defendants knew had its principal place of business in Illinois. In addition, that tortious conduct is directly related to and arises out of Phillips' and NuGen's significant prior contacts with HQ in Illinois in 2003 and 2004. In 2003 and 2004, Phillips met with HQ in Illinois on at least four occasions, and he directed numerous emails, phone calls, and faxes to HQ in Illinois – all for the purpose of trying to "re-gain" rights to the eDoc Express software that is at issue in this case.

Significantly, not only did Phillips reach out to HQ in Illinois on numerous occasions, but he also attempted to negotiate an agreement with HQ on behalf of the yet-to-be-incorporated NuGen I.T. entity. In that proposed agreement, *Phillips himself proposed an Illinois choice-of-law and an Illinois forum selection clause* – thereby acknowledging the appropriateness of the venue for disputes between the parties, and admitting that Phillips and

NuGen could reasonably foresee being called upon to answer for their actions vis-à-vis HQ in Illinois. These facts alone are more than sufficient to support a finding of personal jurisdiction over Defendants in this case.

Nonetheless, NuGen and Phillips also ignore the import that the nature of their internet-based business has on the jurisdictional analysis. NuGen's business consists of selling electronic claims processing services via the internet to users all over the country, including the State of Illinois. For this reason as well, subjecting the Defendants to the jurisdiction of an Illinois court is entirely proper.

Finally, HQ has alleged that Phillips – the driving force behind the original development of the eDoc Express software and the current President, Secretary, Treasurer and shareholder of NuGen – was personally involved in the infringement of HQ's rights. Accordingly, HQ has made the "special showing" required to assert jurisdiction over Phillips in his individual capacity.

For all of these reasons, explained in more detail below, Defendants' motions should be denied.

## II.    FACTS

### A.    The Initial Development Of The eDoc Express Software By Phillips And Quivox.

In or about 1996, Phillips founded DAIS, Inc. ("DAIS"), a Kansas corporation. Complaint for Injunctive Relief and Damages ("Complaint") at ¶ 7. In or about 1999, DAIS began product development for application software commonly referred to as "eDoc Express." Complaint at ¶ 8. On or about October 3, 2000, Quivox Systems Incorporated ("Quivox") was incorporated as the result of a merger between DAIS and Small Hill, Inc. *Id.* at ¶ 9.

In or about 2001, Quivox completed development of the eDoc Express software. *Id.* at ¶ 10.  Phillips was the driving force behind the development of the eDoc Express software. *Id.* at ¶ 19; Declaration of Jeffrey Hogan ("Hogan Declaration") at ¶ 9, attached hereto as Ex. A. John "Pete" Tagliapietra ("Tagliapietra"), the current majority shareholder of NuGen, was also with Quivox at the time that Quivox developed the eDoc Express software.   *Id.* at ¶ 55; Declaration of John "Pete" Tagliapietra ("Tagliapietra Declaration"), attached to Defendants' memorandum in support of their motion as Ex. B, at  ¶ 2.

**B.     The eDoc Express Software.**

The eDoc Express software is an electronic workflow system that was initially designed for use primarily in connection with the electronic processing of insurance claims. Hogan Declaration at  ¶ 57.  It is application software which, in contrast to software packages that are packaged and sold through commercial and retail channels, is accessed and used by customers through the internet.  *Id.*

The eDoc Express software is specifically used for the electronic assignment (or "dispatch") of repair claims and for the electronic return (or "upload") of completed repair estimates.  *Id.* at ¶ 58.  For example, in the automobile insurance and collision repair industry, there are generally three groups of people who prepare estimates of repair costs  –  appraisers that are employees of insurance companies; appraisers that work for independent appraisal companies; and appraisers that work for repair shops.  *Id.* at ¶ 59.  When an insured wrecks his or her car and calls the insurance company, the insurance company typically creates a claim and then either tells its insured to take the car to one of its approved repair facilities or assigns the claim to an appraiser.  *Id.*  If the insured takes the car to an approved repair facility, the repair shop creates an estimate of the cost of repair.  If the claim is assigned to an appraiser, the appraiser makes arrangements to inspect the vehicle and then creates the estimate.  *Id.*

The eDoc Express software provides the functionality for the electronic assignment of the claims to the appraisers and the repair shops and for the electronic upload of completed estimates back to the insurance company (or others such as third party administrators who provide estimate review services for review and approval of the estimates) via the internet. *Id.* at ¶ 60. The software is made available to users via an interactive website. *Id.* at ¶ 61.

In order for an appraiser or repair shop to be able to accept an assignment; complete the estimate; and then return the completed estimate back to the insurance company via the internet, the appraiser or the repair shop has to download onto its own computers a "control" – essentially a bundle of computer programs – that will provide that functionality. *Id.* Other users of the website through which the service is being provided (such as insurance company employees who just need to be able to view the claim information) do not need to have the control, they can simply access the information by logging on to the website of the provider of the electronic claims processing service (the services included in the eDoc Express software). *Id.*

In addition, it is custom and practice in the industry that customers typically pay for the electronic processing of claims on a per claim basis. *Id.* at ¶ 62. For example, if the eDoc Express software is used to process 1,000 claims for XYZ Insurance Company, there will be an agreed-upon price per claim. *Id.*

C.      **Safelite's Acquisition Of The eDoc Express Software.**

In July 2001, Quivox ceased operations. The following year, in or about the summer of 2002, Safelite Group Inc. f/k/a Safelite Glass Corp. ("Safelite") began conducting due diligence in connection with a potential acquisition of the assets of Quivox, including the eDoc Express software. *Id.* at ¶ 16.

In connection with its due diligence regarding a potential acquisition of the eDoc Express software, Safelite identified Phillips as a valuable resource because of Phillips' intimate

knowledge of the software. *Id.* at ¶ 18. Safelite ultimately decided to purchase the rights to the eDoc Express software, and hired Phillips in approximately April 2003. *Id.* at ¶¶ 18-20.

### D.    HyperQuest.

Jeffrey Hogan ("Hogan") is the President and Founder of HQ. Hogan Declaration at ¶ 1. HQ is a provider of primarily internet-based technology products and services to insurance companies and others in the property and casualty insurance industry, including repair shops, professional appraisers and parts suppliers. *Id.* at ¶ 3. HQ's principal place of business is, and since approximately July 2004 has been, in Skokie, Illinois. *Id.* at ¶ 4. All of HQ's computer equipment including its internet servers, web servers and database servers are located in Illinois. *Id.* at ¶ 5. Prior to July 2004, HQ's offices were in Chicago, Illinois. *Id.* at ¶ 6.

### E.    Initial Negotiations Between HQ And Safelite And HQ's Introduction To Phillips.

In or about May 2003, Safelite approached HQ about potentially working together because Safelite was interested in some of HQ's technology solutions. *Id.* at ¶ 7. Shortly thereafter, HQ learned that Safelite had acquired certain software commonly referred to as "eDoc Express" and Safelite and HQ both thought that there were possibilities for HQ and Safelite to work together. *Id.* at ¶ 8.

Relatively early in HQ's discussions with Safelite, Hogan's business contacts at Safelite introduced him to Phillips ("Phillips"). *Id.* at ¶ 9. In late June or early July, the discussions between Safelite and HQ had progressed, and Hogan was told by his business contacts at Safelite that there was going to be a meeting with some of Safelite's Board of Directors on July 11 and that Safelite wanted him to make a presentation on behalf of HQ regarding HQ's business and potential synergies between HQ and Safelite. *Id.* at ¶ 10.

Hogan's business contacts requested that he coordinate with Phillips in advance of the meeting because Phillips was also going to be making a presentation regarding what Safelite could do with the eDoc Express software.  *Id.* at ¶ 11.  Phillips and Hogan had several discussions in advance of the July 11 meeting.  *Id.*  Ultimately, Hogan and Phillips each gave an initial presentation at the meeting on their own, but they also prepared a joint presentation explaining to the Board of Directors ways that HQ (with its technology offerings) and Safelite (with its eDoc Express software) could work together.  *Id.*  By late summer/early fall 2003, HQ and Safelite were involved in serious discussions regarding a potential integration of Safelite's eDoc Express software into HQ's business.  *Id.* at ¶ 12.

**F.    Phillips' Initial Communications With HQ About A Potential Business Relationship.**

On several occasions between the July 11, 2003 meeting with members of Safelite's Board of Directors and August 1, 2003 – while Phillips was still a Safelite employee – Phillips approached Hogan about potentially developing a business relationship for himself with HQ.  *Id.* at ¶ 13.  Phillips told Hogan that he had been attempting to negotiate his own deal with Safelite whereby he would "re-gain" rights to "his" eDoc software.  *Id.* at ¶ 14.  Phillips explained that his goal was to somehow "re-gain" rights to the software and be in a position to commercialize the product without the constraints of Safelite's management team.  *Id.*

On August 1, 2003, Phillips sent to Hogan an email from a personal email address – dayleman@yahoo.com – instead of his Safelite work email address.  He informed Hogan that they could use that personal email address "to communicate more openly" about a potential business relationship.  *Id.* at ¶ 15.  On August 4, 2003, Phillips also sent Hogan an email with his Safelite cell phone number but Phillips warned Hogan to use it "judiciously."  *Id.* at ¶ 16.

Phillips told Hogan over the phone that he did not want Hogan to use his Safelite cell phone number too frequently because the bill would be going to Safelite.  *Id.*

At or about that time, Phillips continued trying to pursue some sort of relationship between himself and HQ.  Phillips suggested various potential working relationships, including a suggestion that he would join HQ and run the part of HQ's business that would involve commercialization of the eDoc Express software.  Hogan Declaration at ¶ 17.  Hogan inquired as to whether Phillips was really free to enter into such a business relationship given his position with Safelite.  *Id.* at ¶ 18.  In response, on or about August 7, 2003, Phillips faxed to Hogan a copy of an "Agreement Not to Compete and Agreement Not to Disclose Confidential Information" between himself and Safelite which he told Hogan he had signed.  *Id.*   Also on August 7, 2003, Phillips sent an email to Hogan confirming that he had faxed the non-compete agreement and stating that Hogan should "keep in mind that Safelite is not in the 'software development' business."  *Id.* at ¶ 19.

Meanwhile, the discussions between HQ and Safelite continued to move forward.  *Id.* at ¶ 20.  Although Phillips was not involved in the negotiations between HQ and Safelite regarding business terms of a potential deal, Phillips was the key technical person involved in those discussions because he was one of the original developers of the eDoc software and he was the only person at Safelite that had any significant knowledge of the software.  *Id.*

On August 15, 2003, Don Jackson, the Vice-President of IT Budget and Planning for Safelite, sent to Hogan an email requesting that Hogan schedule an in-person meeting with him and Phillips in Chicago to "talk in depth about the architecture of [the HQ] application" for the purpose of understanding the integration needs between the eDoc software and the HQ system, and suggesting a meeting on August 21.  *Id.* at ¶ 21.

Shortly thereafter, on August 19, 2003, Phillips sent Hogan another email from his personal email account stating: "I don't know if you still want to pursue the approach we have talked about, or if you are going down a different path.  If so, I can send you an outline of a possible working relationship."  *Id.* at ¶ 22.  Then, on August 21, 2003, Phillips sent an email and an attachment titled "Outline."  *Id.* at ¶ 23. The "Outline" was prepared by Phillips to describe the type of business relationship he was hoping to establish with HQ.  *Id.*

In his proposed "Outline" Phillips suggested "[t]here would be two separately owned companies, Company A and Company M."  One of the companies – Company A – was supposed to be HQ.  *Id.* at ¶ 24.  The other company – Company M – was a company to be formed by Phillips.  Phillips suggested that the company to be formed by him would, among other things, get certain rights to the eDoc Express software – including joint ownership of the source code.  *Id.*

### G.  Phillips' In-Person Visits To Chicago And Phillips' Continued Pursuit Of A Potential Business Relationship With HQ Through May 2004.

Between September 2003 and March 2004, Phillips traveled to Chicago to meet with HQ at least four times to discuss the integration of the HQ software with the eDoc Express software.  *Id.* at ¶ 25.  Although Phillips was officially traveling on Safelite business during each of those visits, there were also many times during those visits when he approached Hogan in person about a potential working relationship for himself with HQ.  *Id.* at ¶ 26.

Also during this period of time, Phillips spoke to Hogan on the phone on numerous occasions.  *Id.* at ¶ 27.  Most often the conversations were about technical issues with the integration of the HQ software with the eDoc Express software, but Phillips and Hogan also had several phone conversations involving discussion of potential ideas that Phillips had for a proposed working relationship for himself with HQ.  *Id.*

In particular, on September 25, 2003, Phillips flew to Chicago for a meeting at HQ's offices in Chicago. *Id.* at ¶ 28. During that meeting, the participants discussed HQ's business and HQ's product capabilities as well as the participants' visions of an integrated application – integrating HQ's products and the eDoc Express software. *Id.* at ¶ 28.

Shortly after that meeting, Safelite and HQ agreed to expand the type of relationship that they had been discussing to include the grant of an exclusive license from Safelite to HQ for the eDoc Express software and to work together to develop an effectively integrated product. *Id.* at ¶ 29. In or about early October 2003, Safelite and HQ began working on a draft letter of intent to reflect their agreement. *Id.* at ¶ 30.

From the technical perspective, Phillips was assigned responsibility for helping to develop, and then execute on, the integration plan between HQ and Safelite. *Id.* at ¶ 31. In connection with his work on a proposed integration plan, Phillips was privy to significant amounts of information about HQ's and Safelite's plans for product integration and development. *Id.*

On October 29, 2003, Phillips sent to Hogan by email a document titled "Proposed Integration – eDoc Express and Hyperquest" dated October 24, 2003. *Id.* at ¶ 32. The following week, on or about November 3, 2003, Phillips planned a trip to Chicago to discuss with Hogan the proposed integration in more detail. *Id.* at ¶ 33. At this time, Phillips once again broached the subject of a potential working relationship for himself with HQ. *Id.* at ¶ 34. In connection with this visit, Phillips had also specifically planned to fly in the night before the meeting so that he would be able to meet separately with Hogan before anyone from Safelite arrived, but the meeting was ultimately postponed. *Id.*

On December 17, 2003, Safelite and HQ entered into an official letter of intent describing an agreement in principle pursuant to which, among other things, Safelite would grant

to HQ an exclusive license to the eDoc Express software. *Id.* at ¶ 35. Shortly thereafter, either in December 2003 or January 2004, Phillips called Hogan to congratulate him on getting the deal done with Safelite. *Id.* at ¶ 36. At or about that same time, Phillips also told Hogan that now that he knew Safelite was moving forward with HQ, he was planning to leave Safelite and "do his own thing." *Id.* Phillips told Hogan that to accomplish what he wanted to do he would need a workflow solution, and he would prefer to partner with HQ because it would enable him to move more quickly and he thought it could be a mutually beneficial relationship. *Id.*

On January 21 and 22, 2004, Phillips came to Chicago for two more days of in-person meetings with HQ. *Id.* at ¶ 37. Although the primary purpose of the two-days of meetings was for technology due diligence in connection with the deal between Safelite and HQ and for technical discussions between Phillips and HQ's software developers about the eDoc Express integration issues, once again, Phillips directly asked about a potential working relationship for himself with HQ. *Id.* In fact, during this visit, Phillips and Hogan had a 2-3 hour dinner meeting during which they talked about a potential working relationship essentially the entire time. *Id.*

During the week of February 23, 2004, Phillips came to Chicago for another set of in-person meetings. *Id.* at ¶ 38. Phillips was in town for several days between February 23 and February 26, 2004. *Id.* Mike Thacker, a software developer employed by Safelite, was also in town for those meetings. *Id.* Once again, the subject of a potential relationship between Phillips and HQ came up. *Id.* at ¶ 39. By that time, Phillips and Safelite had already agreed that Phillips' last day at Safelite would be in early March 2004. *Id.* Nonetheless, Phillips did not feel comfortable discussing a potential relationship with a Safelite employee in the room, so he sent

Hogan a follow up email later in the week again raising the issue of a potential working relationship between himself and HQ. *Id.*

The last in-person visit that Hogan recalls by Phillips to Chicago was the week of March 1, 2004. *Id.* at ¶ 40. Phillips arrived in Chicago either on March 1 or 2 and he stayed in town through March 4. *Id.* That entire week was an intense week of work trying to make sure that a number of tasks essential to the integration of the eDoc software and the HQ system were completed before Phillips' final day at Safelite on March 5, 2004. *Id.* at ¶ 40. Also during this visit, Phillips and Hogan had further discussions about a potential working relationship between Phillips and HQ after his official last day at Safelite. *Id.*

On March 11 and March 12, 2004, after Phillips was no longer working for Safelite, he sent to Hogan additional emails in order to continue the dialogue about a possible relationship and providing some more details about an application that his "partners" had built that he wanted to integrate with HQ's system and the eDoc software. *Id.* at ¶ 41. During the month of March 2004, Phillips and Hogan had additional phone conversations about a potential relationship. *Id.* at ¶ 42.

On March 22, 2004, Phillips sent an email to Hogan asking to set up a time to get together by phone to "discuss possibilities." *Id.* at ¶ 43. Phillips had informed Hogan that at that time he and an entity that he was working with were piloting certain products with potential customers. *Id.* at ¶ 44. Phillips continued to pursue a relationship with HQ because, as he explained to Hogan, he thought his clients needed the "finesse" of the eDoc Express solution. *Id.* On March 29, 2004, HQ's head of technology, Dennis Hogan, and Hogan had a conference call with Phillips to better understand what Phillips wanted from HQ to support his pilots with his potential customers and his future needs. *Id.* at ¶ 45.

Thereafter, on March 31, 2004, Phillips sent Hogan, via email, a draft agreement – titled "Value Added Reseller Software License Agreement" – that he proposed would establish an ongoing relationship between HQ and "NuGen I.T. Incorporated, a Value Added Reseller." *Id.* at ¶ 46.  Phillips proposed that "NuGen I.T. Incorporated" would act as a "value added reseller" of the eDoc Express software and that the relationship between HQ and "NuGen I.T. Incorporated" would begin on May 1, 2004.  *Id.* at ¶ 47.

The draft VAR Agreement stated that notices should be sent to "NuGen I.T. Incorporated" at 14933 Huntington Gate Drive in Poway, California 92064 (the city in which Tagliapietra currently lives and works).  *Id.* at ¶ 48.  The draft VAR Agreement also proposed that the laws of the State of Illinois would govern the agreement and that any legal action between HQ and "NuGen I.T. Incorporated" would be brought in the state and federal courts located in Cook County, Illinois.  *Id.* at ¶ 49. Finally, Phillips acknowledged in the draft VAR Agreement that HQ owned an "exclusive world wide distribution license" to the eDoc Express Software. *Id.* at ¶ 50.

Phillips and Hogan exchanged a few more emails and had a few more discussions about a potential relationship through May 2004.  *Id.* at ¶ 51.  Ultimately, however, HQ decided not to enter into any sort of relationship with Phillips or "NuGen I.T. Incorporated."  *Id.* at ¶ 52.

**H.      Phillips And Tagliapietra Have Been Doing Business As "NuGen" Since 2004.**

NuGen was started by Tagliapietra, who used to work with Phillips at Quivox when Quivox initially completed the development of the eDoc Express software.  Tagliapietra and Phillips have been doing business together as "NuGen" since at least 2004, and Tagliapietra has been identifying himself as the President of NuGen since at least 2005.  *Id.* at ¶ 54-56.

I.     **Phillips And NuGen Are Marketing Infringing Software To Nationwide Insurance Companies That They Know Will Use The Software All Over The Country, Including In Illinois.**

Phillips is the President, Secretary, Treasurer and Shareholder of NuGen. Declaration of Dayle E. Phillips ("Phillips Declaration"), attached to Defendants' memorandum in support of their motion as Ex. A, at ¶ 3. In the fall of 2007, HQ learned that Phillips and his company, NuGen, had been willfully infringing HQ's rights in the eDoc Express software. Hogan Declaration at ¶ 63. In attempting to secure new business from Metropolitan Life Insurance Company ("MetLife"), in approximately October 2007, HQ learned that MetLife was considering a competing product from NuGen that NuGen was calling its "Enterprise Workflow" software. *Id.* at ¶ 64.

MetLife had sent out a Request for Proposal soliciting responses from companies that could provide an automated estimate review tool which, among other things, could be used by MetLife's approved repair shop network as well as independent appraisers. HQ responded to the RFP in late August 2007. *Id.* at ¶ 65. The Request for Proposal required, among other things, that respondents be prepared to service all of MetLife's approved repair shop network throughout the country, including Illinois, and that respondents be prepared to provide "robust training" at the repair shop level and the insurance company level. *Id.* at ¶ 66. The RFP specifically listed a number of MetLife operating companies, including "Economy Fire and Casualty Company, Freeport, Illinois" and specifically stated that "[t]hese companies would be party to any contract resulting from this bid request." *Id.* at ¶ 67.

HQ learned that five other companies had also responded to the RFP and that MetLife, after evaluating the responses, had selected HQ and one other company to participate in a pilot program so that MetLife could compare the results of the competing products and make a

determination regarding the contract award.  *Id.* at ¶ 68.  HQ did not initially know that NuGen was the other company but later learned that information from MetLife.  *Id.* at ¶ 69.

MetLife set up the pilot program to take place at certain of MetLife's approved repair shop facilities in Illinois, Texas, and the New England States.  *Id.* at ¶ 70.  In anticipation of the start of this pilot program, HQ was given a list of certain repair shops in Illinois and Texas to contact, and HQ was told that the other company would also be given the same list of shops to contact in order to get ready for the pilot.  *Id.* at ¶ 71.  In October 2007, in order to participate in the pilot, HQ contacted the identified repair shops about making arrangements to install the necessary piece of software on the repair shop computers so that they could participate in the pilot.  *Id.* at ¶ 72.

In early November 2007, HQ was informed that HQ was no longer going to be considered and MetLife was moving forward with NuGen.  *Id.* at ¶ 73.  Then, on or about December 24, 2007, HQ was once again invited to participate in the pilot program.  HQ was informed that NuGen was no longer being considered because NuGen had been trying to get the repair shops to agree to pay a significant sum of money for training their personnel on how to use their system.  *Id.* at ¶ 74.

If NuGen had gotten the business that it had solicited in the fall of 2007 from MetLife, NuGen's system would have been used for the electronic assignment and dispatch of all automobile insurance claims received from MetLife's insureds throughout the country, including Illinois, via use of a password-protected interactive website maintained by NuGen.  *Id.* at ¶ 75. Among other things, each of the repair shops in MetLife's approved repair shop network in the United States, including Illinois, would have had to download onto its own computers the necessary piece of software to enable them to upload estimates to NuGen's system.  *Id.* at ¶ 76. Then, once uploaded into NuGen's system, MetLife employees throughout the country would

have been able to log on to NuGen's website to review, request changes to, or approve the completed estimate. *Id.* NuGen would have earned revenue for every insurance claim processed using its system, including insurance claims processed by repair shops and independent appraisers in Illinois logging on to NuGen's system to accept assignment of claims and to return completed estimates. *Id.* at ¶ 77.

**J.    NuGen Transacts Business All Over The Country, Including Illinois, Via The Internet.**

NuGen's current and former customers include national independent appraisal companies; nationwide insurance companies; and nationwide independent third-party administrators with whom NuGen is transacting business all over the country, including Illinois, via the internet. *Id.* at ¶¶ 78-87. NuGen's current and former customer base includes at least one nationwide insurance company and five different national independent appraisal companies that work with hundreds of insurance companies all over the country, including Illinois. *Id.* at ¶¶ 78-84. Another significant and long-term customer of NuGen is Akzo Nobel, a nationwide independent third-party administrator for insurance companies that provides services such as third-party review of automobile insurance repair claims. *Id.* at ¶¶ 85-86.

Akzo Nobel has a network of repair shops which it calls its Auto Service Verify Repair Network ("A.S.V.R.N."). *Id.* at ¶ 87. Akzo Nobel conducted a successful pilot program using NuGen's system for the repair shops in its A.S.V.R.N. in Illinois. *Id.* As a result, Akzo Nobel currently uses (and for quite some time has used) NuGen's system for its A.S.V.R.N. network not only in Illinois but also in many other states throughout the country as well. *Id.* As a result of this business relationship with Akzo Nobel, NuGen earns additional revenue as a direct result of its interaction with Illinois residents (e.g. Akzo Nobel's approved repair shops) via its interactive website. *Id.*

III.    **ARGUMENT**

   A.    **Legal Standards Applicable To Personal Jurisdiction Analysis.**

      1.    <u>Personal Jurisdiction Over Out-Of-State Defendants</u>.

   Once a defendant has challenged a court's exercise of personal jurisdiction, the plaintiff has the burden of demonstrating that the court's exercise of personal jurisdiction over a defendant is proper.  *See RAR, Inc. v. Turner Diesel, Ltd.,* 107 F.3d 1272, 1276 (7th Cir.1997). A plaintiff need only make a prima facie showing that jurisdiction over a defendant is proper. *Michael J. Neuman & Assoc., Ltd. v. Florabelle Flowers, Inc.,* 15 F.3d 721, 724-25 (7th Cir. 1994).  The jurisdictional allegations in the complaint are taken as true, unless controverted by defendants' affidavits, and any conflicts between affidavits are normally resolved in the plaintiff's favor.  *Habitat Wallpaper and Blinds, Inc. v. K.T. Scott Ltd. Partnership*, 807 F. Supp. 470, 472 (N.D. Ill. 1992) (citing *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987).

   It is well-established that a federal court can only exercise personal jurisdiction over a non-resident defendant "if the court of the state in which it sits would have such jurisdiction."  *George S. May Int'l Co. v.  Xcentric Ventures, LLC*, 409 F. Supp. 2d 1052, 1055 (N.D. Ill. 2006).  "After considering Illinois' statutory framework concerning jurisdiction over non-resident defendants, the court must then consider whether its exercise of jurisdiction would 'comport with due process.'"  *Id.* (quoting *Jennings v. AC Hydraulic A/S*, 383 F.3d 546, 548 (7th Cir. 2004).  "The Seventh Circuit has determined that 'there is no operative difference between the limits imposed by the Illinois Constitution and the federal limitations on personal jurisdiction.'"  *Id.* (quoting *Hyatt Int'l Corp. v. Coco,* 302 F.3d 707, 715 (7th Cir. 2002).  Accordingly, one due process inquiry is sufficient.  *Id.*

   Under the Illinois Long Arm Statute, an Illinois court may exercise personal jurisdiction over any non-resident defendant "who in person or through an agent [engages in]

[t]he commission of a tortious act within this State." *Id*. (citing 735 ILCS 5/2-209(a)(2)).  An

Illinois court may also exercise jurisdiction when a defendant transacts "any business within this

state." *Id*. (citing 735 ILCS 5/2-209(a)(1)).

Due process requirements are satisfied when there are "minimum contacts"

between the forum and the defendants "such that the maintenance of the suit does not offend

traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S.

310, 316 (1945).  In determining whether specific jurisdiction exists, courts must decide whether

a defendant has "purposefully established minimum contacts within the forum State." *Burger*

*King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985).  In *Burger King*, the Supreme Court

explained:

> This purposeful availment requirement ensures that a defendant will not be
> haled into a jurisdiction solely as a result of random … contacts, or of the
> unilateral activity of another party or a third person.  Jurisdiction is proper,
> however, where the contacts proximately result from actions by the
> defendant himself that create a substantial connection with the forum
> State.

*Id*. at 475-76.

After determining that minimum contacts exist, the court should also ask whether

exercising personal jurisdiction under the circumstance is reasonable.  *May*, 409 F. Supp. 2d at

1056.  In connection with this inquiry, the court should consider the nature of the relationship

among "the defendant, the forum, and the litigation." *Id*. (quoting *Shaffer v. Heitner*, 433 U.S.

186, 204 (1977)).  "This relationship must be such that it is reasonable to require a non-resident

corporation to defend a suit in the forum state in the context of our federal system of

government." *Id*. (quoting *Deluxe Ice Cream Co. v. R.C.H. Tool Corp.*, 726 F.2d 1209, 1213

(7th Cir. 1984), (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292-93

(1980)).

Finally, courts may exercise either general or specific jurisdiction over out-of-state defendants. *Id*. (citing *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414-16 (1984)). General jurisdiction exists when the defendant has "continuous and systemic" contacts with the forum state. *Id*. Where general jurisdiction exists, the court can exercise personal jurisdiction over the defendant even if the lawsuit does not arise out of and is not related to the defendant's contacts with the forum state. *Id*. (citing *Hyatt*, 302 F.3d at 713). In the absence of general jurisdiction, courts may exercise specific jurisdiction, which is limited to cases where the 'litigation arises out of or is related to [the defendant's contact with the forum state]." *Id*.

    2.    <u>Personal Jurisdiction And The Internet</u>.

Given that this case involves a defendant that conducts business primarily via the internet, and given that the infringing use of the software that is complained about includes the distribution of such infringing software via the internet, there are additional legal standards to be considered. As this Court has observed:

> Businesses now routinely maintain Internet websites which offer consumers the opportunity to communicate directly with these business and other consumers, and where consumers can gather information about and purchase the companies' products and services. These websites are accessible anywhere an individual has a computer, including, obviously, all fifty of the United States.

*Chicago Architecture Foundation v. Domain Magic LLC*, No. 07 C 764, 2007 WL 3046124 (N.D. Ill. Oct. 12, 2007). This Court has further observed that "[p]erhaps the seminal case involving the Internet and personal jurisdiction over nonresident defendants is *Zippo Mfg. Co. v. Zippo Dot Com. Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997) (McLaughlin, J.)." *Id*. at *5.

In *Zippo*, the district court established a "sliding scale" analysis. *Domain Magic LLC,* at *5 (citing *Zippo*, 952 F. Supp. at 1124.) "Central to this 'sliding scale' analysis is the

notion that 'the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet.'" *Id*. Under the "sliding scale" approach:

> At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive website that does little more than make information available to those who are interested in it is not grounds for the exercise of personal jurisdiction. The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

*Id*. (quoting *Zippo*, 952 F. Supp. at 1124). Numerous district courts in the Northern District of Illinois (including this Court) as well as Illinois appellate courts have adopted this "sliding scale" approach toward analyzing the issue of personal jurisdiction and Internet websites. *Id*. at *4-*6 (citing numerous cases).

> B.    **Jurisdiction Exists Under The Illinois Long-Arm Statute Because Both Defendants Have Committed Tortious Acts In Illinois And Because NuGen Transacts Business In Illinois Via The Internet.**

> 1.    Defendants Have Committed Tortious Acts In Illinois.

Defendants have both committed tortious acts in Illinois by knowingly and willfully infringing the exclusive rights of HQ in the eDoc software, actions they knew would injure HQ in Illinois. *See Janmark, Inc. v. Reidy*, 132 F.3d 1200, 1202-03 (7th Cir. 1997) (tort occurred in Illinois where injury was suffered); *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Limited Partnership,* 34 F.3d 410, 411-12 (7th Cir. 1994) (tort occurred in Indiana where trademark owner was located).

-19-

Under the Seventh Circuit's decisions in *Janmark* and *Indianapolis Colts*, there can be no doubt that the injury to the owner of intellectual property rights as a result of a defendant's alleged infringement occurs in the forum in which the owner of the intellectual property rights is located. The Seventh Circuit has observed: "[t]here is no tort without injury." *Janmark*, 132 F.3d at 1202. Accordingly, "the location of the injury is . . . vital to understanding where the tort occurred." *Id*. Therefore, the Seventh Circuit explained: "the state in which the injury (and therefore the tort) occurs may require the wrongdoer to answer for its deed even if events were put in train outside its borders." *Id*.

*Janmark* involved a California shopping cart seller, Dreamkeeper, who was alleged to have tortiously interfered with a prospective contract between an Illinois shopping cart seller, Janmark, and its New Jersey customer. *See Janmark*, 132 F.3d at 1202. Even though the "interference" complained of was a telephone call placed by the defendant in California to one of plaintiff's customers in New Jersey, the conduct injured plaintiff in Illinois. The tort, therefore, occurred in Illinois. *Id.*

Similarly, in *Indianapolis Colts*, the Indianapolis Colts alleged that their trademarks had been infringed by a team using their trademark in Baltimore, Maryland. "Applying the principle that there is no tort without injury, [the Seventh Circuit] held that the tort (if there was one) occurred in Indiana rather than Maryland." *Janmark*, 132 F.3d at 1203 (discussing *Indianapolis Colts*).

In this case, HQ's principal place of business is in Illinois, and it primarily uses the eDoc software in Illinois. As in *Janmark* and *Indianapolis Colts*, the injury suffered by HQ – as an exclusive licensee of rights in the eDoc software with its principal place of business in Illinois – was suffered in Illinois. In addition, given Phillips' prior history with HQ and prior proposal of the draft VAR Agreement to HQ in Illinois, there can be no doubt that Phillips and

NuGen knew that HQ's principal place of business was in Illinois; that Phillips and NuGen knew of HQ's exclusive rights in the eDoc software; and that Phillips and NuGen by improperly infringing HQ's rights purposefully directed activities at an Illinois resident and intended to affect Illinois interests.  The torts at issue in this case, therefore, are deemed to have occurred in Illinois.

2.    NuGen Transacts Business In Illinois.

Jurisdiction is also proper over NuGen under the Illinois long-arm statute because NuGen has transacted and currently transacts business in Illinois.  *See* Hogan Declaration, ¶¶ 78-87 (discussing numerous current and former customers of NuGen with offices and/or repair networks in Illinois).  Tagliapietra conclusively states in his declaration that NuGen "does not conduct any business in the State of Illinois" and "has not solicited business, nor made sales in the State of Illinois" Tagliapietra's declaration ignores the nature of NuGen's internet-based operations and the numerous transactions that NuGen participates in with Illinois residents who are using and accessing NuGen's infringing system for the electronic processing of insurance claims originating in Illinois.  *Id*., ¶¶ 57, 78-87.  Tagliapietra's declaration also ignores the fact that NuGen receives additional revenue as a direct result of its interaction with Illinois residents who are receiving and uploading insurance claims via NuGen's interactive website.  *Id.*, ¶¶ 61, 78-87.

This Court's decision in *Chicago Architecture Foundation v. Domain Magic* is instructive.  In that case, the defendant was a Florida limited liability company with an office in Florida.  2007 WL 3046124, at *1.  The plaintiff alleged that the defendant had registered an internet website with a domain name that infringed plaintiff's trademarks.  *Id*.  Although the defendant was not actually selling products or services via the internet, the website included advertisements and hyperlinks for various businesses.  *Id*. at *1-*2.  The defendant received a

certain amount of revenue based upon the number of times users would click on the various advertisements or hyperlinks. *Id.* The Court explained: "There is no question that Domain Magic's actions satisfy Illinois' Long-Arm statute. Domain Magic has clearly transacted business within the State of Illinois, as it has profited from individuals clicking on the hyperlinks that were posted on the offending website." *Id.* at *8. In this case, as in *Domain Magic*, there is no doubt that NuGen has transacted business in Illinois because NuGen has profited from individuals in Illinois accessing and using NuGen's services via the internet.[1]

### C.    Phillips Has The Requisite Minimum Contacts With Illinois.

Phillips has the requisite minimum contacts with Illinois because he committed tortious acts in Illinois which he knew would injure HQ in Illinois; he visited Illinois to meet with HQ on numerous occasions; and he directed numerous emails, faxes, and telephone calls to HQ in Illinois.

### 1.    Phillips Committed Tortious Acts In Illinois.

As discussed in Section III.B.1 above, under *Janmark* and *Indianapolis Colts*, the injury to HQ as an intellectual property owner in Illinois was suffered in Illinois. The torts at issue in this case, therefore, occurred in Illinois. In addition, under *Janmark*, that fact alone is sufficient to constitute the requisite minimum contacts necessary to comport with due process. *Janmark*, 132 F.3d at 1202 ("[T]here can be no doubt after *Calder v. Jones* that the state in which the victim of a tort suffers the injury may entertain a suit against the accused tortfeasor.") (citing *Indianapolis Colts*, 34 F.3d at 411-12) (internal citation omitted). Accordingly, Phillips has established the necessary minimum contacts with Illinois simply by taking action to knowingly

---

[1]    In this regard, the software at issue in this case is somewhat analogous to application software marketed by electronic legal research companies such as Westlaw and Lexis. A user does not have to buy any software per se, a user simply logs on to a website using a password and then is charged based on usage. Although the user does not pay a fee at the time of use, the usage results in additional charges and additional revenues are generated for the legal research company.

and willfully infringe the intellectual property rights of a corporation with its principal place of business in Illinois. *Id.*

HQ recognizes, however, that there is some disagreement among the district courts in the Northern District regarding the exact scope of the Seventh Circuit's holding in *Janmark*. Accordingly, the district courts often analyze whether there are additional contacts that demonstrate a sufficient relationship among "the defendant, the forum, and the litigation" to make it "reasonable to require a nonresident corporation to defend a suit in the forum state." *George S. May*, 409 F. Supp. 2d at 1056. In this case, there are numerous additional contacts that further support a finding of personal jurisdiction.

    2.    Phillips Visited HQ In Illinois On Numerous Occasions And Phillips Directed Numerous Email, Fax, And Telephone Communications To HQ In Illinois.

Phillips is less than forthright in his declaration regarding the extent and the nature of his contacts with HQ in Illinois. Phillips would have this Court believe that his contacts with Illinois are limited to two visits during 2004; that those visits had nothing to do with this case; and that his actions during those visits were undertaken by him solely in his capacity as a Safelite employee. Phillips Declaration at ¶¶ 11-12.

A review of the actual facts demonstrates that Phillips and NuGen have numerous contacts with Illinois related to this case. Between July 2003 and May 2004, Phillips visited Illinois on at least four occasions, and also reached out to HQ in Illinois by phone, fax, and email. These contacts subject Phillips to jurisdiction in Illinois. *See Abbott Labs, Inc. v. Biovalve Techs., Inc.*, No. 07 C 2094, 2008 WL 373220, at *7-*10 (N.D. Ill. Feb. 12, 2008) (visits to Illinois that relate to the cause of action, particularly in conjunction with email and telephone communications with the forum over a period of several months, give rise to personal

-23-

jurisdiction); *Mid-Am. Tablewares v. Mogi Trading Co.*, 100 F.3d 1353, 1361 (7th Cir. 1996) (email communications can be used to assert jurisdiction over a defendant).

During Phillips' trips to Illinois he actively sought a relationship with HQ on behalf of himself and an entity with which he was affiliated, eventually identified as "NuGen I.T. Incorporated." Hogan Declaration at ¶¶ 25-40. Phillips repeatedly sought a relationship with HQ by email and phone, including sending to HQ in Illinois a detailed outline of what he envisioned for the relationship between HQ and a company to be formed by him. *Id*. at ¶¶ 13-24. Phillips' attempts to solicit business from HQ culminated with Phillips sending to HQ in Illinois a draft VAR Agreement to be signed by "NuGen I.T. Incorporated," pursuant to which Phillips proposed that, among other things, beginning on May 1, 2004, HQ would give to "NuGen I.T. Incorporated" certain rights with respect to the eDoc Software. *Id*. at ¶ 46. Notably, Phillips acknowledged in the draft agreement that he was aware of HQ's rights in the software. *Id*. at ¶ 50. He also proposed that Illinois law would govern, and that any legal action regarding the agreement would take place in the federal or state courts in Cook County, Illinois. *Id*. at ¶ 49.

Phillips cannot credibly claim that his contacts with Illinois are "random" or the result of "unilateral activity of another party or third person." Phillips himself took deliberate action – including not only his decision to willfully infringe the rights of HQ in the eDoc Express software, but also the numerous in-person, email, phone and other communications with HQ in Illinois – which created a substantial connection between himself and the State of Illinois such that he could reasonably foresee being called upon to answer here for his actions.

### D.    NuGen Has The Requisite Minimum Contacts With Illinois.

NuGen also has the requisite minimum contacts with Illinois for several reasons. First, NuGen (like Phillips) has committed tortious acts within Illinois. Second, Phillips' actions in visiting Illinois and attempting to negotiate a license agreement with HQ in Illinois in 2003

and 2004 are attributable to NuGen.  Third, NuGen transacts business with Illinois residents over the internet.

1.     NuGen Committed Tortious Acts In Illinois.

As discussed in Section III.B.1 above, NuGen knowingly infringed HQ's rights in the eDoc Express software, knowing that such action would injure HQ in Illinois.  Because NuGen's actions have injured HQ in Illinois, the torts at issue occurred in Illinois.  Therefore, under Janmark, NuGen has the necessary minimum contacts with the State of Illinois to satisfy due process.

In addition, as discussed in Section III.B.2 above, NuGen transacts business in Illinois via the internet.  The transaction of business that is taking place involves the display and distribution of NuGen's infringing Enterprise Workflow software to Illinois residents.  Hogan Declaration at ¶¶ 78-87.  These transactions themselves, therefore, constitute the commission of tortious acts within the State of Illinois.

2.     Phillips' Contacts With HQ In Illinois In 2003 And 2004 Are Attributable To NuGen.

Phillips' contacts with HQ in Illinois in 2003 and 2004, whereby he tried to negotiation a license to the eDoc Express software on behalf of the yet-to-be-incorporated entity "NuGen I.T. Incorporated," are attributable to NuGen.  A corporate defendant can be subjected to personal jurisdiction in a forum as the result of the activities of a "representative of the defendant corporation who is authorized to manage its affairs." *Deluxe Ice Cream Co. v. R .C.H. Tool Corp.*, 726 F.2d 1209, 1215-16 (7th Cir. 1984).  As President, Secretary, Treasurer and Shareholder of NuGen, Phillips undoubtedly has authority to manage its affairs.  Accordingly, Phillips actions are attributable to NuGen.  *Id*.

-25-

Although Phillips states in his declaration that "NuGen was incorporated in the State of Nevada on January 4, 2006" (Phillips Declaration at ¶ 5), Phillips and Taglipietra have been doing business as "NuGen I.T." since at least 2004. In the spring of 2004, Phillips was trying to convince HQ to give "NuGen I.T. Incorporated" rights to the eDoc Express software. Hogan Declaration at ¶¶ 46-51. Notably, the draft VAR Agreement stated that notices should be sent to "NuGen I.T. Incorporated" in Poway, California – the same city in which Tagliapietra states that he currently lives and works. *Id.* at ¶ 48, Tagliapietra Declaration at ¶ 2. NuGen, therefore, cannot assert the incorporation date as a defense against corporate liability. *See Peterson v. Baloun*, 715 F. Supp. 212, 218 (N.D. Ill. 1989) ("When persons hold themselves out as acting on behalf of a corporation and do business as such, they cannot later assert the lack of technical incorporation as a defense to corporate liability.") (citing 8 W.M. Fletcher, Cyclopedia of the Law of Private Corporations, §§ 3930-3932 (1982 Revised Edition). Accordingly, Phillips' contacts with the State of Illinois, when he was trying to negotiate a deal on behalf of the yet-to-be-incorporated entity, are attributable to NuGen.

Like Phillips, NuGen cannot credibly claim that its contacts with Illinois are "random" or the result of "unilateral activity of another party or third person." Nor can NuGen credibly claim that in knowingly infringing HQ's rights in the eDoc Express software it could not reasonably foresee being called upon to answer in Illinois for its actions.

> 3.    NuGen Also Has Minimum Contacts With Illinois Because It Transacts Business With Illinois Residents Over The Internet.

Finally, NuGen does much more than maintain a passive website. Indeed, the very subject of this lawsuit is NuGen's copying, display and distribution of its infringing Enterprise Workflow software – application software which NuGen distributes and, essentially, sells (in the form of electronic claims processing services) via the internet.

Under the "sliding scale" approach adopted by this Court and many others, NuGen's activity falls at the end of the spectrum where the defendant is clearly doing business over the internet.  NuGen has entered into contracts with national independent appraisal companies; national insurance companies, and national third party administrators that "involve the knowing and repeated transmission of computer files over the Internet" with users that are accessing NuGen's website and system from Illinois.  Hogan Declaration at ¶¶ 78-87.  In addition, the activity of users accessing NuGen's website and system from Illinois results in additional revenue for NuGen.  *Id*. at ¶¶ 58-62, 78-87.  Accordingly, under the *Zippo* "sliding scale" approach and this Court's decision in *Domain Magic*, NuGen clearly has the requisite minimum contacts based on its internet activity alone.[2]

**E.    The Exercise Of Specific Jurisdiction Over Defendants Is Reasonable.**

After a plaintiff has established a prima facie case for personal jurisdiction over the defendant, a defendant can only defeat jurisdiction by presenting "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 476.  *See also Deluxe Ice Cream*, 726 F.2d at 1213.  Defendants cannot carry this heavy burden here.  As discussed above, Defendants reached out to HQ in Illinois on numerous occasions.  In addition, recognizing the appropriateness of Illinois as a venue for resolution of disputes between the parties, Phillips included an Illinois choice-of-law and an Illinois forum selection clause in his proposed draft VAR Agreement.  Under these circumstances, Defendants can present no compelling case that jurisdiction is unreasonable.

---

[2]    HQ does not have direct evidence regarding the exact number of people who use and have used NuGen's infringing product in Illinois.  In light of the substantial evidence regarding Phillips' and NuGen's contacts with the State of Illinois, HQ does not believe that such specificity is required in order for this Court to deny Defendants' motion.  If this Court believes, however, that specific evidence regarding the number of Illinois transactions and/or the amount of revenue earned by NuGen from Illinois-related transactions is necessary, HQ respectfully requests leave to conduct discovery on this issue.

**F.    Defendants Have "Continuous And Systematic" Contacts With Illinois That Make The Exercise Of General Jurisdiction Appropriate.**

The exercise of general jurisdiction is also appropriate here because Defendants have "continuous and systematic" contacts with Illinois. *Helicopteros*, 466 U.S. at 416. In *Domain Magic*, this Court exercised general jurisdiction over a defendant because the defendant had "misappropriated an Illinois based company's trademark, and generated revenue created by Illinois citizens clicking on the offending website's hyperlinks." 2007 WL 3046124, at *9. In *Lucini Italia Co. v. Grappolini*, No. 01 C 6405, 2002 WL 206471, at *3 (N.D. Ill. Feb. 11, 2002), this Court upheld general jurisdiction against a defendant that had come to Illinois on several occasions to conduct business, used an Illinois cell phone and solicited business in Illinois. *See also Coburn Group, LLC v. Whitecap Advisors, LLC*, No. 07 C 2448, 2007 WL 2948367, at *5 (N.D. Ill. October 03, 2007) (this Court held that general jurisdiction was appropriate where the defendant had conducted meetings in Illinois, sent marketing materials to Illinois, and solicited investors in Illinois).

General jurisdiction is just as appropriate in this case. As in *Domain Magic*, Defendants are alleged to have misappropriated an Illinois-based company's intellectual property, and are generating revenue based on the activity of users accessing NuGen's website and system from Illinois. Like the defendant in *Lucini*, Phillips is alleged to have visited Illinois on several occasions to conduct business and to have solicited business in Illinois on behalf of NuGen. These contacts, which are discussed in detail above, constitute the "continuous and systematic" contacts that are necessary to give rise to general jurisdiction in this case. Because NuGen is subject to general jurisdiction in Illinois, general jurisdiction over Phillips is appropriate as well. *GMAC Real Estate, LLC v. Canyonside Realty, Inc.*, No. 05 C 0572, 2005 WL 1463498, at *4 (N.D. Ill. June 15, 2005) (in a case involving a "closely-held corporation

where the individual defendants are carrying out the activities on behalf of the corporation…if the court has jurisdiction over the corporation, it must also have jurisdiction over the individual defendants").

        **G.**    **The Fiduciary Shield Doctrine Does Not Protect Phillips.**

        The fiduciary shield doctrine does not protect Phillips because his contacts with Illinois were undertaken at least in part (if not in whole) for his own benefit (and the benefit of the yet to be incorporated NuGen) and not for the benefit of Safelite (his employer at that time). "The fiduciary shield doctrine is discretionary in nature and should be applied only where equity demands it." *Brujis v. Shaw,* 876 F. Supp. 975, 979 (N.D. Ill. 1995). As Defendants indicate, the doctrine is intended to prevent courts from exercising personal jurisdiction over individuals when the individual defendant has not taken action for his personal benefit. Memo at 3-4. The doctrine does not apply in a situation where "the individual's personal interests motivated his actions." *Netzky v. Fiedler*, No. 00 C 4652, 2001 WL 521396, at *1 (N.D. Ill. May 15, 2001). Similarly, the courts that have addressed the issue have predominantly decided that when an "employee has the power to decide what is to be done and chooses to commit the acts that subject him to long-arm jurisdiction," the fiduciary shield doctrine does not apply. *Brujis v. Shaw*, 876 F. Supp. 975, 978 (N.D. Ill.1995) (collecting cases).

        The fiduciary shield doctrine is inapplicable here because Phillips' visits to and communications directed toward Illinois were indisputably motivated by Phillips' own stated interest in "re-gaining" rights to the eDoc Express software and were taken at his own discretion. Although Phillips was ostensibly in Illinois on Safelite business, during Phillips' visits to Illinois to meet with HQ he pursued a business relationship with HQ for himself and for an entity eventually identified as NuGen. Hogan Declaration at ¶ 26. Phillips' visits included, among

other things, a two or three-hour in-person dinner meeting with Hogan during which Phillips and Hogan discussed such a potential business relationship almost the entire time. *Id.* at ¶ 37.

In addition, Phillips' numerous phone calls, emails, and faxes directed toward HQ in Illinois (even those that were sent during his period of employment with Safelite) cannot be fairly characterized as communications that were made by Phillips in his capacity as a Safelite employee. For example, Phillips sent emails to Hogan from a personal email account while Phillips was working for Safelite to enable Phillips to "communicate more freely, and Phillips cautioned Hogan to use Phillips' Safelite cell phone number "judiciously" because he did not want Safelite to be aware of the communications. *Id.* at ¶¶ 15-16. By way of further example, Phillips faxed to Hogan a copy of his non-compete agreement with Safelite to convince Hogan that Phillips could enter into a business relationship with HQ without violating any obligations to Safelite. *Id.* at ¶ 19. Moreover, Phillips' communications with HQ continued after his official departure from Safelite including, among other things, the March 31, 2004 email with the proposed draft VAR Agreement. *Id.* at ¶ 46. Under these circumstances, the fiduciary shield doctrine does not apply.

**H.      Phillips' Motion For Judgment On The Pleadings Should Also Be Denied.**

Phillips also moves for judgment on the pleadings in accordance with Fed. R. Civ. P. 12(c), on the basis that HQ has failed to satisfy the "special showing" requirement. A motion for judgment on the pleadings under Rule 12(c) is decided under the same standard as a motion to dismiss under Rule 12(b)(6). *Flenner v. Sheahan*, 107 F.3d 459, 461 (7th Cir. 1997). A motion for judgment on the pleadings may not be granted "unless it appears beyond doubt that the [nonmovant] can prove no facts sufficient to support his claim for relief." *Id.* Thus, judgment on the pleadings is only appropriate where no genuine issues of material fact remain to be resolved. *Alexander v. City of Chicago*, 994 F.2d 333, 336 (7th Cir. 1993). The Court must

view all allegations in the light most favorable to the nonmoving party. *Flenner*, 107 F.3d at

461. The "suit should not be dismissed if it is possible to hypothesize facts, consistent with the

complaint, that would make out a claim." *Graehling v. Village of Lombard, Ill.*, 58 F.3d 295,

297 (7th Cir. 1995).

HQ has made the "special showing" required to assert jurisdiction over Phillips in

his individual capacity. In *Dangler v. Imperial Mach., Co*., 11 F.2d 945 (7th Cir. 1926), the

Seventh Circuit set forth the rule for when officers of a corporation can be held personally liable

for the infringement of their companies:

> [I]n the absence of some special showing, the managing officers of a corporation
> are not liable for the infringements of such corporation, though committed under
> their general direction.... It is when the officer acts willfully and knowingly-that
> is, when he *personally participates* in the manufacture or sale of the infringing
> article (acts other than as an officer), or when he uses the corporation to carry out
> his own willful and deliberate infringements, or when he knowingly uses an
> irresponsible corporation with the purpose of avoiding personal liability-that
> officers are held jointly with the company. The foregoing are by no means cited
> as the only instances when the officers may be held liable, but they are sufficient
> for the present case.

*Dangler*, 11 F.2d at 947 (emphasis added). In addition to the factors in *Dangler,* a plaintiff can

meet the "special showing" requirement by pleading that the defendant was "the founder,

president, and majority shareholder" of the defendant and that the defendant had "willfully and

deliberately induced, aided and abetted the past and continuing infringement." *Peaceable Planet*

*Inc. v. Ty, Inc.*, 185 F. Supp. 2d 893, 896 (N.D. Ill. 2002) (citing *Cooper Industries, Inc. v. Juno*

*Lighting, Inc.,* 1 U.S.P.Q. 1313, 1313-14 (N.D. Ill. 1986)).

In accordance with *Dangler*, this "special showing" generally requires evidence of

the officer's personal involvement in the infringement. *See Syscon, Inc. v. Vehicle Valuation*

*Services, Inc.,* 274 F. Supp.2d 975, 976 (N.D. Ill. 2003). Where a plaintiff has alleged that the

defendant was personally involved in the infringement, that is sufficient to satisfy the "special

showing" requirement.  In *Nordstrom Consulting, Inc. v. M & S Techs., Inc.*, No. 06 C 3234, 2006 WL 2931677 (N.D. Ill. Oct. 12, 2006),  for example, the court held that the plaintiffs had made the requisite showing by alleging that the defendant "personally participated in the infringing actions."  *Id.* at *2.  Similarly, in *Syscon*, the court held that the plaintiff had satisfied the "special showing" test by alleging that the plaintiff had "personal involvement in the purported infringement."  *Syscon*, 274 F. Supp. 2d at 977.

HQ has sufficiently alleged the manner in which Phillips has been personally responsible for the infringement.  Among other things, HQ alleges:

(i)     Phillips is currently President, Secretary and Treasurer of NuGen;

(ii)    in connection with its due diligence regarding a potential acquisition of the eDoc Express software, Safelite identified Phillips as a valuable resource because of Phillips' intimate knowledge of the software;

(iii)   during and after his employment at Safelite, Phillips was intimately involved in the work on eDoc Express, in the transition of the eDoc Express software development work to HQ, and on the integration of the eDoc Express software with HQ's existing system and products; and

(iv)    on several occasions between late February and early May 2004, Phillips approached HQ about the possibility of Phillips being able to license the eDoc Express software from HQ.

Complaint at ¶¶ 3, 17, 27 and 28.

The Complaint further alleges that based on this contact with HQ, Phillips "copied and incorporated protected, original expression directly from the eDoc Express software," then used it to work with NuGen to market and sell infringing application software to insurance companies and others in the property and casualty insurance industry.  *Id.* at ¶¶ 33, 35.  HQ's allegations are similar in many respects to the allegations that were held to satisfy the "special showing" requirement in *Syscon* and *Nordstrom*.  *See Nordstrom,* 2006 WL 2931677, at *2 (finding allegations that defendants made unauthorized copies of software by circumventing the

-32-

plaintiff's digital security system, then sold it, sufficient to constitute a "special showing"); *Syscon*, 274 F. Supp. 2d at 976-77 (plaintiff made "special showing" by alleging, among other things, that the defendant was the president of the defendant corporation, that the defendant corporation had devised the scheme to infringe and accomplished the alleged infringement, and that the defendant individual had engaged in copyright infringement).[3]

## IV.    CONCLUSION

For these reasons, Defendants' motion to dismiss for lack of personal jurisdiction and Phillips' motion for judgment on the pleadings should be denied.

Dated: March 31, 2008

Respectfully submitted,

**HYPERQUEST, INC.**

By:  /s/ Deborah Rzasnicki Hogan
One of Its Attorneys

Deborah Rzasnicki Hogan
Chad A. Blumenfield
GOLDBERG, KOHN, BELL, BLACK,
  ROSENBLOOM & MORITZ, LTD.
55 East Monroe, Suite 3300
Chicago, Illinois 60603
(312) 201-4000

---

[3] As discussed above, HQ asserts that Phillips was personally involved in the development and sale of the infringing software, thereby making personal liability appropriate under *Dangler*.  If this Court finds, however, that additional specificity is required, HQ respectfully requests leave to amend to add additional, more specific allegations regarding Phillips' personal involvement in the infringement of HQ's rights.