# EXHIBIT A

.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| HYPERQUEST, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08 C 485 |
| | ) | |
| NUGEN I.T., INC. , and DAYLE | ) | |
| PHILLIPS | ) | |
| | ) | JURY DEMAND |
| Defendants. | | |

## DECLARATION OF JEFFREY J. HOGAN

I, Jeffrey J. Hogan, declare and state as follows:

1.      I am the President and founder of HyperQuest, Inc. f/k/a HQ, Inc. ("HQ").

2.      I am over 18 years of age and the information contained in this declaration is based on my personal knowledge, and I could and would testify to such information if called to do so in connection with the above-captioned matter.

### HQ

3.      HQ is a provider of primarily internet-based technology products and services to insurance companies and others in the property and casualty insurance industry, including repair shops, professional appraisers and parts suppliers.

4.      HQ's principal place of business is, and since approximately July 2004 has been, in Skokie, Illinois.

5.      All of HQ's computer equipment including its internet servers, web servers and database servers are located in Illinois.

6.      Prior to July 2004, HQ's offices were in Chicago, Illinois.

<u>HQ's Initial Discussions with Safelite and Introduction to Phillips</u>

7.      In or about May 2003, Safelite Group Inc. f/k/a Safelite Glass Corp. ("Safelite") approached HQ about potentially working together because Safelite was interested in some of HQ's technology solutions.

8.      Shortly thereafter, I learned that Safelite had acquired certain software commonly referred to as "eDoc Express," and Safelite and I both thought that there were opportunities for HQ and Safelite to work together.

9.      Relatively early in my discussions with Safelite, my business contacts at Safelite introduced me to Dayle Phillips ("Phillips").  I was informed that Phillips had been the driving force behind the development of the eDoc Express software.  I was also informed that Phillips had been an employee of Quivox Systems Incorporated ("Quivox"), and that Phillips had recently been hired by Safelite in connection with Safelite's acquisition of the eDoc Express software from Quivox earlier that year.

10.     In late June or early July, the discussions between Safelite and HQ had progressed.  I was told by my business contacts at Safelite that some of Safelite's Board of Directors would be meeting on July 11 and that Safelite wanted me to make a presentation at that meeting on behalf of HQ regarding HQ's business and potential synergies between HQ and Safelite.

11.     My business contacts also requested that I coordinate with Phillips in advance of the meeting because Phillips was also going to be making a presentation at the meeting regarding what Safelite could do with the eDoc Express software.  Phillips and I had several discussions in advance of the July 11 meeting.  Ultimately, each of us gave an initial presentation on our own, but we also prepared a joint presentation explaining to the Board of

Directors ways that HQ (with its technology offerings) and Safelite (with its eDoc Express software) could work together.

12.    By late summer/early fall 2003, HQ and Safelite were involved in serious discussions regarding a potential integration of Safelite's eDoc Express software into HQ's business.

<u>Phillips' Initial Communications with HQ About a Potential Business Relationship</u>

13.    On several occasions between the July 11, 2003 meeting with members of Safelite's Board of Directors and August 1, 2003 – while Phillips was still a Safelite employee – Phillips approached me about potentially developing a business relationship for himself with HQ.

14.    In particular, Phillips told me that he had been attempting to negotiate his own deal with Safelite whereby he would "re-gain" rights to "his" eDoc Express software.  He explained to me that his goal was to somehow "re-gain" rights to the software and be in a position to commercialize the product without the constraints of Safelite's management team.

15.    On August 1, 2003, Phillips sent me an email from a personal email address – dayleman@yahoo.com – instead of his Safelite work email address.  He informed me that we could use that personal email address "to communicate more openly" about a potential business relationship.  A true and correct copy of the August 1 email is attached hereto as Ex. A.

16.    On August 4, 2003, Phillips also sent me an email with his Safelite cell phone number but warned me to use it "judiciously."  Phillips told me over the phone that he did not want me to use his Safelite cell phone number too frequently because the bill would

be going to Safelite.  A true and correct copy of the August 4 email is attached hereto as Ex. B.

17.     At or about that time, Phillips continued trying to pursue some sort of relationship between himself and HQ.  Phillips suggested various potential working relationships, including a suggestion that he would join HQ and run the part of HQ's business that would involve commercialization of the eDoc Express software.

18.     I inquired as to whether Phillips was really free to enter into such a business relationship given his position with Safelite.  In response to my inquiry, on or about August 7, 2003, Phillips faxed to me a copy of an "Agreement Not to Compete and Agreement Not to Disclose Confidential Information" between himself and Safelite which he told me he had signed.  A true and correct copy of that agreement is attached hereto as Ex. C.

19.     Also on August 7, 2003, Phillips sent an email to me confirming that he had faxed the non-compete agreement and stating that I should "keep in mind that Safelite is not in the 'software development' business."  A true and correct copy of the August 7 email is attached hereto as Ex. D.

20.     Meanwhile, the discussions between HQ and Safelite continued to move forward.  Although Phillips was not involved in the negotiations between HQ and Safelite regarding business terms of a potential deal, Phillips was the key technical person involved in those discussions because he was one of the original developers of the eDoc Express software and he was the only person at Safelite who had any significant knowledge of the software.

21.     On August 15, 2003, Don Jackson, the Vice-President of IT Budget and Planning for Safelite, sent me an email requesting that I schedule an in-person meeting with

him and Phillips in Chicago to "talk in depth about the architecture of [the HQ] application" for the purpose of understanding the integration needs between the eDoc Express software and the HQ system, and suggesting that we meet on August 21. A true and correct copy of the August 15 email is attached hereto as Ex. E.

22.     Shortly thereafter, on August 19, 2003, Phillips sent me another email from his personal email account stating: "I don't know if you still want to pursue the approach we have talked about, or if you are going down a different path. If so, I can send you an outline of a possible working relationship." A true and correct copy of the August 19 email is attached hereto as Ex. F.

23.     Then, on August 21, 2003, Phillips sent an email and an attachment titled "Outline." The "Outline" was prepared by Phillips to describe the type of business relationship he hoped to establish with HQ. A true and correct copy of the August 21 email and the attachment is attached hereto as Ex. G.

24.     In his proposed "Outline," Phillips suggested that "[t]here would be two separately owned companies, Company A and Company M." One of the companies – Company A – was supposed to be HQ. The other company – Company M – was a company to be formed by Phillips. Phillips suggested that the company to be formed by him would, among other things, get certain rights to the eDoc Express software – including joint ownership of the source code.

<u>Phillips' In Person Visits to Chicago and Phillips' Continued Pursuit of a Potential Business Relationship with HQ Through May 2004</u>

25.    Thereafter, between September 2003 and March 2004, Phillips traveled to Chicago to meet with HQ at least four times to discuss the integration of the HQ software with the eDoc Express software.

26.    Although Phillips was officially traveling on Safelite business during each of those visits, there were also many times during those visits when he approached me in person about a potential working relationship for himself with HQ.

27.    Also during this period of time, I spoke to Phillips on the phone on numerous occasions. Most often our conversations were about technical issues with the integration of the HQ software with the eDoc Express software, but we also had several phone conversations involving discussion of potential ideas that Phillips had for a proposed working relationship for himself with HQ.

28.    In particular, on September 25, 2003, Phillips flew to Chicago from Kansas City, and John Barlow, the CEO of Safelite, and David Fryman, a senior person in Safelite's information technology department, flew to Chicago from Columbus, Ohio (where Safelite is based), for a meeting at HQ's offices in Chicago. During that meeting we discussed HQ's business and HQ's product capabilities as well as our visions of an integrated application that would result from an integration of HQ's products and the eDoc Express software. True and correct copies of an email chain dated September 15 and 16 regarding the September 25 meeting, and a copy of the Agenda for that meeting are attached hereto as Ex. H and I, respectively.

29.    Shortly after that meeting, Safelite and HQ agreed to expand the type of relationship that they had been discussing to include the grant of an exclusive license from Safelite to HQ for the eDoc Express software and to work together to develop an effectively integrated product.

30.    In or about early October 2003, Safelite and HQ began working on a draft letter of intent to reflect our agreement.

31.    From the technical perspective, Phillips was assigned responsibility for helping to develop, and then execute, the integration plan between HQ and Safelite.  In connection with his work on a proposed integration plan, Phillips was privy to significant amounts of information about HQ's and Safelite's plans for product integration and development.

32.    On October 29, 2003, Phillips sent to me by email a document titled "Proposed Integration – eDoc Express and Hyperquest" dated October 24, 2003.  A true and correct copy of the October 29 email and its attachment are attached hereto as Ex. J.

33.    The following week, on or about November 3, 2003, Phillips planned a trip to Chicago to discuss with me the proposed integration in more detail.  A true and correct copy of an October 29 email from me to Phillips discussing the upcoming visit is attached hereto as Ex. K.

34.    At this time, Phillips once again broached the subject of a potential working relationship for himself with HQ.  To the best of my recollection, in connection with this visit, Phillips had also specifically planned to fly in the night before the meeting so that he would be able to meet separately with me before anyone from Safelite arrived, but the meeting was ultimately postponed.

35.     On December 17, 2003, Safelite and HQ entered into an official letter of intent describing an agreement in principle pursuant to which, among other things, Safelite would grant to HQ an exclusive license to the eDoc Express software.

36.     Shortly thereafter, either in December 2003 or January 2004, Phillips called me to congratulate me on getting the deal done with Safelite.  At or about that same time, Phillips also told me that now that he knew Safelite was moving forward with HQ, he was planning to leave Safelite and "do his own thing."  Phillips told me that to accomplish what he wanted to do he would need a workflow solution, and he would prefer to partner with HQ because it would enable him to move more quickly and he thought it could be a mutually beneficial relationship.

37.     On January 21 and 22, 2004, Phillips came to Chicago for two more days of in-person meetings with HQ.  Although the primary purpose of the two days of meetings was for technology due diligence in connection with the deal between Safelite and HQ and for technical discussions between Phillips and HQ's software developers about the eDoc Express integration issues, once again, Phillips directly asked about a potential working relationship for himself with HQ.  In fact, during this visit, Phillips and I had a 2-3 hour dinner meeting during which we talked about a potential working relationship essentially the entire time.  A true and correct copy of an email chain dated January 19 discussing the upcoming visit is attached hereto as Ex. L.

38.     During the week of February 23, 2004, Phillips came to Chicago for another set of in-person meetings.  I do not recall exactly how many days of meetings took place that week, but to the best of my recollection Phillips was in town for several days

between February 23 and February 26, 2004. Mike Thacker, a software developer employed by Safelite, was also in town for those meetings.

39.    Once again, the subject of a potential relationship between Phillips and HQ came up during those meetings. By that time, Phillips and Safelite had already agreed that Phillips' last day at Safelite would be in early March 2004. Nonetheless, Phillips did not feel comfortable discussing a potential relationship with a Safelite employee in the room, so he sent me a follow up email later in the week again raising the issue of a potential working relationship between himself and HQ. A true and correct copy of the February 26 email from Phillips to me stating that he "did not feel totally comfortable speaking with [me] when Mike [Thacker] was in the room" and discussing a potential relationship for himself with HQ is attached hereto as Ex. M.

40.    The last in-person visit that I recall by Phillips to Chicago was the week of March 1, 2004. Phillips arrived in Chicago either on March 1 or 2 and he stayed in town through March 4. That entire week was an intense week of work trying to make sure that a number of tasks essential to the integration of the eDoc Express software and the HQ system were completed before Phillips' final day at Safelite on March 5, 2004. Also during this visit, Phillips and I had further discussions about a potential working relationship between Phillips and HQ after his official last day at Safelite.

41.    On March 11 and March 12, 2004, after Phillips was no longer working for Safelite, he sent me additional emails in order to continue our dialogue about a possible relationship and to provide more details about an application that his "partners" had built that he wanted to integrate with HQ's system and the eDoc Express software. True and correct

copies of the March 11 and March 12 emails are attached hereto as Ex. N and Ex. O, respectively.

42.     During the month of March 2004, Phillips and I had additional phone conversations about a potential relationship.

43.     On March 22, 2004, Phillips sent an email to me asking to set up a time to get together by phone to "discuss possibilities." A true and correct copy of an email string between Phillips and me (which includes the March 22 email from Phillips and another email to me from Phillips dated March 24) is attached hereto as Ex. P.

44.     Phillips informed me at that time that he and an entity that he was working with were piloting certain products with potential customers.  Phillips continued to pursue a relationship with HQ because, as he explained to me, he thought his clients needed the "finesse" of the eDoc Express solution.

45.     On March 29, 2004, HQ's head of technology, Dennis Hogan, and I had a conference call with Phillips to better understand what Phillips wanted from HQ to support his pilots with his potential customers and his future needs.  A true and correct copy of an email string including a March 29 email from me to Phillips asking him to call me and Dennis is attached hereto as Ex. Q.

46.     Thereafter, on March 31, 2004, Phillips sent me, via email, a draft agreement – titled "Value Added Reseller Software License Agreement" – that he proposed would establish an ongoing relationship between HQ and "NuGen I.T. Incorporated, a Value Added Reseller."  A true and correct copy of the March 31 email and the draft agreement (the "VAR Agreement") are attached hereto as Ex. R.

47.     Phillips proposed that "NuGen I.T. Incorporated" would act as a "value added reseller" of the eDoc Express software and that the relationship between HQ and "NuGen I.T. Incorporated" would begin on May 1, 2004.

48.     The draft VAR Agreement stated that notices should be sent to "NuGen I.T. Incorporated" at 14933 Huntington Gate Drive in Poway, California 92064.

49.     The draft VAR Agreement also proposed that the laws of the State of Illinois would govern the agreement and that any legal action between HQ and "NuGen I.T. Incorporated" would be brought in the state and federal courts located in Cook County, Illinois.

50.     Finally, Phillips acknowledged in the draft VAR Agreement that HQ owned an "exclusive world wide distribution license" to the eDoc Express Software.

51.     Phillips and I exchanged a few more emails and had a few more discussions about a potential relationship through May 2004.  True and correct copies of an email from me to Phillips dated May 7, 2004 and an email from him to me dated May 11, 2004, are attached hereto as Ex. S and T, respectively.

52.     Ultimately, HQ decided not to enter into any sort of relationship with Phillips or "NuGen I.T. Incorporated."

53.     Except for a brief encounter with Phillips at an industry convention in Las Vegas in November 2007, I have not had any direct contact with Phillips since approximately May or June 2004.

<u>Phillips and Tagliapietra Have Been Doing Business as "NuGen" since 2004</u>

54.    I did not know in 2004 who Phillips' "partners" were or who else was involved with the "NuGen" entity that he proposed as a "value added reseller" of the eDoc Express product.

55.    Recently, I have learned from my contacts in the industry – including senior contacts at current and former customers of NuGen – that NuGen was started by Pete Tagliapietra ("Tagliapietra"), who used to work with Phillips at Quivox when Quivox initially completed the development of the eDoc Express software.

56.    I have also learned that Tagliapietra has been identifying himself as the President of NuGen since at least 2005.  True and correct copies of articles dated May 5, 2005 (available at http://www.searchautoparts.com/searchautoparts/article/articleDetail.jsp-?id=160044),    November    1,    2005    (available    at    http://www.accessmylibrary.com/-coms2/summary_028631186107_ITM),    and    November    16,    2005    (available    at http://www.asashop.org/autoinc/nov2005/collision.htm),    referring    to    "Pete    Tagliapietra, president of Nu Gen IT"; "Pete Tagliapietra, NuGen I.T. Inc."; and "Pete Tagliapietra, of NuGen I.T. Inc." are attached hereto as Group Ex. U.

<u>The eDoc Express Software</u>

57.    The eDoc Express software is an electronic workflow system that was initially designed for use primarily in connection with the electronic processing of insurance claims.  It is application software that, in contrast to software packages that are packaged and sold through commercial and retail channels, is accessed and used by customers through the internet.

58.    The eDoc Express software is specifically used for the electronic assignment (or "dispatch") of vehicle claims and for the electronic return (or "upload") of completed vehicle repair estimates.

59.    For example, in the automobile insurance and collision repair industry, there are generally three groups of people who prepare estimates of repair costs – appraisers that are employees of insurance companies; appraisers that work for independent appraisal companies; and appraisers that work for repair shops.  When an insured wrecks his or her car and calls the insurance company, the insurance company typically creates a claim and then either tells its insured to take the car to one of its approved repair facilities or assigns the claim to an appraiser.  If the insured takes the car to an approved repair facility, the repair shop creates an estimate of the cost of repair.  If the claim is assigned to an appraiser, the appraiser makes arrangements to inspect the vehicle and then creates the estimate.

60.    The eDoc Express software provides the functionality for the electronic assignment of the claims to the appraisers and the repair shops and for the electronic upload of completed estimates back to the insurance company (or others such as third party administrators who provide estimate review services for review and approval of the estimates) via the internet.

61.    The eDoc Express software is made available to users via an interactive website.  In order for an appraiser or repair shop to be able to accept an assignment, complete the estimate, and then return the completed estimate back to the insurance company via the internet, the appraiser or the repair shop has to download onto its own computers a "control" – essentially a bundle of computer programs – that will provide that functionality.  Other users of the website through which the service is being provided (such as insurance company

employees who only need to be able to view the claim information) do not need to have the control on their computers. They can simply access the information by logging on to the website of the provider of the electronic claims processing service (the services included in the eDoc Express software).

62.    It is custom and practice in the industry that customers typically pay for the electronic processing of claims on a per-claim basis. For example, if HQ's system is used to process 1,000 claims for XYZ Insurance Company, there will be an agreed upon price per claim.

<u>HQ Learns that Phillips and NuGen Are Selling and Marketing Infringing Software</u>

63.    In the fall of 2007, I learned that Phillips and his company, NuGen, were willfully infringing HQ's rights in the eDoc Express software.

64.    In attempting to secure new business from Metropolitan Life Insurance Company ("MetLife"), in approximately October 2007, HQ learned that MetLife was considering a competing product from NuGen that NuGen was calling its "Enterprise Workflow" software.

65.    MetLife had sent out a Request for Proposal soliciting responses from companies that could provide an automated estimate review tool that, among other things, could be used by MetLife's approved repair shop network as well as independent appraisers. HQ responded to the RFP in late August 2007.

66.    The Request for Proposal required, among other things, that respondents be prepared to service all of MetLife's approved repair shop network throughout the country, including Illinois, and that respondents be prepared to provide "robust training" at the repair shop level and the insurance company level.

-14-

67.     The RFP specifically listed a number of MetLife operating companies, including "Economy Fire and Casualty Company, Freeport, Illinois" and specifically stated that "[t]hese companies would be party to any contract resulting from this bid request."

68.     HQ learned that five other companies had also responded to the RFP and that MetLife, after evaluating the responses, had selected HQ and one other company to participate in a pilot program so that MetLife could compare the results of the competing products and make a determination regarding the contract award.

69.     HQ did not initially know that NuGen was the other company, but later learned that information from MetLife.

70.     MetLife set up the pilot program to take place at certain of MetLife's approved repair shop facilities in Illinois, Texas, and the New England States.

71.     In anticipation of the start of this pilot program, HQ was given a list of certain repair shops in Illinois and Texas to contact, and HQ was told that the other company would also be given the same list of shops to contact in order to get ready for the pilot.

72.     In October 2007, in order to participate in the pilot, HQ contacted the identified repair shops about making arrangements to install the necessary piece of software on the repair shop computers so that they could participate in the pilot.

73.     In early November 2007, HQ was informed that HQ was no longer going to be considered and MetLife was moving forward with NuGen.

74.     Then, on or about December 24, 2007, I received a call from MetLife telling me that HQ was once again being invited to participate in the pilot program and that NuGen was no longer being considered because NuGen had been trying to get the repair

-15-

shops to agree to pay a significant sum of money in exchange for NuGen training their personnel on how to use their system.

75.     If NuGen had gotten the business that it had solicited in the fall of 2007 from MetLife, NuGen's system would have been used for the electronic assignment and dispatch of all automobile insurance claims received from MetLife's insureds throughout the country, including Illinois, via use of a password-protected interactive website maintained by NuGen.

76.     Among other things, each of the repair shops in MetLife's approved repair shop network in the United States, including Illinois, would have had to download onto its own computers the necessary piece of software to enable them to upload estimates to NuGen's system. Then, once uploaded into NuGen's system, MetLife employees throughout the country would have been able to log on to NuGen's website to review, request changes to, or approve the completed estimate.

77.     NuGen would have earned revenue for every insurance claim processed using its system, including insurance claims processed by repair shops and independent appraisers in Illinois logging on to NuGen's system to accept assignment of claims and to return completed estimates.

Additional Information About NuGen's Current and Former Customers

78.     Since first encountering NuGen in the marketplace last fall, I have learned that one of NuGen's customers is CSAA, an insurance company that provides insurance throughout the country, including Illinois.

79.     In addition, I have learned from senior level contacts at a number of companies in the industry with whom HQ has ongoing business relationships that NuGen's

customers include a number of independent appraisal companies that work with hundreds of insurance companies throughout the country.

80.     In particular, I have learned that NuGen's current and former customers include the following national independent appraisal companies:  Auto Claims Direct, SCA Appraisal Company ("SCA"), and Property Damage Appraisers, Inc. ("PDA").

81.     I have been told by the CEO of Auto Claims Direct that Auto Claims Direct has appraiser support throughout Illinois and that Auto Claims Direct has processed insurance repair estimates prepared by appraisers in Illinois for insurance claims originating in Illinois using NuGen's system.

82.     SCA advertises that "SCA Services the Entire State of Illinois." SCA's website lists offices in Chicago and Bloomington and a client services director in Illinois.  A true and correct copy of information printed from SCA's website is attached hereto as Ex. V.

83.     PDA's website lists five locations in Illinois.  A true and correct copy of information printed from PDA's website is attached hereto as Ex. W.

84.     I was further informed by the CEO of IANet that NuGen has marketed its Enterprise Workflow software to IANet.  IANet describes itself as "the nation's most comprehensive Insurance Appraisal Network offering electronic-based assignment, dispatch, communication and reporting between insurance carriers and independent appraisers." IANet's website also lists 7 appraisal offices in Illinois.  A true and correct copy of information printed from IANet's website is attached hereto as Ex. X.

85.     I was also specifically informed by a former executive of an Akzo Nobel company that one of NuGen's customers is Akzo Nobel, which does business throughout the country, including Illinois.

86.    Akzo Nobel is in the business of manufacturing coatings and decorative paints, but Akzo Nobel also acts as a third-party administrator for insurance companies providing services such as third-party review of automobile insurance repair claims.

87.    I was further informed that Akzo Nobel has a network of repair shops that it calls its Auto Service Verify Repair Network ("A.S.V.R.N."); that Akzo Nobel conducted a pilot program using NuGen's system for the repair shops in its A.S.V.R.N. in Illinois; that the pilot was successful; and that Akzo Nobel currently uses (and for quite some time has used) NuGen's system for its A.S.V.R.N. network not only in Illinois, but also in many other states throughout the country as well. As a result of this business relationship with Akzo Nobel, NuGen earns additional revenue as a direct result of its interaction with Illinois residents (e.g. Akzo Nobel's approved repair shops) via its interactive website.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on March 31, 2008.

Jeffrey J. Hogan

# EXHIBIT A

REDACTED

```
-----Original Message-----
From: Jeffrey J. Hogan [mailto:jhogan@hyperquest.com]
Sent: Friday, August 01, 2003 12:53 PM
To: Dayle Phillips
Subject: RE: emails
```

Thanks - I will be in the office in about 45 minutes.

Jeff


HyperQuest
President & Founder
1300 West Belmont Avenue, Suite 200
Chicago, Illinois 60657
T 312.372.7555
F 312.372.7577
M 773.551.6468
jhogan@hyperquest.com <mailto:jhogan@hyperquest.com>
------------------------------------------------------------------------
------------------------------------------------------------------

Note: The information contained in this message may be privileged and
confidential and protected from disclosure. If the reader of this message is
not the intended recipient, or an employee or agent responsible for
delivering this message to the intended recipient, you are hereby notified
that any dissemination, distribution or copying of this communication is
strictly prohibited. If you have received this communication in error,
please notify us immediately by replying to the message and deleting it from
your computer.  Thank you.

------------------------------------------------------------------------

-----Original Message-----
From: Dayle Phillips [mailto:dayleman@yahoo.com]
Sent: Friday, August 01, 2003 10:06 AM
To: jhogan@hyperquest.com
Subject: emails

jeff,

here is an email address we can use to communicate more openly.

dayle

_____
Do you Yahoo!?
Yahoo! SiteBuilder - Free, easy-to-use web site design software
http://sitebuilder.yahoo.com

# EXHIBIT B

REDACTED

```
-----Original Message-----
From: Jeffrey J. Hogan [mailto:jhogan@hyperquest.com]
Sent: Monday, August 04, 2003 6:14 PM
To: Dayle Phillips
Subject: RE: safelite cell phone

Understood - Thanks.

USAA called me today to arrange time to talk..  You guys should include
HyperQuest in discussions...whatever you can do to help build additional
pull from clients (smile)



HyperQuest
President & Founder
1300 West Belmont Avenue, Suite 200
Chicago, Illinois 60657
T 312.372.7555
F 312.372.7577
M 773.551.6468
jhogan@hyperquest.com <mailto:jhogan@hyperquest.com>
---------------------------------------------------------------------
---------------------------------------------------------------
```

Note: The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.  Thank you.

-------------------------------------------------------------------------
-----------------------------------------------------------------------

-----Original Message-----
From: Dayle Phillips [mailto:dayleman@yahoo.com]
Sent: Monday, August 04, 2003 2:32 PM
To: Jeffrey Hogan
Subject: safelite cell phone

Jeff,

fyi, my safelite cell phone is 614-264-7471

but use it judiciously

Dayle

_____
Do you Yahoo!?
Yahoo! SiteBuilder - Free, easy-to-use web site design software
http://sitebuilder.yahoo.com

# EXHIBIT C

08/07 03  14:12 FAX 9136771738          KC_SALES                                    @002

# AGREEMENT NOT TO COMPETE
## AND
## AGREEMENT NOT TO DISCLOSE CONFIDENTIAL INFORMATION

This is an Agreement made on April ___, 2003, between Safelite Glass Corp. ("Safelite") and Dayle Phillips (the "Associate").

1.    Background.  Safelite has developed and uses in its business certain methods and systems, sources of supply, and sales techniques and has customer lists, files, records, pricing information, sales plans, business plans, and other business information that are confidential and proprietary that Safelite believes are valuable and useful in its business and enable it to operate successfully, all of which are referred to in this Agreement as the "Safelite System".  The Associate desires to be employed by Safelite and acknowledges that in connection therewith Safelite will disclose to the Associate certain or all of the Safelite System and improvements thereto. Safelite and the Associate are entering into this Agreement to provide reasonable restrictions on the Associate's activities that compete with the business of Safelite and upon disclosure by the Associate of the Safelite System to persons who are not employees of Safelite, or the use of the Safelite System by the Associate other than in the business of Safelite.  It is understood and agreed, however, that the restrictions set forth in section 4B of this Agreement shall not apply to any part of the Safelite System that was known to the Associate prior to the Associate's employment by Safelite or that is or becomes generally known within the replacement auto glass industry through no fault of the Associate.

2.    Necessity for Agreement.  The Associate acknowledges and agrees that the Safelite System is a valuable business asset; that there are significant business reasons for entering into this Agreement; and that this Agreement is necessary to protect the legitimate business interests of Safelite.

3.    Consideration for Agreement. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

4.    Restrictive Covenants.

A. Agreement Not to Compete.  During the term of Associate's employment by Safelite and for a period of six (6) to twelve (12) months after termination of such employment, as determined below, regardless of whether such termination is voluntary or involuntary, or with or without cause, the Associate shall not (i) directly or indirectly, for the Associate or any other person or business entity, compete with the business of Safelite; (ii) become employed by or perform services in any capacity for any person or business entity that competes with the business of Safelite; (iii) directly or indirectly have an ownership interest of any kind or any interest in the revenue or profits of any person or business entity that competes with the business of Safelite, except that the provisions of this clause (iii) shall not be applicable to an investment by the Associate in securities of an entity whose shares are listed and publicly traded that does not exceed five per cent (5%) of the total

HCAJFORM58KIT.asc

amount of such securities outstanding; (iv) divert or attempt to divert from Safelite any customer or business whatsoever; or (v) solicit or attempt to solicit any associate of Safelite to terminate employment with Safelite, or employ any person who was employed by Safelite at the time the Associate's employment with Safelite terminated. The period of restriction shall be one (1) month for every year or portion thereof of employment of the Associate by Safelite (or any of its predecessors in interest) subject to a six (6) month minimum and a twelve (12) month maximum period of restriction.  For purposes of this section 4A, the Associate shall be deemed to be competing with the business of Safelite if the Associate is engaged in any way in any business engaged in by Safelite at the time of the termination of the Associate's employment or in the business of manufacturing automobile or truck windshields or other glass, selling (whether retail or wholesale) or installing automobile or truck windshields or other glass, repairing windshields, selling or installing those kinds of automobile and truck accessories sold by Safelite at the time of the termination of the Associate's employment, processing insurance claims, taking first notices of loss, or managing insurance claims for third parties.

B. Agreement Not to Disclose Confidential Information.  The Associate shall not at any time, during or after the term of the Associate's employment by Safelite, disclose, declare, or reveal to any person, or in any way use for the Associate's own profit, gain, or benefit, all or any part of the Safelite System, which the Associate acknowledges for purposes hereof consists of all information regarding the business methods, systems, business plans, customers, pricing, costs, sources of supply, and other information about the products, customers, suppliers, and business of Safelite.  It is understood and agreed, however, that the restrictions set forth in this section 4B shall not apply to any part of the Safelite System that was known to the Associate prior to the Associate's employment by Safelite or any of its predecessors in interest or that is or becomes generally known within the replacement auto glass industry through no fault of the Associate.

C. Scope of Restrictive Covenants.  The Associate shall not engage in any competitive activity prohibited by section 4A within the geographic area(s) to which the Associate was assigned at the time of, or at any time during the twelve (12) month period immediately preceding, the termination of the Associate's employment.  The Associate acknowledges that the period of restriction and geographic area of restriction imposed by the provisions of this Agreement are fair and reasonable and are reasonably required for the protection of Safelite.  In the event that any of the provisions of this Agreement relating to the geographic area of restriction or the period of restriction shall be determined by a court of competent jurisdiction to exceed the maximum area or period of time that such court would deem enforceable, the geographic area of restriction and the period of restriction shall, for the purposes of this Agreement, be reduced to the maximum area or period that such court would deem valid and enforceable.

5.      Remedies.  The Associate hereby acknowledges and confirms that the breach of this Agreement would cause immediate and irreparable injury, loss, and damage to Safelite and that an adequate remedy at law for such injury, loss, or damage may not exist.  Therefore, the Associate agrees that, in the event of any such breach, Safelite shall be entitled to institute and prosecute proceedings in a court of competent jurisdiction to obtain temporary and permanent injunctive relief to enforce any provision hereof, without

NCAFORMS\NKT.DOC

-2-

the necessity of proof of actual injury, loss, or damage or notice to the Associate.  No remedy conferred upon Safelite by this Agreement is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Agreement or now or hereafter existing at law, in equity, or by statute.

6.    Salary Continuation.  In the event that Safelite terminates the Associate without cause (as hereinafter defined), Safelite will continue to pay the Associate the amount of the Associate's base pay (excluding commissions, bonuses, fringe benefits, and other compensation) at the time of termination for a period ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬ until the Associate is able to obtain employment that is not in violation of this Agreement.  In addition, if the Associate is able to obtain employment that is not in violation of this Agreement prior to the expiration of said period that pays less than the amount being paid by Safelite to the Associate, Safelite will pay the Associate the difference until the expiration of said period (or until the Associate's pay equals or exceeds the amount that Safelite was paying).  For purposes hereof, cause shall mean and include poor performance (as determined in good faith by Safelite), violation of Safelite's policies or standards of conduct, any misconduct that could be injurious to Safelite, and conviction of any crime involving Safelite's money or other property or of any felony.

In order to receive any payments hereunder, the Associate must make diligent, conscientious, and aggressive efforts to obtain employment that does not violate this Agreement and must, upon request, provide Safelite with written documentation of such efforts.  In the event that the Associate obtains such employment, the Associate agrees to promptly inform Safelite in writing and to provide Safelite with written documentation thereof containing such details as may be requested by Safelite.

If Safelite pays the Associate any amount hereunder that is in excess of the amount to which the Associate is entitled, the Associate shall promptly reimburse Safelite for such excess and shall bring the same to Safelite's attention by written notice thereof.

7.    Employment-at-Will.  This Agreement is not intended to create, and should not be interpreted to create, an employment contract for any specific position, location, or period of time between Safelite and the Associate.  Regardless of any statement contained in this Agreement, Safelite has the right to terminate the Associate's employment at any time, for any reason, with or without cause or notice.

8.    Severability.  If any of the covenants contained herein or any part thereof are hereafter construed to be invalid or unenforceable, the remainder of this Agreement and any application of the other provisions of this Agreement shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

9.    Entire Agreement.  This Agreement contains the entire agreement of the parties relating to the subject matter hereof and supersedes all prior agreements or understandings, written or oral, with respect to such subject.  This Agreement may not be

08/07/03  14:13 FAX 9138771736          KC_SALES                                          ☑005

changed orally, and may be amended only by an agreement in writing signed by both parties hereto.

10.    Choice of Law. The internal laws of the state of Ohio (without reference to its choice of law or conflicts of laws provisions) shall govern the validity, interpretation, construction, performance, and enforcement of this Agreement.

11.    Binding Effect. This Agreement shall inure to the benefit of, and be binding upon, the heirs, successors, and assigns of the parties hereto.

IN WITNESS WHEREOF, this Agreement is executed by the undersigned as of the effective date set forth above.

Associate:                                    Safelite Glass Corp.

                                              By:_____
_____
(Signature)                                        Elizabeth A. Wolszon,
                                                   Senior Vice President, Marketing,
                                                   Strategic Planning and Human
                                                   Resources

_____
(Printed Name)

SSN: _____-____-_____

NCAFORM8NIGHT.DOC

AUG 07 2003 15:15

# EXHIBIT D

-------------------------------------------------------------------------

```
-----Original Message-----
From: Dayle Phillips [mailto:dayleman@yahoo.com]
Sent: Thursday, August 07, 2003 4:05 PM
To: Jeffrey Hogan
Subject: faxed docs
```

Jeff,

I faxed the docs.  When you read the non-compete
section, keep in mind that Safelite is not in the
'software development' business.

Later,
Dayle

---

Do you Yahoo!?
Yahoo! SiteBuilder - Free, easy-to-use web site design software
http://sitebuilder.yahoo.com

# EXHIBIT E

.



**From:** Jeffrey J. Hogan [mailto:jhogan@hyperquest.com]
**Sent:** Friday, August 15, 2003 9:18 AM
**To:** Jackson, Don
**Cc:** Tim Clark; Dayle Phillips
**Subject:** RE: Technology review meeting

Don,

Getting together would be great. I am a little shackled on days and times because of trips out of town that I cannot break. Next week I would be able to get together early on Tuesday, August 19th (early AM - 12:30PM). This is the only day I am in town next week - I will be in San Diego Tuesday afternoon and Wednesday, NC on Thursday and Friday with GMAC and Royal Sun Alliance. I am available on the weekend, August 23rd and 24th, but on the 25th I leave the country until the night of the 31st. I am then available September 2nd - 4th (early on the 4th).

Sorry for the calendar, but I would like to get together as soon as possible as we have so much going on I see opportunity brimming over for a joint Safelite/HyperQuest product. If you can make the 19th, I would prefer we meet close to O'Hare. I could arrange a room to talk and view the products.

Please let me know. I leave for Tennessee this afternoon and will be available on cell after 1PM. Please advise, and again, thanks.

Jeff


HyperQuest
President & Founder
1300 West Belmont Avenue, Suite 200
Chicago, Illinois 60657
T 312.372.7555
F 312.372.7577
M 773.551.6468
jhogan@hyperquest.com

---

Note: The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.

---

-----Original Message-----
**From:** Jackson, Don [mailto:Don.Jackson@safelite.com]
**Sent:** Friday, August 15, 2003 8:16 AM
**To:** 'jhogan@hyperquest.com'
**Cc:** Phillips, Dayle; Clark, Tim
**Subject:** Technology review meeting

Hi Jeff,
Dayle and I would like to meet you in Chicago next week and talk in depth about the architecture of you application.
We have looked at our schedule and Thursday, Aug 21st works for us....Are you available? If so, Please send me your location and directions...

Thanks,
Don Jackson
V.P. IT Budget & Planning
614-264-3645

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This message, including any attachments, may contain confidential information
intended for a specific individual and purpose, and may be protected by law. If you are
not the intended recipient, please notify the sender by e-mail or telephone immediately,
and then immediately delete this message. Any disclosure, copying or distribution of
this message, or the taking of any action based on it, by any unintended recipient is
strictly prohibited.

# EXHIBIT F

REDACTED

-----Original Message-----
From: Jeffrey J. Hogan [mailto:jeffreyjhogan@msn.com]
Sent: Tuesday, August 19, 2003 10:26 PM
To: Dayle Phillips
Subject: RE: stuff

Dayle,

Please , send it to me.  I felt like you might have been in a tough position
and you shouldn't feel pushed from me, so I have been waiting to get a feel
from you on how you would like to proceed.  Also, with your ideas on
structure, I still have some people waiting on me to give them a better idea
of cost and timing of a product becoming available.

I am on the West Coast today and will be traveling until the weekend, but
maybe I can track you down tomorrow afternoon before my next flight.  Let me
know where I might find you.

Thanks.

Jeff


HyperQuest
President & Founder
1300 West Belmont Avenue, Suite 200
Chicago, Illinois 60657
T 312.372.7555
F 312.372.7577
M 773.551.6468
jhogan@hyperquest.com <mailto:jhogan@hyperquest.com>
-------------------------------------------------------------------------------

1

Note: The information contained in this message may be privileged and
confidential and protected from disclosure. If the reader of this message is
not the intended recipient, or an employee or agent responsible for
delivering this message to the intended recipient, you are hereby notified
that any dissemination, distribution or copying of this communication is
strictly prohibited. If you have received this communication in error,
please notify us immediately by replying to the message and deleting it from
your computer.  Thank you.

-----Original Message-----
From: Dayle Phillips [mailto:dayleman@yahoo.com]
Sent: Tuesday, August 19, 2003 2:48 PM
To: Jeffrey Hogan
Subject: stuff

Jeff,

I dont know if you still want to pursue the approach
we have talked about, or if you are going down a
different path.  If so, I can send you an outline of a
possible working relationship.

Dayle


_____
Do you Yahoo!?
Yahoo! SiteBuilder - Free, easy-to-use web site design software
http://sitebuilder.yahoo.com

# EXHIBIT G

REDACTED

-----Original Message-----
From: Dayle Phillips [mailto:dayleman@yahoo.com]
Sent: Thursday, August 21, 2003 1:57 PM
To: Jeffrey Hogan
Subject: outline

Jeff,

Attached is a one page document describing a possible basis for a working
relationship.  It has no numbers in it.  I think it is better to first
establish how we would work together before discussing the numbers behind it.

This document is obviously not meant to be the end-all basis for an agreement
... just a way to get things moving.  I should be back in KC tomorrow, so if
you are around, you can give me a call at your convenience.

Later,
Dayle

_____
Do you Yahoo!?
Yahoo! SiteBuilder - Free, easy-to-use web site design software
http://sitebuilder.yahoo.com

There would be two separately owned companies, Company A and Company M.

The software product to be developed will form an online trading partner network whereby various participants in the auto collision repair industry will be able to interact with one another for the purpose of transmitting work assignments, attaching repair estimates, auditing repair estimates, and approving repair estimates.

The source code of the product will be jointly owned in equal share by both Company A and Company M.  Neither company will be able to sell or license the source code without the approval of the other company.  However, either company will be able to assign their joint ownership right.

Company M will design and build software product over a 15 month time frame.  Development will be staged with 3 product deliverables: one at 4 months, the next at 9 months, the last at 15 months.

Company A will receive a perpetual exclusive right to market the software to U.S. insurance companies for auto physical damage, and shall be able to establish pricing at its discretion.  All product branding for this insurance company marketplace shall be determined by Company A.

Company M will receive a perpetual exclusive right to market the software to all other participants in the auto collision repair industry, and shall be able to establish pricing at its discretion.  All product branding for non-insurance participants (with multiple user sign-ons) shall be determined by Company M.

Notwithstanding the previous two declarations, all trading partner network participants with a single sign-on shall be able to perform the basic functionality of receiving work assignments and attaching repair estimates at NO cost.

Company A will provide partial funding for the original development of the software.  This amount would be paid to Company M in 15 equal monthly installments over the development cycle.

Company M will be responsible for maintaining a production environment in a highly redundant hosting facility for the software.  Company A will pay Company M a transaction-based fee to cover the costs of hosting and maintaining the production environment.

Each company will be responsible for providing customer support to their own customers.  Support for 'single sign-on' participants shall be provided by Company A.

Company M will retain the right to modify the software (at its own expense) for all other markets.  Any derivative works created for markets other than the collision repair industry will become the sole property of Company M.

# EXHIBIT H

REDACTED

**From:** Jeffrey J. Hogan [mailto:jeffreyjhogan@msn.com]
**Sent:** Tuesday, September 16, 2003 6:16 AM
**To:** Fryman, David
**Cc:** Barlow, John; Dayle Phillips
**Subject:** RE: September 25th visit

David,

I will plan on seeing you the morning of the 25th. It occurred to me I cannot get to the refreshment area at Midway airport without a flight ticket, so I will meet you, John and Dayle outside the security check at 8:00–8:15AM. I would suggest you and John have a cup of coffee at the large food court after your flight arrives - it is located next to the main security gates on your way out of the terminal. There are nice tables to sit at and relax. Outside security there is nothing but standing room only.

Please forward the agenda to me as soon as you are able.

With thanks.

Jeff

HyperQuest
President & Founder
1300 West Belmont Avenue, Suite 200
Chicago, Illinois 60657
T 312.372.7555
F 312.372.7577
M 773.551.6468
jhogan@hyperquest.com

---

Note: The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.

---

-----Original Message-----
**From:** Fryman, David [mailto:David.Fryman@safelite.com]

**Sent:** Monday, September 15, 2003 4:48 PM
**To:** 'jhogan@hyperquest.com'
**Cc:** Barlow, John
**Subject:** September 25th visit

Jeff thanks for your offer to pick us up at Midway on Thursday 9/25.  John and I arrive at 7:20 am on Southwest and Dayle at 7:45.

I'll forward a few things for our discussion agenda later this week.

Looking forward to meeting with you.

Dave

-----Original Message-----
**From:** Phillips, Dayle
**Sent:** Monday, September 15, 2003 5:36 PM
**To:** Fryman, David
**Subject:** RE: 09 25 03 Hyperquest.doc

Dave,

My plane arrives at 7:45am at Midway
That is the earliest I can get there without coming the night before.

Let me know if that will work

Dayle


> -----Original Message-----
> **From:** Fryman, David
> **Sent:** Monday, September 15, 2003 4:43 PM
> **To:** Phillips, Dayle
> **Subject:** FW: 09 25 03 Hyperquest.doc
>
> Dayle, when do you land?
>
> -----Original Message-----
> **From:** Chewning, Catherine
> **Sent:** Monday, September 15, 2003 3:02 PM
> **To:** Fryman, David
> **Cc:** Wilkes, Becky
> **Subject:** 09 25 03 Hyperquest.doc
>
> Dave - please confirm airport pick up with Jeff Hogan.
>
> Thanks - Catherine

---------------------------------------------------------------------- Travel -

HyperQuest

John Barlow, Dave Fryman

*Thursday, September 25, 2003*

7:15 AM   Depart Columbus, Southwest #415
7:20 AM   Arrival Midway

> *Jeff Hogan - will meet flight - David - please confirm*

Meeting Location
HyperQuest
1300 West Belmont Avenue, Suite 200
Chicago, IL  60657
312.372.7555; 312.372.7577 (Fax) 773.551.6468 (Cellular)
Contact:  Jeff Hogan, President and Founder jhogan@hyperquest.com

David Fryman
4:25 PM   Depart Midway, DL 786, Seat N/A

6:25 PM   Arrival Columbus

John
3:45 PM   Depart Midway, DL 5839, Seat 6-D
6:14 PM   Arrival Cincinnati

****************************************************************************************

This message, including any attachments, may contain confidential information
intended for a specific individual and purpose, and may be protected by law. If you are
not the intended recipient, please notify the sender by e-mail or telephone immediately,
and then immediately delete this message. Any disclosure, copying or distribution of
this message, or the taking of any action based on it, by any unintended recipient is
strictly prohibited.

# EXHIBIT I

# AGENDA
### Hyperquest and Safelite
### September 25, 2003

Meeting Location

      **HyperQuest**
      **1300 West Belmont Avenue, Suite 200**
      **Chicago, IL  60657**

9 am  DISCUSSIONS

BUSINESS UPDATES
Hyperquest Business Update                                  Jeff
    Production Clients business benefit
    New business opportunities

Safelite Business Updates                                      John
    Client interest in Other Claims

PRODUCT CAPABILITIES
Gain additional product understanding            All
    Features and functionality of Hyperquest
    Hyperquest as a Procurement Engine??
    Technical components                       Dave/Dayle
        Database
        Application and middleware tiers
        EDI/XML integration
    Item Master description
    Parts, Suppliers, Catalogs, Updates—How does it all come together

VISIONS OF AN INTEGRATED APPLICATION
Potential synergies between applications         Jeff/Dayle
    eDoc, Hyperquest, Siebel, Oracle iSupplier
    Points of potential integration between applications

Next Steps Discussions                                Jeff/John

12:00 Depart for Lunch or Airport

# EXHIBIT J

REDACTED

**From:** Phillips, Dayle [mailto:Dayle.Phillips@safelite.com]
**Sent:** Wednesday, October 29, 2003 7:27 AM
**To:** Jeffrey J. Hogan
**Cc:** Clark, Tim; Thacker, Michael
**Subject:** Proposed integration between eDocExpress and Hyperquest

Jeff,

Attached is a document proposing the nuts and bolts of the integration.

Call if you have questions.

Later,

Dayle

*********************************************************************************
This message,, including any attachments, may contain confidential information
intended for a specific individual and purpose, and may be protected by law. If you
not the intended recipient, please notify the sender by e-mail or telephone immediat
and then immediately delete this message. Any disclosure, copying or distribution of
this message, or the taking of any action based on it, by any unintended recipient i
strictly prohibited.

# Proposed Integration - eDocExpress and Hyperquest
## October 24, 2003

## Overview

This document outlines a loosely coupled two-way interface between the eDocExpress product and the Hyperquest product. It is meant to be a simplistic transactional format that allows for easy tracking within each separate system.

Although it is not mandatory to start with, it is desirable to have two way communications between the two products. Without it, there would be confusion about the true status of an estimate. The basic workflow would be as follows:

1. Appraisal Entity submits estimate via eDocExpress
2. eDocExpress performs assignment level approval process
3. Upon success, eDocExpress submits estimate to Hyperquest via web service
4. eDocExpress changes status of assignment to 'Pending Hyperquest Audit'

5. Hyperquest receives estimate via web service
6. Hyperquest performs part audit and generates response
7. Hyperquest sends email responses to various entities
8. Hyperquest submits response to eDocExpress via web service

9. eDocExpress receives response via web service
10. Based upon response, eDocExpress updates status as Rejected, Approved, or routes to a manual approval queue.

This approach lets each system operate independently on its own schedule. It also prevents the introduction of processing delays in one system due to outage or heavy usage on the other system.

## Hyperquest Web Service

The web service to be provided by Hyperquest would be of the basic format:

SubmitEstimate(sAuthID, sAuthPwd, sSubmissionID, sRouting, sEstimate)

> Where:     sAuthID is a valid ID on the Hyperquest system
> sAuthPwd is the password corresponding to the ID
> sSubmissionID is the caller's unique ID for the submission
> sRouting is an XML string containing routing information
> sEstimate is an XML string containing the estimate data

The SubmissionID is the unique identifier for the transaction between eDocExpress and Hyperquest. The purpose of the ID is to provide Hyperquest an ID to use when submitting the result of the audit back to eDocExpress. Typically, eDocExpress would pass a GUID as the ID.

Note that the estimate information is segregated from the basic control and routing information. The reason for the segregation is because the information within the EMS estimate is not reliable for routing instructions. It is also nice to have the original exported information from the estimating system.

The return value of the web service should be a simple Boolean True or False. 'True' means that the request has been received and stored by Hyperquest. 'False' means that the submission was not completely received or stored. No validation would take place at this time ... validation errors would be returned via a web service call to eDocExpress. It is up to the calling program to handle this failure, either by resubmitting at a later time, or by creating an exception log.

The estimate XML follows the EMS 2.6 standard, and is self-explanatory upon referencing the CIECA EMS definition document. (Sample EMS XML files have already been communicated.)

The routing XML is defined below:

```
<Transaction >
        <Assignment_ID/>

        <Parent_Assignment_ID/>

        <Originating_Entity>
                <Company_ID/>
                <Company_Office_ID/>
                <Policy_Number/>
                <Claim_Number/>
        </Originating_Entity>

        <Ruleset/>

        <Appraisal_Entity>
                <Partner_Type/>
                <Company_ID/>
                <Company_Office_ID/>
                <Estimator_ID/>
                <Estimator_Last_Name/>
                <Estimator_First_Name/>
        </Appraisal_Entity>

        <Notifications>
                <Notify>
                        <Email_Address/>
                        <First_Name/>
                        <Last_Name/>
```

```
                    <Role/>
                </Notify>
                    .
                    .
            </Notifications>

</Transaction>
```

## Tag Definitions

**Transaction (mandatory):** This tag is just the outer container for the transaction.

**Assignment_ID (mandatory):** The assignment ID is eDocExpress' unique identifier for the work assignment containing the estimate. This ID will be consistent among multiple submissions of the same estimate until approval is obtained.

**Parent_Assignment_ID (mandatory):** If this assignment is a supplement, then this tag contains the ID of the original assignment. If the assignment is not a supplement, then this tag is empty.

**Originating_Entity (mandatory):** This tag contains information about the company that originated the assignment. This is typically the insurance company, but could also be a TPA working on behalf of an insurance company.

> **Company_ID (mandatory):** Contains eDocExpress' ID for the company. Typically this would be in the form of a GUID. It is assumed that Hyperquest would maintain a cross-reference list of company IDs to correlate the eDocExpress ID to their own internal company ID.

> **Company_Office_ID (mandatory):** Contains eDocExpress' ID for the company office responsible for handling the claim. Typically this would be in the form of a GUID. It is assumed that Hyperquest would maintain a cross-reference list of company office IDs to correlate the eDocExpress ID to their own internal ID.

> **Policy_Number (mandatory):** contains the originating company's policy number associated with the assignment. This is necessary because sometimes the policy number is mangled or omitted within the estimating system.

> **Claim_Number (mandatory):** contains the originating company's claim number associated with the assignment. This is necessary because sometimes the claim number is omitted or incorrectly keyed within the estimating system.

**Ruleset (optional):** This tag contains information that could be used to explicitly specify the ruleset to be used when auditing the estimate. This is anticipated for TPAs, who routinely process assignments for insurance companies. The TPA may want to apply different rules based upon the client they are serving. The value passed in this tag would be the name or ID of the ruleset to be used.

**Appraisal_Entity (mandatory):** This tag contains information about the individual or entity that submitted the assignment. This can be a repair facility, an independent appraiser, or a staff appraiser.

> **Partner_Type (mandatory):** contains one of the following values:
>
> AF – independent appraisal firm
> IA – independent appraiser (individual company)
> RF – repair facility (individual company)
> CON – consolidator
> SA – staff appraiser

> **Company_ID (mandatory):** Contains eDocExpress' ID for the company that submitted the appraisal. Typically this would be in the form of a GUID. It is assumed that Hyperquest would maintain a cross-reference list of company IDs to correlate the eDocExpress ID to their own internal company ID.

> **Company_Office_ID (optional):** In the case of a partner type of AF, CON, or SA, there will be an ID passed identifying the office the appraiser is working for. (For example, a staff appraiser sometimes works for multiple offices on different days of the week).

> **Estimator_ID (optional):** In the case of a partner type of AF, CON, or SA, there will be an ID passed identifying the user submitting the assignment. Otherwise, the tag will be empty.

> **Estimator_Last_Name (optional):** In the case of a partner type of AF, CON, or SA, contains the last name of the user submitting the assignment.

> **Estimator_First_Name (optional):** In the case of a partner type of AF, CON, or SA, contains the first name of the user submitting the assignment.

**Notifications (optional):** this section specifies entities that should receive notification of the result of the part audit.

> **Notify (mandatory):** the outer tag delimiting a specific entity to notify

> > **Email_Address (mandatory):** the email address to receive result

> > **First_Name (mandatory):** the first name of the addressee.

> > **Last_Name (mandatory):** the last name of the addressee.

> > **Role (mandatory):** contains a code identifying the role of the recipient, in case customized responses are necessary:
> > Sub – submitter of the assignment

Rev – file reviewer
Rep – claim rep, file handler, etc
Adj – adjuster

# eDocExpress Web Service

The web service to be provided by eDocExpress will receive the result of the audit, and would be of the basic format:

PostResult(sAuthID, sAuthPwd, sSubmissionID, sResult)

Where:   sAuthID is a valid ID on the eDocExpress system
sAuthPwd is the password corresponding to the ID
sSubmissionID is the ID of the submission that prompted this result
sResult is an XML string containing the result of a submission

The return value of the web service should be a simple Boolean True or False. 'True' means that the request has been received and stored by eDocExpress. 'False' means that the submission was not completely received or stored. It is up to the calling program to handle this failure, either by resubmitting at a later time, or by creating an exception log.

The result XML is defined below:

```
<Transaction>

        <Result_Code/>
        <Reinspection_Flag/>
        <Audit_Flag/>
        <Score/>
        <Message/>

</Transaction>
```

## Tag Definitions

**Transaction (mandatory):**  This is the outer tag of the transaction.

**Result_Code (mandatory):**  contains a code categorizing the result of the part audit:
   0 = not acceptable, reject to submitter
   1 = passed
   2 = requires manual review
   3 = invalid submission (reason specified in message tag)

**Reinspection_Flag (optional):** contains the Boolean text 'True' or 'False'. The purpose of the tag is to allow Hyperquest to flag an assignment within eDocExpress to be re-inspected based upon the part utilization contained within an estimate.

**Audit_Flag (optional):** contains the Boolean text 'True' or 'False'. The purpose of the tag is to allow Hyperquest to flag an assignment within eDocExpress to be audited based upon the part utilization contained within an estimate.

**Score (optional):** contains a value between 0 and 100. The purpose of the tag is to allow Hyperquest to return an audit score that can be used in the eDocExpress approval process.

**Message (mandatory):** this message contains the textual result of the audit is stored in eDocExpress' claim comment log.

# EXHIBIT K



**From:** Jeffrey J. Hogan [mailto:jeffreyjhogan@msn.com]
**Sent:** Wednesday, October 29, 2003 9:14 AM
**To:** Phillips, Dayle
**Cc:** Tom Feeney; Dennis Hogan; Tim Clark
**Subject:** RE: Proposed integration between eDocExpress and Hyperquest

Dayle,

Thank you. I am beginning to go through the document and assume some of the items, such as WEB SERVICE, will utilize the already established connection - with some slight enhancements. We are anticipating testing the loosely coupled two-way integration ASAP - in preparation for NACE and GMAC opportunity. I know we had originally targeted Oct 31 as a time frame for completing the routing development routines on the eDoc side. Do you believe we are going to be able to test the upload, pass to HQ, appropriate return message to eDoc - next week (week of November 1)?

Also, I will have the CCC estimating platform updates to you in KS this week. It will include installation disks and upgrade disks. I spoke with Tim briefly about you and I getting together in Chicago. It sounds like he supports that idea, so we should try to put plans together for Thursday and Friday (11/6 & 11/7) in Chicago. I am with Hartford on the 4th and 5th. Our plan should be to:
a. look at and test the integration between the systems
b. identify and document elements of the systems that need to be "touched" to bring the product to market
c. discuss the system workflows and help me gain better understanding of the eDocs product
d. reach mutual agreement on implementation requirements within a client environment
e. create a project and resource plan for completing all necessary upgrades, enhancements, and testing prior to NACE and Market Rollout

Between NACE and some meetings coming in mid-November, the more time we can spend together between now and NACE, the better. We discussed a little about eAutoClaims, but I also want to talk with you more broadly about other offerings in the market so we can begin formulating a broader architecture requirements plan.

I look forward to getting together, and as soon as you and Tim give me the ok on getting together, I will make arrangements at my friends hotel...you will live high on the hog on the Miracle Mile...

Thanks again Dayle - I am excited at the prospect of us beginning to work on these opportunities.

Jeff


HyperQuest
President & Founder
1300 West Belmont Avenue, Suite 200
Chicago, Illinois 60657

**T** 312.372.7555
**F** 312.372.7577
**M** 773.551.6468
jhogan@hyperquest.com

---

Note: The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.  Thank you.

---

-----Original Message-----
**From:** Phillips, Dayle [mailto:Dayle.Phillips@safelite.com]
**Sent:** Wednesday, October 29, 2003 6:27 AM
**To:** Jeffrey J. Hogan
**Cc:** Clark, Tim; Thacker, Michael
**Subject:** Proposed integration between eDocExpress and Hyperquest

Jeff,

Attached is a document proposing the nuts and bolts of the integration.

Call if you have questions.

Later,

Dayle

*************************************************************************************************
This message, including any attachments, may contain confidential information
intended for a specific individual and purpose, and may be protected by law. If you are
not the intended recipient, please notify the sender by e-mail or telephone immediately,
and then immediately delete this message. Any disclosure, copying or distribution of
this message, or the taking of any action based on it, by any unintended recipient is
strictly prohibited.

# EXHIBIT L

REDACTED

**From:** Jeffrey J. Hogan [mailto:jhogan@hyperquest.com]
**Sent:** Monday, January 19, 2004 5:15 PM
**To:** 'Clark, Tim'
**Subject:** RE: Wednesday and Thursday Due Diligence Meeting

Thanks Tim -

Dayle and I exchanged voice mails and all seems copasetic.  Look forward to talking.

Jeff

---

**From:** Clark, Tim [mailto:Tim.Clark@safelite.com]
**Sent:** Monday, January 19, 2004 4:57 PM
**To:** 'jeffreyjhogan@msn.com'
**Subject:** RE: Wednesday and Thursday Due Diligence Meeting

Jeff, we'll pay for all of Dayle's expenses.  no need for you to shell-out $$$ out of your pocket.  tim

    -----Original Message-----
    **From:** Jeffrey J Hogan [mailto:jeffreyjhogan@msn.com]
    **Sent:** Monday, January 19, 2004 6:33 AM
    **To:** Dayle Phillips; Dayle Phillips
    **Cc:** Tim Clark
    **Subject:** Wednesday and Thursday Due Diligence Meeting

    Dayle,

Sorry that we did not hook up personally last week. We haven't had a chance to talk personally this year so I am looking forward to your trip into Chicago to aid in the due diligence process. Tim indicated a Wednesday and Thursday trip worked and we have planned to bring in a primary team member from California as well as have a few from Chicago to participate. I do not know if you have other plans, but if not, I would like to take you to dinner on Wednesday.

If possible, would you be able to plan an arrival on Wednesday morning around 9AM into O'Hare? I am not sure if you prefer to have a car, but if not I will pick you up and arrange for your hotel and transportation.

I am traveling today but can be reached on my cell phone - I will try to reach you as well. My number is 773-551-6468.

Looking forward to seeing you again.

Jeff

HyperQuest
President & Founder
1300 West Belmont Avenue, Suite 200
Chicago, Illinois 60657
T 312.372.7555
F 312.372.7577
M 773.551.6468
jhogan@hyperquest.com

----

Note: The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.

----

*************************************************************
This message, including any attachments, may contain
confidential information intended for a specific individual
and purpose, and may be protected by law. If you are not
the intended recipient, please notify the sender by e-mail
or telephone immediately, and then immediately delete this
message. Any disclosure, copying or distribution of this
message, or the taking of any action based on it, by any
unintended recipient is strictly prohibited.

# EXHIBIT M

Note: The information contained in this message may be privileged and
confidential and protected from disclosure. If the reader of this message is
not the intended recipient, or an employee or agent responsible for
delivering this message to the intended recipient, you are hereby notified
that any dissemination, distribution or copying of this communication is
strictly prohibited. If you have received this communication in error,
please notify us immediately by replying to the message and deleting it from
your computer.  Thank you.

-------------------------------------------------------------------
----------------------------------------------------------------

-----Original Message-----
From: Dayle Phillips [mailto:DaylePhillips@go.com]
Sent: Thursday, February 26, 2004 8:06 AM
To: jhogan@hyperquest.com
Subject: schedule

Jeff,

I didnt feel totally comfortable speaking with you when Mike was in the
room.  I know you have some deadlines coming up, so it is best that I share
my short term schedule so you can make plans accordingly.

I have made prior commitments for the weeks of March 8th and March 15th that
will require 100% of my time.  Hopefully, during this time, we can discuss
the issues of working together and come to a formal arrangement.  As I said
on Monday, I would prefer to somehow link together a contracting agreement
with a license agreement.  As you can probably understand, I need to partner
with someone to provide the 'plumbing' for my future product ... and I want
to make that decision as soon as possible.

The only issue that came to my mind when you were describing how a license
agreement would work is that HQ would make all alterations to accomodate the
linkage between eDoc/SB and my future product.  I would like to propose that
you would host 2 sites from your web servers, one for my use (that I would
be able to alter) and the other for your use.  As evidenced by the scramble
to demo for Progressive, you and I both know that in order to be successful,
a small company has to move fast to accomodate the changes a potential
client requires.  Any changes I would make to the 'plumbing' would be
readily available to be incorporated into eDoc/SB if you want.

I look forward to discussing this more with you in the near future.

Later,
Dayle

Check-out GO.com
GO get your free GO E-Mail account with expanded storage of 6 MB!

***********************************************************
This message, including any attachments, may contain
confidential information intended for a specific individual
and purpose, and may be protected by law. If you are not
the intended recipient, please notify the sender by e-mail
or telephone immediately, and then immediately delete this
message. Any disclosure, copying or distribution of this
message, or the taking of any action based on it, by any
unintended recipient is strictly prohibited.

# EXHIBIT N

REDACTED

-----Original Message-----
From: Dayle Phillips [mailto:dayleman@yahoo.com]
Sent: Thursday, March 11, 2004 7:48 AM
To: jeffreyjhogan@msn.com
Subject: Re: Outlook?

Hey Jeff,

I turned in my phone early Friday morning, and I think
Safelite turned it off immediately.  So, unfortunately
I did not get any messages.

Actually there are 2 pilots scheduled.  One next week,
where I will be helping to integrate with their
in-house communications ... and the other is scheduled
around mid-April.  I would prefer to do the 2nd one
without integrating to the incumbent estimating
communications channel, for obvious reasons.  Luckily,
they are also open to a new communications channel
because they have recently expanded into several new
states.  Both would be ripe for a parts audit
solution.

Question ... would it be possible to call the
Hyperquest service from within an 'Outlook' type
application ... right at the appraiser's or shop's
desktop?  I think that would have great value.

Give a call at my home office anytime this week.  The
number is 913-780-6693.

Dayle


--- Jeffrey J Hogan <jeffreyjhogan@msn.com> wrote:
> Dayle,
>
> I called you right after the Progressive meeting and
> still haven't heard
> from you.  How did Friday go?  How are things now
> with the pilot?
>
> Let me know the best way to catch up with you.
>
> Jeff
>
>
>
>
>
>
>
>
>
>
> HyperQuest
>
> President & Founder
>
> 1300 West Belmont Avenue, Suite 200
>
> Chicago, Illinois 60657
>
> T 312.372.7555
>
> F 312.372.7577
>
> M 773.551.6468
>
> jhogan@hyperquest.com
>
>
>-------------------------------------------------------------------
>
>-------------------------------------------------------------
>
> Note: The information contained in this message may
> be privileged and
> confidential and protected from disclosure. If the
> reader of this message is
> not the intended recipient, or an employee or agent
> responsible for
> delivering this message to the intended recipient,
> you are hereby notified
> that any dissemination, distribution or copying of
> this communication is
> strictly prohibited. If you have received this
> communication in error,
> please notify us immediately by replying to the
> message and deleting it from
> your computer.  Thank you.
>
>-----------------------------------------------------------------------
>

# EXHIBIT O

REDACTED

-----Original Message-----
From: Jeffrey J. Hogan [mailto:jhogan@hyperquest.com]
Sent: Friday, March 12, 2004 9:37 AM
To: 'Dennis Hogan'; 'vinitha.mary@masconit.com'
Subject: FW: FW: Outlook?

 fyi

-----Original Message-----
From: Dayle Phillips [mailto:dayleman@yahoo.com]
Sent: Friday, March 12, 2004 7:12 AM
To: jeffreyjhogan@msn.com
Subject: Re: FW: Outlook?


Jeff,

Actually, the call would not be from Microsoft Outlook.  It would be called
from an appraiser's desktop application (that my partners have built), which
has the same look and feel as Outlook, except that it has special extensions
to do what a field appraiser/adjuster does on a daily basis with property
and auto claim files.

Since we have the source code, I am sure that it would be possible to make a
web service call to Hyperquest that could get the 'parts list' and perform a
'parts audit' on an estimate.  Doing this from within a fat application on
the appraisers machine would eliminate a lot of the hassle of having to do
an 'attachment, mark as complete, send to server, refresh web page, view
results' cycle.  It would be a lot more user friendly.

Dayle

1

```
--- Jeffrey J Hogan <jeffreyjhogan@msn.com> wrote:
>
> Dayle,
>
> Help us understand more of what you would like the call from Outlook
> to do.
> We want to look into it and get you some feedback, but we are unsure
> of what you want called.
>
> Jeff
>
>
> ----- Original Message -----
> From: "Vinitha Mary Benedictus"
> <vinitha.mary@masconit.com>
> To: "'Dennis Hogan'" <dennishogan@earthlink.net>
> Sent: Thursday, March 11, 2004 4:17 PM
> Subject: RE: Outlook?
>
> > Dennis,
> >
> > I would like to know more about this requirement.
> >
> > Which Hyperquest Service needs to be called from
> Outlook?
> >
> > Please send its name, so that i can tell you
> whether it is possible or
> not.
> >
> > Mary
> >
> > -----Original Message-----
> > From: Dennis Hogan
> [mailto:dennishogan@earthlink.net]
> > Sent: Thursday, March 11, 2004 3:11 PM
> > To: Mary Vinitha
> > Subject: Fw: Outlook?
> >
> >
> > Mary is it possible to call SB from OutLook see
> attached question?
> > >
> > > -----Original Message-----
> > > From: Dayle Phillips [mailto:dayleman@yahoo.com]
> > > Sent: Thursday, March 11, 2004 7:48 AM
> > > To: jeffreyjhogan@msn.com
> > > Subject: Re: Outlook?
> > >
> > > Hey Jeff,
> > >
> > > Question ... would it be possible to call the
> HyperQuest service from
> within
> > > an 'Outlook' type application ... right at the
> appraiser's or shop's
> > > desktop?  I think that would have great value.
> > >
> > > Give a call at my home office anytime this week.
>   The number is
```

2

```
> > > 913-780-6693.
> > >
> > > Dayle
>
```

# EXHIBIT P

REDACTED

-----Original Message-----
From: Dayle Phillips [mailto:dayleman@yahoo.com]
Sent: Wednesday, March 24, 2004 8:50 AM
To: jeffreyjhogan@msn.com
Subject: RE: Discussion


Jeff,

The pilot so far is going good.  Doing a lot of minor
adjustments to their workflow ... they still have a
'green screen' claim system, so getting data into it
and out of it requires finesse.

Later,
Dayle

--- Jeffrey J Hogan <jeffreyjhogan@msn.com> wrote:
> Let me catch up with Dennis later this morning.  We
> conclude the Farmers
> market test today and are slotted for a ton of
> reporting developments, etc.
> I just need to see from him when he doesn't need me.
>
> How are you doing?  Have the tests been going
> well???  I hope so.
>
> Jeff
>
> -----Original Message-----
> From: Dayle Phillips [mailto:dayleman@yahoo.com]
> Sent: Monday, March 22, 2004 1:54 PM
> To: Jeffrey J Hogan

1

> Subject: Discussion
>
> Jeff,
>
> Its been a couple of really busy weeks since we last
> talked.  If I recall,
> the ball was in my court to contact you with
> specifics about working
> together on certain insurance company opportunities.
>
> Can you give a time this week when we could get
> together by phone to discuss
> possibilities?
>
> Dayle
>

# EXHIBIT Q

| | |
|---|---|
| **From:** | Jeffrey J Hogan [jeffreyjhogan@msn.com] |
| **Sent:** | Monday, March 29, 2004 7:06 AM |
| **To:** | 'Dayle Phillips' |
| **Cc:** | Dennis Hogan (dhogan@hyperquest.com) |
| **Subject:** | RE: Discussion |
| | |
| **Importance:** | High |

Dayle,

Sorry for the unintentional silent treatment.  Things have been incredibly busy.  Dennis and I should talk with you to understand what you need to do to get the system ready for your own needs.  We are in the process of rewriting the Web Services right now.  I am completely out of the loop right now on technology, but Dennis and I spoke last night and he can work with you to get what you need in play.  I will be in the office today -

Call me then I will get us on a call with Dennis or have you call him directly.  I look forward to doing something together.

Jeff

-----Original Message-----
From: Dayle Phillips [mailto:dayleman@yahoo.com]
Sent: Wednesday, March 24, 2004 7:50 AM
To: jeffreyjhogan@msn.com
Subject: RE: Discussion

Jeff,

The pilot so far is going good.  Doing a lot of minor adjustments to their workflow ... they still have a 'green screen' claim system, so getting data into it and out of it requires finesse.

Later,
Dayle

--- Jeffrey J Hogan <jeffreyjhogan@msn.com> wrote:
> Let me catch up with Dennis later this morning.  We conclude the
> Farmers market test today and are slotted for a ton of reporting
> developments, etc.
> I just need to see from him when he doesn't need me.
>
> How are you doing?  Have the tests been going well???  I hope so.
>
> Jeff
>
> -----Original Message-----
> From: Dayle Phillips [mailto:dayleman@yahoo.com]
> Sent: Monday, March 22, 2004 1:54 PM
> To: Jeffrey J Hogan
> Subject: Discussion
>
> Jeff,
>
> Its been a couple of really busy weeks since we last talked.  If I
> recall, the ball was in my court to contact you with specifics about
> working together on certain insurance company opportunities.
>
> Can you give a time this week when we could get together by phone to
> discuss possibilities?
>

> Daylo
>

# EXHIBIT R

REDACTED

-----Original Message-----
From: Jeffrey J Hogan [mailto:jeffreyjhogan@msn.com]
Sent: Thursday, April 01, 2004 8:01 AM
To: 'Dennis M Hogan'; 'thogan@hyperquest.com'
Subject: FW: First Draft Agreement

 I have not yet reviewed this, but Dayle would like to enter into an
agreement where he could use the SB communication (upload and download of
claims between appraisers and insurers) and plug in his own functionality
modules.  He would need access to develop within a version of the SB system,
that once we were satisfied was within quality standards we could move onto
SB and use for SB related needs (we would own the SB related development).

Take a look - this may be an opportunity to generate revenue and leads
without any effort on our side - not sure, but possible.


-----Original Message-----
From: Dayle Phillips [mailto:dayleman@yahoo.com]
Sent: Wednesday, March 31, 2004 6:05 PM
To: Jeffrey J Hogan
Subject: First Draft Agreement

Jeff,

Attached is a first cut at a VAR agreement.  Happy reading...

Dayle

## "First Draft"

## Value Added Reseller Software License Agreement

Deleted:
Second Revision

This Agreement ("Agreement") is entered into as of May 1st, 2004 (the "Effective Date"), between HyperQuest Incorporated, a _____ corporation ("HyperQuest") and NuGen I.T. Incorporated, a Value Added Reseller ("VAR").

### RECITALS

VAR desires to license an Internet based software program known as eDocExpress which is owned by Safelite Glass Corporation. Safelite Corporation has granted HyperQuest an exclusive world wide distribution license (collectively the "Licensed Product"). The Licensed Product is being provided by HyperQuest to VAR for electronic claims and underwriting functions as well as collision repair information. VAR may identify other markets to HyperQuest for the purpose of additional sales opportunities.

In consideration of the promises and the mutual agreements, provisions and covenants herein contained, HyperQuest and VAR hereby agree as follows:

1. The Licensed Products:  During the term of this Agreement, HyperQuest agrees to provide to VAR an unlimited nonexclusive license to sell the Licensed Product.

2. Term:   The Agreement shall be for a period of three (3) years, commencing on the Effective Date and automatically renew for successive terms of one (1) year thereafter.

3. Termination:   The Agreement, however, may be terminated:

    3.1.  By HyperQuest through written notice of not less than 180 days prior to the date of termination under the following conditions:

    3.2. Failure of VAR to meet agreed upon administrative fees identified in Schedule A.

    3.3. Upon any use, transfer or dissemination of the Licensed Product which is not expressly permitted by this Agreement

    3.4. Institution of bankruptcy by or against the VAR or the appointment of a receiver to the possession of VAR's assets

    3.5. The end of the initial three-year term, or any successive one-year term

    3.6. Breach any term of the Agreement, which is not cured after appropriate notification

4.  Payment Terms:  HyperQuest and VAR agree that VAR will pay an administrative fee for the sale of the Licensed Product (the "License Fee") in the amounts set forth in Exhibit A attached hereto and incorporated herein by this reference.   The administrative fee paid to HyperQuest during the term of this Agreement and in accordance with this Agreement shall be payable by

VAR within thirty (30) days of VAR's receipt of sales revenue, subscription or transaction, for the Licensed Product from VAR customers. VAR shall be solely responsible for procuring and maintaining any license or franchise, and paying any fees, required to operate its business in each country, state, county and city in which the Licensed Product is utilized.

5. Licensed Products: VAR agrees to sell and use the Licensed Product in the manner set forth in Section 5. In consideration of VAR's administrative payments of the Licensed Product, and of VAR's agreement to abide by the terms and conditions of this Agreement, HyperQuest grants VAR a nonexclusive nontransferable right to sell and use the Licensed Product (hereafter the "License"), and to render services to customers world wide using the Licensed Product during the term of this Agreement and any renewals thereof. HyperQuest retains the right to terminate this License, at any time, should VAR violate any of its provisions. HyperQuest reserves all rights relating to the Licensed Product not expressly granted to VAR. During the term of this Agreement, VAR may

5.1 Sell and use the Licensed Product on an unlimited basis throughout its organization.

5.2 Install the Licensed Product operating system at location(s) specified by VAR in writing except those excluded by HyperQuest as identified in Exhibit B.

5.3 Modify the source code to incorporate routine product fixes and enhancements and specific VAR requirements that support new sales opportunities. HyperQuest will own all such fixes and enhancements. Hyperquest's ownership rights of such enhancements will survive termination of this Agreement. Such enhancements shall be defined as software functions added by VAR to the existing code of the Licensed Product as of the Effective Date of this Agreement.

5.4   Develop new software modules that may be integrated into the Licensed Product or operate independently of the Licensed Product. VAR will own these separate modules. VAR ownership rights of such new modules will survive termination of this Agreement. Such new modules shall be defined as any modules designed and developed by VAR and described in Exhibit C and subsequently provide written notice to

5.5 Sell and use the Licensed Product for primary purpose of electronically collecting, storing and transferring claim information. Recognizing that VAR may elect to utilize this License through a partnership or subsidiary corporation in which VAR is the controlling partner or the majority shareholder, HyperQuest hereby grants to VAR (but not the VAR's Assignee) the limited right to assign this Agreement with its rights to use the Licensed Product licensed hereunder to any business entity of which VAR is and continues to be a controlling partner or majority shareholder ("Assignee"), for operations within a particular territory. However, VAR may not partner with, form a joint venture with or become a co-owner of a subsidiary corporation with any entities without written approval of Hyperquest. .

5.5.1 If at any point VAR ceases to be the controlling partner or majority shareholder of the Assignee, then HyperQuest may, but need not, require the termination of any assignment. If HyperQuest requires the termination of the assignment under this provision, said assignment shall by itself terminate with no further action on the part of Hyperquest, and the License shall be deemed reassigned to VAR. VAR shall be required to provide supporting documentation of any such change in control with respect to Assignee.

5.5.2 VAR shall continue to be liable for all sums due from the Assignee and no failure on the part of the Assignee to make payments due to VAR shall relieve VAR from its individual obligation to make said payments to Hyperquest. The bankruptcy or insolvency of the Assignee or of VAR itself shall be cause for

immediate termination of this License, and should HyperQuest be unable to terminate the License because of the provisions of the United States Bankruptcy Laws, then the trustee or other party in possession of the software and documentation shall be obligated to protect the trade secret status of the said information by executing a trade secret agreement or returning any source code and internal documentation which it may possess to HyperQuest immediately upon request.  The Assignee holding this License under any assignment shall have no authority whatsoever to further assign or to sublicense this License or any software and documentation and on termination or liquidation of the Assignee, the assignment shall automatically terminate and all the rights granted in this License shall revert to Hyperquest.

5.6 VAR may distribute printed copies and electronic copies of information derived from the Licensed Product to all VAR customers as necessary in the ordinary course of business.

5.7 VAR agrees to promptly advise HyperQuest and take all reasonable steps to protect the software and documentation from theft or from use by others contrary to the terms of this License and act in accordance with the separately executed Proprietary Information Agreement attached as Exhibit C.

5.8 VAR agrees that all agreements between VAR and its customers, by which portions of the software and documentation are used by such customers, shall be in writing, shall be in such form and substance as HyperQuest shall reasonably approve, and shall among other provisions include proprietary information provisions substantially in the form as contained in Exhibit C.

5.9     Within thirty (30) days after entering into an agreement with any customer and before the customer starts receiving any services, VAR shall provide HyperQuest with a copy of each customer agreement.

5.10 VAR agrees to return the all of the existing copies of the software and documentation issued with respect to the Licensed Product to HyperQuest within 30 (30) days after the termination date set forth in the written notice of Hyperquest's termination of this License for any authorized reason, whether a breach or expiration under this Agreement.

5.11     An express condition of this License is that HyperQuest shall at all times retain ownership of the Licensed Product recorded on the original media copy or copies and all subsequent modified copies of the Licensed Product, regardless of the form or media in or on which the original and other copies may subsequently exist.  VAR shall provide HyperQuest with an original media copy and industry standard documentation of any enhancement that VAR effects under this License.  This License is not a sale of the Licensed Product data content recorded on VAR's copy or any subsequent copy. HyperQuest and VAR agree to each retain identical software copies of the original Licensed Product to substantiate the functionality of the original version at the inception of this agreement.

6.  Confidentiality of Licensed Product: VAR acknowledges that the Licensed Product comprises information, which constitutes a trade secret of HyperQuest in which HyperQuest has a proprietary interest.  VAR agrees that the information constituting the Licensed Product shall not be disclosed to others, copied, reproduced or used for any purpose other than those uses expressly authorized by this Agreement.  VAR will use all reasonable efforts to ensure that all its personnel and all other persons afforded access to the Licensed Product shall protect the Licensed Product from unauthorized use, dissemination or disclosure, including having such persons execute a proprietary information agreement containing language substantially in the

form of Exhibit C. For purposes of this Agreement, the term "TRADE SECRET" means the program structure, logic, data structures, design, processes, procedures, formulae, and algorithms contained in the ordered set of instructions, which together constitute the software that, may be disclosed by either the software or the documentation. Trade Secret does not include information which is publicly known through no fault of VAR or VAR's employees, contractors, or agents, nor does it include information which is lawfully received by VAR from a third party not bound in a confidential relationship to Hyperquest, nor information disclosed by HyperQuest to a third party without obligation of confidentiality.

6.1 VAR and HyperQuest shall advise their employees of the confidential nature of the Confidential Information and Professional Service being provided hereunder and shall enforce such employees' strict compliance with the provisions of this. VAR shall require its employees to execute a Proprietary Information Agreement substantially in the form of Exhibit C.

6.2 VAR and HyperQuest agree that the Licensed Product operating system will only be installed at VAR location(s) for the purpose of providing services to its customers unless prior written authorization is provided to VAR by Hyperquest.

7.  Warranty: HyperQuest has no control over the conditions under which VAR sells and uses the Licensed Product. Therefore, HyperQuest does not and cannot warrant the results that may be obtained by its use. However, HyperQuest provides the following limited performance warranties:

7.1    HyperQuest warrants that it owns and possesses all rights and interests necessary to grant the License to VAR. HyperQuest warrants that the Licensed Product shall not violate or infringe on any contractual, trade secret, proprietary information and non-disclosure rights or any intellectual property rights. HyperQuest further warrants that if VAR is precluded from selling and using the Licensed Product because of an actual or claimed infringement or any patent right, copyright, trademark or other intellectual property right, or for any other reason, then, at Hyperquest' option and Hyperquest' expense: (i) HyperQuest shall either procure for buyer the right to continue to sell and use the Licensed Product; (ii) or terminate this Agreement and refund to VAR a pro rata portion of  the administrative fee paid.

7.2 EXCEPT FOR THE WARRANTIES DESCRIBED IN THE PRECEEDING PARAGRAPHS, HYPERQUESTMAKES NO WARRANTIES OR GUARANTEES, EXPRESS, ORAL, IMPLIED OR STATUTORY. HYPERQUESTHEREBY SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OR WARRANTIES OTHERWISE ARISING BY OPERATION OF LAW, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. IN NO EVENT SHALL HYPERQUEST, ITS AGENTS OR EMPLOYEES BE LIABLE TO VAR OR ANY THIRD PARTY FOR LOSS OF PROFITS, LOSS OF USE OR ANY INCIDENTAL, CONSEQUENTIAL, INDIRECT, CONTINGENT, SECONDARY, SPECIAL OR OTHER DAMAGES OR EXPENSES OF ANY NATURE WHATSOEVER AND HOWSOEVER ARISING, EVEN IF HYPERQUESTHAS BEEN ADVISED OF THE POSSIBILITY OR CERTAINTY OF SUCH DAMAGES.  VAR'S SOLE REMEDY FOR ANY BREACH OF WARRANTY BY HYPERQUESTSHALL BE LIMITED TO THE SPECIFIC WARRANTY REMEDIES DESCRIBED IN THIS SECTION 6.  NOTHING CONTAINED IN THIS SECTION 6 SHALL ASSURE THAT THE FUNCTIONS CONTAINED IN THE LICENSED PRODUCT WILL MEET VAR'S REQUIREMENTS OR ASSURE THE UNINTERRUPTED OPERATION OF THE LICENSED PRODUCT OR THE VAR'S BUSINESS.  HYPERQUEST' LIABILITY FOR DAMAGES TO VAR FOR ANY CAUSE WHATSOEVER, REGARDLESS OF THE FORM OF ACTION, WHETHER FOR CONTRACT OR TORT, INCLUDING NEGLIGENCE, SHALL BE LIMITED TO THE LICENSE FEE FOR THE THEN CURRENT TERM OF THIS AGREEMENT.

7.4. This warranty allocates risks of product failure between VAR and Hyperquest. Hyperquest's administrative fee for the Licensed Product reflects this allocation of risk and the limitations of liability contained in this warranty. The warranties set forth above are in lieu of all other expressed warranties, whether oral or written, and the remedies set forth above are VAR's sole and exclusive remedies. The agents and employees of HyperQuest are not authorized to make modifications to this warranty, or additional warranties binding on HyperQuest. Accordingly, additional statements such as advertising or presentations, whether oral or written, do not constitute warranties by HyperQuest and should not be relied upon.

8. Limitation of Liability:  HyperQuest shall not be obligated under Section 6 to take any action with respect to a Licensed Product, which has been misused or damaged by VAR in any respect, or if the VAR has not reported to HyperQuest the existence and nature of such nonconformity or defect within the period set forth in Section 6.  HyperQuest is not responsible for obsolescence of the Licensed Product that may result from changes in VAR's requirements after the effective date.  HyperQuest obligations under this Agreement shall apply only to the most current version of Licensed Product issued by Hyperquest.  HyperQuest shall have no responsibility for suspended, outdated or uncorrected versions of the Licensed Product.

9. Disclaimer:  Neither party shall be responsible for consequential indirect or special damages including without limitation any damages for lost business or lost or anticipatory profits, interruption of service or otherwise arising under any circumstances, or from any cause of action whatsoever including contract, warranty, strict liability or negligence, even if a party has been advised of such damages.

10. Acts of Insolvency:  Either party may terminate this Agreement by written notice to the other and may regard the party as in default of this Agreement, if the other party becomes insolvent, makes a general assignment of the benefit of creditors, files a voluntary petition of bankruptcy, suffers or permits the appointment of a receiver for its business or assets, or becomes subject to proceedings under bankruptcy or insolvency laws, or has wound up or liquidated, voluntarily or otherwise, and such proceeding is not discharged within ninety (90) days of filing.  In the event that any of the above events occurs, the party shall immediately notify the other of its occurrence.

10.1 In the event that HyperQuest becomes insolvent as outlined in Section 10 above; and if VAR was not the cause of insolvency, a exclusive license to sell and use the Licensed Product with full access to the Source Code shall be granted to VAR for the remaining term of the agreement and shall be subjected to the terms and conditions of Section 4 of this agreement.

11. Force Majeure:  In the event that HyperQuest is unable to perform its obligations under this Agreement or to enjoy any of its benefits because of (or if failure to perform the services is caused by) natural disaster, actions or decrees of government bodies, acts of God, or other causes beyond the reasonable control of HyperQuest (herein referred to as a "Force Majeure Event"), HyperQuest shall immediately give notice to VAR and shall do everything within its reasonable control to resume performance.  Upon receipt of such notice, all obligations under this Agreement shall be immediately suspended.  If the period of non-performance exceeds sixty (60) days from the receipt of notice of the "Force Majeure Event", the VAR may, by giving written notice, terminate this Agreement.

12. General Obligations:  Each of the parties (HyperQuest and VAR) will use reasonable efforts to (a) cause all of the obligations imposed upon it in this Agreement to be duly complied with, and to cause all conditions precedent to such obligations to be satisfied; and (b) obtain any and all consents, waivers, amendments, modifications, approvals, authorizations, notations and licenses necessary to the consummation of the transactions contemplated by this Agreement.

13. Entire Agreement: This Agreement constitutes the entire agreement between HyperQuest and VAR, and as such supersedes all previous agreements, promises, proposals, representations, understandings, and negotiations, whether written or oral, between the Parties representing subject matter hereof. All Schedules referred to in this Agreement shall be deemed to be incorporated in and be a part of the "entire Agreement". Notwithstanding the foregoing, however, the parties may amend, or modify this Agreement in such a manner as may be agreed upon, by a written instrument executed by both HyperQuest and VAR.

14. Counterparts: This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together constitute one and the same instrument.

15. Severability: In the event that any of the terms, conditions and provisions of this Agreement are held to be invalid, illegal, or unenforceable by any court of competent jurisdiction, the legality, validity, and enforceability of the remaining terms, conditions, and provisions shall not be affected thereby and the illegal, unenforceable or invalid provision shall be replaced by a mutually acceptable provision that, which being legal, enforceable and valid, comes closest to the intention of the parties underlying the illegal, unenforceable or invalid provision.

16. Binding Effect: This Agreement shall inure to and be binding upon the parties and their respective legal representatives, successors, and Assignees. Without limiting the foregoing, HyperQuest and VAR acknowledge and agree that this Agreement shall remain in full force and effect except pursuant to the terms and conditions as specified in section 4 of this Agreement.

17. No Assignment: This Agreement may not be assigned by either party without the prior written consent of the other party; provided however, VAR and HyperQuest shall be entitled to assign this Agreement to an affiliate or in connection with a sale of all or substantially all of its assets to a third party or in the manner and subject to the limitations set forth in section 4 of this Agreement.

18. Advertising: VAR may not use the name of HyperQuest and or the Licensed Product in advertising/promotion efforts without securing written approval in advance.

19. Applicable Law: The laws of the State of Illinois shall govern this Agreement and the transactions contemplated hereunder. Any legal action between HyperQuest and VAR regarding this Agreement shall be brought in, and HyperQuest and VAR hereby consent to the jurisdiction of and venue in, the federal and state courts located in Cook County, State of Illinois.

21. Notices: Except as otherwise expressly provided, all notices, consents, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered personally, sent by facsimile transmission with confirmation of receipt, or if mailed by certified mail, return receipt requested, with first class postage prepaid, addressed as follows:

To Hyperquest:    HyperQuest Incorporated
                  68 East Wacker Place
                  Suite 450
                  Chicago, IL 60601
                  Phone: (888) 661-5525

                  Attention: Jeff Hogan

To VAR:           NuGen I.T. Incorporated
                  14933 Huntington Gate Drive
                  Poway, Ca 92064

Attention: Contract Specialist

22. Indemnity: HyperQuest and VAR, and their permitted Assignees, if any, agree that they, jointly and severally, if more than one individual or entity, shall indemnify and hold each other harmless from any and all liability and claims against either party by anyone, which arise out of or in connection with the   sale and use of the Licensed Product and the database contained therein in the operation of VAR's business and which are not caused by either party.  The indemnity shall include all costs, attorney fees, and damages, which either party is required to pay by reason of litigation or claims against either party for such reason.  Both Parties shall have the right to retain, at their own cost, legal counsel of their selection for the purpose of defending such claims, but no settlement of any such claims will be made without consultation with either party and its insurance carriers, if any.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

"HyperQuest"                                "VAR"
HyperQuest Incorporated                     NuGen I.T. Incorporated


By: _____                  By: _____


Title: _____               Title: _____


Date: _____                Date: _____

# EXHIBIT S

**From:**    Jeffrey J Hogan [jhogan@hyperquest.com]
**Sent:**    Friday, May 07, 2004 4:49 PM
**To:**      Dayle Phillips (dayleman@yahoo.com)
**Subject:** Long overdue discussions

Dayle,

I am sorry for the delay…really sorry.  I should have picked up the phone but I got so engaged in Zurich, Progressive and Farmers and at the same time hit a roadblock with Safelite that our documents were placed on a back seat.  I just resolved the issue with Safelite about two hours ago and if you are still interested I will hit those documents and get you some feedback?  We have been continuing work on the system so we have been able to improve on the communications piece, and I know that was something you said needed work.

Please let me know and please accept my sincerest apologies.  If you are still wanting this to tie together, I will hop onto it.

Hope you are well.

Jeff



Jeffrey J Hogan
HyperQuest
President & Founder
Chicago, Illinois 60657
T 312.372.7555
F 312.372.7577
M 773.551.6468
jhogan@hyperquest.com

# EXHIBIT T

**From:**        Dayle Phillips [dayleman@yahoo.com]
**Sent:**        Tuesday, May 11, 2004 9:31 AM
**To:**          jhogan@hyperquest.com
**Subject:**     Re: Long overdue discussions

Hey Jeff,

Sure ... let's move forward.  I've got another company that we are piloting with that I would think we could jointly approach with your parts audit service and our staff adjuster software.

Plus, with Mitchell's recent debacles with eMitchell at AmFam and Met, it could be perfect timing to go in with both staff adjuster and connectivity software.
You really need both in order to compete.

I also find it interesting that a couple of other large insurance companies are actually decreasing their use of DRPs and are hiring staff adjusters (to mimic Progressive's model).  The good thing is that these companies dont have Progressive's workbench software and are in need of software to actually pull it off.

Dont worry about the delay, business opportunity drives relationships.

Dayle


— Jeffrey J Hogan <jhogan@hyperquest.com> wrote:
> Dayle,
>
>
>
> I am sorry for the delay.really sorry.  I should have picked up the
> phone but I got so engaged in Zurich, Progressive and Farmers and at
> the same time hit a roadblock with Safelite that our documents were
> placed on a back seat.
> I just resolved the issue with Safelite about two hours ago and if you
> are still interested I will hit those documents and get you some
> feedback?  We have been continuing work on the system so we have been
> able to improve on the communications piece, and I know that was
> something you said needed work.
>
>
>
> Please let me know and please accept my sincerest apologies.  If you
> are still wanting this to tie together, I will hop onto it.
>
>
>
> Hope you are well.
>
>
>
> Jeff
>
>
>
>
>
>

1

```
>
>
>
> Jeffrey J Hogan
>
> HyperQuest
>
> President & Founder
>
> Chicago, Illinois 60657
>
> T 312.372.7555
>
> F 312.372.7577
>
> M 773.551.6468
>
> jhogan@hyperquest.com
>
>
>
>
>
>
```

# EXHIBIT U

Case 1:08-cv-00485    Document 41-2    Filed 04/04/2008    Page 94 of 111





May 5, 2005

# HOM: A date with destiny
By Chris Kemp

*Your shop□s success relies on your ability to measure performance in all phases of your operation. Such processes will lead you down a profitable path.*

For years, key performance indicators (KPIs) have been used by the insurance industry to measure claims-related performance. With the business relationship between insurers and body shops closer than ever, collision repairers are adapting the approach and making it their own.

"Performance measurement." If you're a collision repairer, you've heard the phrase many times over. You work in an industry filled with numbers and numbers are made to be measured. Gross profit percentage, turn rate, labor hours, door rate . . . they're just a few of the figures successful body shops monitor, and have been monitoring, for decades.

Precise measurement of business indicators became widespread in the early 1980s, corresponding with the development of business technology designed especially for collision repairers. Computerized estimating and management systems allowed owners and managers—even those not inclined to be disciplined—to quickly and accurately track performance. Out of this mini-revolution rose the practice of job costing—the analysis of labor, parts and materials costs on individual jobs that allowed assessment of job profitability in real time, with cumulative reporting as a by-product.

"Historically speaking, the science of measurement just doesn't go forward without computerization," states Brian Von Tress, vice president of operations for Bodycraft Collision Centers, a nine-unit collision repair business headquartered in Sacramento, Calif. "The management system, especially, forced repairers to take a numbers-oriented approach to their business." 

Job costing remains a cornerstone of shop business analysis to this day, but over time, performance measurement has evolved. More specifically, collision repair measurement methodology has been influenced by the direct repair program (DRP) relationships. The influence even extends to terminology, with KPIs—an acronym common in the insurance and financial services industry to denote important measurable criteria—now used commonly in the collision repair industry.

Is this a good development or a bad one? As is the case with so many industry issues, it depends on the perspective of each individual business.

Case 1:08-cv-00485    Document 41-2    Filed 04/04/2008    Page 95 of 111

*Finding common ground*

Certain KPIs represent a language of measurement that provides common ground between collision repairers and insurers. For years insurers have used powerful computers, analytics and reporting—beyond the scope of those available to most smaller businesses—to drill down and look across performance in a variety of claims performance categories. Many of these focus on the operational aspects of the collision repair facilities participating in the insurer's DRP programs and may include such categories as:

- **Average cycle time.** The time between the drop off of a vehicle in need of a repair and when that repaired vehicle is returned to the customer.
- **Repair versus replacement.** A comparison on a given repair order between the labor/dollar costs for repair against labor/dollar costs for replacement labor and parts.
- **OEM parts use versus alternative parts use.** The ratio of new parts from the manufacturer to like-kind-and-quality (LKQ) parts from other sources, including recycled and aftermarket parts.
- **Percentage of supplements to estimates.** How many supplements the shop is writing in comparison to the total number of estimates it writes. A number of measures can be used here, including supplement lines versus estimate lines, estimate dollars versus supplement dollars, or a simple ratio of supplements to estimates.
- **Customer Satisfaction Index (CSI).** The measure of approval by a shop's customers, usually a numerical figure collected by a third-party resource. Can also include subjective customer comments elicited through phone calls by the same data collection agency.

The above KPIs are not the only shop performance categories an insurance company measures, but they are fairly common and cited often as examples. In each category, the insurance company sets a measurable standard—a benchmark—that the body shop is expected to achieve, say a certain percentage of alternative parts on a job with a particular make/model of car. Different insurance companies will set different benchmarks for comparable categories.

Some, like cycle time and CSI, are of high concern to all repairers—even those not participating in a DRP—while others may seem, at first, less important to a collision repair business than such internal measurements as flagged hours to shop hours, and ratio of flat rate hours sold to clock hours by department per job.

If so inclined, collision repairers might view a KPI such as OEM parts use versus alternate parts use as somewhat controversial, given past debate about the suitability of non-OEM parts on certain types of repairs. This line of thinking can be taken one step further, with objections raised on the grounds that subscribing to insurance generated standards and benchmarks are a further step in the codification of insurance company control over the way body shops do business.

For reasons like these, there are plenty of collision repair businesses that do their best to avoid engaging in any DRP relationships. But for the multitudes of owners who willingly attract and maintain business through DRP relationships—or who wish to attract more business from them—these KPIs and the criteria that are attached to them must be taken into consideration, and can be used to the benefit of the collision repair business.

"It makes sense to monitor these KPIs, even if what isn't being measured doesn't 'feel' relevant to the shop at first," states Janet Chaney, who provides business and marketing consultation for a group of Arizona-based repair businesses. "By monitoring one's performance through the filter of 'shared' KPIs you can avoid unpleasant surprises, perhaps a site review where you find out, after the fact, that you've fallen short in key areas. On the other hand, if you're actively monitoring the same measures the DRP representatives monitor, you can make adjustments on the fly and stay ahead of the game."

In addition, Chaney sees shared measurement as a marketing opportunity for shops. "If you're a salesperson trying to drum up business with insurance company prospects," she says, "the fact that you can demonstrate the ability to accurately track KPIs of interest is a compelling sales advantage."

Von Tress advises that DRP guidelines, which at first seem irrelevant and controlling, often end up proving to be significant. "It's helpful to remember that the basic goal of the insurance company and the repairer is the same: keep customers happy," he says. "Take supplement frequency, for example, a common KPI guideline for DRPs.

I'm not saying don't write supplements for hidden damage after tear down, but I also know unwarranted supplementing does result in problems, like administrative burdens and delivery delays. If you start digging into the percentage of supplements to estimates, something maybe you wouldn't have otherwise done, you may uncover useful information—maybe an estimator in need of training on writing a thorough estimate prior to tear down."

*Plotting a course with KPIs*

If one accepts that it's worthwhile to keep tabs on KPIs specific to DRPs, how does one go about accomplishing it? In this day of multiple-shop organizations, a collision repair business may enter into close to 20 different agreements, each with different benchmarks for different categories, which may vary depending on factors such as geographic area and vehicle year/make/model. Adding to the complexity is that benchmarks are frequently adjusted, meaning the shop finds itself chasing moving targets.

It's a potentially impossible situation, and to deal with it collision repairers are again turning to technology. Industry information providers have started to provide data, analytics and report sets—partially generated from the information their estimating systems collect—that are designed with the DRP repair facility in mind. In most cases these applications are engineered with multi-shop organizations in mind, enabling KPIs to be tracked across the organization, with the capability to match up individual sites to each other. Performance against a composite of relevant competition is often offered, too. If the business is performing well against its peers, the feedback proves useful when marketing the organization.

But the technological strides don't end there. A powerful new breed of software tools is beginning to hit the market, allowing owners, managers, estimators and other shop personnel to assess performance on the fly. At the heart of these systems are dynamic rules-based engines that store the parameters and thresholds from multiple KPIs across DRPs, and apply them on a real-time basis to shop processes and procedures. When something falls outside guidelines, it is flagged immediately on the user's desktop.

"It's hard to assess just how far these systems have come because there are so many of them and they are recent entries to the market," explains Tony Passwater, president of AEII, a provider of collision repair consulting, training and product development products and services. "But in theory they provide exactly what is needed. You import the estimate into the software and go from there. The shop sets the rules, whether they match up with the DRPs or not. In that way they have control over the criteria."

Pete Tagliapietra, president of Nu Gen IT, a provider of this type of software, emphasizes the shop's control over settings. "It's not just about shared KPIs—a collision repair business decides on the rules that get input to the system," he says. "Their primary goal needs to be writing a right and proper estimate. The system's built-in discipline keeps them on the path to that goal. It provides the means to analyze how each DRP is working out in terms of profitability, so a shop can be selective about its partners. It's a good negotiating tool. The instant feedback makes it a useful training resource, as well."

These software packages are designed to help streamline DRP administration and paper flow, long a thorn in the side of the collision repair industry. "Say a service writer enters an estimate into the system that crosses the total loss threshold," states Von Tress. "In theory, not only will the application flag the crossing of the dollar threshold, it knows what forms have to be filed in that particular situation and prompts the user for them. At a minimum it prevents paperwork from falling through the cracks."

As sophisticated as these measuring aids may turn out to be, Passwater warns that they should never be considered fail-safe. Sometimes it may be a technical glitch such as a system disallowing an OEM wheel bearing on an older car, because it reads the line item as "wheel." In many cases, it's the human element involved.

"Everyone's heard the saying, 'garbage in, garbage out,' and that can be a problem," Passwater explains. "Take cycle time. Ask someone what it is and they'll say the time elapsed between repair authorization and delivery. But there's a ton of variables that should be considered between those absolutes. Do you count weekends? Do you factor in a painter's extended shifts? Was the customer unavailable at the scheduled time of pickup? If not identified, these kinds of subtleties can distort what you're trying to measure. You have to be discerning and somewhat subjective when you apply the rules."

Von Tress uses CSI as an example to make a similar point about qualifying measurement. "Most of the third parties used for reporting on customers are excellent," he begins, "but you still run into discrepancies. A customer feedback card may come back with a set of perfect 10s, yet the customer writes in that she would not refer the shop. What's going on, then? Is the data collection faulty? Did someone at point-of-delivery try to pre-stage the customer's answers, which caused underlying resentment expressed in their reluctance to provide positive word-of-mouth?"

No doubt these rough spots will be ironed out in the future, although it is difficult to predict exactly how performance measurement is destined to evolve, or how it will affect the way collision repairers conduct business. While some believe the advent of shared KPIs foreshadow increased insurance industry influence and control, there are others, like Von Tress, who predict the opposite will happen.

"When an insurance company sends a representative out to talk to the shop, it costs time and money," he says. "It makes even less sense when you consider the conversation is going to cover past history, which may not be relevant and certainly can't be changed.

"I think, given the developing complexity and intelligence of measurement software combined with movement toward a common set of KPIs, the in-person site review will be soon rendered obsolete. I think a case can me made that shared KPIs may, in the long run, actually help position the shop to control more of its destiny."



Copyright © 2005 Advanstar Communications Inc.. Permission granted for up to 5 copies. All rights reserved. You may forward this article or get additional permissions by typing http://license.icopyright.net/3.7702?icx_id=160044 into any web browser. Advanstar Communications Inc. and Search-Autoparts logos are registered trademarks of Advanstar Communications Inc.. The iCopyright logo is a registered trademark of iCopyright, Inc.

## A safe bet: NACE 2005; Take advantage of everything NACE 2005 has to offer your business.(NACE PREVIEW)(Calendar)

Source: ■▶Automotive Body Repair News
Publication Date: 01-NOV-05

What's new at NACE?

Each year the NACE show gets better and better. With new clinics and a focus on products, this year's NACE is sure to offer you and your shop new ideas for growth and profitability. Following is a quick glimpse at just some of the exciting offerings at this year's NACE.

LIVE ACTION THEATER: On the Exposition Floor

Previously known as the Action Demos, NACE steps it up a notch this year with the Live Action Theater. Challenge yourself with the Process and Profit Clinics and take away real practical knowledge. The Live Action Theater provides you with the following opportunities:

PROCESS CLINICS -- Learn the tips and tricks involved in certain on-the-job processes--processes that are required in every shop, every day. Check out the variety of Process Clinics being offered.

PROFIT CLINICS -- Looking to increase your bottom line? Who isn't? Check out the line up of Profit Clinics being offered to give you ideas to bring extra dollars into your business. (See the complete Live Action Theater schedule on page 46.)

New product pavillion

More than 80 percent of you--NACE attendees--come to NACE expecting to see new products, and this year NACE delivers better than ever. New for 2005, NACE will introduce an area on the trade show floor-- NEW PRODUCT PAVILION--allowing participating exhibitors to showcase their newest products just hitting the collision repair market.

This year, as an added bonus, you'll have the chance to play "judge" and vote on-site on the products-- giving one the distinguished honor of being named "BEST NEW PRODUCT OF THE YEAR @ NACE 2005." NACE takes friendly competition to a whole new level and you get to play along.

WEDNESDAY, NOVEMBER 2

8:30 a.m. to 10 a.m.

Writing Proper Estimates

PRESENTERS: Mark Olson, VeriFacts Automotive Robert Tavarez, Caliber Collision Centers

It is vital to write an estimate that is consistent to what's been promised and compliant with insurance company standards. Learn how standardized tools can be helpful for estimators and management, and discover helpful techniques to track performance.

Successfully Managing Your DRP Relationships

PRESENTERS: Pete Tagliapietra, NuGen I.T. Inc.

What do collision repairers need to know to establish and maintain successful DRP relationships? In this seminar you'll learn to measure and compare your shop's DRP Performance Compliance Index (PCI) against your competitors and insurance partners' operational objectives.

Years of Leading-Edge Kustom Finishes Technology

PRESENTERS: Jon Kosmoski, House of Kolor/Valspar Corporation

Tom Prewitt, House of Kolor/Valspar Corporation

This session will feature House of Kolor brand paint products from Valspar Corporation. You'll have the opportunity to further explore the House of Kolor Kustom Finishes.

Knowing Your Numbers: Back to Basics

PRESENTER: Hank Nunn, HW Nunn & Associates

This session, presented by DuPont Performance Coatings, will explain why understanding the numbers is a crucial factor to your shop's success and profitability. You'll find out how to gain a cleaner understanding of your balance sheet.

Planning Additional Locations

PRESENTERS: Matthew Ohrnstein, Caliber Collision Centers, Barry Rinehart, Akzo Nobel Coatings Inc., Kevin Schatz, Akzo Nobel Coatings Inc.

Are you considering an additional shop location? This session, presented by Akzo Nobel, will assist you if you are planning to expand your business, either by building a new facility, expanding or acquiring additional shops. (Repeated on Friday)

Service: Achieving Excellence in the Changing Collision Repair Industry

PRESENTER: Nicholas Bartoszek, Sherwin-Williams Automotive Finishes Corp.

This session is designed to teach anyone who interacts with customers methods they must have in order to receive, understand and keep customers. (Repeated on Friday)

Diagnosing Problem Alignments

PRESENTER: Mel Schampers, Fox Valley Technical College

Learn, through proper alignment diagnosis, which components require replacement and why. This seminar will help you understand steering dynamics and determine handling problems resulting from various causes.

9:15 a.m.-10 a.m.

Understanding Severity 101

PRESENTER: Roger Wright, AIG -- American International Group, Inc.

Severity--the amount paid out to settle a claim--is measured by insurers as one element to determine profitability. Find out how to discuss severity issues with insurers and identify the collision repair shop's impact on severity.

Social Security: What You Need To Know Before You Retire

The state of the current Social Security program has been widely covered in the news recently--Is it in need of repair or revision? Hear an explanation of the proposed changes to Social Security currently under consideration. And learn how the proposed plans could affect you.

Paint Shop Productivity

PRESENTERS: J. Castillo, BASF; M. Main, BASF

This session is designed to help you improve profits through increased paint shop productivity. You'll discuss the knowledge and...




Search this site    **SEARCH**

### Collision Feature

PHOTO CONTEST

MAGAZINE
HOME
CURRENT ISSUE
ADVERTISER INDEX
BACK ISSUES
HOW TO CONTRIBUTE
REPRINT PERMISSION
AUTOINC. RSS FEEDS
READER SERVICES
SUBSCRIPTION INFO
LETTERS TO THE EDITOR
ANNUAL FEATURES
TOP 10 WEB SITES
SOFTWARE GUIDE
NACE ONLINE DAILY
HOW'S YOUR BUSINESS
ADVERTISING
AD OPPORTUNITIES
MEDIA PLANNER
ABOUT AUTOINC.
AUTOINC. MISSION
MEET OUR STAFF

✉ E-mail this page    🖶 Print this page 

# DRPs: Sorting Through Different Requirements

Posted 11/16/2005
**By Rachael J. Mercer**



As a collision shop owner, you may be willing to try many methods to increase profitability and customer satisfaction. While many collision shop owners take on this goal without outside help, others choose the option of working within the stipulations of a direct repair program (DRP). For many shop owners, DRP agreements have led to a significant increase in business. But there are also many shop owners who have had less successful experiences with DRPs. How should you go about deciding whether or not to participate in a DRP program? And, if you decide to participate in a program, how do you go about deciding which insurer's program is best for your shop? Education is vital in the process before and after signing a DRP agreement.

**Seek wise counsel**

Most major decisions in life and business come after considering the opinions of people who believe they have your best interest at heart. As you are deciding whether to participate in a direct repair program, you will most certainly receive advice - both wanted and unwanted. And there will be plenty of opinions out there. According to the Automotive Service Association's 2004 "How's Your Business?" survey, 87 percent of ASA collision shop members participate in direct repair programs.

Because of the tenuous relationship between insurers and collision shop owners, shop owners are often polarized on the issue of DRPs. There are some shops that do a majority of their business through various DRPs. Most likely any discussion with them will paint DRP agreements in a favorable light. However, there are other shop owners who have had trouble in their DRP relationships, and you will likely get a negative picture from them. It is important to weigh any advice you receive carefully.

**Deciding the right company for you**

Once you have decided your business may profit from a direct repair agreement, you must make a decision about which company (or companies) you will align with. Begin by evaluating your current relationship with your insurers and adjusters.

Look carefully and critically at the claims process in which you currently

participate. Is the claims process complicated? Do you waste time waiting on adjusters to approve claims? Is your relationship with the adjuster strained? Cold? Frustrating? Do you feel they compromise customer safety or satisfaction simply to increase profitability or save money? These may be red flags that indicate you need to think long and hard about signing a DRP agreement with this company. On the other hand, there are insurers whose processes are less complicated, friendlier and more customer-driven.

"It is essential to connect with insurers who share the same goals you have for your shop," said Carroll Proctor, owner of A.C. Proctor's Paint & Body Inc. in Augusta, Ga. "You can find good, honest and forthright insurers who are interested in you doing good, quality work and adhering to guidelines without having to cut corners." Evaluating your current relationship with adjusters is an important step to deciding whether to participate in a DRP program.

Ron Nagy, AAM, of Nagy's Collision Center in Doylestown, Ohio, said, "Weigh the checks and balances when making your decision. Remain open-minded in reviewing the agreements."

As you are reviewing agreements and having discussions with insurers, remain open-minded and as neutral as possible, until you understand the principles that company embraces. If you enter the learning process with a neutral attitude, you probably end up in the best situation. On the other hand, if you're gung-ho to participate in any and all direct repair agreements, chances are you may end up in some agreements that aren't a strong match for your business.

### How much DRP business is right for you?

Another consideration must be deciding whether you will participate in multiple direct repair programs. The 2004 "How's Your Business?" survey revealed that 87 percent of businesses participated in an average of five DRP programs. Multiple participation is widespread: 34 percent of those surveyed participate in one to three programs; 32 percent participate in four to six direct repair programs; 14 percent participate in seven to 10 direct repair programs; five percent in 11 to 14 programs; and 2 percent in 15 or more programs.

One reason shop owners give for dissatisfaction with direct repair programs is the "cut-throat clamoring" that often surrounds the business. For example, some collision repair shops see direct repair agreements as the "golden egg" for their business, and will pursue these agreements and sign contracts often at extreme costs. Concessions, lowered rates and negotiating sometimes lead shop owners into a relationship that is not a positive, win-win situation for them and for the insurer. Maintaining balance is key in deciding how much business will truly enhance the profitability of your shop.

### Evaluate your current situation

Evaluate the profitability that you currently experience with your customer base. What are your profit margins? Do you have many repeat customers? How many of your customers are happy enough with your service to refer you to others? What sort of management software do you have? Are you currently able to track these statistics?

Two disadvantages many shop owners mention in talking about direct repair programs is the increased paperwork and increased administrative costs. Obtaining the proper training and management tools to track performance, customer satisfaction, and profits is essential to making the direct repair

relationship a success.

## Making your DRP relationship a success

The education surrounding DRPs does not end once you've signed the agreement. In fact, the education process should have just begun. Most insurers have their own systems for filing claims, which involve precise steps and exact terminology. Without this process and correct information, insurers often assess penalties and shops begin making concessions. With these issues come profit loss and decreased satisfaction, and can eventually lead to a collision shop being "dropped" by the insurer.

"It is essential that shop owners be proactive, not reactive, with managing their direct repair relationships," said Pete Tagliapietra, of NuGen I.T. Inc. NuGen I.T. develops management tools for collision shop owners. Tagliapietra believes insurers and shop owners belong on an even playing field - and that equality comes when shop owners understand the methodology and terminology used by the insurers in "grading" and assessing the work completed by collision shops.

"Shops are probably at a disadvantage," he said, "because insurance companies manage by the numbers - numbers that shops don't readily have access to."

Technology updates are distinctly important to shops that decide to participate in direct repair agreements. Management systems from major information providers give shops statistical information that is useful in evaluating productivity and profitability. If these systems do not fully address insurer requirements, you may want to consider additional sources from other software information providers.

There are some systems available that are sold to both shop owners and insurers that allow the two to work on an even plane - each understanding what the other requires for successful business transactions.

In addition to technology updates, business owners must continue to stay educated. ASA offers many opportunities for continued education, including opportunities for you to learn about DRP agreements and how to make these relationships successful. The International Autobody Congress and Exposition (NACE) is held each November, and offers seminars on DRPs and insurer-collision shop relationships, such as the ones provided by the Automotive Management Institute. Events like these offer possibilities to network with other shop owners who are facing the same issues and decisions, while also exposing you to industry experts who can offer statistics and hard evidence to support or dispel information you have received in your decision-making process.

## How can I be sure I'm making the right decision?

Knowing you've made the right decision can be a hard assurance to come by. There are many factors that come into play in deciding whether to sign a DRP agreement. Not all of the questions you ask will have easy or clear answers. Without a doubt, a successful DRP relationship begins with an informed shop owner. You must be willing to do the legwork and the research required, so that you can enter the relationship as knowledgeable as possible. You must be willing to take risks - sometimes even the best-laid plans fail, and even the most thought-out business venture can sometimes flop.

Fortunately, there are not any penalties involved in dissolving a DRP agreement, and most require a written notice of 30, 60 or 90 days. You must understand the

situation your shop is in presently - and know whether the business brought by becoming a DRP will be to your advantage or not. You must develop a relationship with the insurer that thrives on information and mutual communication.

And lastly, you must be willing to stay educated, continually adjusting to meet the challenges that are brought on by such a changing part of the automotive repair industry.

*Rachael J. Mercer is a freelance writer based in Moultrie, Ga. She can be reached at merceropqr@alltell.net.*

**SHARE YOUR THOUGHTS...**

**RATE THIS ARTICLE**

○ ★  ○ ★★  ○ ★★★  ○ ★★★★  ○ ★★★★★

What do you think of this article? Your input will help AutoInc. develop additional articles on this subject. Share your thoughts!

Your name

Your e-mail address

[ Send ]  [ Reset ]

**MOST ACCESSED ARTICLES**

- Fuel Injection Service, Not Just Cleaning
- The Art of Extraction
- EGR Systems: Operation and Diagnosis
- Proactive Target Marketing:_Rethinking Your Business Strategy
- Engine Performance: HO2S Diagnostics

................................................

**MOST E-MAILED ARTICLES**

- Developing Employee Potential
- How Critical Thinking Can Help Your Business
- How to Diagnose the Ford Glow Plug
- What to Look for When Shopping for the Right Shop Management Software
- Putting a Price Tag on Complaints

AutoInc. Web Site | ASA Web Site | Right to Repair Talks Fall Short | DRPs: Sorting Through Different Requirements | Information Availability: An Update | How Your Customer Database Can Improve Your Bottom Line | Guest Editorial | Tech to Tech | Tech Tips | Around ASA | Shop Profile | Net Worth | Stat Corner | Chairman's Message

Copyright (c) 1996-2008. Automotive Service Association. All rights reserved.

**XML** Add RSS headlines.

# EXHIBIT V



# Illinois

## SCA SERVICES THE ENTIRE STATE OF ILLINOIS



Illinois Hub Offices

1. Chicago
2. St. Louis ( MO )
3. Bloomington

**Illinois Standard Appraisal Rate**
Includes 60 miles roundtrip (30 miles each way) from any SCA hub office.

Additional Mileage is billed at $0.90 per mile over 60 miles round trip.  (30 miles each way from a hub office).

\*\*\* For Mileage charges on remote inspections, please contact our Regional Office. \*\*\*

**Client Services Director for Illinois**
**Steve Anderson**
**(847) 910-1322**
**sanderson@sca-appraisal.com**

**Call your client services director to learn how to access your claims online.**

To assign a claim to any of the Alabama SCA Hub Offices please contact:

East Coast Regional Dispatch
41 Ludlam Avenue
Bayville, NY 11709
Office: 800-856-4353
Fax: 800-856-5853
E-mail: newclaims@sca-appraisal.com
Website: www.sca-appraisal.com

Vice President of Eastern Division Operations: Scott Southard ext. 104     ssouthard@sca-appraisal.com
Quality Control Manager: Nelson Bertran ext. 103     nbetran@sca-appraisal.com
Director of Eastern Division Operations: Jeanne Price ext. 110     jprice@sca-appraisal.com

# EXHIBIT W




**800-872-4732**

Home    Franchise Inquiries    Contact Us    Office Locations    Assign A Claim    Locate An Office    About PDA    PDA Office Login

Locate PDA Office By City

*Enter the full or partial city name **(without state)** then click **Search***

chicago    Search

| City | State | PDA Office |
|------|-------|-----------|
| CHICAGO | IL | **896 Chicago - North, IL**<br><br>Auto:  Yes<br>Heavy Equipment Certified:  Yes<br>Property Certified:  Yes<br>Adjuster License:  No<br><br>Bob Russo<br>2413 W. Algonquin Rd STE 427<br>Algonquin, IL 60102<br>Phone: 847-516-3225<br>Fax: 847-516-3119<br>E-mail: pdachicago-north@pdaorg.net |
| CHICAGO | IL | **564 Chicago - Southwest, IL**<br><br>Auto:  Yes<br>Heavy Equipment Certified:  Yes<br>Property Certified:  Yes<br>Adjuster License:  No<br><br>James Karges<br>P.O. Box 7260<br>Villa Park, IL 60181<br>Phone: 630-279-2245<br>Fax: 630-279-2456<br>E-mail: pdachicago-Southwest@pdaorg.net |
| CHICAGO | IL | **563 Chicago - South, IL**<br><br>Auto:  Yes<br>Heavy Equipment Certified:  Yes<br>Property Certified:  Yes<br>Adjuster License:  No<br><br>Mike Gaffigan |

| | | |
|---|---|---|
| | | 15774 S. LaGrange Road<br>Orland Park, IL 60462<br>Phone: 630-279-2245<br>Fax: 630-279-2456<br>E-mail: pdachicago-south@pdaorg.net |
| CHICAGO HEIGHTS | IL | **563 Chicago - South, IL**<br><br>Auto:　Yes<br>Heavy Equipment Certified:　Yes<br>Property Certified:　Yes<br>Adjuster License:　No<br><br>Mike Gaffigan<br>15774 S. LaGrange Road<br>Orland Park, IL 60462<br>Phone: 630-279-2245<br>Fax: 630-279-2456<br>E-mail: pdachicago-south@pdaorg.net |
| CHICAGO PARK | CA | **883 Sacramento, CA**<br><br>Auto:　Yes<br>Heavy Equipment Certified:　Yes<br>Property Certified:　Yes<br>Adjuster License:　No<br><br>Brian Nygaard<br>9175 Kiefer Blvd., Suite 204<br>Sacramento, CA 95826<br>Phone: 916-635-2575<br>Fax: 925-634-6275<br>E-mail: pdasacramento@pdaorg.net |
| CHICAGO RIDGE | IL | **563 Chicago - South, IL**<br><br>Auto:　Yes<br>Heavy Equipment Certified:　Yes<br>Property Certified:　Yes<br>Adjuster License:　No<br><br>Mike Gaffigan<br>15774 S. LaGrange Road<br>Orland Park, IL 60462<br>Phone: 630-279-2245<br>Fax: 630-279-2456<br>E-mail: pdachicago-south@pdaorg.net |

If you would like the entire PDA Zip Code / City Database please contact support@pdaorg.net . This database is available in Excel or Access format.

# EXHIBIT X



| Home | About Us | People | Coverage Area | FAQ | Contact Us |

## Coverage Area



| State | Appraisal Offices | State | Appraisal Offices |
|---|---|---|---|
| Alabama | 5 | Montana | 6 |
| Alaska | 2 | Nebraska | 7 |
| Arizona | 8 | Nevada | 4 |
| Arkansas | 5 | New Hampshire | 4 |
| California | 27 | New Jersey | 12 |
| Colorado | 13 | New Mexico | 3 |
| Connecticut | 8 | New York | 16 |
| Delaware | 4 | North Carolina | 7 |
| Florida | 13 | North Dakota | 3 |
| Georgia | 8 | Ohio | 10 |
| Hawaii | 2 | Oklahoma | 5 |
| Idaho | 3 | Oregon | 11 |
| Illinois | 7 | Pennsylvania | 10 |
| Indiana | 7 | Rhode Island | 4 |
| Iowa | 8 | South Carolina | 5 |
| Kansas | 6 | South Dakota | 3 |
| Kentucky | 4 | Tennessee | 7 |
| Louisiana | 5 | Texas | 21 |
| Maine | 3 | Utah | 4 |
| Maryland | 5 | Vermont | 3 |
| Massachusetts | 6 | Virginia | 10 |
| Michigan | 7 | Washington | 7 |
| Minnesota | 4 | West Virginia | 5 |
| Mississippi | 3 | Wisconsin | 6 |
| Missouri | 5 | Wyoming | 5 |

Copyright [2006] IAnet Inc. All rights reserved

