UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HYPERQUEST, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 C 485 |
| | ) | |
| v. | ) | Judge Charles R. Norgle |
| | ) | Magistrate Judge Cole |
| NUGEN I.T., INC. , and DAYLE | ) | |
| PHILLIPS | ) | |
| | ) | JURY DEMAND |
| Defendants. | | |

**MOTION TO COMPEL PRODUCTION OF RULE 26(A)
DISCLOSURE DOCUMENTS AND FOR ENTRY OF PROTECTIVE ORDER**

Plaintiff, HyperQuest, Inc. ("HQ"), by and through its undersigned counsel, hereby moves this Honorable Court for the entry of an order compelling Defendants NuGen I.T., Inc. and Dayle Phillips (collectively, "Defendants") to produce their Rule 26(a) disclosure documents on or before May 5, 2008, and for entry of the draft protective order attached as Exhibit A, the terms of which have been agreed to by the parties except for one outstanding issue, as explained below.  In support of its motion, HQ states as follows:

**Factual Background**

1.    On January 22, 2008, HQ filed its single-count complaint against NuGen I.T., Inc. ("NuGen") and Dayle Phillips ("Phillips") for copyright infringement.

2.    HQ is a provider of primarily internet-based technology products and services to insurance companies and others in the property and casualty insurance industry, including repair shops, professional appraisers and parts suppliers.

3.    HQ has an exclusive license to use certain software originally called

eDoc Express software.

4.    NuGen is a competitor of HQ.  In or about October 2007, HQ learned that Phillips was working with NuGen and marketing and selling NuGen's "Enterprise Workflow" application software.  Among other things, in attempting to secure new business from Metropolitan Life Insurance Company ("MetLife"), in or about October 2007, HQ learned that MetLife was considering a competing product from NuGen that was quite similar to the eDoc Express software being marketed by HQ.

5.    Phillips previously worked for the company that initially developed the eDoc Express software, Quivox Systems Incorporated ("Quivox").  Phillips also worked for Safelite Group Inc. f/k/a Safelite Glass Corp. ("Safelite") after Safelite acquired from Quivox, among other things, all rights to the eDoc Express software.  Phillips then worked intimately on the transition of the eDoc Express software from Safelite to HQ in 2003 and 2004, first as an employee of Safelite and then later as a consultant for HQ.

6.    Given Phillips' prior history with respect to the eDoc Express software and the significant similarities between NuGen's "Enterprise Workflow" software and the eDoc Express software, HQ believes that NuGen and Phillips have improperly copied and incorporated protected original expression from the eDoc Express software, including original programs, original architecture, original process flow, original layout, original graphics, original textual material, original graphical user interface, and original database design.

7.    Accordingly, HQ filed this action to stop NuGen and Phillips from infringing HQ's rights and from harming HQ in the marketplace.

**Rule 26 Disclosure Issues and Recent Dispute Regarding Protective Order**

8.      On February 21, 2008, this Court entered an order requiring the parties to confer pursuant to Rule 26(f) no later than March 4, 2008.

9.      On March 4, 2008, the parties met and conferred pursuant to Rule 26(f).  That same day, however, Defendants filed a motion to dismiss and a motion requesting a stay of all discovery.

10.     On March 17, 2008, this Court entered an order granting the request for a stay as to depositions but denying the request for a stay as to written discovery.

11.     On March 18, 2008, the parties exchanged their Rule 26(a)(1) written disclosures.

12.     On April 11, 2008, HQ served HyperQuest's First Set of Document Requests to Defendants, HyperQuest's First Set of Interrogatories to Dayle Phillips, and HyperQuest's First Set of Interrogatories to NuGen.

13.     On April 15, 2008, HQ sent an email to Defendants asking to schedule a telephone call to discuss the exchange of documents related to the Rule 26(a) disclosures. Defendants refused to produce the documents themselves and, instead, would only agree to supplement by April 28 the descriptions of the documents identified in the initial disclosures. See April 15 and 16 email exchange, attached as Exhibit B.

14.     On April 23, 2008, this Court held a status hearing and ordered the parties to produce the Rule 26 disclosure documents subject to entry of an appropriate protective order.  The Court advised the parties to try and mutually agree on the terms of an appropriate protective order.

15.     Later that day, HQ sent an email to Defendants attaching a draft

proposed protective order to Defendants and inquiring as to the anticipated timing of an exchange of documents.  <u>See</u> April 23 email, attached as Exhibit C.

16.     On April 24, 2008, Defendants sent a letter to HQ informing HQ that Defendants believed it would be reasonable for Defendants not to produce their Rule 26 disclosure documents until May 14, 2008, the date upon which they contended their responses to HQ's written document requests were due.  <u>See</u> April 24 letter, attached as Exhibit D.  Defendants also stated that "no confidential documents will be produced unless and until Deborah Hogan has removed herself from this case, absent a Court Order to the contrary." <u>Id</u>.

17.     In response to the April 24 letter, HQ encouraged Defendants' lead counsel to speak with Defendants' local counsel about this Court's comments at the status hearing and this Court's statement that Defendants were not to wait until their responses to written discovery were due to produce their Rule 26 disclosure documents.  <u>See</u> April 25 email in the email chain attached as Exhibit E.  HQ also requested that Defendants agree to produce Rule 26 disclosure documents no later than May 2.  <u>Id</u>.  HQ further advised that HQ could not agree to entry of an order that would prohibit HQ's lead counsel from having access to all documents produced in the litigation; informed Defendants that HQ was not aware of any legal support for Defendants' position; and invited Defendants to provide any legal support that they might have for their position.  <u>Id</u>.  Finally, HQ inquired as to whether Defendants had any other objections to the proposed draft protective order.  <u>Id</u>.

18.     On April 28, 2008, Defendants responded only to HQ's inquiry regarding objections to the proposed protective order.  <u>See</u> April 28 email in the email chain attached as Exhibit E.  Defendants requested only one change.  <u>Id</u>.

19.     HQ agreed to make the one change requested by Defendants to the draft protective order.  <u>See</u> April 28 email in the email chain attached as Exhibit E.

20.     On April 29, 2008, HQ asked Defendants to clarify their position regarding the "highly confidential" documents.  <u>See</u> April 29 email in the email chain attached as Exhibit E.  HQ had initially understood Defendants' position to be that Defendants would not produce "highly confidential" documents absent a protective order restricting Ms. Hogan's access to such documents.  HQ also requested that Defendants clarify which documents Defendants intended to produce that Defendants viewed as "highly confidential."  <u>Id</u>.  HQ again requested that Defendants respond to HQ's inquiry as to whether Defendants would agree to produce non-confidential Rule 26 disclosure documents by May 2, and other confidential documents within one business day after entry of an appropriate protective order.  <u>Id</u>.  Finally, HQ invited Defendants to participate in a call to attempt to resolve the outstanding issues.  <u>Id</u>.

21.     In response, Defendants informed HQ that not only did they want to restrict Ms. Hogan's access to "highly confidential" documents but, in fact, wanted Ms. Hogan and her firm to be disqualified from representing HQ in this matter at all.  <u>See</u> April 29 email in the email chain attached as Exhibit E.  Defendants also refused to describe the documents that Defendants intend to produce that Defendants believe are confidential; Defendants refused to answer HQ's inquiry as to when it planned to produce its Rule 26 disclosure documents (confidential or otherwise); and Defendants refused to participate in a telephone conference to attempt to resolve the issues.  <u>Id</u>.

## **Argument**

22.     Defendants should promptly produce any non-confidential Rule 26

disclosure documents.  Defendants have not provided any basis for avoiding compliance with this Court's directives.

23.    With respect to "confidential" or "highly confidential" documents, this Court has already ordered that such documents should be produced promptly upon entry of an appropriate protective order.

24.    The parties have agreed on all terms of the proposed protective order attached as Exhibit A, except that Defendants object to Ms. Hogan's access to "highly confidential" documents.  In addition, Defendants are now insisting upon disqualification of Ms. Hogan and her law firm as counsel for HQ before they will produce any "highly confidential" documents.

25.    Defendants have refused to provide any legal support for their position and have refused to even describe generally what documents they actually intend to produce that they view as "highly confidential."

26.    There is no support for Defendants' request that Ms. Hogan and her law firm be disqualified.  The fact that a lawyer is related by marriage or otherwise to a principal of a client is not grounds for disqualification.  See, e.g., 8 Fed. Proc. §20:221 (discussing various grounds for disqualification).  Moreover, motions to disqualify should be viewed with extreme caution to avoid misuse as an instrument of harassment, and the court must maintain a balance between the right of the client to retain counsel of his or her free choice and the necessity that ethical standards by upheld.  Id.  (citing cases).

27.    In this instance, it is evident that Defendants' request for disqualification is a litigation tactic designed for harassment and delay.  Even if there were support for Defendants' request that Ms. Hogan's access to "highly confidential" documents

be restricted (which there is not, as discussed below), it does not follow that Ms. Hogan and/or her firm should be disqualified from representing HQ in this matter entirely.

28.     There is also no support for Defendants' request that Ms. Hogan be restricted from access to "highly confidential" documents.  As an initial matter, the burden is on Defendants to show good cause for the protection that they are requesting.  Fed. R. Civ. P. 26(c)(1)(G).  Despite several inquires from HQ, Defendants have not cited a single case supporting their position, nor has HQ located any.  There are, however, a number of cases addressing the issue of restricted access to "highly confidential" documents in the in-house counsel context.     See, e.g.,     Autotech Technologies Limited Partnership v. AutomationDirect.com, Inc., 237 F.R.D 405, 407-09 (N.D. Ill. 2006) (Cole, J.) (discussing cases).

29.     One of the leading cases on the issue cautions against arbitrary distinctions based on the type of counsel employed, noting that in practice the risk of inadvertent disclosure of trade secrets obtains equally for both in-house and outside counsel. See U.S. Steel Corp. v. United States, 730 F.2d 1465, 1468 (Fed. Cir. 1984).  Notably, the analysis starts with a presumption that all lawyers (whether in-house or outside counsel) will endeavor to abide by any attorneys'-eyes-only protective order that is entered.  Autotech, 237 F.R.D. at 408-09.  "The issue concerns not good faith but risk of inadvertent disclosure."  Id. at 408 (quoting FTC v. Exxon Corp., 636 F.2d at 1350.  See also Nazomi Communications, Inc. v. Arm Holdings PLC, No. 02-2521, 2002 WL 32831822 * 3 (N.D. Cal. Oct. 11, 2002) ("leading cases in this area . . . presuppose fidelity to ethical duties and bar access only when there is a significant risk of *inadvertent* disclosure) (emphasis added).  Accordingly, when a party seeks to restrict access of specific lawyers to "highly confidential" documents, courts

must undertake to examine the factual circumstances of the counsel's relationship to the party and the risk of inadvertent disclosure.

30.     In order to evaluate the risk of inadvertent disclosure, the primary factor is whether counsel is involved in "competitive decision-making" such that counsel is involved in the client's decisions regarding pricing or product design, or other decisions that would be made in light of similar or corresponding information about a competitor.  See, e.g., U.S. Steel, 730 F.2d at 49-50.  In this case, Ms. Hogan is lead outside counsel in this litigation.  See Declaration of Deborah Rzasnicki Hogan, attached hereto as Exhibit F, ¶ 1.  Ms. Hogan is generally not involved in HQ's business.  Id. at ¶¶2-6.  Ms. Hogan has only recently started representing HQ in litigation matters; Ms. Hogan does not provide legal advice to HQ regarding transactional or general corporate matters; Ms. Hogan is not a shareholder of HQ; and Ms. Hogan is not involved in any "competitive decision-making" at HQ or any other decision-making at HQ, except in her role as outside litigation counsel.  Id.  Given Ms. Hogan's lack of involvement in HQ's business, there is no risk of inadvertent disclosure.  Instead, Defendants' concern about Ms. Hogan's access to "highly confidential" documents appears to be based on an unsupported and unsupportable assumption that Ms. Hogan would be willing to violate her ethical obligations simply because she is married to one of the principals of the client.  The case law is clear: counsel's access to "highly confidential" documents will not be restricted based on unsupported assumptions that a lawyer will violate his or her ethical obligations.  See, e.g., Autotech, 237 F.R.D. at 408-09 (citing cases).

31.     Moreover, Defendants will not even discuss the nature of the documents which they intend to produce that they view as "highly confidential."  Given that

this is a copyright infringement action involving computer software, HQ anticipates (and has requested) that Defendants produce the source code for the infringing product. HQ further anticipates that Defendants would view their source code as "highly confidential." The nature of the documents likely to be marked as "highly confidential" is important and further undermines any potential claim of inadvertent disclosure. It is hard to see, for example, how Ms. Hogan (or anyone other than, perhaps, a computer programmer) would "inadvertently" disclose the source code of a software program. HQ should not be deprived of its choice of counsel based on a baseless assumption that counsel would choose to violate ethical obligations.

WHEREFORE, Plaintiff HyperQuest, Inc. respectfully requests the entry of the proposed protective order attached hereto as Exhibit A; entry of an order requiring Defendants to produce their Rule 26 disclosure documents no later than May 5; and for all other and further relief deemed appropriate by the Court.

Dated: April 30, 2008

HYPERQUEST, INC.


By: /s/ Deborah Rzasnicki Hogan
     One of Its Attorneys

Deborah Rzasnicki Hogan
Chad A. Blumenfield
GOLDBERG, KOHN, BELL, BLACK,
   ROSENBLOOM & MORITZ, LTD.
55 East Monroe, Suite 3300
Chicago, Illinois 60603
(312) 201-4000