# EXHIBIT 1

## TO

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HYPERQUEST, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. |
| | ) |
| N'SITE SOLUTIONS, INC., and UNITRIN DIRECT AUTO INSURANCE | ) |
| | ) |
| | ) |
| Defendants. | ) JURY DEMAND |

FILED
JANUARY 22, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

08 C 483

JUDGE SHADUR
MAGISTRATE JUDGE MASON

### COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff, HyperQuest, Inc., by and through its undersigned counsel, for its Complaint against Defendants, N'Site Solutions, Inc. and Unitrin Direct Auto Insurance, alleges as follows:

### GENERAL ALLEGATIONS

#### The Parties

1.   HyperQuest, Inc. f/k/a HQ, Inc. ("HQ"), is a Delaware corporation with its principal place of business in Skokie, Illinois. HQ is a provider of primarily internet-based technology products and services to insurance companies and others in the property and casualty insurance industry, including repair shops, professional appraisers and parts suppliers.

2.   N'Site Solutions, Inc. ("N'Site") is a Delaware corporation with its principal place of business in Overland Park, Kansas. When it was initially founded in 2000, N'Site was in the business of providing outsourced claims services for property and casualty insurance companies, such as first notice of loss taking and desk review of automobile insurance repair claim estimates. Currently N'Site advertises itself as "a leading provider of web-based

integrated technology and service solutions for the property and casualty insurance industry."

3. Upon information and belief, Unitrin Direct Auto Insurance ("Unitrin") is an insurance company incorporated in Illinois, with its principal place of business in Chicago, Illinois. Unitrin actively markets and sells automobile insurance directly to consumers in approximately 25 different states.

## Jurisdiction And Venue

4. This action arises under the Copyright Act, 17 U.S.C. § 101 et seq.

5. This Court has jurisdiction over this action under 28 U.S.C. §§1331 and 1338(a).

6. Venue is proper under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to HQ's claims occurred in this district.

## The April 2001 Quivox/N'Site Limited Use License and the eDoc Express Software

7. On or about April 1, 2001, N'Site entered into a Software Application Services and Integration Agreement with Quivox Systems Incorporated ("Quivox"), pursuant to which Quivox agreed, among other things, to give N'Site a limited non-exclusive license to use and display certain application software developed by Quivox, commonly referred to as "eDoc Express." A copy of the Software Application Services and Integration Agreement, dated April 1, 2001 between N'Site and Quivox (the "Quivox/N'Site Limited Use License") is attached hereto as Exhibit A.

8. The eDoc Express software is application software initially designed for use primarily in connection with the electronic processing of insurance claims. As an application software program, in contrast to software packages that are packaged and sold through commercial and retail channels, eDoc Express is accessed and used by customers through the

-2-

internet.

9.  Under the terms of the Quivox/N'Site Limited Use License, N'Site was to pay certain license fees ranging from $.25 to $10.00 per transaction depending upon, among other things, the module of the software being used and the volume of transactions for which the software was used.

10. The term of the Quivox/N'Site Limited Use License was for five years commencing April 1, 2001.

11. Under the terms of the Quivox/N'Site Limited Use License, N'Site's right to use the eDoc Express software was limited in many ways. Among other things: (i) N'Site could only use eDoc Express within its immediate organization and could only install it in its own facility at locations specified in writing and approved by Quivox; (ii) N'Site could only use the eDoc Express software for the purpose of electronically collecting, storing and transferring claim information; (iii) N'Site could only use eDoc Express for its own use and the use of its subsidiaries; (iv) N'Site could not "sell, market or in any other manner distribute to any third party or to any location" the eDoc Express software (except that N'Site could distribute printed copies and electronic copies of information derived from the eDoc Express software to insurance agent(s), trading partners and insurance companies, their policyholders and claimants, as necessary in the ordinary course of business); (v) N'Site could not make any modifications to the eDoc Express software without Quivox's prior written consent; and (vi) N'Site could not create any derivative work based upon eDoc Express without Quivox's prior written consent.

### Quivox Cessation of Operations and Sale of Assets to Safelite

12. Upon information and belief, in or about July 2001, Quivox ceased operations.

13. After Quivox ceased operations, N'Site obtained a copy of the source code for the eDoc Express software.

14. On May 9, 2003, Safelite Group Inc. f/k/a Safelite Glass Corp. ("Safelite") entered into an Asset Purchase Agreement ("APA") with Quivox.

15. Also on May 9, 2003, pursuant to the terms of the APA, and through an Assignment of Software agreement (the "May 2003 Quivox/Safelite Assignment"), Quivox assigned all rights, title and interest in and to numerous computer software programs, including but not limited to eDoc Express, to Safelite.

16. The May 2003 Quivox/Safelite Assignment included an assignment of all licenses, sublicenses or agreements pursuant to which any of the software, including eDoc Express, had been licensed for use by third parties.

17. On or about June 9, 2003, Safelite notified N'Site of Safelite's acquisition of the assets of Quivox, including the assignment to Safelite of all rights, title and interest in the eDoc Express software and the Quivox/N'Site Limited Use License.

18. On or about October 1, 2003, Safelite notified N'Site in writing of Safelite's exclusive copyright in the eDoc Express software.

19. Also on or about October 1, 2003, Safelite notified N'Site that N'Site was in breach of the Quivox/N'Site Limited Use License because N'Site had failed to pay certain license fees to Safelite, and Safelite demanded that N'Site cease use of the eDoc Express software.

20. In the spring of 2004, Safelite and N'Site attempted to resolve the disputes between them related to Safelite's acquisition of the Quivox/N'Site Limited Use License and N'Site's continued use of the eDoc Express software.

21. Among other things, Safelite and N'Site attempted to negotiate terms of a revised license agreement with respect to the eDoc Express software.

22. Safelite and N'Site were unable to resolve the disputes between them and no revised license agreement between Safelite and N'Site was ever executed.

### Safelite's Grant to HQ of an Exclusive License to Use the eDoc Express Software

23. On July 6, 2004, Safelite granted to HQ an exclusive license to use the eDoc Express software. A copy of the July 6, 2004 Software License between HQ and Safelite (the "Safelite/HQ Exclusive License Agreement") is attached hereto as Exhibit B.

24. Specifically, pursuant to the terms of the Safelite/HQ Exclusive License Agreement, Safelite granted to HQ a perpetual, worldwide, exclusive license to use, develop, modify, enhance, copy, reproduce, make, have made, store, demonstrate, market, promote, display, give access to, transmit, communicate, perform, adapt, modify, prepare derivative works based upon, develop, import, rent, lease and/or sub-license the eDoc Express software.

### Expiration of N'Site's Rights under the April 2001 N'Site/Quivox Agreement

25. Given Safelite's October 1, 2003 notice of breach, N'Site had no right to use the eDoc Express software in any way for any purpose after October 1, 2003.

26. Even absent N'Site's prior breach, any rights that N'Site had to use the eDoc Express software expired no later than April 1, 2006.

### N'Site's Infringing Software Product

27. In violation of the limitations set forth in the Quivox/N'Site Limited Use License: (i) N'Site installed the eDoc Express software at locations other than its own facility; (ii) N'Site did not use the eDoc Express software only within its immediate organization, solely for its own use and the use of its wholly owned subsidiaries, and solely for the purpose of

electronically collecting, storing and transferring claim information; (iii) N'Site modified and created derivative works based upon the eDoc Express software; and (iv) N'Site marketed and sold the eDoc Express software and/or derivative works based upon the eDoc Express software to third parties.

28. Among other things, in 2004, 2005 and 2006, N'Site was marketing and selling its "N'Solutions" software which was a derivative work based upon the eDoc Express software.

29. Not only was N'Site marketing and selling its infringing N'Solutions software on a per transaction usage basis, but also, in or about the summer of 2006, N'Site sold the source code of its infringing "N'Solutions" software to Unitrin for over $700,000.

30. In 2007, N'Site released a new version of its N'Solutions software which it renamed "ClaimHub." N'Site continues to market and sell "ClaimHub."

31. The "ClaimHub" software, upon information and belief, like the prior "N'Solutions" software, is a derivative work based upon the eDoc Express software.

### Registration of Copyright

32. In November 2006, Safelite filed a U.S. copyright application for registration of the eDoc Express software. On November 21, 2006, the U.S. Copyright Office issued to Safelite copyright registration TXu001318816 for the eDoc Express software.

### Recordation of Exclusive License

33. HQ formally recorded the Safelite/HQ Exclusive License with the U.S. Copyright Office on January 7, 2008.

## COUNT I

### Copyright Infringement against N'Site

1-33.   HQ hereby repeats and realleges the allegations contained in paragraphs 1-33 of the General Allegations as if fully set forth herein.

34.   The foregoing acts, practices, and conduct of N'Site constitute the infringement of HQ's exclusive rights in the eDoc Express software including HQ's exclusive rights to: (i) reproduce the eDoc Express software; (ii) prepare derivative works based upon the eDoc Express software; (iii) distribute copies of the eDoc Express software; and (iv) display the eDoc Express software pursuant to 17 U.S.C. §§ 106(1), (2), (3) and (5) and 17 U.S.C. § 501(a).

35.   N'Site's conduct constitutes willful infringement of HQ's exclusive rights pursuant to 17 U.S.C. § 504(c)(2).

36.   HQ has no adequate remedy at law because the eDoc Express software is intellectual property to which HQ has exclusive rights such that damages alone cannot fully compensate HQ for N'Site's misconduct.

37.   Unless enjoined by the Court, N'Site will continue to infringe on HQ's exclusive rights to the eDoc Express software. This threat of future injury to HQ's rights requires injunctive relief to prevent such infringement and to ameliorate and mitigate HQ's injury.

**WHEREFORE,** HQ respectfully requests a judgment in its favor and against N'Site: (i) entering a preliminary and permanent injunction against N'Site prohibiting N'Site from copying, displaying, distributing and creating derivative works based upon any protected material from the eDoc Express software pursuant to 17 U.S.C. § 502; (ii) ordering the destruction of N'Site's infringing plans, software, computer files and/or other media comprising

infringing copies or derivative works of HQ's copyrighted eDoc Express software pursuant to 17 U.S.C. § 503; and (iii) awarding HQ damages as proven at trial along with a disgorgement of N'Site's profits attributable to the infringement pursuant to 17 U.S.C. § 504(b), plus prejudgment interest, court costs, statutory damages, attorneys' fees, and such other and further relief as this Court deems just.

## COUNT II

### Copyright Infringement against Unitrin

1-33.   HQ hereby repeats and realleges the allegations contained in paragraphs 1-33 of the General Allegations as if fully set forth herein.

34.   Since its purchase of the infringing N'Solutions software from N'Site in or about the summer of 2006, Unitrin has copied, modified, distributed, and used the software.

35.   The foregoing acts, practices, and conduct of Unitrin constitute the infringement of HQ's exclusive rights in the eDoc Express software including HQ's exclusive rights to: (i) reproduce the eDoc Express software; (ii) prepare derivative works based upon the eDoc Express software; (iii) distribute copies of the eDoc Express software; and (iv) display the eDoc Express software pursuant to 17 U.S.C. §§ 106(1), (2), (3) and (5) and 17 U.S.C. § 501(a).

36.   HQ has no adequate remedy at law because the eDoc Express software is intellectual property to which HQ has exclusive rights such that damages alone cannot fully compensate HQ for Unitrin's misconduct.

37.   Unless enjoined by the Court, Unitrin will continue to infringe on HQ's exclusive rights to the eDoc Express software. This threat of future injury to HQ's rights requires injunctive relief to prevent such infringement and to ameliorate and mitigate HQ's injury.

**WHEREFORE**, HQ respectfully requests a judgment in its favor and against Unitrin: (i) entering a preliminary and permanent injunction against Unitrin prohibiting Unitrin from copying, displaying, and distributing any protected material from the eDoc Express software pursuant to 17 U.S.C. § 502; (ii) ordering the destruction of Unitrin's infringing plans, software, computer files and/or other media comprising infringing copies or derivative works of HQ's copyrighted eDoc Express software pursuant to 17 U.S.C. § 503; and (iii) awarding HQ damages as proven at trial along with a disgorgement of Unitrin's profits attributable to the infringement pursuant to 17 U.S.C. § 504(b), plus prejudgment interest, court costs, statutory damages, attorneys' fees, and such other and further relief as this Court deems just.

Dated: January 22, 2008

                                HYPERQUEST, INC.


                                By: /s/ Deborah Rzasnicki Hogan
                                      One of Its Attorneys

Deborah Rzasnicki Hogan
Chad A. Blumenfield
GOLDBERG, KOHN, BELL, BLACK,
  ROSENBLOOM & MORITZ, LTD.
55 East Monroe, Suite 3300
Chicago, Illinois 60603
(312) 201-4000