# EXHIBIT 3 (Part 1 of 2)

## TO

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
FOR LACK OF SUBJECT MATTER JURISDICTION**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **HYPERQUEST, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) **Civil Action No. 08 C 483** |
| | ) |
| **N'SITE SOLUTIONS, INC., and** | ) **Honorable Milton I. Shadur** |
| **UNITRIN DIRECT AUTO INSURANCE** | ) **Magistrate Judge Michael T. Mason** |
| | ) |
| **Defendants.** | ) **JURY DEMAND** |

### HYPERQUEST'S OPPOSITION TO DEFENDANTS' MOTION
### TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

Plaintiff, HyperQuest, Inc. ("HQ"), by and through its undersigned counsel, hereby submits its opposition to the motion of Defendants N'Site Solutions, Inc. ("N'Site") and Unitrin Direct Insurance Company ("Unitrin") (collectively, "Defendants") to dismiss for lack of subject-matter jurisdiction.

### I.    INTRODUCTION

Defendants concede, as they must, that exclusive licensees have standing to sue for copyright infringement under the Copyright Act. See Memorandum of Law in Support of Motion to Dismiss for Lack of Subject Matter Jurisdiction and Hearing Request ("Memorandum") at 3.   Defendants argue, however, that HQ is, in fact, a "non-exclusive licensee." Memorandum at 3-6.  Therefore, Defendants argue that HQ lacks standing to bring the claims asserted in this case. Id.

Although it is not entirely clear from Defendants' pleadings, Defendants appear to argue that HQ is a "non-exclusive" licensee for three reasons: (i) the grant of the exclusive license from Safelite Group Inc. f/k/a Safelite Glass Corp. ("Safelite") to HQ was

"subject to N'Site's use of the copyrighted materials;" (ii) Safelite "reserved to itself the sole discretion to enforce the copyright against N'Site and the sole right to terminate N'Site's license;" and (iii) "the license contains additional restrictions which are inconsistent with the grant of an exclusive license." See Memorandum at 5-6.

There are several problems with Defendants' arguments. First, the main problem with all of these arguments is that Defendants ignore the relevant language of the Copyright Act and applicable case law expressly acknowledging the divisibility of rights under a copyright and granting a statutory cause of action to the "legal or beneficial owner of an exclusive right under a copyright. . . to institute an action for any infringement of that particular right committed while he or she is the owner of it."    17 U.S.C.A. § 501(b) (emphasis added). Second, Defendants simply fail to acknowledge that N'Site never had any right to reproduce, create derivative works based upon, or distribute the eDoc software -- those rights have belonged exclusively to HQ since July 6, 2004. Third, Defendants also fail to acknowledge that any limited rights that N'Site might have had to use the eDoc software expired no later than April 1, 2006. Accordingly, since at least April 1, 2006, HQ's rights to the eDoc software have been completely exclusive. Fourth, Defendants base their argument about the alleged "retention" of "enforcement rights" by Safelite on a complete mischaracterization of language in the license agreement between HQ and Safelite whereby Safelite undertook affirmative obligations to HQ to enforce certain contractual rights of Safelite's.

For these reasons, explained in more detail below, defendants' motion to dismiss for lack of subject-matter jurisdiction should be denied.

## II.    STANDARD OF REVIEW

When considering the sufficiency of a complaint under Rule 12(b)(1), a court must accept all of the complaint's well-pleaded factual allegations as true and draw all reasonable inferences in plaintiff's favor. *Marcavage v. City of Chicago*, 467 F. Supp. 2d 823, 825 (N.D. Ill. 2006) (citing *Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698, 701 (7th Cir. 2003). The standard for a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is largely identical to the standard for a Rule 12(b)(6) motion. *Johnson v. Orr*, 2007 WL 4531798, at *2 (N.D. Ill. December 19, 2007) (citing *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995). The lone difference is that the court is not limited to the jurisdictional contentions asserted in the complaint, but may consider other evidence submitted to determine whether subject matter jurisdiction exists. *Id.*[1]

## III.    FACTUAL BACKGROUND

On July 6, 2004, Safelite granted to HQ an exclusive license to use certain software commonly referred to as eDoc Express software. Complaint at ¶23-24; *see also* July 6, 2004 Software License between HQ and Safelite (the "Safelite/HQ Exclusive License Agreement"), attached to the Complaint as Exhibit B, at ¶ 2. The scope of the grant from Safelite to HQ was quite broad – Safelite granted to HQ a perpetual, worldwide, exclusive license to use, develop, modify, enhance, copy, reproduce, make, have made, store,

---

[1]    Defendants have not submitted any additional evidence and HQ does not believe this Court needs any additional evidence in order to determine that HQ has standing to bring this action. HQ believes that its standing to bring this action is evident from the uncontested factual allegations in HQ's Complaint for Injunctive Relief and Damages (the "Complaint") and the unambiguous terms of the agreements attached thereto. Nonetheless, out of an abundance of caution, HQ submits herewith the Declaration of Jeffrey J. Hogan ("Hogan Declaration"), a copy of which is attached hereto as Exhibit A, regarding certain aspects of the negotiations between HQ and Safelite as additional evidence regarding the meaning of certain relevant terms of the agreements in the event that this Court disagrees with HQ's position and finds certain relevant terms to be ambiguous and requiring parol evidence be admitted in order to determine the meaning of such terms.

demonstrate, market, promote, display, give access to, transmit, communicate, perform, adapt, modify, prepare derivative works based upon, develop, import, rent, lease and/or sub-license the eDoc Express software. *Id.*

Nonetheless, despite the broad grant of a perpetual, worldwide, exclusive license to HQ, HQ acknowledged that it was aware of a prior limited use license that had been granted to N'Site by Safelite's predecessor in interest to the eDoc software, Quivox Systems Incorporated ("Quivox"). *See* Safelite/HQ Exclusive License Agreement at ¶ 2(b). Specifically, HQ acknowledged that it was aware of the Software Application Services and Integration Agreement dated as of April 1, 2001 between N'Site and Quivox (the "Quivox/N'Site Limited Use License"). *Id.* HQ further acknowledged that it was aware that N'Site and Safelite were in the process of attempting to negotiate terms of a revised license (the "Revised License") and that HQ had received a copy of the latest draft of the Revised License. *Id.*

Notably, N'Site's right to use the eDoc Express software under the Quivox/N'Site Limited Use License was limited in many ways:

    (i)    N'Site could only use eDoc Express within its immediate organization and could only install it in its own facility at locations specified in writing and approved by Quivox;

    (ii)    N'Site could only use the eDoc Express software for the purpose of electronically collecting, storing and transferring claim information;

    (iii)    N'Site could only use eDoc Express for its own use and the use of its subsidiaries;

    (iv)    N'Site could not "sell, market or in any other manner distribute to any third party or to any location" the eDoc Express software (except that N'Site could distribute printed copies and electronic copies of information derived from the eDoc Express software to insurance

agent(s), trading partners and insurance companies, their policyholders and claimants, as necessary in the ordinary course of business);

(v)    N'Site could not make any modifications to the eDoc Express software without Quivox's prior written consent; and

(vi)    N'Site could not create any derivative work based upon eDoc Express without Quivox's prior written consent.

Complaint at ¶ 11; *see also* Quivox/N'Site Limited Use License, attached to the Complaint as Exhibit A, at ¶ 4.1, 4.2, 4.3, 4.4, and 4.10.

Moreover, no Revised License was ever executed by Safelite and N'Site, and any such Revised License would have necessarily been similarly limited in scope. Complaint at ¶ 22; Hogan Declaration at ¶¶ 7-10 and Revised License attached thereto as Exhibit 4. One of the principal aspects of consideration in the July 2004 transaction between Safelite and HQ was the grant to HQ of the exclusive license to the eDoc Software. Safelite/HQ Exclusive License at ¶ 2; Hogan Declaration at ¶¶ 3-6. Safelite did not retain the right to give any rights to the eDoc software to anyone else other than N'Site and Safelite retained only the limited right to enter into the Revised License with N'Site, or a Revised License with similarly restrictive terms. Safelite/HQ Exclusive License at ¶ 2; Hogan Declaration at ¶¶ 3-10.

In any event, Safelite and HQ agreed that Safelite would terminate the Quivox/N'Site Limited Use License or any Revised License no later than April 1, 2006. Safelite/HQ Exclusive License at ¶ 2; Hogan Declaration at ¶¶ 11-12. Safelite did not retain the right to give any rights to the eDoc software to anyone for any purpose – not even N'Site – after April 1, 2006. *Id.*

## IV.    ARGUMENT

### A.    Defendants' Arguments Ignore The Principle Of Divisibility Under the Copyright Act.

Under the Copyright Act, rights are divisible and owners of an exclusive right have standing to bring an infringement action to enforce that right. Nonetheless, Defendants argue that HQ cannot be an exclusive licensee because the grant of exclusivity was "subject to N'Site's use" of the eDoc software and because the license contains certain restrictions (for example, regarding HQ's ability to sell the eDoc software to Safelite's competitors without Safelite's consent). Defendants' arguments ignore well-settled principles of divisibility and standing under the Copyright Act.

The Copyright Act explicitly recognizes the divisibility of rights under a copyright and provides that the exclusive licensee of any exclusive right under a copyright has standing to bring an infringement action to enforce that right. Specifically, Section 501(b) of the Copyright Act provides:

> (b) The legal or beneficial <u>owner of an exclusive right</u> under a copyright <u>is entitled . . . to institute an action for any infringement</u> of that particular right committed while he or she is the owner of it.

17 U.S.C.A. §501(b) (emphasis added). Moreover, Section 201(d) of the Copyright Act provides:

> (1) <u>The ownership of a copyright may be transferred in whole or in part</u> by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property b the applicable law of intestate succession.
>
> (2) <u>Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred as provided by clause (1) and owned separately.</u> The owner of any particular exclusive right is entitled, to the extent of that right, to

> all of the protection and remedies accorded to the copyright owner by
> this title.

17 U.S.C.A. §201(d) (emphasis added).  Similarly, Section 101 of the Copyright Act defines

"transfer of copyright ownership" as:

> an assignment, mortgage, exclusive license, or any other conveyance,
> alienation, or hypothecation of a copyright <u>or of any of the exclusive
> rights comprised in a copyright</u>, <u>whether or not it is limited in time or
> place of effect</u>, but not including a nonexclusive licensee.

17 U.S.C.A. §101 (emphasis added).

Section 106 of the Copyright Act in turn sets forth the several different

exclusive rights which are "comprised in a copyright" (and which may be further subdivided

and transferred and owned separately under Section 201(d)):

> Subject to sections 107 through 122, the owner of copyright under this
> title has the exclusive rights to do and to authorize any of the following:
>
> (1)   to reproduce the copyrighted work in copies or phonorecords;
>
> (2)   to prepare derivative works based upon the copyrighted work;
>
> (3)   to distribute copies or phonorecords of the copyrighted work to
> the public by sale or other transfer of ownership, or by rental,
> lease, or lending;
>
> (4)   in the case of literary, musical, dramatic, and choreographed
> works, pantomimes, and motion pictures and other audiovisual
> works, to perform the copyrighted work publicly;
>
> (5)   in the case of literary, musical, dramatic, and choreographed
> works, pantomimes, and pictorial, graphic, or sculptural works,
> including the individual images of a motion picture or other
> audiovisual work, to display the copyrighted work publicly; and
>
> (6)   in the case of sound recordings, to perform the copyrighted
> work publicly by means of a digital audio transmission.

17 U.S.C.A. §106.

In light of these provisions, it is well-settled that the owner of any of the exclusive rights set forth in Section 106 (including any further subdivided exclusive right under Section 106) has standing to bring a cause of action for infringement of that particular right. *See, e.g.,* Melville B. Nimmer & David Nimmer, 3 Nimmer on Copyright § 10.02[A], at 10-20-10-22 (2007) (discussing the "abolition of indivisibility"; the relevant provisions of the Copyright Act; the legislative history; and relevant case law). *See also Burns v. Rockwood Distributing Co.*, 481 F. Supp. 841 (N.D. Ill. 1979) (in accordance with Section 201(d) of the Copyright Act, the owner of a copyright has certain divisible rights which may be transferred in whole or in part by means of an exclusive license); *Library Publications, Inc. v. Medical Economics Co.*, 548 F.Supp. 1231, 1233-34 (E.D. Pa. 1982) ("The legislative history of section 201 makes it clear that an exclusive license can be limited to given rights at a particular time. For example, a local broadcasting station can hold an exclusive license to transmit a particular work within a particular geographic area for a particular time. H.R. Report, No. 94-1476, 94th Cong., 2nd Sess. 123, reprinted in (1976) U.S. Code Cong. & Ad. News 5659, 5739. Furthermore, there appears to be no limit on how narrow the scope of exclusive rights can be yet still constitute a "transfer of ownership," provided the licensed rights are exclusive. See Nimmer on Copyright s 10.02(A) (1982). An exclusive license to a newsstand dealer to distribute a given edition of a given newspaper at a designated corner on a particular afternoon, for example, gives the dealer "ownership" of that right. Id."); *Swarovski America Ltd. v. Silver Deer Ltd.*, 537 F.Supp. 1201, 1205 (D. Co. 1982) ("I note at the outset that this is an action for infringement of both the plaintiff's right to manufacture and the plaintiff's right to distribute or sell, the copyrighted figurines. These rights are extended to copyright owners pursuant to 17 U.S.C. s 106(1) and s 106(3) respectively.

Since the plaintiff has not granted the right of manufacture to any other party, there is no question that it has an exclusive right to manufacture the copyrighted materials and thus, standing to sue for infringement of the right of manufacture. The situation regarding the plaintiff's right to distribute or sell the copyrighted materials is more complex.")

Given these well-settled principles of divisibility and standing under the Copyright Act, the fact that the grant of the exclusive license to HQ may have been "subject to N'Site's [limited] use of the copyrighted material" (Memorandum at 5), does not mean that HQ is a "non-exclusive licensee" without standing to sue. The relevant inquiry is not whether any other party has any rights at all with respect to the copyrighted material. Instead, the inquiry is whether the claimant has an exclusive right under the copyright at issue which the claimant is attempting to enforce.

**B.      HQ Is An "Exclusive Licensee" Because N'Site Was Never Granted Any Right To Reproduce, Prepare Derivative Works Based Upon Or Distribute The eDoc Software – Those Rights Have Belonged Exclusively To HQ Since July 6, 2004.**

In light of the limited scope of the license granted to N'Site in the Quivox/N'Site Limited Use License there can be no doubt that even if the Quivox/N'Site Limited Use License were still in effect today (which it is not), HQ has an exclusive right under the copyright at issue and standing to sue. For example, N'Site was never granted any right to reproduce, prepare derivative works based upon, or distribute the eDoc software. *See* Quivox/N'Site Limited Use License at ¶ 4 (listing limited rights and explicitly stating, among other things, "[N'Site] may not sell, market or in any other manner distribute to any third party or to any location, the Licensed Product …" and "[N'Site] agrees to comply with the terms and conditions of this License and agrees not to use the software and documentation

- 9 -

licensed hereunder in any way beyond the scope of this License…."). N'Site does not and cannot argue otherwise. Therefore, the rights to reproduce, prepare derivative works based upon, and distribute the eDoc software have belonged exclusively to HQ since July 6, 2004. Accordingly, HQ has standing to bring an infringement action to enforce those rights.

   **C.   HQ Is An "Exclusive Licensee" Because Any Right That N'Site Had To Use The eDoc Software Expired In 2003, Or At The Very Latest, In April 2006.**

   In addition, HQ has alleged that any rights that N'Site had with respect to the copyrighted material expired in 2003 or, at the very latest, in April 2006. Complaint at ¶¶ 25-26. Defendants have not challenged HQ's allegations in this regard, nor have Defendants submitted any evidence to contradict such allegations. Accordingly, taking such allegations as true for purposes of Defendants' motion to dismiss, notwithstanding HQ's acknowledgement of the Quivox/N'Site Limited Use License in the Safelite/HQ Exclusive License, HQ's rights have been completely exclusive since at least April 1, 2006. HQ has standing to bring this infringement action for this reason as well.[2]

   **D.   Defendants' Argument That HQ Is Not An "Exclusive Licensee" Because Safelite "Retained" Certain "Enforcement Rights" Is Based On A Complete Mischaracterization Of The Relevant Language In The Safelite/HQ Exclusive License and Misplaced Reliance On The Decision In *Althin v. West Suburban Kidney Center*.**

   Defendants argue that Safelite "reserved to itself the sole discretion to enforce the copyright against N'Site and the sole right to terminate N'Site's license." Memorandum at 5 (emphasis added). Notably, that is not what the agreement between Safelite and HQ actually says. The agreement states:

> Safelite covenants to HQ that prior to April 1, 2006, Safelite shall notify N'Site in writing of Safelite's intention to terminate the Original License and/or the revised license in accordance with their respective terms and further covenants to take whatever action (if any) Safelite deems appropriate (1) to enforce its rights under the License and/or Revised License and (2) to terminate the License and/or Revised License.

Safelite/HQ Exclusive License at ¶ 2(b).  Accordingly, under the terms of the Safelite/HQ Exclusive License, Safelite undertook an affirmative obligation to HQ to take certain action to enforce "[Safelite's] rights under the License …."

For example, under the Quivox/N'Site Limited Use License, Safelite had the contractual right to terminate the license in advance of April 1, 2006, if N'Site defaulted on payment of License Fees.  *See* Quivox/N'Site Limited Use License at ¶ 9.  Safelite promised to HQ that Safelite would take actions that Safelite deemed appropriate in such circumstances to enforce Safelite's contractual rights.  Nothing in the Safelite/HQ Exclusive License refers to any "retention" of rights by Safelite that would otherwise be transferred to HQ – such as the statutory right to bring an infringement action for infringement of any of the exclusive rights being licensed to HQ.  And nothing in the Safelite/HQ Exclusive License refers to any "sole discretion" on the part of Safelite to bring infringement actions.

Defendants appear to be mischaracterizing the language of the Safelite/HQ Exclusive License in a misguided attempt to analogize the license agreement in this case to the license agreement at issue in *Althin CD Med., Inc. v. W. Suburban*, 873 F. Supp. 837

_____

(continued)
[2]    In the event that this Court determines that HQ has the burden at this stage of the proceedings to submit evidence proving that N'Site's license was, in fact, terminated prior to April 1, 2006, even though Defendants have not disputed that fact, HQ respectfully requests that HQ be permitted to conduct discovery with respect to that issue.

(N.D. Ill. 1995). The problem for Defendants is that the grant of rights in *Althin* was significantly different from the grant of rights at issue in this case.

*Althin* does not stand for the proposition that any time a copyright owner retains contractual rights to terminate limited non-exclusive licenses, the copyright owner is therefore precluded from transferring exclusive rights to a license. In *Althin*, the license provided by the copyright owner expressly forbade the licensee from bringing copyright infringement suits: "Licensee shall not institute any suit or take any action on account of such infringements without first obtaining Licensor's written consent." *Id.* at 839. HQ's license was wholly different; it provided no limitation whatsoever on HQ's ability to bring suit for copyright infringement against alleged infringers of the exclusive rights granted to HQ.

## V.    CONCLUSION

For these reasons HQ has standing to bring suit under the Copyright Act as an exclusive licensee and Defendants' motion to dismiss should be denied.

Dated:  February 21, 2008

Respectfully submitted,

**HYPERQUEST, INC.**

By: /s/ Deborah Rzasnicki Hogan
    One of Its Attorneys

Deborah Rzasnicki Hogan
Chad A. Blumenfield
GOLDBERG, KOHN, BELL, BLACK,
   ROSENBLOOM & MORITZ, LTD.
55 East Monroe, Suite 3300
Chicago, Illinois 60603
(312) 201-4000

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on February 21, 2008, she

caused a copy of the attached **HYPERQUEST'S OPPOSITION TO DEFENDANTS'**

**MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION** to be

served via the Court's electronic notification system upon:

> Paul R. Kitch
> Jodi Rosen Wine
> Elizabeth W. Baio
> Nixon Peabody LLP
> 161 N. Clark St., 48th floor
> Chicago IL 60601
>
> Steven L. Tiedemann
> 8820 Columbia 100 Parkway Suite 400
> Columbia Maryland 21045


By:    /s/ Deborah Rzasnicki Hogan

6137.005

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| HYPERQUEST, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 08 C 483 |
| | ) |
| N'SITE SOLUTIONS, INC., and | ) Honorable Milton I. Shadur |
| UNITRIN DIRECT AUTO INSURANCE | ) Magistrate Judge Michael T. Mason |
| | ) |
| Defendants. | ) JURY DEMAND |

### DECLARATION OF JEFFREY J. HOGAN

I, Jeffrey J. Hogan, declare and state as follows:

1.    I am the President and founder of HyperQuest, Inc. f/k/a HQ, Inc. ("HQ").

2.    I am over 18 years of age and the information contained in this declaration is based on my personal knowledge, and I could and would testify to such information if called to do so in connection with the above-captioned matter.

3.    On or about July 6, 2004, HQ entered into a Software License Agreement with Safelite Group Inc. f/k/a Safelite Glass Corp. ("Safelite"). A true and correct copy of that Software License Agreement (the "Safelite/HQ Exclusive License Agreement") is attached hereto as Exhibit 1.

4.    I was the principal negotiator of the terms of the Safelite/HQ Exclusive License Agreement on behalf of HQ.

5.    I was also the principal negotiator on behalf of HQ of the terms of certain other related agreements also entered into between Safelite and HQ on or about July

6, 2004, including the Master Agreement referred to in the Safelite/HQ Exclusive License Agreement. A true and correct copy of the Master Agreement is attached hereto as Exhibit 2.

6.    Pursuant to the Master Agreement, HQ agreed, among other things, to issue certain shares of HQ common stock to Safelite representing 15% of the pro forma common stock of HQ at that time. One of the principal aspects of consideration Safelite gave to HQ in the July 2004 transaction between Safelite and HQ was the grant to HQ of the exclusive license to the eDoc Software.

7.    During the negotiations of the terms of the Safelite/HQ Exclusive License Agreement, I discussed with Safelite the existence of a prior license that had been granted to N'Site Solutions, Inc. ("N'Site") by Quivox Systems Incorporated ("Quivox") and then subsequently "inherited" by Safelite. In addition, shortly before closing, an actual copy of the Software Application Services and Integration Agreement dated April 1, 2001 between N'Site and Quivox (the "Quivox/N'Site Limited Use License") was provided to me. A true and correct copy of the Quivox/N'Site Limited Use License that was provided to me in or about early July 2004 is attached hereto as Exhibit 3.

8.    During the negotiations, I also discussed with Safelite the fact that Safelite and N'Site were attempting to negotiate terms of a revised license.

9.    During these negotiations, Safelite repeatedly assured me that N'Site's rights to use the eDoc software were quite limited. For example, Safelite explained to me that N'Site could only use the eDoc software within its own four walls. Safelite also repeatedly assured me that any revised license that it was negotiating with N'Site would be similarly restrictive in scope.

-2-

10.      As with the Quivox/N'Site Limited Use License, I was provided an actual copy of the proposed draft revised license (the "Revised License") that Safelite was considering entering into with N'Site shortly before closing. A true and correct copy of the Revised License that was provided to me in or about early July 2004 is attached hereto as Exhibit 4.

11.      In addition, during the negotiations, Safelite informed me that the term of the Quivox/N'Site Limited Use License would expire on April 1, 2006.

12.      In my discussions with Safelite, I insisted that Safelite agree that under no circumstances would Safelite continue to license the eDoc software to N'Site in any way – under either the Quivox/N'Site Limited Use License or any revised license – after April 1, 2006. Safelite agreed with my request and agreed that under no circumstances would Safelite continue to license the eDoc software to N'Site after April 1, 2006.

13.      In my discussions with Safelite I also explained that it was important to HQ that if N'Site was in breach of the Quivox/N'Site Limited Use License or any revised license prior to April 1, 2006, and Safelite therefore had the contractual right to terminate either the Quivox/N'Site Limited Use License or any revised license prior to April 1, 2006, that Safelite do so. In response to my request, Safelite agreed to include the language in the agreement which states that Safelite "further covenants to take whatever action (if any) Safelite deems appropriate (1) to enforce its rights under the License and/or Revised License and (2) to terminate the License and/or Revised License."

14.      At no time in my discussions with Safelite did Safelite request, or HQ agree to give to Safelite, rights to pursue infringement actions against N'Site or any other

-3-

potential infringer of the exclusive rights in the eDoc software which were being granted to

HQ.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the

foregoing is true and correct. Executed on February 21, 2008.

Jeffrey J. Hogan

-4-

# EXHIBIT 1

Execution Copy

## SOFTWARE LICENSE AGREEMENT

This Software License Agreement (the "**License Agreement**") is made and entered into as of the 6th day of July, 2004, by and between HQ, Inc., an Illinois corporation ("**HQ**"), and Safelite Group, Inc., a Delaware corporation ("**Safelite**"). HQ and Safelite hereinafter sometimes are referred to, individually, as a "**Party**" and, collectively, as "**Parties**."

### RECITALS

A.    Safelite owns all rights to collision claims management software commonly referred to as eDoc ("**eDoc Software**").

B.    Safelite and HQ have entered into an Agreement dated as of the date hereof (the "**Master Agreement**") pursuant to which Safelite has agreed to license to HQ the source code for the eDoc Software, subject to the terms and conditions set forth in this License Agreement.

**NOW, THEREFORE**, in consideration of the foregoing Recitals, which are specifically incorporated herein by this reference, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.    **Definitions**.

(a)    "**HQ Services**" means those services HQ provides to various users and industries including, but not limited to, the insurance, professional repair and parts supply industries for the purpose of ensuring the proper identification, selection, procurement and use of parts and for the purpose of reporting information on such activities and related processes. HQ Services does not include the eDoc software.

(b)    "**HQ Modifications**" means all modifications, derivative works, adaptations, partial versions or improvements of or to the eDoc Software authored, invented, developed, conceived or first reduced to practice by HQ. All HQ Modifications shall be deemed a part of the eDoc Software.

(c)    "**HQ System**" means HQ's system, consisting of hardware and equipment used by HQ upon which is installed HQ's software and data used to perform the HQ Services and support HQ's business.

(d)    "**Intellectual Property Rights**" means patent, copyright, trade secret, trademark, source codes, object codes or other proprietary rights.

(e)    "**Market Ready**" means that HQ is prepared to offer the eDoc Software product to its customers.

(f)    **"Other Documents"** shall mean the Master Agreement, the Note (as defined in the Master Agreement), the Security Agreement (as defined in the Master Agreement) and the Shareholders Agreement (as defined in the Master Agreement).

(g)    **"Territory"** means the United States of America and Canada.

2.    **License Grant.**

(a)    Grant To HQ. Subject to all limitations and obligations set forth in this License Agreement, Safelite grants to HQ a perpetual (subject to termination only as provided in Section 4), worldwide, exclusive (except as set forth in Section 2(b)) license (i) to use the eDoc Software, in source code form, to support the development and commercialization of HQ Services, and (ii) to develop, modify and enhance the eDoc Software as HQ in its sole discretion determines; provided, that such modifications and enhancements are solely related to the development and commercialization of HQ Services. The term "use" means use, copy, reproduce, make, have made, store, demonstrate, market, promote, display, give access to, transmit, communicate, perform, adapt, modify, prepare derivative works based upon, develop, import, rent, lease and/or sublicense the eDoc Software to a third party pursuant to an agreement, the terms of which shall provide that such third party: (i) shall have no right, license, or authority to sub-license, rent, or grant access to all, or any part, of the eDoc Software to any person or entity; (ii) shall have no right to use the terms "eDoc" or "Safelite" in any promotional or advertising materials created or published in relation to such third party's use of the eDoc Software; (iii) shall indemnify, defend, and hold Safelite, its directors, officers, subsidiaries, agents, and employees (collectively, **"Safelite Indemnitees"**), harmless from and against any and all claims, damages, liabilities, costs, judgements, and fees (including reasonable attorney fees) incurred by Safelite Indemnities in relation to any breach by such third party of it agreement with HQ or in relation to any unauthorized use by such third party of the eDoc Software. Notwithstanding the foregoing, HQ may not, without the prior written consent of Safelite, which consent shall not be unreasonably withheld, rent, sell, lease, transfer or sublicense the eDoc Software to any person or entity that competes with Safelite in the manufacture, distribution, or sale of automotive glass or related services, including but not limited to, those competitors set forth on Schedule 2(a).

(b)    Exclusivity. Except as otherwise provided in this Section 2(b), HQ's license to the eDoc Software is exclusive in the Territory. Such exclusivity shall terminate if a Sale of of HQ (as defined in the Master Agreement) occurs prior to July 5, 2009. Safelite shall have the right to use the eDoc Software and may license the eDoc Software to third parties solely for purposes of testing or development. Safelite will not use the eDoc Software in a manner that competes with HQ Services, except as part of Safelite's claims management solutions which does and will include a comprehensive estimate audit capability. Safelite's comprehensive estimate audit capability will provide for the auditing of an entire estimate and/or specific line items within an estimate for the

purpose of adherence and reporting. However, Safelite's comprehensive estimate audit capability will not encompass adherence to part use rules, reporting on parts usage, adherence to insurance operating guidelines for estimate development as related to parts, or for the determination, provisioning, or procurement of correct parts through its own or another company's database of parts, except to the extent that these services are used for the sole purpose of identifying and addressing auto glass parts. Notwithstanding the foregoing, HQ acknowledges the eDoc Software is licensed ("License") to N'SITE Solutions, Inc. ("N'SITE"). HQ further acknowledges Safelite and N'SITE are presently negotiating the terms of a revised license ("Revised License") regarding N'SITE's use of the eDoc Software. Safelite represents and warrants to HQ that Safelite has delivered to HQ a true and accurate copy of the latest draft of the Revised License and a true and accurate copy of the Software Application Services and Integration Agreement ("Services and Integration Agreement") dated as of April 1, 2001, by and between N'SITE and Quivox Systems Incorporated. HQ acknowledges receipt of a copy of the Revised License and the Services and Integration Agreement. Safelite covenants to HQ that prior to April 1, 2006, Safelite shall notify N'Site, in writing, of Safelite's intention to terminate the Original License and/or the Revised License in accordance with their respective terms and further covenants to take whatever action (if any) Safelite deems appropriate (1) to enforce its rights under the License and/or Revised License and (2) to terminate the License and/or Revised License. Safelite agrees to periodically apprise HQ of the status of its discussions with N'SITE regarding the execution of the Revised License and in the event the Revised License is modified to include terms substantially different than the Revised License provided to HQ, Safelite will advise and include HQ in the determination of the final terms of the Revised License.

(c)     Support. Safelite shall make its employees listed on Schedule 2(c) available to HQ at HQ's request, without charge to HQ and on the terms and conditions set forth in Schedule 2(c) in order to support and advise HQ with respect to the development, marketing, deployment and ongoing support of the eDoc Software.

(d)     Royalty. HQ will pay Safelite a royalty as follows: (i) before Full Integration if HQ uses all or any part of eDoc Software to process a claim, the lesser of (x) 7.5% of all fees associated with such claim processing or (y) $1.50 per claim processed and (ii) after Full Integration, all claims processed by HQ, except where HQ can demonstrate and document that the functionality of the eDoc Software was not used in whole or in part, the lesser of (x) 7.5% of all fees associated with such claim processing or (y) $1.50 per claim invoiced. HQ shall generate a report setting forth all claims invoiced by HQ each month and shall pay the royalties due to Safelite on a monthly basis within niney (90) days after the end of each calendar month.

(e)     Audit. During the Term of this License Agreement, Safelite shall have the right to audit, including by inspecting the books and records of HQ to verify HQ's compliance with the terms of Section 2(d). Safelite shall condut such audits upon at least ten (10) days prior written notice, during HQ's normal business hours and in such a manner as not to interfere unreasonably with HQ's normal business operations.

Safelite may conduct such audits from time to time, but not more than once every six (6) months, as Safelite deems necessary to determine if HQ is making proper royalty payments in compliance with Section 2(d). HQ shall pay such audit expenses if such audit shows underpayment of royalty payments of 10% or more.

(f)     HQ agrees that the source code for the eDoc Software are Safelite's Confidential Information (as defined below) and shall treat and handle eConfidential iInformation in accordance with Section 7.

(g)     HQ shall have the eDoc Software Market Ready by the first anniversary of the Effective Date.

(h)     HQ shall timely provide HQ's updates and patches of the HQ Modification, if any, to Safelite in accordance with Schedule 2(h).

3.     **Ownership.**

(a)     Ownership prior to Full Integration.    Subject to Section 3(b) below, all right, title and interest in and to the eDoc Software (including, but not limited to, all Intellectual Property Rights) will remain the exclusive property of Safelite, and all right, title and interest in and to the HQ Modifications shall vest in Safelite upon creation.    Subject to Section 3(b) below, all Intellectual Property Rights in or related to the eDoc Software are and will remain the exclusive property of Safelite, and all Intellectual Property Rights in or related to the HQ Modifications will be the exclusive property of Safelite.    Subject to Section 3(b) below, HQ assigns all rights, title, and ownership interest in the HQ Modification to Safelite. HQ agrees to enter into any additional documents reasonably necessary to perfect Safelite's ownership rights.

(b)     Ownership after Full Integration. The eDoc Software will be fully integrated and embedded into the HQ System to a degree that the eDoc Software will no longer be identifiable as a software program independent of the other components of the HQ System (the completion of that process being **"Full Integration"** and the resulting software or system being **"Full Integration Software"**). HQ and Safelite will jointly determine when Full Integration is accomplished.    HQ will not accomplish Full Integration within 2 years of the date of this License Agreement without Safelite's consent. Promptly following Full Integration, HQ will deliver to Safelite a written notice setting forth the date on which Full Integration was accomplished accompanied by a copy of the eDoc Software with all HQ Modifications thereto (including source code, object code and all required instructions) as of Full Integration. All modifications to the Full Integration Software made by HQ from and after Full Integration (**"Future Modifications"**) will not be considered "HQ Modifications" but will become part of the Full Integration Software.    Subject to Safelite's rights under this Agreement and the Master Agreement, HQ will own all right, title and interest in and to the Future Modifications, and all Intellectual Property Rights in or related in the Future Modifications will be the exclusive property of HQ. Prior to transfering, licensing, or

assigning the Full Integration Software to any person listed on Schedule 3(b), HQ must obtain the prior written consent of Safelite which consent may be withheld at Safelite's sole discretion.

(c)    Ownership of HQ System. In no event shall Safelite have any right, title or interest in the HQ System or any part thereof other than through Safelite's ownership interests in HQ.

4.    **Term and Termination**.

(a)    Term. This License Agreement will commence on the Effective Date and continue in perpetuity, unless earlier terminated as provided herein.

(b)    Termination for Breach. Either Party may terminate this License Agreement upon ninety (90) days written notice to the other Party if the other Party has committed an Event of Default under this License Agreement and such Event of Default is not cured within such ninety (90) day period. Notwithstanding anything in this Agreement to the contrary, in the event of a material breach by HQ of it obligations under Sections 2(a) or 7 of this Agreement, Safelite shall have the right to declare HQ in violation of its obligations hereunder. If HQ materially breaches its obligations under Section 2(a) or 7 of this Agreement, HQ shall have the limited right to continue to use the eDoc Software, HQ Modifications and Future Modifications for a period of forty-five (45) days from the date of Safelite's written notice to HQ generally identifying such breach. At the option of Safelite, all rights granted to HQ hereunder shall terminate on the expiration of any such forty-five (45) day period.. The Parties acknowledge and agree that the occurrence of one or more of the following events shall constitute an event of default ("**Event of Default**"):

(i)    if a Party materially breaches or fails or neglects to perform, keep or observe any material provision, covenant or term of this License Agreement or any Other Document;

(ii)    if any representation or warranty made by a Party in this License Agreement shall prove to have been inaccurate or untrue in any material respect on the date when made or deemed to have been made; or

(iii)    if a Party ceases to do business or becomes insolvent or admits in writing its inability to pay its debts as they mature, or makes an assignment for the benefit of creditors; if a petition under any foreign, state, or United States bankruptcy act, receivership statute, or the like, as they now exist, or as they may be amended, is filed by a Party; or if such a petition is filed by any third party, or an application for a receiver is made by anyone.

(c)    Termination for Failure to have eDoc Software Market Ready. Safelite may terminate this License Agreement by delivering written notice of

termination to HQ within fifteen (15) days after the first anniversary of the Effective Date if the eDoc Software is not Market Ready prior to the first anniversary of the Effective Date. Safelite agrees that it shall not license the HQ Modifications to a third party if Safelite terminates this License Agreement pursuant to this Section 4(c) unless Safelite pays to HQ a mutually agreed upon amount; provided, that, in determining such amount, Safelite shall receive full credit for the costs and expenses associated with the support services provided by Safelite pursuant to Section 2(c).

(d)   Obligations On Termination.   Within ten (10) days after termination of this License Agreement, (i) HQ shall cease all use of the eDoc Software, HQ Modifications and Future Modifications (provided, however, in the event of a material breach by HQ of Sections 2(a) or 7 of this Agreement, HQ shall cease all use of the eDoc Software, HQ Modifications and Future Modifications in accordance with the terms of Section 4(b) above), and (ii) pay Safelite any accrued but unpaid royalty fees within thirty (30) days after the termination of this License Agreement. HQ will deliver to Safelite or destroy, as directed by Safelite, and certify in writing to Safelite of such destruction, any full or partial copies of eDoc Software received hereunder, HQ Modifications and Future Modifications, in HQ's possession or under its control Safelite within thirty (30) days after termination of this License Agreement.

(e)   Survival.   Subject to this Section 4 (Term and Termination), the provisions set forth in Sections 3 (Ownership), 4(d) (Obligations on Termination), 4(e) (Survival), 6 (Limitation of Liability), 7 (Confidential Information), 8 (Indemnity) and 9 (Miscellaneous) will survive termination of this License Agreement.

## 5.   **Warranties.**

(a)   HQ Authority.   (i) HQ has all requisite legal and corporate power to execute and deliver this License Agreement, to perform its obligations under this License Agreement and to consummate the transactions contemplated by this License Agreement, (ii) HQ has taken all corporate action necessary for the authorization, execution and delivery of this License Agreement and the consummate the transactions contemplated by this License Agreement, (iii) HQ has no agreement or understanding with any third party that interferes with or will interfere with its performance of its obligations under this License Agreement, (iv) HQ has obtained and will maintain all rights, approvals and consents necessary to perform its obligations under this License Agreement and (v) this License Agreement constitutes legal, valid, and binding obligations of HQ, enforceable against HQ in accordance with its respective terms except as enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws, both state and federal, affecting the enforcement of creditors' rights or remedies in general from time to time in effect and the exercise by courts of equity powers or their application of principles of public policy.

(b)   Safelite Authority.   (i) Safelite has all requisite legal and corporate power to execute and deliver this License Agreement, to perform its obligations under

this License Agreement and to consummate the transactions contemplated by this License Agreement, (ii) Safelite has taken all corporate action necessary for the authorization, execution and delivery of this License Agreement and the consummate the transactions contemplated by this License Agreement, (iii) Safelite has no agreement or understanding with any third party that interferes with or will interfere with its performance of its obligations under this License Agreement, (iv) Safelite has obtained and will maintain all rights, approvals and consents necessary to perform its obligations under this License Agreement and (v) this License Agreement constitutes legal, valid, and binding obligations of Safelite, enforceable against Safelite in accordance with its respective terms except as enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws, both state and federal, affecting the enforcement of creditors' rights or remedies in general from time to time in effect and the exercise by courts of equity powers or their application of principles of public policy.

(c)     Non-Infringement. Except as set forth on Schedule 5(c), Safelite represents and warrants that it owns or has the right, under valid and enforceable agreements, to grant the license of the eDoc Software herein; the eDoc Software does not, and its use by HQ and its customers as contemplated by this License Agreement will not infringe or otherwise violate any Intellectual Property Rights or other proprietary rights of any third party, and Safelite has not received any charge, complaint, claim, demand or notice alleging any such infringement or violation. HQ represents and warrants that in connection with the use of the eDoc Software and HQ Modifications, it has not and shall not infringe on any Intellectual Property Rights or other proprietary right of any third party. Neither HQ nor any other company or individual involved with the use of eDoc Software and HQ Modifications is under any obligations to assign or give any work under this License Agreement to a third party.

(d)     Disclaimer. EXCEPT AS SET FORTH ABOVE, NEITHER PARTY MAKES ANY OTHER REPRESENTATIONS AND WARRANTIES INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY AND OF FITNESS FOR A PARTICULAR PURPOSE.

6.     **Limitation of Liability**.

(a)     Disclaimer of Indirect Damages. NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES, INCLUDING LOST PROFITS, REGARDLESS OF THE FORM OF THE ACTION OR THE THEORY OF RECOVERY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF THOSE DAMAGES. SAFELITE SHALL NOT BE LIABLE TO HQ FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES FROM USE OF THE EDOC SOFTWARE IN A MANNER NOT AUTHORIZED BY THIS LICENSE AGREEMENT, USE OR INABILITY TO USE THE EDOC SOFTWARE AND LOSS OF DATA.

      (b)    Exclusions.  Notwithstanding the foregoing, the limitations of liability set forth in this Article 6 will not apply to losses in connection with (i) death or personal injury caused by a Party; (ii) a Party's breach of the confidentiality provisions or or (iii) claims pursuant to the indemnification provisions set forth in Article 8.

      7.    **Confidential Information.**

      (a)    Confidential Information.  Each Party has made and will continue to make available to the other Party information (including, without limitation, the source code for the eDoc Software) that is not generally known to the public and at the time of disclosure is identified, or would reasonably be understood by the receiving Party, to be proprietary or confidential (**"Confidential Information"**).  Confidential Information may be disclosed in oral, written, visual, electronic or other form.

      (b)    Obligations.  The receiving Party will use the same care and discretion to avoid disclosure, publication or dissemination of any Confidential Information received from the disclosing Party as the receiving Party uses with its own similar information that it does not wish to disclose, publish or disseminate (but in no event less than a reasonable degree of care).  The receiving Party will be liable for any unauthorized disclosure or use of Confidential Information by any of its personnel, agents, subcontractors or advisors.  The receiving Party will promptly report to the disclosing Party any breaches in security that may materially affect the disclosing Party and will specify the corrective action to be taken.  Upon the termination of this License Agreement, each Party shall return to the other Party the Confidential Information of the other Party.

      (c)    Third Party.  Subject to the terms and conditions herein, HQ may disclose Safelite's Confidential Information to any affiliates, contractors, consultants, and other third parties (the "Third Party") that have a need-to-know and are obligated to maintain the confidentiality of Safelite's Confidential Information upon terms similar to those contained in this License Agreement; provided, that the Third Party executes a non-disclosure and confidentiality agreement in form and substance attached hereto as Schedule 7(c).  HQ will be liable for any unauthorized disclosure or use of Safelite's Confidential Information by the Third Party.  HQ will promptly report to Safelite any breaches in security that may materially affect Safelite and will specify the corrective action to be taken.  HQ shall promptly deliver to Safelite a signed copy of all such confidentiality agreements.

      (d)    Injunctive Relief. HQ acknowledges that the unauthorized use, transfer or disclosure of the source code of the eDoc Software or any HQ Modifications will (i) substantially diminish the value to Safelite of the trade secrets and other proprietary interests that are the subject of this License Agreement; (ii) render Safelite's remedy at law for such unauthorized use, disclosure or transfer inadequate; and (iii) cause irreparable injury in a short period of time.  If HQ breaches any of its obligations with respect to the use or confidentiality of the source code of the eDoc Software or HQ

Modifications, Safelite shall be entitled to equitable relief to protect its interests therein, including, but not limited to, preliminary and permanent injunctive relief.

      (e)    Exceptions to Confidential Treatment.

      (i)    Exclusions. The obligations set forth in Section 7 do not apply to any Confidential Information that the receiving Party can demonstrate: (i) the receiving Party possessed prior to disclosure by the disclosing Party, without an obligation of confidentiality; (ii) is or becomes publicly available without breach of this License Agreement by the receiving Party; (iii) is or was independently developed by the receiving Party without the use of any Confidential Information of the disclosing Party; or (iv) is or was received by the receiving Party from a third Party that does not have an obligation of confidentiality to the disclosing Party.

      (ii)    Legally Required Disclosure. If the receiving Party is legally required to disclose any Confidential Information of the disclosing Party in connection with any legal or regulatory proceeding, the receiving Party will endeavor to notify the disclosing Party within a reasonable time prior to disclosure, and will allow the disclosing Party a reasonable opportunity to seek appropriate protective measures or other remedies prior to disclosure and/or waive compliance with the terms of this License Agreement. If these protective measures or other remedies are not obtained, or the disclosing Party waives compliance with the terms of this License Agreement, the receiving Party may disclose only that portion of that Confidential Information that it is, according to the opinion of counsel, legally required and will exercise all reasonable efforts to obtain assurance that confidential treatment will be accorded to that Confidential Information.

    8.    **Indemnity**.

      (a)    Safelite Indemnification. Safelite will indemnify, defend and hold harmless HQ and its officers, directors, employees, agents, successors and assigns from any and all third party claims to recover any and all losses, liabilities, damages and claims (including taxes), and all related costs and expenses, including reasonable legal fees and disbursements and costs of investigation, litigation, settlement, judgment, interest and penalties (collectively, "**Losses**"), due to third party claims arising from, or in connection with, (i) Safelite's breach of this License Agreement, (ii) any actual or alleged U.S. or Canadian infringement, violation or misappropriation of the Intellectual Property Rights of a third party by the eDoc Software (or the use of the eDoc Software) or (iii) grossly negligent or willful acts or omissions of or by Safelite or its personnel. The foregoing indemnity will not cover third party infringement claims (i) outside the United States and Canada, or (ii) to the extent resulting from HQ Modifications.

      (b)    HQ Indemnification. HQ will indemnify, defend and hold harmless

Safelite and its officers, directors, employees, agents, successors and assigns from any and all third party claims to recover any and all Losses due to third party claims arising from, or in connection with, (i) HQ's breach of this License Agreement, (ii) any actual or alleged infringement, violation or misappropriation of the Intellectual Property Rights of a third party by the HQ Modifications (or the use of the HQ Modifications) or the Future Modifications (or the use of the Future Modifications), or (iii) grossly negligent or willful acts or omissions of or by HQ or its personnel. The foregoing indemnity will not cover third party infringement claims to the extent resulting from modifications by any party other than HQ or HQ's employees, sublicensees, agents, representatives or licensees to the eDoc Software.

        (c)    Indemnification Procedures. The obligations of an indemnifying party under this Section 7 are subject to the conditions that: (i) the indemnifying party is notified promptly in writing by the indemnified party of any claim; (ii) the indemnifying party has sole control of the defense and all negotiation for any settlement or compromise; and (iii) the indemnified party reasonably assists the indemnifying party in the defense of the claim. No settlement or compromise that imposes any liability or obligation on any indemnified party will be made without such party's prior written consent (not to be unreasonably withheld).

9.    **Miscellaneous.**

        (a)    Non-solicitation. Each Party covenants and agrees that it, directly or indirectly, shall not, during the term of this License Agreement and for a period of two years after the termination of this License Agreement, solicit any of the employees, consultants or subcontractors of the other Party.

        (b)    Notices. All notices, requests, demands, or other communications hereunder (including notices of all asserted claims or liabilities) shall be in writing and shall be either delivered personally, by messenger service, or by prepaid guaranteed overnight delivery service, or mailed by U.S. mail, certified or registered, with appropriate postage prepaid, to the addressees and addresses herein designated, or such other address as may be designated in writing by notice given in the manner provided herein, and shall be effective (a) upon personal delivery thereof, if delivered personally or by messenger service, (b) one (1) business day after delivery to the overnight delivery service for next business day delivery, if delivered by overnight delivery service, or (c) three (3) days following deposit in the U.S. mail if sent by mail, whether or not delivery is accepted:

        To HQ:        HQ, Inc.
                            1300 West Belmont Avenue
                            Suite 200
                            Chicago, IL 60657
                            Attn: Jeff Hogan

| With a copy to: | Sachnoff & Weaver, Ltd.<br>30 S. Wacker Drive<br>29th Floor<br>Chicago, IL 60606<br>Attn:   Stewart Dolin, Esq. |
| --- | --- |
| To Safelite: | Safelite Group, Inc.<br>2400 Farmers Drive<br>Columbus, OH 43235<br>Attn: Chief Financial Officer |
| With a copy to: | Safelite Group, Inc.<br>2400 Farmers Drive<br>Columbus, OH 43235<br>Attention:  General Counsel |

or to such other place and with such other copies as any Party may designate as to itself by written notice to the other Parties.

(b)     Successors and Assigns; Third Party Beneficiaries. This License Agreement will be binding upon the Parties and their respective successors, personal representatives, heirs and assigns; however, no Party will have any right to assign any of its rights and obligations pursuant to this License Agreement except with the prior written consent of the other Party, except that HQ may assign this License Agreement in connection with a Sale of HQ (as that term is defined in the Master Agreement) without Safelite's consent.  Notwithstanding the foregoing, HQ must have the prior written consent of Safelite to assign this License Agreement in connection with a Sale of HQ prior to July 6, 2009 to Visteon Corporation, PPG Industries, Inc., Pilkington, or any affiliate or subsidiary thereof, or to any third party that, at the time of such Sale of HQ, competes with Safelite in the business of glass manufacturing or automotive glass repair or replacement.

(c)     Further Execution. The Parties agree to execute any additional documents or instruments, and to take any and all other actions, necessary to carry out the purposes of this License Agreement.

(d)     Headings. The headings herein are solely for the convenience of the parties and shall not serve to modify or interpret the text of the Sections at the beginning of which they appear.

(e)     Entire Agreement.   This License Agreement and the related agreements referred to herein constitute the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior communications, writings, and other documents with regard thereto. No modification, amendment, or waiver of any

provision hereof shall be binding upon any Party unless it is in writing and executed by all of the Parties or, in the case of a waiver, by the Party waiving compliance.

        (f)     <u>Governing Law; Jurisdiction</u>.  This License Agreement shall be construed and governed in accordance with the internal laws of the State of Illinois, without regard to its choice of law principles. Each of the Parties hereby submits to the exclusive jurisdiction and venue of the federal and state courts presiding in Cook County, Illinois, with respect to any dispute concerning or arising out of this License Agreement.

        (g)     <u>Counterparts and Facsimile Signature</u>.  This License Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement. For purposes of executing and delivering this License Agreement or any of the other documents or instruments required hereunder, a signed document transmitted by facsimile machine ("Fax") shall be treated in all manner and respect as an original document. The signature of any Party by Fax shall be considered for these purposes as an original signature. Any such Fax shall be considered to have the same binding legal effect as an original document. At the request of either Party, any Fax document subject to this License Agreement shall be re-executed by both Parties in an original form. The Parties hereby agree that none of the Parties shall raise the use of the Fax or the fact that any signature or document was transmitted or communicated through the use of a Fax as a defense to the formation of this License Agreement.

        (h)     <u>Severability</u>.  If any provision (in whole or in part) of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable, then such provision shall be deemed modified, restricted, or reformulated to the extent and in the manner necessary to render the same valid and enforceable, or shall be deemed excised from this Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent permitted by law, as if such provision had been originally incorporated herein as so modified, restricted, or reformulated or as if such provision had not been originally incorporated herein, as the case may be. The parties hereto further agree to seek a lawful substitute for any provision found to be unlawful. If such modification, restriction or reformulation is not reasonably possible, the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected thereby and the provisions of this Agreement shall be severable in any such instance.

**[Signature Pages Follows]**

IN WITNESS WHEREOF, the undersigned have caused this License Agreement to be duly executed as of the day and year first above written.

HQ, INC.

_____
Jeffrey J. Hogan
Its: President

SAFELITE GROUP, INC.

_____
Douglas A. Herron
Its: Executive Vice President, CFO

IN WITNESS WHEREOF, the undersigned have caused this License
Agreement to be duly executed as of the day and year first above written.

HQ, INC.

Jeffrey J. Hogan
Its: President

SAFELITE GROUP, INC.

_____
Douglas A. Herron
Its: Executive Vice President, CFO

IN WITNESS WHEREOF, the undersigned have caused this License Agreement to be duly executed as of the day and year first above written.

HQ, INC.

_____

Jeffrey J. Hogan
Its: President

SAFELITE GROUP, INC.

_____

Douglas A. Herron
Its: Executive Vice President, CFO

# EXHIBIT 2

Execution Copy

### MASTER AGREEMENT

This Agreement (the "**Agreement**") is made and entered into as of the 6th day of July, 2004, by and between HQ, Inc., an Illinois corporation ("**HQ**"), and Safelite Group, Inc., a Delaware corporation ("**Safelite**"). HQ and Safelite hereinafter sometimes are referred to, individually, as a "**Party**" and, collectively, as "**Parties**."

### RECITALS

A.     Safelite owns all rights to collision claims management software commonly referred to as eDoc ("**eDoc Software**").

B.     Safelite desires to grant HQ a perpetual license to the eDoc Software in consideration for certain royalties, an equity interest in HQ and certain rights regarding future equity financings of HQ or a sale of HQ, all as set forth herein.

**NOW, THEREFORE,** in consideration of the foregoing Recitals, which are specifically incorporated herein by this reference, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.     **Closing.**  The closing of the transactions provided for herein (the "**Closing**") will occur at the offices of HQ, or other mutually agreed upon location, on the date hereof. All actions to be taken at Closing will be considered to be taken simultaneously, and no document, agreement, or instrument will be considered to be delivered until all items which are to be delivered at the Closing have been delivered. At the Closing, the following actions will occur:

(a)     **Software License.**  Safelite and HQ will enter into the Software License Agreement attached hereto as Exhibit A (the "**Software License Agreement**") and Safelite will deliver to HQ any updates to the source code for the eDoc Software previously delivered to HQ.

(b)     **Software Services Agreement.**  Safelite and HQ will enter into the Services Agreement attached hereto as Exhibit B (the "**Services Agreement**") and the Supplements related to the Collision Glass Solution and Vandalism Solution that are included in Exhibit B.

(c)     **Shareholder Agreement.**  Safelite, HQ and all of the shareholders of HQ will enter into the Amended and Restated Shareholders Agreement attached hereto as Exhibit C ("**Shareholders Agreement**").

(d)     **Safelite Loan to HQ.**  Safelite will make available to HQ up to Four Hundred Fifty Thousand Dollars ($450,000) pursuant to that certain promissory note in the form of Exhibit D attached hereto ("**Note**") and HQ shall execute the Note.

(e)     **Security Agreement.**  Safelite and HQ will enter into the Security Agreement attached hereto as Exhibit E ("**Security Agreement**", and collectively with the Software License Agreement, Services Agreement, Shareholders Agreement and Note, the "**Other Agreements**").

(f)   **Issuance of HQ Shares to Safelite.** HQ will issue to Safelite 1,232 shares of Common Stock, par value $0.001 per share (the "**Shares**"), in consideration for $10.00 and Safelite shall pay the purchase price of $10.00.

(g)   **Representations True.** All of the representations and warranties made by each of the Parties in this Agreement shall be true and correct in all respects as of the Closing Date.

(h)   **No Default.** There shall exist as of the date hereof no condition or event that constitutes, or that after notice or lapse of time, or both, would constitute, an Event of Default under this Agreement or under any of the Other Agreements.

(i)   **Proceedings.** All corporate and other proceedings and all documents incidental to the transactions contemplated herein, including but not limited, to the purchase of the Shares shall be reasonably satisfactory in substance and form to Safelite and Safelite shall have received the following:

(i)   The Certificate of Incorporation certified by the Secretary of State of the State of Illinois;

(ii)   Certificates as to the corporate good standing of HQ issued by the Secretary of State of the State of Illinois;

(iii)   By-laws of HQ, certified by its Secretary as of the Closing Date; and

(iv)   Resolutions of the Board of Directors of HQ ("**Board**") and shareholders of HQ, authorizing and approving all matters in connection with this Agreement and the transactions contemplated hereby, certified by the Secretary of HQ as of the Closing Date.

(j)   **Board of Directors.** The Board shall consist of those members appointed in accordance with Section 8 of the Shareholders Agreement.

(k)   **Other Acts.** The Parties will execute any other documents reasonably required to carry out the intent of this Agreement. Each of the Parties shall have performed in all material respects all obligations and agreements and complied with all covenants and other items contained in this Agreement required to be performed or fulfilled by such Party on or before the applicable date of performance of fulfillment.

(l)   **Closing Costs.** Safelite and HQ shall pay their respective closing costs and all other items required to be paid at Closing, except as otherwise provided herein. Safelite and HQ shall sign all required documents at or before Closing.

2.   **[Reserve].**

3.   **Representations and Warranties by HQ.** HQ represents and warrants to Safelite as follows:

208361/0000/666226/Version #:.4

(a)     Capitalization. The authorized capital stock of HQ consists of 100,000 shares of common stock, par value $0.001 per share (the **"Common Stock"**), of which 6,981 shares are issued and outstanding, and 3,000 shares of preferred stock, none of which are issued and outstanding. All of the issued and outstanding shares of common stock are duly authorized, validly issued, fully paid and nonassessable, and were issued in conformity with all applicable state and federal securities laws. Except as described on Schedule 3(a), HQ has no other equity securities of any class issued, reserved for issuance, or outstanding. Except as described on Schedule 3(a), there are no outstanding options, offers, warrants, conversion rights, agreements, or other rights to subscribe for or to purchase from HQ, or commitments by HQ to issue, transfer, or sell (either written or oral, formal or informal, firm or contingent), shares of or interests in the capital stock or other securities of HQ (whether debt, equity, or a combination thereof) or obligating HQ to grant, extend or enter into any such agreement or commitment. The Shares represent fifteen percent (15%) of the Pro Forma Stock of HQ. **"Pro Forma Stock"** means, as of the date of this Agreement, all issued and outstanding shares of Common Stock plus all shares of Common Stock which would then be issuable upon conversion or exchange of all issued and outstanding options, warrants, or other rights to acquire shares of Common Stock, and securities and other instruments that are convertible into or exchangeable for shares of the Common Stock.

(b)     Authority. (i) HQ has all requisite legal, corporate power and authority to enter into this Agreement and the Other Agreements, to perform its obligations under this Agreement and the Other Agreements and to consummate the transactions contemplated by this Agreement and the Other Agreements; (ii) all necessary corporate action has been taken by and on behalf of HQ and its shareholders with respect to the execution, delivery, and performance by HQ of this Agreement and the Other Agreements and the consummation of the transactions contemplated by this Agreement and the Other Agreements; (iii) HQ has no agreement or understanding with any third party that interferes with or will interfere with its performance of its obligations under this Agreement and the Other Agreements; (iv) HQ has obtained and will maintain all rights, approvals and consents necessary to perform its obligations under this Agreement and the Other Agreements; and (v) this Agreement and the Other Agreements constitute legal, valid, and binding obligations of HQ, enforceable against HQ in accordance with their respective terms except as enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws, both state and federal, affecting the enforcement of creditors' rights or remedies in general from time to time in effect and the exercise by courts of equity powers or their application of principles of public policy.

(c)     Shareholder List and Agreements. Schedule 3(c) is an accurate and complete list of the shareholders of HQ, showing the number of Common Stock or other securities of HQ held by such shareholder as of the date of this Agreement. Except as contemplated by this Agreement or as set forth in Schedule 3(c), there are no agreements, written or oral, between HQ and any holder of its capital stock, or, to HQ's knowledge, among any holders of its capital stock, relating to the acquisition, disposition or voting of the capital stock of HQ.

(d)     Noncontravention. Neither the execution, delivery, and performance of this Agreement, the Other Agreements, and the other instruments and transactions contemplated by this Agreement, nor the sale of the Shares will violate any provision of law, any order of any court or other agency of government, the certificate of incorporation or by-laws of HQ or any

agreement or instrument to which HQ is a party or by which HQ is bound, or be in conflict with, result in a breach of, or constitute (with notice or lapse of time, or both) a default under any such agreement or instrument, or result in the creation or imposition of any lien of any nature whatsoever upon the Shares or, except as set forth on Schedule 3(d) require HQ to obtain any consents or approvals of any governmental authority or third party.

(e)   Financial Statements.  The balance sheet of HQ as of December 31, 2003 and income statements of HQ for the 12 months ended December 31, 2003, are attached hereto as Schedule 3(e) (collectively the "**Financial Statements**"), have been prepared from and are in accordance with the books and records of HQ.  The Financial Statements fairly present the financial condition and results of operations of HQ as of the dates and for the periods stated or covered thereby in all material respects.  The Financial Statements do not omit or fail to identify material nonrecurring income or other specific items, do not omit or fail to identify the existence of material transactions not in the ordinary course of business, and contain no excessive write-downs or write-ups of any material assets.  Except as set forth on Schedule 3(e) and other than those shown in the Financial Statements, HQ does not have any material liabilities or material obligations of any nature whatsoever, whether accrued, absolute, contingent, or otherwise, and whether due or to become due, nor does HQ have knowledge of any basis for the assertion against HQ of any material liability of any nature whatsoever, unless such liability has been fully reflected or reserved against in the Financial Statements.  Since December 31, 2003, (a) there has been no material adverse change in the business, assets or condition, financial or otherwise, operations or prospects of HQ; and (b) HQ has not entered into any material transaction other than in the ordinary course of business or made any distribution on its capital stock.

(f)   Litigation.  Except as set forth on Schedule 3(f), there is no claim, litigation, action, suit, proceeding, investigation or inquiry, administrative or judicial, at law, in equity or before or by any federal, state, local or other governmental authority, pending or, to HQ's knowledge, threatened against or that could be threatened or affecting HQ or any of its properties or assets, including, without limitation, any for the purpose of enjoining or preventing the consummation of the transactions contemplated by this Agreement and the Other Agreements, or otherwise claiming that this Agreement and the Other Agreements, the transactions contemplated by this Agreement and the Other Agreements, or the consummation of those transactions are improper.  HQ and its properties and assets are not subject to any order, writ, injunction or decree of any court or any governmental authority.

(g)   Securities.  The Shares have been duly authorized and will be validly issued, fully paid and nonassessable and will be free of restrictions on transfers other than restrictions imposed on HQ or its shareholders as set forth on Schedule 3(g) as are contained in this Agreement, the Shareholders Agreement and under applicable state and federal securities laws.

(h)   Securities Laws.  No consent, authorization, approval, permit, or order of or filing with any governmental or regulatory authority is required under current laws and regulations in connection with the execution and delivery of either this Agreement, the Other Agreements, or the issuance, sale, or delivery of the Shares to Safelite in conformity with the terms of this Agreement and the Other Agreements other than the notification with respect thereto, if required, under applicable federal and state securities laws, which notification has

4

been or will be effected. HQ has not: (a) issued any securities in violation of the requirements of Section 5 of the Securities Act or any other law; (b) violated any rule, regulation or requirement under the Securities Act or the Securities Exchange Act of 1934, as amended; (c) issued any securities in violation of any state securities laws; or (d) redeemed any securities in violation of any applicable state or federal securities law or any agreement or contract governing the redemption of such securities.

(i)  Material Contracts and Agreements.  Schedule 3(i) lists all material contracts, agreements, leases, commitments, instruments, arrangements and understandings, whether written or oral, to which HQ is a party (the "**Material Contracts**").  The Material Contracts are valid and binding, are in full force and effect and are enforceable in accordance with their respective terms, except as enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws, both state and federal, affecting the enforcement of creditors' rights or remedies in general from time to time in effect and the exercise by courts of equity powers or their application of principles of public policy.  HQ has not assigned, mortgaged, pledged, encumbered or otherwise hypothecated any of its right, title and interest under the Material Contracts.  Except as set forth on Schedule 3(i), neither HQ nor, to the HQ's knowledge, any other party thereto is in violation of, or in default in respect of any Material Contract.  HQ has not received any oral or written notice claiming any such violation or default by HQ or indicating the desire or intention of any other party thereto to amend, modify, rescind or terminate a Material Contract.

(j)  Proprietary Rights.  Schedule 3(j) lists or describes all patents, trademarks, service names, trade names, copyrights, licenses and other proprietary rights used in HQ's business as now conducted (the "**Proprietary Rights**").  HQ owns, or has the right to use under the agreements or upon the terms described in Schedule 3(j), all of the Proprietary Rights, and has taken all actions reasonably necessary to protect the Proprietary Rights.  HQ has not received any oral or written notice that it is infringing upon or otherwise acting adversely to the right or claimed right of any Person under or with respect to any of the foregoing, and to HQ's knowledge, there is no basis for any such claim.  HQ has no knowledge of any violation by a third party of any of the Proprietary Rights.  HQ has no knowledge that any of its employees is obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would materially interfere with his or her duties to HQ or that would materially conflict with HQ's business as presently conducted.  HQ does not believe it is or will be necessary to utilize any inventions of any of its employees made prior to their employment by HQ, except for inventions that have been assigned to HQ.

(k)  Subsidiaries.  HQ has no Subsidiaries and does not otherwise own or control, directly or indirectly, any interest in any corporation, partnership, limited liability company, joint venture or other entity or business concern.

(l)  Regulation.  Except as provided in Schedule 3(l), HQ has obtained, or is in the process of obtaining, all licenses, permits and other authorizations required by any federal, state, or local regulatory body to conduct the business of HQ, the failure of which to obtain would reasonably be expected to have a material adverse effect on HQ, and there is no regulatory

208361/0000/666226/Version #:.4

restriction that has a material adverse effect on the ability of HQ to conduct its business as presently conducted.

(m) <u>Other Agreements of Employees</u>. Except as set forth on <u>Schedule 3(m)</u>, to HQ's knowledge, no officer, director, stockholder, or employee of HQ is a party to or bound by any agreement, contract, or commitment that affects the business, operations or prospects of HQ, or the right of any such person to participate in HQ's affairs and perform the duties of his or her office or capacity in connection therewith, or that obligates any such person to perform any duty for any prior employer or principal.

(n) <u>Title to Properties and Assets; Liens, etc.</u> HQ has good and marketable title to its properties and assets and good title to all its leasehold estates, in each case subject to no mortgage, pledge, lien, encumbrance or charge, other than Permitted Liens. HQ owns no real property and with respect to the property and assets that HQ leases, HQ is in material compliance with all terms of each such lease and holds a valid leasehold interest free of any liens, claims or encumbrances except for Permitted Liens. **"Permitted Liens"** means (a) liens for taxes, assessments or governmental charges or levies not yet due and payable; (b) liens imposed by law, such as materialmen's, mechanics', carriers', workers', employees' and repairmen's liens; (c) pledges or deposits to secure obligations under workers' compensation laws or similar legislation or to secure public or statutory obligations of HQ; (d) the Security Interests existing on the date of this Agreement disclosed on <u>Schedule 3(n)</u>; (e) Security Interests created in connection with and limited to capitalized lease obligations disclosed on <u>Schedule 3(n)</u>; or (f) zoning restrictions, easements, licenses, restrictions on the use of real property or minor irregularities in title thereto that do not materially impair the use of such property in the operation of its business or the value of such property for the purpose of such business; provided, however, that none of the liens, Security Interests or other encumbrances listed in clauses (a), (b), (c) or (d) will constitute a "Permitted Lien" on and after the commencement in respect thereof of any enforcement, collection, execution, levy or foreclosure or forfeiture proceeding that remains unstayed or unbonded for ten consecutive days and that involves more than $100,000. **"Security Interest"** means any lien, pledge, mortgage, encumbrance, charge or security interest of any kind whatsoever (including, without limitation, the lien or retained security title of a conditional vendor) whether arising under a security instrument or as a matter of law, judicial process or otherwise or the agreement by any Person to grant any lien, security interest or pledge, mortgage or encumber any asset.

(o) <u>Taxes</u>. The amount shown on the Financial Statements as provision for taxes is sufficient in all material respects for payment of all accrued and unpaid federal, state, county, local and foreign taxes for the period then ended and all prior periods. HQ has filed or has obtained presently effective extensions with respect to all federal, state, county, local and foreign tax returns that are required to be filed by it. All returns filed by HQ are accurate and correct in all material respects and all taxes shown on those returns to be due have been timely paid, except where the failure to timely pay would not have a material adverse effect on HQ. HQ's federal income tax returns have not been audited by the Internal Revenue Service, and no controversy with respect to taxes to any type is pending or, to HQ's knowledge, threatened.

(p) <u>No Preemptive Rights</u>. Except as set forth on <u>Schedule 3(p)</u>, no person has any right of first refusal or any preemptive rights in connection with the issuance of the

Shares or any future issuance of securities by HQ, except pursuant to and as set forth in this Agreement and the Shareholders Agreement.

(q) <u>Registration Rights.</u> HQ is not under any contractual obligation to register with the Securities Exchange Commission or any state any of its currently outstanding securities or any of its securities that may hereafter be issued.

(r) <u>Employee Benefit Plans.</u> Except as set forth on <u>Schedule 3(r)</u>, HQ does not maintain or contribute to, and has never maintained or contributed to, any employee benefit plan.

(s) <u>Employees.</u> Except as set forth on <u>Schedule 3(s)</u>, no employee or consultant of HQ has any written agreement with HQ governing, relating or otherwise regarding such employee's employment with HQ. Except as set forth in <u>Schedule 3(s)</u>, all the employees and consultants of HQ are at-will employees. To HQ's knowledge, no employee of or consultant to HQ is in violation of any term of any employment contract or any other contract or agreement relating to the relationship of any such person with HQ or any other party because of the nature of the business conducted by HQ. To HQ's knowledge, there is no material information that is proprietary to another party that HQ is now utilizing that was provided by any employee of HQ. HQ is not aware of any key employee of HQ who has any plans to terminate his or her employment with HQ.

(t) <u>Labor Agreements and Actions.</u> HQ is not bound by or subject to (and none of its assets or properties is bound by or subject to) any written or oral, express or implied, contract, commitment or arrangement with any labor union, and no labor union has requested or has sought to represent any of the employees, representatives or agents of HQ. There is no strike or other labor dispute involving HQ pending, or, to HQ's knowledge, threatened, nor is HQ aware of any labor organization activity involving employees of HQ.

(u) <u>Insurance.</u> Schedule 3(q) contains a description of each insurance policy maintained by HQ with respect to its properties, assets and business, and each such policy is presently in full force and effect. HQ is not in material default with respect to any insurance policy maintained by it.

(v) <u>Representations Complete.</u> No representation or warranty of HQ made in this Agreement or any of the Other Agreements, or in any schedule, document or certificate furnished pursuant to this Agreement or any of the Other Agreements, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make any statement of fact contained herein or therein not misleading. There is no fact or circumstance that is not disclosed in this Agreement, the Other Agreements or the schedules hereto that could reasonably be expected to have a material adverse effect on the HQ's financial condition, operating results, assets, supplier relations, customer relations, employee relations or business prospects.

4. **Representations, Warranties and Covenants by Safelite.** Safelite represents and warrants as follows:

208361/0000/666226/Version #:.4

(a)    Authority. (i) Safelite has all requisite corporate power and authority to enter into this Agreement and the Other Agreements, to perform its obligations under this Agreement and the Other Agreements and to consummate the transactions contemplated by this Agreement and the Other Agreements; (ii) all necessary corporate action has been taken by and on behalf of Safelite and its shareholders with respect to the execution, delivery, and performance by Safelite of this Agreement and the Other Agreements and the consummation of the transactions contemplated by this Agreement and the Other Agreements; (iii) Safelite has no agreement or understanding with any third party that interferes with or will interfere with its performance of its obligations under this Agreement and the Other Agreements except as set forth on Schedule 4(a); (iv) Safelite has obtained and will maintain all rights, approvals and consents necessary to perform its obligations under this Agreement and the Other Agreements except as set forth on Schedule 4(a); and (v) this Agreement and the Other Agreements constitute legal, valid, and binding obligations of Safelite, enforceable against Safelite in accordance with their respective terms except as enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws, both state and federal, affecting the enforcement of creditors' rights or remedies in general from time to time in effect and the exercise by courts of equity powers or their application of principles of public policy.

(b)    Noncontravention. Neither the execution, delivery, and performance by Safelite of this Agreement, the Other Agreements, and the other instruments and transactions contemplated by this Agreement and the Other Agreements will violate any provision of law, any order of any court or other agency of government, the certificate of incorporation or by-laws of Safelite or any agreement or instrument to which Safelite is a party or by which Safelite is bound, or be in conflict with, result in a breach of, or constitute (with notice or lapse of time, or both) a default under any such agreement or instrument.

(c)    Investment Representations.

(i)    Safelite represents that the Shares are being acquired for Safelite's own account, for investment purposes only and not with a view towards distribution or resale to others. Safelite will not attempt to sell, transfer, assign, pledge or otherwise dispose of all or any portion of the Shares unless it is registered under the Securities Act of 1933, as amended ("**Securities Act**"), or unless in the opinion of counsel satisfactory to HQ an exemption from such registration is available.

(ii)    Safelite confirms that HQ has made available to it the opportunity to ask questions of and receive answers and additional information from HQ concerning HQ and the activities of HQ.

(iii)    Safelite has relied solely upon the investigations made by or on behalf of Safelite in evaluating the suitability of an investment in HQ. Safelite recognizes that an investment in HQ involves a high degree of risk. Safelite is familiar with and understands the terms of this Agreement and has not relied on any representations or warranties of HQ in evaluating the investment other than the representations and warranties contained herein or in the Other Documents.

8

(iv)   In making an investment decision, Safelite must rely on its own examination of HQ and the terms of this Agreement, including the merits and risks involved. Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the Shares.

(v)   The Shares are subject to restrictions on transferability and resale under applicable law and may not be transferred or resold except as permitted under the Securities Act and the applicable state securities laws, pursuant to registration or exemption therefrom. Safelite acknowledges that it will be required to bear the financial risks of this investment for an indefinite period of time.

(vi)   Safelite is an "accredited investor" as that term is defined under Regulation D of the Securities Act of 1933, as amended.

5.   **Covenants of HQ.**

(a)   HQ shall deliver the following to Safelite:

(i)   As soon as available and in any event within 90 days after the end of each fiscal year of HQ: (x) a balance sheet of HQ as of the end of such year, a statement of income and of surplus for such year and a statement of changes in financial position during such year (collectively the **"Annual Financial Statements"**), including such annual financial statements that set forth in comparative form, if possible, the corresponding figures for the preceding year. Such Annual Financial Statements must be certified by an officer of HQ as complete and accurate to the best of his or her knowledge, and were prepared in accordance with GAAP (except for the lack of footnotes).

(ii)   As soon as available and in any event within 60 days after the end of the first three quarters of each fiscal year of HQ, a balance sheet of HQ as of the end of such period(s), a statement of income and surplus for such period(s) and the fiscal year to that date and a statement of changes in financial position for the fiscal year to that date, subject to changes resulting from normal year-end adjustments, setting forth in each case in comparative form, if possible, the corresponding figures for the corresponding period of the preceding fiscal year and the corresponding figures for sales, gross profit, net income and the heading titled "EBIT" for the corresponding period for the budget for the current fiscal year. Such balance sheet and statements must be certified by an officer of HQ as complete and accurate to the best of his or her knowledge, subject to normal year-end adjustments.

(iii)   Concurrent with the furnishing of the Annual Financial Statements pursuant to paragraph (i) and each of the quarterly statements pursuant to paragraph (ii), a certificate of an officer of HQ that contains a statement, in form and substance satisfactory to Safelite, to the effect that, to his or her knowledge and belief, no Event of Default, or any event that, upon notice or lapse of time, or both, would constitute an Event of Default, has occurred, or if there shall have been an Event of Default, or an event that upon notice or lapse of time, or both, would constitute an Event of Default,

   208361/0000/666226/Version #: 4

such certificate must disclose the details thereof. In each such certificate the officer of HQ must also certify that the financial statements furnished pursuant to paragraphs (i) and (ii) were prepared in accordance with GAAP (except for the lack of footnotes).

(b)    If all or any portion of any indebtedness of HQ is declared due and payable before its express maturity, or if HQ otherwise is in continuous default under any agreement with respect to indebtedness of HQ, which default may reasonably be expected to have a material adverse effect on the HQ's business, HQ shall give written notice thereof to Safelite, within ten days after the occurrence of each such event.

(c)    HQ shall give notice to Safelite as soon as practicable and in any event within ten days after the occurrence of any of the following events, stating in detail the nature thereof: (i) any proceeding instituted against HQ or any Subsidiary by or in any federal or state court or before any commission, board, or other regulatory body, federal, state, or local; (ii) the occurrence of any event that is, or with notice or passage of time, or both, would be, an Event of Default under any of the Other Agreements; or (iii) any condition or event that may have a material adverse effect on HQ's financial condition, operating results, assets, operations, business or prospects, but excluding conditions or events which effect the economy in general and/or the industry in which HQ operates in general.

(d)    HQ shall keep, and shall cause each of its Subsidiaries to keep, books and records reflecting all of its business affairs and transactions in accordance with GAAP and permit Safelite and its representatives, at Safelite's sole cost and expense, during normal business hours, at intervals not more often than one times every twelve months and upon reasonable advanced written notice to HQ of at least fifteen (15) business days, to (i) visit and inspect any of the properties of HQ and its subsidiaries, (ii) examine the corporate and financial records of HQ and its Subsidiaries, if any, and (iii) discuss the affairs, finances and accounts of any such corporations with the directors, officers and independent accountants of HQ and its Subsidiaries.

(e)    HQ shall designate Safelite as its primary provider of collision glass repair and replacement; provided, however, that HQ may revoke this designation for a particular client at any time if such client requests that HQ revoke this designation.

(f)    HQ shall comply in all material respects with all applicable laws (whether federal, state or local and whether statutory, administrative or judicial or other) and with every applicable lawful governmental order (whether administrative or judicial) regarding its business where the failure to so comply would reasonably be expected to have a material adverse effect on HQ.

(g)    The covenants and agreements of HQ contained in Subsections 5(a) through 5(f) above shall terminate upon the earlier of (a) the Sale of HQ, (b) a Qualified Public Offering, or (c) July 6, 2009.

6.    **Negative Covenants**. HQ, for itself and for each Subsidiary that is hereafter formed or acquired, covenants to and agrees with Safelite that, prior to a Qualified Public

Offering or the Sale of HQ, neither HQ nor any Subsidiary shall do any of the following without the prior written consent of Safelite.

    (a)    Except as otherwise provided herein or in the Shareholder Agreement, HQ shall not, and shall not permit any of its Subsidiaries to, (a) directly or indirectly sell, lease, or otherwise dispose of more than 50% of its properties and assets, in the aggregate, to any Person(s), whether in one transaction or in a series of transactions over any period of time other than in the ordinary course of business; (b) merge into or with or consolidate with any other Person; or (c) adopt any plan or arrangement for the dissolution or liquidation of HQ or any Subsidiary.

    (b)    Except as otherwise provided herein or in the Shareholder Agreement, until the termination of Section 5(G) of the Shareholder Agreement, HQ shall not take, or authorize, any action, or fail to take any action, that would dilute the share ownership of Safelite in the Company below fifteen percent (15%).

    (c)    HQ shall not, and shall not permit any of its Subsidiaries to materially change its business purpose and amend, alter or modify its Certificate of Incorporation or By-laws if such amendment, alteration or modification would affect the rights, privileges or powers of Safelite as a shareholder of HQ.

    7.    **Covenants of Safelite.**  In consideration for HQ entering into this Agreement and the Other Agreements, Safelite shall pay to HQ Three Hundred Thousand Dollars ($300,000), payable as follows: Twenty Five Thousand Dollars ($25,000) at the Closing, Twenty Five Thousand Dollars ($25,000) on August 1, 2004 and Twenty Five Thousand Dollars ($25,000) on the first day of each calendar month thereafter until Safelite shall have paid the full Three Hundred Thousand Dollars ($300,000) under this Section 7.

    8.    **Term and Termination.**

    (a)    Term.  This Agreement will commence on the Closing Date and continue in perpetuity, unless earlier terminated as provided herein.

    (b)    Termination for Breach.  Either Party may terminate this Agreement upon ninety (90) days' written notice to the other Party if the other Party has committed an Event of Default under this Agreement and such Event of Default fails to be cured within such ninety (90) day period.

    9.    **Events of Default.**  The Parties acknowledge and agree that the occurrence of one or more of the following events shall constitute an event of default ("**Event of Default**"):

    (a)    if either Party breaches or fails or neglects to perform, keep or observe any provision, covenant, or term of this Agreement or any Other Agreement;

    (b)    if any representation or warranty made by either Party in this Agreement or any Other Agreement or in any other certificate, document or financial statement furnished at any time in connection herewith or therewith shall prove to have been misleading on the date when made or deemed to have been made; or

208361/0000/666226/Version #:.4

(c)     if a Party ceases to do business or becomes insolvent or admits in writing its inability to pay its debts as they mature, or makes an assignment for the benefit of creditors; if a petition under any foreign, state, or United States bankruptcy act, receivership statute, or the like, as they now exist, or as they may be amended, is filed by a Party; or if such a petition is filed by any third party, or an application for a receiver is made by anyone.

10.     **Indemnification.**

(a)     Safelite Indemnification. Safelite will indemnify, defend and hold harmless HQ and its officers, directors, employees, agents, successors and assigns from any and all third party claims to recover any and all losses, liabilities, damages and claims (including taxes), and all related costs and expenses, including reasonable legal fees and disbursements and costs of investigation,. litigation, settlement, judgment, interest and penalties (collectively, "**Losses**"), due to third party claims arising from, or in connection with, Safelite's breach of this Agreement.

(b)     HQ Indemnification. HQ will indemnify, defend and hold harmless Safelite and its officers, directors, employees, agents, successors and assigns from any and all third party claims to recover any and all Losses due to third party claims arising from, or in connection with, HQ's breach of this Agreement.

(c)     Indemnification Procedures. The obligations of an indemnifying party under this Section 5 are subject to the conditions that: (i) the indemnifying party is notified promptly in writing by the indemnified party of any claim; (ii) the indemnifying party has sole control of the defense and all negotiation for any settlement or compromise; and (iii) the indemnified party reasonably assists the indemnifying party in the defense of the claim. No settlement or compromise that imposes any liability or obligation on any indemnified party will be made without such party's prior written consent (not to be unreasonably withheld).

11.     **Miscellaneous.**

(a)     Survival of Agreement. This Agreement and all terms, warranties, and provisions hereof will be true and correct as of the time of Closing and will survive the Closing.

(b)     Notices.     All notices, requests, demands, or other communications hereunder (including notices of all asserted claims or liabilities) shall be in writing and shall be either delivered personally, by messenger service, or by prepaid guaranteed overnight delivery service, or mailed by U.S. mail, certified or registered, with appropriate postage prepaid, to the addressees and addresses herein designated, or such other address as may be designated in writing by notice given in the manner provided herein, and shall be effective (a) upon personal delivery thereof, if delivered personally or by messenger service, (b) one (1) business day after delivery to the overnight delivery service for next business day delivery, if delivered by overnight delivery service, or (c) three (3) days following deposit in the U.S. mail if sent by mail, whether or not delivery is accepted:

To HQ:          HQ, Inc.
                1300 West Belmont Avenue

|                    | Suite 200<br>Chicago, IL 60657<br>Attn: Jeff Hogan |
|--------------------|----------------------------------------------------|
| With a copy to:    | Sachnoff & Weaver, Ltd.<br>30 S. Wacker Drive<br>29th Floor<br>Chicago, IL 60606<br>Attn:   Stewart Dolin, Esq. |

With a copy to:         Sachnoff & Weaver, Ltd.
                        30 S. Wacker Drive
                        29th Floor
                        Chicago, IL 60606
                        Attn:   Stewart Dolin, Esq.

To Safelite:            Safelite Group, Inc.
                        2400 Farmers Drive
                        Columbus, OH 43235
                        Attn: Chief Financial Officer

With a copy to:         Safelite Group, Inc.
                        2400 Farmers Drive
                        Columbus, OH 43235
                        Attention: General Counsel

or to such other place and with such other copies as any Party may designate as to itself by written notice to the other Parties.

(c)    Successors and Assigns; Third Party Beneficiaries. This Agreement will be binding upon the Parties and their respective successors, personal representatives, heirs and assigns; however, no Party will have any right to assign any of its obligations pursuant to this Agreement except with the prior written consent of the other Party.

(d)    Entire Agreement. This Agreement and the related agreements referred to herein constitute the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior communications, writings, and other documents with regard thereto. No modification, amendment, or waiver of any provision hereof shall be binding upon any Party unless it is in writing and executed by all of the Parties or, in the case of a waiver, by the Party waiving compliance.

(e)    Further Execution. The Parties agree to execute any additional documents or instruments, and to take any and all other actions, necessary to carry out the purposes of this Agreement.

(f)    Headings. The headings herein are solely for the convenience of the parties and shall not serve to modify or interpret the text of the Sections at the beginning of which they appear.

(g)    Governing Law; Jurisdiction. This Agreement shall be construed and governed in accordance with the internal laws of the State of Illinois, without regard to its choice of law principles.

208361/0000/666226/Version #:.4

(h)     Counterparts and Facsimile Signature. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement. For purposes of executing and delivering this Agreement or any of the other documents or instruments required hereunder, a signed document transmitted by facsimile machine ("Fax") shall be treated in all manner and respect as an original document. The signature of any Party by Fax shall be considered for these purposes as an original signature. Any such Fax shall be considered to have the same binding legal effect as an original document. At the request of either Party, any Fax document subject to this Agreement shall be re-executed by both Parties in an original form. The Parties hereby agree that none of the Parties shall raise the use of the Fax or the fact that any signature or document was transmitted or communicated through the use of a Fax as a defense to the formation of this Agreement.

(i)     Severability. If any provision (in whole or in part) of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable, then such provision shall be deemed modified, restricted, or reformulated to the extent and in the manner necessary to render the same valid and enforceable, or shall be deemed excised from this Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent permitted by law, as if such provision had been originally incorporated herein as so modified, restricted, or reformulated or as if such provision had not been originally incorporated herein, as the case may be. The parties hereto further agree to seek a lawful substitute for any provision found to be unlawful. If such modification, restriction or reformulation is not reasonably possible, the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected thereby and the provisions of this Agreement shall be severable in any such instance.

[Signature Page Follows]

   208361/0000/666226/Version #:.4

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed as of the day and year first above written.

HQ, INC.

_____

Jeffrey J. Hogan
Its: President

SAFELITE GROUP, INC.

_____

Douglas A. Herron
Its: Executive Vice President, CFO