# EXHIBIT 3 (Part 2 of 2)

## TO

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

# EXHIBIT 3

## Software Application Services and Integration Agreement

This Agreement ("Agreement") is entered into as of April 1, 2001 (the "Effective Date"), between Quivox Systems Incorporated, a Delaware corporation ("Quivox") and N'SITE Solutions, Inc. and its affiliates ("Customer").

### RECITALS

A.  Customer desires to license and make use of the application software developed by Quivox (collectively the "Licensed Product") as well as procure custom programming services. The services provided by Quivox to the Customer will be for electronic claims processing and related functions.

In consideration of the promises and the mutual agreements, provisions and covenants herein contained, Quivox and Customer hereby agree as follows:

1. Professional Services:  During the term of this Agreement Quivox agrees to provide Customer with professional consulting, software development and integration services as requested by Customer and mutually agreed upon with Quivox, along with a limited non-exclusive license to use the Licensed Product and certain other computer software owned by Quivox (collectively called "Professional Services").

2. Term:  The term of this Agreement shall be for a period of five (5) years, commencing on the Effective Date.  As long as the Agreement is not terminated by either party by reason of any default, as hereafter provided, of the other party during the first five (5) year term, the Agreement shall continue thereafter and will be automatically renewed for successive terms of one (1) year, unless either party notifies the other in writing not less than 180 days prior to the end of the initial five (5) year term, or any successive one year term. This Agreement may not be modified orally and may only be amended in writing executed by all parties hereto.

3. Payment Terms:  Customer agrees to pay Quivox for such Professional Services, including a fee for the Licensed Product (the "License Fee") in the amounts set forth in Exhibit A attached hereto and incorporated herein by this reference. Professional services may include and without limitation Quivox personnel's reasonable travel, food and lodging expenses incurred in performance of Professional Services hereunder as agreed upon beforehand between Quivox and Customer . The charges invoiced to Customer by Quivox in accordance with this Agreement shall be payable by Customer within thirty (30) days of Customer's receipt of the invoice. Customer agrees to pay, upon demand, any and all sales, use, or other similar tax, which may be assessed on Quivox by any governmental agency on any aspect of the transaction, contemplated hereby.  Customer shall be solely responsible for procuring and maintaining any license or franchise, and paying any fees, required to operate its business in each country, state, county and city in which the Licensed Product is utilized.

4. Licensed Product:  Customer agrees to use Licensed Product in the manner set forth in this Section 4.  In consideration of Customer's payment of the Professional Services fees, and of Customer's agreement to abide by the terms and conditions of this Agreement, Quivox grants Customer a non-exclusive nontransferable right to use and display the Licensed Product (hereafter the "License"), and to render services to customers using the Licensed Product and documentation during the term of this Agreement and any renewals thereof. Quivox retains the right to terminate this License, at any time, should Customer violate any of its provisions.  Quivox reserves all rights relating to the Licensed Product not expressly granted to Customer.  During the term of this Agreement, Customer may

4.1 Use the Licensed Product on an unlimited basis within its immediate organization.

4.2 Install the Licensed Product only in its own facility(s) at location(s) specified by Customer in writing and approved by Quivox.

4.3 Use the Licensed Product solely for its own use, and within wholly owned subsidiaries, and solely for the purpose of electronically collecting, storing and transferring claim information. Recognizing that Customer may elect to utilize this License through a partnership or subsidiary corporation in which Customer is the controlling partner or the majority shareholder, Quivox hereby grants to Customer (but not the Customer's Assignee) the limited right to assign this Agreement with its rights to use the Licensed Product licensed hereunder to any business entity of which Customer is and continues to be a controlling partner or majority shareholder ("Assignee"), for operations within a particular territory.

4.3.1 If at any point Customer ceases to be the controlling partner or majority shareholder of the Assignee, then Quivox may, but need not, require the termination of any assignment. If Quivox requires the termination of the assignment under this provision, said assignment shall by itself terminate with no further action on the part of Quivox, and the License shall be deemed reassigned to Customer. Customer shall be required to provide supporting documentation of any such change in control with respect to Assignee. This provision does not limit Customer to be organized as a limited liability corporation. (LLC)

4.3.2 Customer shall continue to be liable for all sums due from the Assignee and no failure on the part of the Assignee to make payments due to Quivox shall relieve Customer from its individual obligation to make said payments. The bankruptcy or insolvency of the Assignee or of Customer itself shall be cause for immediate termination of this License except as specified in Section 11 of this Agreement, and should Quivox be unable to terminate the License because of the provisions of the United States Bankruptcy Laws, then the trustee or other party in possession of the software and documentation shall be obligated to protect the trade secret status of the said information by executing a trade secret agreement or returning any Source Code and internal documentation which it may possess to Quivox immediately upon request. The Assignee holding this License under any assignment shall have no authority whatsoever to further assign or to sublicense this License or any software and documentation and on termination or liquidation of the Assignee, the assignment shall automatically terminate and all the rights granted in this License shall be revested in Quivox.

4.4 Customer may not sell, market or in any other manner distribute to any third party or to any location, the Licensed Product or any information contained in or derived from the Licensed Product. Notwithstanding the above, Customer may distribute printed copies and electronic copies of information derived from the Licensed Product to insurance agent(s), trading partners and insurance companies, their policyholders and claimants, as necessary in the ordinary course of business.

4.5 Customer shall pay Quivox for all Professional Services fees described in this Agreement and the attached exhibit(s) on or before their due dates.

4.6 Customer agrees to comply with the terms and conditions of this License and agrees not to use the software and documentation licensed hereunder in any way beyond the scope of this License. Customer agrees to promptly advise Quivox and take all reasonable steps to protect the software and documentation from theft or from use by others contrary to the terms of this License.

4.7 Customer agrees that all agreements between Customer and its customers, by which portions of the software and documentation are used by such customers, shall be in writing, shall be in such form and substance as Quivox shall reasonably approve. Customer may use a form agreement, previously approved by Quivox, but shall nonetheless provide Quivox with true copies of all such licenses signed, without further request of Quivox. However, without limitation of the foregoing, Customer shall cause each such agreement to contain the following provision:

Notwithstanding anything herein to the contrary, in the event of the termination of the certain Application Software Services and Integration Agreement dated April 1,2001 between Quivox and Customer, at the election of Customer all rights of Customer under this Agreement shall be assigned and transferred to Quivox. Quivox shall not be liable to any party hereto for any liability or obligation of Customer whatsoever except as specified in Section 11 of this Agreement, including without limitation any computer software or databases licensed by Quivox to Customer; provided, however, that if Quivox shall elect to have Customer's rights in this Agreement assigned to Quivox, as above provided, then Quivox shall be liable for all of Customer's obligations under such Agreement that do not arise during or in any way relate to the period prior to such assignment. The provisions of this paragraph are for the express benefit of Quivox, its successors or assignees.

4.8    Within ten (10) days after entering into an agreement with any customer and before the customer starts receiving any services, Customer shall provide Quivox with a copy of each customer agreement. All information provided to Quivox will be considered "Company Confidential" and as such shall not be duplicated, forwarded, or shared without the express written consent of Customer.

4.9 Customer agrees to return the original and all existing copies of the software and documentation issued with respect to the Licensed Product to Quivox within five (5) days after the termination date set forth in the written notice of Quivox's termination of this License for any authorized reason, whether a breach or expiration under this Agreement.

4.10    An express condition of this License is that Quivox shall at all times retain ownership of the Licensed Product recorded on the original media copy or copies and all subsequent copies of the Licensed Product, regardless of the form or media in or on which the original and other copies may subsequently exist. This License is not a sale of the Licensed Product data content recorded on Customer's copy or any subsequent copy. Customer agrees not to make any modifications to the Licensed Product and agrees not to create any derivative of the Licensed Product without the prior written consent of Quivox, which may be withheld in its sole and absolute discretion except as specified in Section 11 of this Agreement.

5.    Confidentiality of Licensed Product:    Customer acknowledges that the Licensed Product comprises information, which constitutes a trade secret of Quivox in which Quivox has a proprietary interest. Customer agrees that the information constituting the Licensed Product shall not be disclosed to others, copied, reproduced or used for any purpose other than those uses expressly authorized by this Agreement. Customer will use all reasonable efforts to ensure that all its personnel and all other persons afforded access to the Licensed Product shall protect the Licensed Product from unauthorized use, dissemination or disclosure. For purposes of this Agreement, the term "TRADE SECRET" means the program structure, logic, data structures, design, processes, procedures, formulae, and algorithms contained in the ordered set of instructions, which together constitute the software that, may be disclosed by either the software or the documentation. Trade Secret does not include information which is publicly known through no fault of Customer or Customer's employees, contractors, or agents, nor does it include information which is lawfully received by Customer from a third party not bound in a confidential relationship to Quivox, nor information disclosed by Quivox to a third party without obligation of confidentiality.

5.1 Notwithstanding the above, Customer hereby consents to and Quivox reserves the right to utilize, Customer's claim information for the sole purpose of generating industry statistical intelligence. Customer's information will be utilized for generating summary information only. Quivox covenants to keep strictly confidential, any specific information pertaining to insurance carrier, independent adjusting company, body shop, insured or claimant. The right granted

Quivox to utilize such claim information is a continuing right vesting in Quivox the right to maintain and disburse such summary information for any reason, subject to maintaining strict confidentiality of the insurance carrier, independent adjusting company, body shop, insured or claimant, which shall survive termination of this Agreement for any reason.

5.2 Customer and Quivox shall advise their employees of the confidential nature of the Confidential Information and Professional Service being provided hereunder and shall enforce such employees' strict compliance with the provisions of this Section.

6. Warranty: QUIVOX has no control over the conditions under which Customer uses the Licensed Product. Therefore, Quivox does not and cannot warrant the results that may be obtained by its use. However, Quivox provides the following limited performance warranties:

6.1 Quivox warrants that it owns and possesses all rights and interests necessary to grant the License to Customer. Quivox warrants that the Licensed Product shall not violate or infringe on any contractual, trade secret, proprietary information and non-disclosure rights or any intellectual property rights. Quivox further warrants that if Customer is precluded from using the Licensed Product because of an actual or claimed infringement or any patent right, copyright, trademark or other intellectual property right, or for any other reason, then, at Quivox' option and Quivox' expense: (i) Quivox shall either procure for buyer the right to continue to use the Licensed Product; (ii) replace or modify the Licensed Product so that the Licensed Product becomes non-infringing; (iii) obtain substantially equivalent replacements for the Licensed Product acceptable to Customer; (iv) or terminate this Agreement and refund to Customer a pro rata portion of the License Fee paid.

6.2 During the Term of this Agreement, should the Licensed Product fail to perform as warranted, Customer shall provide to Quivox a Discrepancy Report (DR) identifying with specificity deficiencies in the Licensed Product. Quivox, in conjunction with Customer, shall assess the severity of the deficiency and will communicate back to Customer the appropriate closed loop corrective action. Quivox shall address all critical product deficiencies, identified as being a deficiency that prevents users from using all or a portion of the Licensed Product, within 3 business days of its receipt of the DR from Customer. With critical deficiencies Quivox will give immediate top priority to resolving the deficiency(s) and respond within three business hours to Customer and make a best effort to resolve the deficiency(s) as fast as possible. Quivox shall address deficiencies that are not serious, identified as being deficiencies of a non-critical nature, within thirty (30) days of its receipt of the DR from Customer. Quivox shall not be responsible or liable for restoring or reconstructing any lost or altered files, data, or programs regardless of the cause of the loss. Customer acknowledges that the warranty given hereunder shall be contingent upon Customer's complying with routine operating procedures and processes for the Licensed Product in accordance with specific operating specifications which shall be specifically disclosed to Customer by Quivox, and to implement any reasonable temporary measures recommended by Quivox while Quivox remedies any deficiency. The warranty set forth in this Paragraph 6 shall apply only to critical deficiencies of the life of the licensed produce and may not apply to non-critical deficiencies for all claims made during the Term of this Agreement, notwithstanding Quivox may not correct any identified deficiency within the Warranty Period.

6.3 EXCEPT FOR THE WARRANTIES DESCRIBED IN THE PRECEDING PARAGRAPHS, QUIVOX MAKES NO WARRANTIES OR GUARANTEES, EXPRESS, ORAL, IMPLIED OR STATUTORY. QUIVOX HEREBY SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OR WARRANTIES OTHERWISE ARISING BY OPERATION OF LAW, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. IN NO EVENT SHALL QUIVOX, ITS AGENTS OR EMPLOYEES BE LIABLE TO CUSTOMER OR ANY THIRD PARTY FOR LOSS OF PROFITS, LOSS OF USE OR ANY INCIDENTAL, CONSEQUENTIAL, INDIRECT, CONTINGENT, SECONDARY, SPECIAL OR OTHER DAMAGES OR EXPENSES OF ANY NATURE WHATSOEVER AND HOWSOEVER ARISING, EVEN IF QUIVOX HAS BEEN ADVISED OF THE POSSIBILITY OR CERTAINTY OF

SUCH DAMAGES.  CUSTOMER'S SOLE REMEDY FOR ANY BREACH OF WARRANTY BY QUIVOX SHALL BE LIMITED TO THE SPECIFIC WARRANTY REMEDIES DESCRIBED IN SECTION 6.  NOTHING CONTAINED IN THIS SECTION 6 SHALL ASSURE THAT THE FUNCTIONS CONTAINED IN THE LICENSED PRODUCT WILL MEET CUSTOMER'S REQUIREMENTS OR ASSURE THE UNINTERRUPTED OPERATION OF THE LICENSED PRODUCT OR THE CUSTOMER'S BUSINESS.  QUIVOX' LIABILITY FOR DAMAGES TO CUSTOMER FOR ANY CAUSE WHATSOEVER, REGARDLESS OF THE FORM OF ACTION, WHETHER FOR CONTRACT OR TORT, INCLUDING NEGLIGENCE, SHALL BE LIMITED TO THE LICENSE FEE FOR THE THEN CURRENT TERM OF THIS AGREEMENT.

   6.4    This warranty allocates risks of product failure between Customer and Quivox. Quivox's pricing for Professional Services reflects this allocation of risk and the limitations of liability contained in this warranty. The warranties set forth above are in lieu of all other express warranties, whether oral or written, and the remedies set forth above are Customer's sole and exclusive remedies.  The agents and employees of Quivox are not authorized to make modifications to this warranty, or additional warranties binding on Quivox. Accordingly, additional statements such as advertising or presentations, whether oral or written, do not constitute warranties by Quivox and should not be relied upon.

7. Limitation of Liability:  Quivox shall not be obligated under Section 6 to take any action with respect to a Licensed Product, which has been misused or damaged by Customer in any respect, or if the Customer has not reported to Quivox the existence and nature of such nonconformity or defect within the period set forth in Section 6.  Quivox is not responsible for obsolescence of the Licensed Product that may result from changes in Customer's requirements after the effective date.  Quivox' obligations under this Agreement shall apply only to the most current version of Licensed Product issued by Quivox from time to time.  Quivox shall have no responsibility for suspended, outdated or uncorrected versions of the Licensed Product.  Quivox does agree to make a best effort to resolve any federal and/or state regulatory for the Customer to maintain compliance.

8. Disclaimer:  Neither party shall be responsible for consequential indirect or special damages including without limitation any damages for lost business or lost or anticipatory profits, interruption of service or otherwise arising under any circumstances, or from any cause of action whatsoever including contract, warranty, strict liability or negligence, even if a party has been advised of such damages.

9. Termination:  Upon any use, transfer or dissemination of the Licensed Product which is not expressly permitted herein, the appointment of a receiver to the possession of Customer's assets or the institution of bankruptcy by or against the User or default in payment of the License Fee, the Customer shall immediately stop using the Licensed Product.  In the event either party breaches any term of the Agreement, which is not cured after appropriate notification, (if applicable) the other party shall be entitled to terminate this Agreement by giving a written notice of termination to Customer, pursuant to Section 22 herein.

10. Acts of Insolvency:  Either party may terminate this Agreement by written notice to the other and may regard the party as in default of this Agreement, if the other party becomes insolvent, makes a general assignment of the benefit of creditors, files a voluntary petition of bankruptcy, suffers or permits the appointment of a receiver for its business or assets, or becomes subject to proceedings under bankruptcy or insolvency laws, or has wound up or liquidated, voluntarily or otherwise, and such proceeding is not discharged within ninety (90) days of filing.  In the event that any of the above events occurs, the party shall immediately notify the other of its occurrence.

11. Source Code Escrow:  "Source Code" shall mean all drawings, documents, source code, programmer's comments, design specification, flow charts, file layouts, report layouts, screen layouts and other documents used by Quivox to create the Licensed Product.  In the event that Quivox becomes insolvent as outlined in Section 10 above; and if Customer was not the cause of

insolvency, a nonexclusive license to the Source Code shall be granted to Customer for the remaining term of the agreement and shall be subjected to the terms and conditions of Section 4 of this agreement. Quivox agrees to place a current version of the Source Code with a third party escrow agent mutually agreed upon with Customer.

12. Force Majeure:  In the event that Quivox is unable to perform its obligations under this Agreement or to enjoy any of its benefits because of (or if failure to perform the services is caused by) natural disaster, actions or decrees of government bodies, acts of God, or other causes beyond the reasonable control of Quivox (herein referred to as a "Force Majeure Event"), Quivox shall immediately give notice to Customer and shall do everything within its reasonable control to resume performance. Upon receipt of such notice, all obligations under this Agreement shall be immediately suspended. If the period of non-performance exceeds sixty (60) days from the receipt of notice of the "Force Majeure Event", the Customer may, by giving written notice, terminate this Agreement.

13. General Obligations:  Each of the parties (Quivox and Customer) will use reasonable efforts to (a) cause all of the obligations imposed upon it in this Agreement to be duly complied with, and to cause all conditions precedent to such obligations to be satisfied; and (b) obtain any and all consents, waivers, amendments, modifications, approvals, authorizations, notations and licenses necessary to the consummation of the transactions contemplated by this Agreement.

14. Entire Agreement; Amendments:  This Agreement constitutes the entire agreement between Quivox and Customer, and as such supersedes all previous agreements, promises, proposals, representations, understandings, and negotiations, whether written or oral, between the Parties representing subject matter hereof.  All Schedules referred to in this Agreement shall be deemed to be incorporated in and be a part of the "entire Agreement".  Notwithstanding the foregoing, however, the parties may amend, or modify this Agreement in such a manner as may be agreed upon, by a written instrument executed by both Quivox and Customer.

15. Counterparts:  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together constitute one and the same instrument.

16. Severability:  In the event that any of the terms, conditions and provisions of this Agreement are held to be invalid, illegal, or unenforceable by any court of competent jurisdiction, the legality, validity, and enforceability of the remaining terms, conditions, and provisions shall not be affected thereby and the illegal, unenforceable or invalid provision shall be replaced by a mutually acceptable provision that, which being legal, enforceable and valid, comes closest to the intention of the parties underlying the illegal, unenforceable or invalid provision.

18. Binding Effect:  This Agreement shall inure to and be binding upon the parties and their respective legal representatives, successors, and Assignees.  Without limiting the foregoing, Quivox and Customer acknowledge and agree that this Agreement shall remain in full force and effect in the event of a sale of the assets or change in ownership of Quivox or Customer, as applicable.

19. No Assignment:  This Agreement may not be assigned by either party without the prior written consent of the other party; provided however, Customer and Quivox shall be entitled to assign this Agreement to an affiliate or in connection with a sale of all or substantially all of its assets to a third party or in the manner and subject to the limitations set forth in section 4 of this Agreement.

20. Advertising:  Neither Quivox nor Customer shall use the name of the other in advertising/promotion efforts in each instance without securing written approval in advance.

21. Applicable Law:  The laws of the State of Kansas shall govern this Agreement and the transactions contemplated hereunder.  Any legal action between Quivox and Customer regarding this Agreement shall be brought in, and Quivox and Customer hereby consent to the jurisdiction of and venue in, the federal and state courts located Johnson County in the State of Kansas.

22. Notices:  Except as otherwise expressly provided, all notices, consents, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered personally, sent by facsimile transmission with confirmation of receipt, or if mailed by certified mail, return receipt requested, with first class postage prepaid, addressed as follows:

To Quivox:          Quivox Systems Incorporated
                    1225 W 190th Street, Suite 250
                    Gardena, CA  90248

                    Attention: Contracts Manager

To Customer:        N'Site Solutions, Inc.
                    10536 Justin Drive
                    Urbandale, Iowa 50322

23. Indemnity:  Customer, and its permitted Assignees, if any, agrees that they, jointly and severally, if more than one individual or entity, shall indemnify and hold Quivox harmless from any and all liability and claims against Quivox by anyone, which arise out of or in connection with the use of the Licensed Product and the database contained therein in the operation of Customer's business and which are not caused by Quivox.  The indemnity shall include all costs, attorney fees, and damages, which Quivox is required to pay by reason of litigation or claims against Quivox for such reason.  Quivox shall have the right to retain, at Customer's cost, legal counsel of Quivox's selection for the purpose of defending such claims, but no settlement of any such claims will be made without consultation with Customer and its insurance carriers, if any.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

"Quivox"                              "Customer"
Quivox Systems Incorporated           N'SITE Solutions, Inc.

By: _____           By: _____

Title: _CEO_____            Title: _Exec. VP_____

Date: _5-22-01_____            Date: _5/22/2001_____

# Exhibit A

**Software Application Services and Integration Pricing Schedule for:
N'Site Solutions, Inc.**

### A. Software Development

As part of this Agreement, Quivox agrees to develop and implement a First Notice of Loss
(FNOL) Internet thin client application for the Customer. This FNOL application is based upon
functional specifications contained in a Detailed Requirements Document mutually agreed upon
and signed by Quivox and the Customer. The Requirements Document is a part of Exhibit A of
the final agreement between Quivox and the Customer.

### B. Pricing

The Customer requires various modules of eDoc Express to perform different tasks and functions
for various customers. The currently defined functions and modules and their pricing may be
amended as a part of this agreement based upon future customer needs of N'Site.

| 1. FNOL | Processed records | Pricing per transaction |
|---|---|---|
| | 1 – 25,000 | $1.25 |
| | 25,001 – 50,000 | $1.00 |
| | 50,001 – 100,000 | $ .75 |
| | 100,001 – 200,000 | $ .70 |
| | 200,001 – 399,999 | $ .65 |
| | 400,000 or more | $ .60 |

| 2. Messaging | Processed records | Pricing per transaction |
|---|---|---|
| | 1 – 25,000 | $ .50 |
| | 25,001 – 50,000 | $ .45 |
| | 50,001 – 100,000 | $ .40 |
| | 100,001 – 200,000 | $ .35 |
| | 200,001 – 399,999 | $ .30 |
| | 400,000 or more | $ .25 |

| 3. Dispatch | per transaction |
|---|---|
| | $.50 |

| 4. Estimatics | per assigned and |
|---|---|
| estimate upload and approval | processed Claim |
| | $ 3.00 |

**5. Auto/Property Claims Handling**
all eDoc modules except FNOL and Messaging

$10.50 per assigned and processed Claim

**6. Independent Adjuster Management**
dispatch, invoice upload with images

$ 3.50 per assigned and processed Claim

**7. Glass Claims Management**
dispatch, invoice upload with images

$ 3.50 per assigned and processed Claim

**8. Rental Car Management**
dispatch extension notification and invoice upload

$ 2.00 per assigned and processed Claim

"Quivox"                              "Customer"
Quivox Systems Incorporated           N'Site

By: _Alan R. Cory_____        By: _Kirb D J_____

Title: _CEO_____         Title: _EXEC. UP____

Date: _5-22-01_____         Date: _5/22/2001____

# EXHIBIT 4

## SOFTWARE LICENSE AGREEMENT

This Software License Agreement (this "Agreement") is effective as of this 3rd~~—~~ day of June~~————————~~, 2004 by and between Safelite Group, Inc.~~lass Corp~~, a Delaware corporation ("Licensor"), and N'SITE Solutions, Inc., a Delaware corporation ("Licensee").

### Background Information

A.   On April 1, 2001 Licensee entered into a Software Application Services and Integration Agreement (the "Quivox Agreement") with Quivox Systems, Inc. ("Quivox")~~, the intent of which was for Quivox to host software (the "Software") at its data center for the purpose of processing actual customer transactions for Licensee (the "Hosting Services")~~.

B.   ~~Quivox terminated its business operations and did not render the Hosting Services to Licensee (the "Quivox Default").~~

~~C.~~   Licensor has acquired from Quivox ownership of the software commonly referred to as eDocExpress, eDocMessaging, and First Notice of Loss internet thin client application software (collectively, the "Software").~~At or about the time Quivox terminated its business operations, Quivox delivered the source code for certain components of the Software (the "Released Source Code") to Licensee under the source code escrow provision of the Quivox Agreement, along with other components of the Software in object code form (the "Object Code Modules").~~

C~~D~~.   Prior to Licensor's acquisition of the Software, Quivox delivered to Licensee the source code for certain components of the Software (the "Released Source Code") under the source code escrow provision of the license agreement between Licensee and Quivox, along with certaim other components of the Software in object code form (the "Object Code Modules").

D.   Licensee made certain modifications ~~Because~~ to the Software ~~(as provided to Licensee in the form of the Released Source Code and Object Code Modules) did not function properly, Licensee made corrections (the "Corrections") to the components of the Software~~ which modifications are listed on attached Schedule 12 (the "Modified~~Corrected~~ Modules").

E.   ~~As a result of assuming the Quivox Agreement,~~ A dispute exists between Licensor and Licensee with respect to Licensee's right to use or use of the Software (the "Dispute") which Dispute the parties desire to resolve in accordance with the terms of this Agreement.~~Licensor now disputes Licensee's rightful use of the Software (the "Dispute"), which Dispute Licensor and Licensee (each, a "Party," and together, the "Parties") now desire to resolve by the terms of this Agreement.~~

### Statement of Agreement

The Parties acknowledge the accuracy of the foregoing Background Information and hereby agree as follows:

1.   License Grant.

1.1   Subject to the provisions of this Agreement and the payment of the Royalties (defined below) and the Payment (defined below), Licensor grants to Licensee, and

Licensee accepts, a limited, personal, nonexclusive, nonassignable and otherwise nontransferable license (the "License") for Licensee's internal use of the Software in the form currently in Licensee's possession. Licensee shall not be entitled to any upgrades, enhancements, corrections, add-ons (including separately marketable products) or other modifications (collectively, "Modifications") of the Software which have been made previously by Licensor or on Licensor's behalf or which may be made in the future by Licensor or on Licensor's behalf (collectively, "Modifications").

The License shall be limited as follows:

(a) Licensee shall use the Software solely for its own use within its organization.

(b) Licensee shall install the Software only in its own facility at a location identified in writing to Licensor by Licensee provided such location is approved by Licensor.

(c) Licensee shall use the Software solely for the purpose of electronically collecting, storing, and transferring claim information.

(d) Licensee shall not sell, market, or in any other manner distribute to any third party or to any location, the Software or any information contained in or derived from the Software, provided that Licensee may distribute printed copies and electronic copies of information derived from the Software to insurance agents, trading partners and insurance companies, their policyholders and claimants, as necessary in the ordinary course of business.

(e) Licensee may use the Released Source Code, together with the Modified Modules Corrections, in Licensee's possession as of the date hereof solely for Licensee's own internal use to maintain the functionality of the Software as of the date hereof.

2. Release; Payment.

2.1 Within ten (10) business days after the execution of this Agreement by both Licensor and Licensee (collectively the "Parties" and individually, a "Party") Parties, Licensee agrees to pay to Licensor Five Thousand Dollars and No Cents ($5,000.00) (the "Payment") by means of a wire transfer of immediately available funds, cashier's check or equivalent means of payment.

2.2 Licensor, on its own behalf and on behalf of its officers, directors, stockholders and affiliates, in consideration of the Payment, does hereby fully and forever release, acquit, exonerate and discharge Licensee of and from any and all claims, actions, suits, damages, expenses, debts, controversies, agreements, promises, judgments, and demands of whatever kind or nature, at law or in equity, that Licensor ever had or now has or may at any time hereafter have, against Licensee arising from or in connection with (i) any obligation Licensee ever had, now has or may have to pay fees or royalties for any use of the Software prior to and including the Effective Date by Licensee; or (ii) any use of the Software, including the Released Source Code and the Corrections, prior to and including the Effective Date by Licensee; except that the foregoing release shall not apply to any of the agreements set forth herein.

2.3 <u>Licensee, on its own behalf and on behalf of its officers, directors, partners, stockholders, predecessors, and affiliates, does hereby fully and forever release, acquit, exonerate and discharge Licensor, its subsidiaries, directors, officers, employees, predecessors, and assigns from and against any and all claims, actions, suits, damages, expenses, debts, controversies, agreements, promises, judgments, and demands of whatever kind or nature, at law or in equity, that Licensee ever had or now has or may at any time hereafter have, against Licensor arising from or in connection with (i) any obligation Licensor ever had, now has or may have to Licensee for any use by Licensee of the Software prior to and including the Effective Date; or (ii) any use by Licensee of the Software, including the Released Source Code and the Modified Modules, prior to and including the Effective Date.</u>

The Parties acknowledge and agree that this Agreement is not an admission of any liability or wrongdoing by either Party, and is not an admission by either Party of any violation of the other Party's legal rights.

3. Term.

3.1 The term of this Agreement shall begin on the Effective Date and continue for a period of six (6) months (the "Initial Term"), subject to earlier termination as set forth in Section 3.2. Thereafter, this Agreement shall automatically renew for successive six (6) month terms (each, a "Renewal Term," and together with the Initial Term, the "Term"), unless one Party gives the other Party notice of its intent not to renew at least thirty (30) days prior to the beginning of the next Renewal Term.

3.2 Upon Licensee's failure to pay Licensor any amount owed hereunder, which failure to pay is not cured within 30 days after notice thereof, Licensor may terminate this Agreement effective immediately. Upon (a) any other breach of this Agreement by a Party which is not cured within 30 days after notice thereof from the other Party, or (b) the institution of bankruptcy, receivership, insolvency, reorganization or other similar proceedings by or against a Party, or (c) a Party's insolvency, assignment for the benefit of creditors, or inability to pay debts as they become due, or (d) the appointment of a receiver for a Party's assets, or (e) the sale of all or substantially all of the stock or assets of a Party, the other Party may terminate this Agreement effective immediately upon notice, in addition to any other remedies which may be available hereunder, at law or in equity.

3.3 Upon the expiration or termination of this Agreement (except for termination due to the institution of bankruptcy, receivership, insolvency, reorganization or other similar proceedings by or against Licensor, or Licensor's insolvency, assignment for the benefit of creditors, or inability to pay debts as they become due) Licensee shall immediately return to Licensor the original and all copies of the Released Source Code, the Object Code Modules and the Modified Modules<del>Corrections</del> (including related source code).

4. Royalties. Licensee shall pay Licensor the royalties set forth on the attached Schedule 2<del>1</del> (the "Royalties").

5. Confidentiality. "Confidential Information" of a Party means any information in whatever form that is provided or disclosed by a Party (the "Disclosing Party") to the other Party (the "Receiving Party"), except for any information that is: (a) publicly available other than through a breach of this Agreement; (b) known to the Receiving Party or its employees, agents of representatives prior to such disclosure, (c) independently developed by the Receiving Party or its employees, agents or representatives; or (d) subsequently lawfully obtained by the

- 3 -

Receiving Party or its employees, agents or representatives from a third party having no duty of confidentiality to the Disclosing Party.  The Receiving Party shall exercise the same degree of care and protection with respect to the Disclosing Party's Confidential Information as it exercises with respect to its own Confidential Information and shall not directly or indirectly disclose, copy, distribute, republish or allow any third party to have access to the Disclosing Party's Confidential Information.   Notwithstanding the above, either Party may disclose Confidential Information to (i) its employees who have a need to know or (ii) after giving reasonable advance notice and after using reasonable efforts to preserve confidentiality, as required by law.  Upon the expiration or termination of this Agreement, at the option of the Disclosing Party, the Receiving Party shall either return or destroy any Confidential Information in its possession.  The terms of this provision shall survive the expiration or termination of this Agreement.

6.  Ownership of the Software.  Licensor represents and warrants, and Licensee does not dispute with Licensor, that tThe Software and all patents, copyrights, circuit layouts, mask works, trade secrets and other proprietary rights in or related to the Software (including the Modified ModulesCorrections, but not including any proprietary N'Site data organized or compiled in the Software), are and will be at all times be and remain the exclusive property of Licensor, whether or not specifically recognized or perfected under the laws of the jurisdiction in which the Software or Modified Modules areis used or licensed.  Licensee will not knowingly take any action that jeopardizes Licensor's proprietary rights as they relate to third parties, or attempt to acquire any right in the Software, Modified Modules, or the Confidential Information not contemplated hereby.

7.  No Warranty.  LICENSEE IS GRANTED THE LICENSE FOR THE SOFTWARE "AS IS," AND, EXCEPT AS SET FORTH IN SECTION 6 HEREOF, LICENSOR MAKES NO WARRANTIES WHATSOEVER TO LICENSEE REGARDING THE SOFTWARE OR MIDIFIED MODULES.   LICENSEE MAKES NO WARRANTIES WHATSOEVER TO LICENSOR REGARDING THE CORRECTIONS.

8.  Limitation of Liability.  LICENSOR SHALL NOT BE LIABLE FOR (A) ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES, INCLUDING LOSS OF PROFITS, ARISING FROM OR RELATED TO A BREACH OF THIS AGREEMENT OR THE OPERATION OR USE OF THE SOFTWARE EVEN IF LICENSOR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES; OR (B) ANY CLAIMS MADE A SUBJECT OF A LEGAL PROCEEDING AGAINST LICENSOR MORE THAN ONE YEAR AFTER ANY SUCH CAUSE OF ACTION FIRST AROSE.  IN NO EVENT SHALL LICENSOR'S LIABILITY UNDER THIS AGREEMENT, WHETHER UNDER CONTRACT LAW, TORT, WARRANTY OR OTHERWISE, EXCEED THE ROYALTIES ACTUALLY RECEIVED BY LICENSOR UNDER THIS AGREEMENT.

9.  Miscellaneous.

9.1  Assignment.  Licensee may not assign or transfer this Agreement by written agreement, merger, consolidation, operation of law or otherwise, without the prior written consent of an authorized executive officer of Licensor.  Any attempt to assign this Agreement by Licensee shall be null and void.  Acquisition of an equity interest in Licensee of greater than 25 percent by any third party shall be considered an "assignment."

9.2  Amendments.  Any amendments or other modification of this Agreement shall be in writing and signed by the authorized representatives of both Parties.

9.3     Governing Law.  This Agreement shall be governed by the laws of the State of Ohio~~Delaware~~ without regard to principles of conflicts of laws.  Any dispute arising hereunder which is not settled amicably by the Parties shall be submitted to a panel of three arbitrators, one of whom shall be selected by Safelite, one of whom shall be selected by NSite, and the other of whom shall be selected by the other two arbitrators.  Such arbitration proceedings shall be conducted in Columbus, Ohio~~Wilmington, Delaware~~ in accordance with the then-current Commercial Arbitration Rules of the American Arbitration Association.   The determination of such arbitrators shall be final and non-appealable, and any judgment on the award rendered by such arbitrators may be entered in any court having jurisdiction thereof.

9.4     Entire Agreement: This Agreement, together with all of its schedules and exhibits which are hereby incorporated herein, is the entire agreement between the Parties regarding the subject matter hereof and supersedes all previous agreements, understandings and negotiations, written or oral, between them.  References to a Section or Schedule shall be to a section or schedule of this Agreement unless otherwise provided.

9.5     Counterparts:   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together constitute one agreement.

9.6     Severability.  If any provision of this Agreement is found to be invalid, illegal or unenforceable by any court of competent jurisdiction, such provision shall be deemed severed herefrom and all other provisions shall remain effective.

9.7     Binding Effect:  This Agreement shall inure to and be binding upon the parties and their respective legal representatives, successors and permitted assigns.   All references herein to "Licensee" shall refer interchangeably, as appropriate, to N'SITE Solutions, Inc., a Delaware corporation, and N'SITE Solutions, Inc., an Iowa corporation.

9.8     Advertising:  Neither Party shall use the name of the other Party in any advertising or promotional efforts without the prior written consent of Licensor.  Licensee shall not use the names "Edoc, eDocExpress, and/or eDocMessaging without the prior written consent of Licensor.

9.9     Notices.  All notices and other communications hereunder shall be in writing and delivered personally, sent by facsimile transmission with electronic confirmation of receipt, or sent by by certified mail, return receipt requested, with first class postage prepaid, to the address set forth below a Party's signature to this Agreement.  The addresses for notices can be changed by giving notice to the other party.

9.10    Employees and Third Parties. During the Term, and for a period of one year subsequent to termination of the same, each Party agrees not to offer employment, or retain as a consultant, any employee of the other Party.

Licensee:                               Licensor:

N'SITE Solutions, Inc.                  Safelite Group, Inc.~~lass Corp.~~


By:_____     By:_____

Print:_____    Print:_____
Title:_____    Title:_____

Address:                               Address:
10536 Justin Drive                     2400 Farmers Drive
Urbandale, IA  50322                   Columbus, Ohio 43235
Facsimile: (800) 929-4084              Facsimile: (614) 210 – 9251

SOFTWARE LICENSE AGREEMENT for Safelite dated May 25, 2004 *N'Site Draft*
effective as of _____ __, 2004 by and between                            *2/6/04*
Safelite Group, Inc.<del>lass Corp.</del> and N'Site Solutions, Inc.

**Royalties**                                                      **Schedule 1**

Amount due upon execution of this Agreement:   $5,000[——————————]

Amount due thereafter:   Licensee shall pay to Licensor a royalty in the amount of $5.00 for
each transaction performed or conducted by Licensee using all or any part of the Software.
[——————————]

SOFTWARE LICENSE AGREEMENT *N'Site Draft*
effective as of _____ __, 2004 by and between    *2/6/04*
Safelite Glass Corp. and N'Site Solutions, Inc.

## Modified~~Corrected~~ Modules                          Schedule 2

| Category | Details | |
|---|---|---|
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions** | default.htm<br>download.asp<br>global.asa<br>nstyle.css<br>printerfriendlystylesheet.css<br>search.htm<br>special.asp | |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\approval** | additionalinfo.asp<br>approvalmanagementmain.asp<br>approvalprocessingmain.asp<br>approvalqueuestatus.asp<br>approvalserver.asp<br>default.asp<br>manualapproval.asp<br>redirector.asp | |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\assignments** | addstatus.asp<br>agent.asp<br>attachments.asp<br>attachments2.asp<br>claimant.asp<br>claimoffice.asp<br>createassignment.asp<br>default.asp<br>displayname.asp<br>editagent.asp<br>editclaimant.asp<br>editclaimoffice.asp<br>editinsured.asp<br>editlocation.asp<br>editowner.asp<br>editrepairfacility.asp<br>estimates.asp<br>frameestimate.asp<br>frameimages.asp | insured.asp<br>mailmerge.asp<br>owner.asp<br>postfunctions.asp<br>postfunctionsnew.asp<br>printimages.asp<br>repairfacility.asp<br>selectcompany.asp<br>selectoffice.asp<br>setup.asp<br>statuslog.asp<br>test.asp<br>vehlocation.asp<br>viewassignment.asp<br>viewestimate.asp<br>viewfile.asp<br>viewimage.asp<br>viewimageframe.asp<br>viewpd.asp |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\audit** | auditmain.asp<br>auditqueryresults.asp<br>auditquerysetup.asp<br>auditreports.asp<br>orglevels.asp<br>printauditreport.asp<br>staffadjusters.asp<br>tpdate.asp<br>tradingpartners.asp<br>viewauditreport.asp | |

N'Site Draft
effective as of _____ __, 2004 by and between                                   2/6/04
Safelite Glass Corp. and N'Site Solutions, Inc.

## Modified~~Corrected~~ Modules                                        Schedule 2

| Category | Details | |
|---|---|---|
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\calendarcontrol** | calendar.asp<br>calendar.htm<br>html page1.htm<br>test1.asp | |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\claim** | a.asp<br>addcomment.asp<br>agent.asp<br>approvalviewassignment.asp<br>processviewonlyinfo.asp<br>assignmentmain.js<br>claimant.asp<br>claimoffice.asp<br>closeframe.asp<br>commentlog.asp<br>copydispatch.asp<br>default.asp<br>deleteme.asp<br>editadmin.asp<br>editagent.asp<br>editclaimant.asp<br>editclaimoffice.asp<br>editglass.asp<br>editinsured.asp<br>editlocation.asp<br>editowner.asp<br>editrepairfacility.asp<br>estimateimages.asp<br>eventlog.asp<br>exit.htm<br>frameestimate.asp<br>frameimages.asp<br>getviewonlyinfo.asp<br>html page1.htm<br>insured.asp<br>newassignment.asp | originalassignment.asp<br>owner.asp<br>pdimages.asp<br>pdleft.asp<br>pdtop.asp<br>ppsave.asp<br>printpreferences.asp<br>printpreferences.js<br>repairfacility.asp<br>selectclaim.asp<br>selectclaim.js<br>statuslog.asp<br>vehiclestatus.asp<br>vehlocation.asp<br>viewassignment.asp<br>viewassignment.js<br>viewclaim.asp<br>viewclaim.js<br>viewestimate.asp<br>viewestimate.js<br>viewfa.asp<br>viewimage.asp<br>viewimageframe.asp<br>viewonlyadmin.asp<br>viewonlypic.asp<br>viewpd2.asp<br>viewpd3.asp |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\dispatch** | addstatus.asp<br>agent.asp<br>assignment.asp<br>assignmentbad.asp<br>checkpolicy.asp<br>claimant.asp<br>claimoffice.asp<br>default.htm<br>dispatch.asp<br>dispatchunit.asp<br>entity.asp<br>estimatics.asp<br>insured.asp | location.asp<br>locationfinder.asp<br>owner.asp<br>selectassignment.asp<br>selectassignmenttype.asp<br>selectclaim.asp<br>staffadjuster.asp<br>statuslog.asp<br>tradingpartner.asp<br>undispatchassignmentselect.asp<br>undispatchnew.asp<br>workpage.asp |

N'Site Draft
2/6/04

effective as of _____ __, 2004 by and between
Safelite Glass Corp. and N'Site Solutions, Inc.

## Modified~~Corrected~~ Modules

Schedule 2

| Category | Details |
|---|---|
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\editmask** | editmask.asp<br>editmask.htc<br>editmask2.asp |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\help** | diagnostics.asp |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\images** | banner.gif<br>bigdown.gif<br>ceicafiles.gif<br>checklist.gif<br>compliancechecklist.gif<br>disk04.ico<br>doc04.gif<br>doc07.gif<br>getacro.gif<br>help_main.gif<br>logo.gif<br>note02.gif<br>paperclip.gif<br>paperclipdown.gif<br>partslist.gif<br>postit.gif<br>postitnew.gif<br>prudentiallogo.gif<br>prudentialslogan.gif<br>readonlycheckboxchecked.gif<br>readonlycheckboxunchecked.gif<br>repairplan.gif<br>sf.gif<br>smalldown.gif<br>smallup.gif<br>spacer.gif<br>superiorbanner.gif<br>tabs_login.gif<br>thumbs.db<br>topbackground.gif<br>typewr1.gif |

Case 1:08-cv-00483   Document 24-1 CENSE led REP ER RP08   Page 59 of 99 *ite Draft*
effective as of _____ ___, 2004 by and between   *2/6/04*
Safelite Glass Corp. and N'Site Solutions, Inc.

## Modified~~Corrected~~ Modules

Schedule 2

| Category | Details |
|---|---|
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\inscompadmin** | approvalq.asp<br>approvalqinfo.asp<br>apprqmanage.asp<br>apprqprocess.asp<br>assignmenttype.asp<br>assignmenttypeedit.asp<br>capabilities.asp<br>checklistedit.asp<br>companyadmin.asp<br>compliancechecklist.asp<br>contactinfo.asp<br>contacts.asp<br>default.htm<br>findtp.asp<br>finduser.asp<br>orgentaudit.asp<br>orgentdispatch.asp<br>orgentmisreports.asp<br>orgentreceiveassignments.asp<br>orgentreports.asp<br>orglevels.asp<br>requestq.asp<br>requestqinfo.asp<br>requestqprocess.asp<br>tradingpartner.asp<br>tradingpartnerinfo.asp<br>user.asp<br>userinfo.asp<br>useroffices.asp<br>viewchecklist.asp |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\main** | default.htm<br>help.asp<br>login.asp<br>mainmenu.asp<br>tradingpartnerenable.asp<br>tradingpartnerlogin.asp |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\maskededit** | gettext.asp<br>maskededit.asp<br>maskededit.htm<br>mimetest.asp |

Case 1:08-cv-00483   Document 24-2   Filed 02/21/2008   Page 60 of 99 *Site Draft*
effective as of _____ __, 2004 by and between   *2/6/04*
Safelite Glass Corp. and N'Site Solutions, Inc.

## Modified~~Corrected~~ Modules                                Schedule 2

| Category | Details |
|---|---|
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\mis** | ctdates.asp<br>ctreport.asp<br>default.asp<br>defaultorig.asp<br>distributionorg.asp<br>distributionsetup.asp<br>distributiontarget.asp<br>findproviders.asp<br>findprovidersmodal.asp<br>getcolumns.asp<br>getcolumnsmodal.asp<br>getdates.asp<br>getsendto.asp<br>misdates.asp<br>misreport.asp<br>misreportorig.asp<br>misreportsetup.asp<br>misreportstatus.asp<br>printmisreport.asp<br>processsendto.asp<br>reporttype.asp<br>tesmm.asp<br>test.asp<br>testpage.asp<br>testwrite.asp<br>thirdpartyview.asp<br>trendorg.asp<br>trendsetup.asp<br>trendtarget.asp<br>zreporttest.htm |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\printerfriendly** | pfapprovalrules.asp<br>pfclaim.asp<br>pfcommentlog.asp<br>pfestimate.asp<br>pfeventlog.asp<br>pfimage.asp<br>pfimages.asp<br>pfvehiclestatus.asp<br>pfvehiclestatushistory.asp<br>pfviewassignment.asp<br>pfwindshieldlist.asp |

N'Site Draft
2/6/04

effective as of _____ __, 2004 by and between
Safelite Glass Corp. and N'Site Solutions, Inc.

## Modified~~Corrected~~ Modules

**Schedule 2**

| Category | Details |
|---|---|
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\reports** | buildsql.inc<br>completedsql.inc<br>csv.asp<br>datedecipher.inc<br>default.asp<br>defaultpage.js<br>dispatchedsql.inc<br>display.asp<br>display.js<br>displaynew.asp<br>displayproviders.asp<br>displaytotalsdetail.inc<br>displaytotalssummary.inc<br>displaytrackingsummary.inc<br>displaytrackingsummaryorig.inc<br>gethistory.inc<br>loadtree.inc<br>opensql.inc<br>partssummary.inc<br>parttotalssql.inc<br>progress.asp<br>reportfunctions.inc<br>reportheader.inc<br>reporttableheader.inc<br>reporttypedecipher.inc<br>saveselectfieldsdata.inc<br>selectfields.asp<br>selectfields.js<br>targetssql.inc<br>totallosssql.inc<br>totalsdetailsql.inc<br>totalssummarysql.inc<br>tracking.inc<br>trackingsummarysql.inc |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\request** | automaticassignment.asp<br>default.asp<br>message.asp<br>newmessage.asp<br>partnerrequest.asp<br>partnershipresponse.asp<br>printmanualrequest.asp<br>response.asp<br>responselist.asp |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\treecontrol** | default.asp<br>tree.asp<br>tree.htm |

SOFTWARE LICENSE AGREEMENT                                                 *Site Draft*
                                                                              *2/6/04*
effective as of _____ __, 2004 by and between
Safelite Glass Corp. and N'Site Solutions, Inc.

## Modified~~Corrected~~ Modules                                    Schedule 2

| Category | Details |
|---|---|
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\treecontrol\images** | minus.gif<br>nothing.gif<br>plus.gif |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\uploaddownload** | beginattachmenttransaction.asp<br>commitattachmenttransaction.asp<br>getemsfilelist.asp<br>insertemsestimate.asp<br>insertfileattachment.asp<br>insertimage.asp<br>insertprintdocument.asp<br>readassignment.asp<br>readassignmentexport.asp<br>reademsfile.asp<br>writefile.asp |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\vehiclestatus** | email.asp<br>parts.asp<br>partsreport.asp<br>pfvehiclestatushistory.asp<br>requestnewstatusrecord.asp<br>sendnewlist.asp<br>showcomment.asp<br>statuscomments.asp<br>statussetup.asp<br>statussetup.js<br>updatevehiclestatus.asp<br>vehiclerepairstatus.asp<br>viewimage.asp<br>viewimageframe.asp |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp** | default.htm<br>download.asp<br>global.asa<br>nstyle.css<br>search.htm |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\admin** | default.htm<br>provideradmin.asp |

Safelite Site Draft
2/6/04

effective as of _____ __, 2004 by and between
Safelite Glass Corp. and N'Site Solutions, Inc.

## Modified~~Corrected~~ Modules

Schedule 2

| Category | Details |
|---|---|
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>\nsolutionstp\assignments | addstatus.asp<br>agent.asp<br>attachments.asp<br>claimant.asp<br>claimoffice.asp<br>copy of default.asp<br>createassignment.asp<br>debugdefault.asp<br>default.asp<br>displayname.asp<br>editagent.asp<br>editclaimant.asp<br>editclaimoffice.asp<br>editinsured.asp<br>editlocation.asp<br>editowner.asp<br>editrepairfacility.asp<br>estimates.asp<br>frameestimate.asp<br>frameimages.asp<br>iamanagement.asp<br>insured.asp<br>mailmerge.asp<br>owner.asp<br>pfestimate.asp<br>pfimage.asp<br>postfunctions.asp<br>printimages.asp<br>repairfacility.asp<br>selectcompany.asp<br>setup.asp<br>statuslog.asp<br>test.asp<br>vehlocation.asp<br>viewassignment.asp<br>viewestimate.asp<br>viewestimate.js<br>viewfile.asp<br>viewimage.asp<br>viewimageframe.asp<br>viewimageold.asp<br>viewpd.asp |

N'Site Draft
effective as of _____ __, 2004 by and between                                              2/6/04
Safelite Glass Corp. and N'Site Solutions, Inc.

## ModifiedCorrected Modules

Schedule 2

| Category | Details | |
|---|---|---|
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\calendarcontrol** | calendar.asp<br>calendar.htm | |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\claim** | addcomment.asp<br>agent.asp<br>approvalviewassignment.asp<br>assignmentmain.js<br>claimant.asp<br>claimoffice.asp<br>closeframe.asp<br>commentlog.asp<br>default.asp<br>deleteme.asp<br>editadmin.asp<br>editagent.asp<br>editclaimant.asp<br>editclaimoffice.asp<br>editinsured.asp<br>editlocation.asp<br>editowner.asp<br>editrepairfacility.asp<br>estimateimages.asp<br>eventlog.asp<br>exit.htm<br>frameestimate.asp<br>frameimages.asp<br>getviewonlyinfo.asp<br>html page1.htm<br>insured.asp<br>newassignment.asp<br>originalassignment.asp | owner.asp<br>pdimages.asp<br>pdleft.asp<br>pdtop.asp<br>ppsave.asp<br>printpreferences.asp<br>printpreferences.js<br>processviewonlyinfo.asp<br>repairfacility.asp<br>selectclaim.asp<br>selectclaim.js<br>statuslog.asp<br>vehlocation.asp<br>viewassignment.asp<br>viewassignment.js<br>viewclaim.asp<br>viewclaim.js<br>viewestimate.asp<br>viewestimate.js<br>viewfa.asp<br>viewimage.asp<br>viewimageframe.asp<br>viewpd2.asp<br>viewpd3.asp |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\claim\delete** | deleteclaim.asp<br>deleteclaim.asp.vsss.tmp<br>deleteimage.asp | |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\dispatch** | workpage.asp | |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\editmask** | editmask.asp<br>editmask.htc<br>editmask2.asp | |

N'Site Draft
effective as of _____ __, 2004 by and between          2/6/04
Safelite Glass Corp. and N'Site Solutions, Inc.

## Modified~~Corrected~~ Modules                     Schedule 2

| Category | Details |
|---|---|
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\help** | diagnostics.asp |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\help\htmfiles** | privacypolicy.htm |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\help\images** | setup.jpg |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\images** | bigdown.gif<br>ceicafiles.gif<br>checklist.gif<br>compliancechecklist.gif<br>edoccircle.gif<br>edoclogosmall.gif<br>edocplugin.gif<br>getacro.gif<br>help_main.gif<br>logo.gif<br>nsolutions.gif<br>paperclip.gif<br>paperclipdown.gif<br>partslist.gif<br>postitnew.gif<br>readonlycheckboxchecked.gif<br>readonlycheckboxunchecked.gif<br>repairplan.gif<br>smalldown.gif<br>smallup.gif<br>spacer.gif<br>topbackground.gif |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\main** | copy of mainmenu.asp<br>default.htm<br>help.asp<br>login.asp<br>mainmenu.asp |

N'Site Draft
effective as of _____ __, 2004 by and between                    2/6/04
Safelite Glass Corp. and N'Site Solutions, Inc.

## Modified~~Corrected~~ Modules                                    Schedule 2

| Category | Details | |
|---|---|---|
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\msadc** | msadcs.dll | |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\printerfriendly** | pfclaim.asp<br>pfcommentlog.asp<br>pfestimate.asp<br>pfeventlog.asp<br>pfimage.asp<br>pfimages.asp<br>pfvehiclestatus.asp<br>pfvehiclestatushistory.asp<br>pfviewassignment.asp<br>pfwindshieldlist.asp | |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\request** | automaticassignment.asp<br>copy of partnerrequest.asp<br>default.asp<br>message.asp<br>newmessage.asp<br>partnerrequest.asp<br>partnershipresponse.asp<br>printmanualrequest.asp<br>response.asp<br>responselist.asp<br>tradingpartneroutline.htm | |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\signup** | billing.asp<br>confirm.asp<br>default.asp<br>signupconfirmation.asp<br>updateconfirmation.asp | |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\signup\help** | help.asp | |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\vehiclestatus** | default.htm<br>download.asp<br>global.asa<br>parts.asp<br>partsreport.asp<br>pfvehiclestatushistory.asp<br>provideradmin.asp<br>equestnewstatusrecord.asp<br>sendnewlist.asp | showcomment.asp<br>statuscomments.asp<br>statussetup.asp<br>statussetup.js<br>updatevehiclestatus.asp<br>vehiclerepairstatus.asp<br>viewimage.asp<br>viewimageframe.asp |

*N'Site Draft*
effective as of _____ __, 2004 by and between     *2/6/04*
Safelite Glass Corp. and N'Site Solutions, Inc.

## Modified~~Corrected~~ Modules                                    Schedule 2

| Category | Details |
|---|---|
| The Microsoft SQL Server tables listed at right: | Approval<br>ApprovalQueue<br>ApprovalQueueRule<br>ApprovalRuleAction<br>Assignment<br>AssignmentClaimant<br>AssignmentClaimOffice<br>AssignmentComment<br>AssignmentCompany<br>AssignmentCompanyStack<br>AssignmentEstimatics<br>AssignmentEstimator<br>AssignmentExports<br>AssignmentInspectionSight<br>AssignmentInsuranceAgent<br>AssignmentInsured<br>AssignmentLink<br>AssignmentLoss<br>AssignmentOwner<br>AssignmentRepairFacility<br>AssignmentRepairStatus<br>AssignmentStatus<br>AssignmentStatusHistory<br>AssignmentType<br>AssignmentVehicle<br>AssignmentVehicleLocation<br>AttachmentTransaction<br>AuditClaimFilesScope<br>AuditQuery<br>AuditQueryRule<br>AuditQueryRuleAction<br>AuditQueryType<br>AuditQueryReport<br>AuditQueryReportAssignment<br>AuditReportStatus<br>ClaimFile<br>ClaimInformationFields<br>ClaimOffice<br>ClaimPrintPreferences<br>ClientAccessUsers<br>Company<br>CompanyContact<br>Company Exports<br>ComplianceItem<br>ComplianceList<br>ComplianceListItem<br>Country<br>DispatchAssignmentScope<br>DispatchFavorites<br>DispatchHistory<br>DispatchHistoryType |

Case 1:08-cv-00483 Document 41-2 Filed 02/21/2008 Page 68 of 99 *Site Draft*
effective as of _____ __, 2004 by and between *2/6/04*
Safelite Glass Corp. and N'Site Solutions, Inc.

## Modified~~Corrected~~ Modules

**Schedule 2**

| Category | Details |
|---|---|
| The Microsoft SQL Server tables listed at right: | EMSAdditionalProfile |
| | EMSAdministration1 |
| | EMSAdministration2 |
| | EMSAdministrationType |
| | EMSBettermentType |
| | EMSCountry |
| | EMSDeductibleType |
| | EMSDetail |
| | EMSDetailTransactionType |
| | EMSEnvelope |
| | EMSEstimate |
| | EMSEstimateStatus |
| | EMSEstimatingPlatform |
| | EMSHeaderProfile |
| | EMSInspectionType |
| | EMSLaborOperation |
| | EMSLaborRates |
| | EMSLaborType |
| | EMSLossCategory |
| | EMSMaterialsCalculationMethod |
| | EMSMaterialsRates |
| | EMSMaterialsType |
| | EMSNonOEMSupplier |
| | EMSPartsRates |
| | EMSPartsType |
| | EMSPaymentType |
| | EMSPointsOfImpact |
| | EMSPrimaryCustomer |
| | EMSSocialTitle |
| | EMSState |
| | EMSSubtotals |
| | EMSTaxTierProfile |
| | EMSToEnglish |
| | EMSTotals |
| | EMSTotalType |
| | EMSTransactionType |
| | EMSVehicle |
| | EMSVehicleType |
| | EMSWhoPays |
| | EMSYearMapping |
| | FileAttachment |
| | FTP |
| | GeneralReportsScope |
| | Image |
| | InsuranceAgent |
| | Insured |
| | LaborDepartment |
| | ManageApprovalQueueScope |
| | MISAssignmentGroupStatistics |
| | MISColumn |
| | MISColumnFormat |
| | MISDailyTotals |

Case 1:08-cv-00483    Document 1-2 Filed 02/21/2008    Page 69 of 69 *N'Site Draft*
effective as of _____ __, 2004 by and between                         *2/6/04*
Safelite Glass Corp. and N'Site Solutions, Inc.

## Modified~~Corrected~~ Modules                                      **Schedule 2**

| Category | Details |
|---|---|
| The Microsoft SQL Server tables listed at right: | MISDistributionRow |
| | MISEstimateStatistics |
| | MISExecutedReport |
| | MISExecutedReportStatus |
| | MISReport |
| | MISReportType |
| | MISScope |
| | MISTrendTimeUnit |
| | MISVariable |
| | OrganizationalUnit |
| | PagerMessageType |
| | PagerType |
| | PrintDocument |
| | ProcessApprovalsScope |
| | ProcessRequestsScope |
| | Provider |
| | ProviderStatus |
| | ProviderStatusHistory |
| | ProviderType |
| | ReceiveAssignmentsScope |
| | Report |
| | ReportDateFrame |
| | ReprotOption |
| | ReportTarget |
| | ReportType |
| | Request |
| | RequstQueue |
| | RequestQueueType |
| | SuperUsers |
| | TargetType |
| | TempEMSEsimate |
| | TempFileAttachment |
| | TempImage |
| | TempPrintDocument |
| | TradingPartnerCategory |
| | TradingPartnership |
| | TradingPartnershipAdjustment |
| | TradingPartnershipLaborRates |
| | TradingPartnershipPartsDiscounts |
| | TradingPartnershipPartMarkup |
| | TradingPartnerType |
| | Users |
| | VehicleTracking |
| | VehicleTrackingComplianceItem |
| | VehicleTrackingMilestone |
| | VehicleTrackingMilestoneType |
| | WorkerType |
| | WorkOfficeScope |
| | WorkOrderLine |
| | WorkOrderLineDistribution |
| | ZipCodes |