# EXHIBIT 5

## TO

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HYPERQUEST, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 08 C 483 |
| ) | |
| N'SITE SOLUTIONS, INC., and UNITRIN ) | Honorable Milton I. Shadur |
| DIRECT AUTO INSURANCE ) | Magistrate Judge Michael T. Mason |
| ) | |
| Defendants. ) | JURY DEMAND |

HYPERQUEST'S MOTION FOR LEAVE
TO FILE SUPPLEMENTAL MEMORANDUM

Plaintiff, HyperQuest, Inc. ("HQ"), by and through its undersigned counsel, hereby respectfully requests that this Honorable Court grant it leave to file a supplemental memorandum in opposition to the pending motion of N'Site Solutions, Inc. ("N'Site") and Unitrin Direct Insurance Company ("Unitrin") to dismiss for lack of subject-matter jurisdiction, a copy of which is attached hereto as Exhibit A. In support thereof, HQ states as follows:

1.      On February 13, 2008, N'Site and Unitrin filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction and Hearing Request and a memorandum of law in support thereof. In their initial motion and memorandum, N'Site and Unitrin argued primarily that HQ has contractually agreed that it would not have the right to bring an infringement action against N'Site and that only Safelite would have that right.    Although the initial motion and memorandum were submitted jointly by N'Site and Unitrin, the only argument set forth for dismissal of Unitrin initially was essentially a statement that for the same reasons as stated with respect to N'Site, HQ also lacked standing to sue Unitrin.

2.      On February 21, 2008, HQ filed HyperQuest's Opposition to Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, including the Declaration of Jeffrey J.

Hogan, one of the principal negotiators of the Safelite/HyperQuest Exclusive License, in support thereof, explaining that N'Site and Unitrin's "interpretation" of the contract language at issue was incorrect.

3.    On February 25, 2008, N'Site, without leave of Court, filed a reply brief. In its reply, N'Site argued, among other things, that: (i) it is not obligated to admit or deny whether or not it currently has any right to use, reproduce, distribute, or create derivative works based upon the eDoc Software; and (ii) there is no evidence that the initial license between N'Site and Quivox Systems Incorporated (the "Quivox/N'Site License"), which was subsequently assigned to Safelite Group Inc. ("Safelite"), was ever terminated.

4.    On February 27, 2008, this Court held a status hearing in this matter. At that status hearing, among other things, the Court indicated that after reviewing N'Site's reply brief, the Court believed that whether or not the Quivox/N'Site License was ever terminated was important for purposes of determining whether or not HQ had exclusivity vis-à-vis N'Site. Transcript of Proceedings ("Transcript"), attached hereto as Exhibit B, at pp. 8-10. The Court further explained that HQ may have exclusivity vis-à-vis Unitrin even if HQ did not have exclusivity vis-à-vis N'Site. Id.

5.    HQ requested leave to conduct discovery on the issue of whether the Quivox/N'Site License was ever terminated. HQ also inquired as to whether the Court's analysis regarding HQ's exclusivity vis-à-vis N'Site was the same with respect to the several exclusive rights under Section 106 of the Copyright Act – even though the Quivox/N'Site License was very limited in scope and never permitted, for example, any distribution to third parties or any creation of derivative works. The Court stated that if HQ wanted to take that position, the Court would "certainly take a look at it." (Transcript at p. 14).

6.    The Court also gave Unitrin leave to file a reply brief to explain why Unitrin is in the same position vis-à-vis HQ as N'Site.  On March 14, 2008, Unitrin filed its reply, raising several new arguments for the first time.

7.    On April 6, 2008, HQ finally received Safelite's document production in response to the subpoena that HQ served upon Safelite on February 29, 2008.

8.    There was no date set for HQ to file a supplemental memorandum addressing the issues discussed at the hearing, the arguments raised for the first time on reply by Unitrin, or the information that was received in response to the discovery served by HQ.

9.    In light of the Court's indication at the February 27 status hearing that the Court would be willing to let HQ submit something additional on the issues that were discussed, and in light of the new arguments raised by Unitrin and the recent completion of Safelite's document production, HQ hereby requests that it be permitted to file a supplemental memorandum addressing such issues.

WHEREFORE, HyperQuest Inc. respectfully requests that this Honorable Court enter an order granting it leave to file HyperQuest's Supplemental Memorandum in Opposition to Defendants' Motion to Dismiss for Lack of Subject-Matter Jurisdiction.

Dated: April 10, 2008

Respectfully submitted,

**HYPERQUEST, INC.**

By: /s/ Deborah Rzasnicki Hogan
One of Its Attorneys

Deborah Rzasnicki Hogan
Chad A. Blumenfield
GOLDBERG, KOHN, BELL, BLACK,
 ROSENBLOOM & MORITZ, LTD.
55 East Monroe, Suite 3300
Chicago, Illinois 60603
(312) 201-4000

- 4 -

# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HYPERQUEST, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 08 C 483 |
| | ) |
| N'SITE SOLUTIONS, INC., and UNITRIN | ) Honorable Milton I. Shadur |
| DIRECT AUTO INSURANCE | ) Magistrate Judge Michael T. Mason |
| | ) |
| Defendants. | ) JURY DEMAND |

## HYPERQUEST'S SUPPLEMENTAL MEMORANDUM
## IN OPPOSITION TO DEFENDANTS' MOTION
## TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

Plaintiff, HyperQuest, Inc. ("HQ"), by and through its undersigned counsel,

hereby submits this supplemental memorandum in opposition to the motion of Defendants N'Site

Solutions, Inc. ("N'Site") and Unitrin Direct Insurance Company ("Unitrin") (collectively,

"Defendants") to dismiss for lack of subject-matter jurisdiction.

## I.    INTRODUCTION

N'Site and Unitrin fail to directly address the issues of standing that this Court

must decide: (i) Does HQ have exclusivity vis-à-vis N'Site to the extent that N'Site is acting

outside the scope and term of its license; and (ii) Does HQ have exclusivity vis-à-vis Unitrin?

In its reply brief, N'Site reiterates that pursuant to certain language in the

Software License Agreement between HQ and Safelite Group, Inc. (the "Safelite/HQ License" or

the "Software License Agreement") HQ contractually gave up any right to bring suit against

N'Site. N'Site also argues that it does not have to take a position on whether or not it is

currently acting outside the scope or term of the initial license granted to it by Quivox in April

2001 (the "N'Site License") and that, in any event, there is no evidence that the N'Site License

was ever terminated. In Unitrin's reply, Unitrin argues that the Safelite/HQ License provides not only that HQ contractually gave away any right to bring an infringement action against N'Site but also that HQ contractually gave away the right to bring any infringement action against anyone, including Unitrin.

Unitrin and N'Site both ignore the actual language of the agreement and further ignore the Declaration of Jeffrey J. Hogan ("Hogan Declaration"), previously submitted by HQ. That declaration of one of the principal negotiators of the Safelite/HQ License clearly evidences that neither Safelite nor HQ ever intended that HQ would be prevented from bringing an infringement action against N'Site in the event that N'Site acted outside the scope or term of its license.

Unitrin also throws in a host of other arguments which are unsupported by applicable case law, rely on "facts" which are contrary to allegations in the complaint and unsupported by any evidence, and demonstrate a fundamental misunderstanding of the nature of an "exclusive license" under applicable law. A proper analysis of the applicable language, in accordance with applicable case law regarding the nature of an exclusive license, demonstrates that HQ has standing to bring its claims against both N'Site and Unitrin.

## II. HQ HAS EXCLUSIVITY VIS-À-VIS N'SITE TO THE EXTENT THAT N'SITE IS ACTING OUTSIDE THE SCOPE OR TERM OF ITS LICENSE

HQ was granted exclusive rights vis-à-vis N'Site to the extent that N'Site is acting outside the scope or term of its license. Defendants' arguments to the contrary are based on a fundamental misunderstanding of the nature of an exclusive license. Specifically, N'Site and Unitrin believe that in order to be an "exclusive licensee," HQ must be a "sole licensee." That is not the case. Accordingly, it is important first to clarify the nature of an "exclusive license" under applicable law, and then to examine the language of the agreement in light of that

- 2 -

understanding. Finally, it is important to address the limited nature of the rights granted to N'Site and the import of HQ's uncontested allegations that N'Site, in violation of the N'Site License, has infringed HQ's exclusive rights to display, distribute, reproduce, and prepare derivative works based upon the eDoc Software.

## A.   A License Is Exclusive If It Conveys The Right To Exclude Others – Even If It Does Not Convey The Right To Exclude *All* Others.

HQ is an exclusive licensee because Safelite not only gave permission to HQ to use the eDoc software, but also promised that those same rights would not be given to others. See Software License Agreement ¶¶2(a) and (b), granting to HQ a perpetual, worldwide, exclusive license to use, develop, modify, enhance, copy, reproduce, make, have made, store, demonstrate, market, promote, display, give access to, transmit, communicate, perform, adapt, modify, prepare derivative works based upon, develop, import, rent, lease and/or sub-license the eDoc Express software with only limited exceptions. Notably, "in its simplest form, a license means only leave to do a thing which the licensor would otherwise have a right to prevent." I.A.E. Inc. v. Shaver, 74 F.3d 768, 775 n. 7 (7th Cir. 1996) (quoting Western Elec. Co. v. Pacent Reproducer Corp., 42 F.2d 116, 118 (2d Cir. 1930). The Seventh Circuit has explained the distinguishing feature of an exclusive license: "In an exclusive license, the copyright holder permits the licensee to use the protected material for a specific use and further promises that the same permission will not be given to others." Id. at 768. It is this ability to "exclude" others (i.e. prevent others) from using the protected material that characterizes the nature of an "exclusive" license and results in a legally protectable interest giving the exclusive licensee standing to sue.

As the Seventh Circuit has recognized, the Second Circuit's discussion of the nature of an "exclusive" license in Western Electric, although set forth in a patent case, is also informative in the copyright context. Id. See also Silvers v. Sony Pictures Entertainment, 402

- 3 -

F.3d 881, 887 (9th Cir. 2005) ("We have long noted the strong connection between copyright

and patent law: 'Where precedent in copyright cases is lacking, it is appropriate to look for

guidance to patent law 'because of the historic kinship between patent law and copyright

law.'").[1]  It is well-settled under Western Electric and its progeny that a license is "exclusive" if

it grants the right to exclude others (expressly or impliedly) even if it does not grant the right to

exclude all others.  In Western Electric, the Second Circuit specifically held that one could be an

exclusive licensee even without being the sole licensee:

> The definition of an exclusive license, quoted above from the English
> case, might be thought to imply that an 'exclusive licensee' is a sole
> licensee.  But we do not so understand it.  A bare license might be
> outstanding in one when the patent owner grants a license to another
> accompanied by the promise that the grantor will give no further licenses.
> In such a case, the second licensee needs the protection of the right of
> joinder in a suit against infringers as much as though he were the sole
> licensee.  We see no reason why he should not have it, and we think the
> authorities recognize his right.

42 F.2d at 119 (emphasis added).   The Second Circuit also contrasted the nature of an

"exclusive" license with that of a nonexclusive or "bare" license:

> Such a license grants to the licensee merely a privilege that protects him
> from a claim of infringement by the owner of the patent monopoly.  He
> has no property interest in the monopoly of the patent, nor any contract
> with the patent owner that others shall not practice the invention.  Hence
> the patent owner may freely license others ... Infringement of the patent
> can no more be a legal injury to a bare licensee than a trespass upon
> Blackacre could be an injury to one having a nonexclusive right of way
> across Blackacre. ...

Id. at 118.

---

[1]   It is, of course, not surprising that the Seventh Circuit finds it appropriate to look at patent cases for
guidance on this particular issue given that the "exclusive" rights of patent and copyright owners both have their
genesis in the same clause of the United States Constitution.  See Article I, Section 8, Clause 8 of the United States
Constitution ("To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and
Inventors the exclusive Right to their respective Writings and Discoveries.")

Numerous courts have followed Western Electric's basic principles, distinguishing between an exclusive licensee (with rights to "exclude others," even without the right to exclude all others) and a bare (or nonexclusive) licensee (with no express or implied promise by the owner that others will not be given the same permission being granted to the licensee). See, e.g., Hawkinson v. Carnell, 112 F.2d 396, 398 (3d Cir. 1940) ("Tiresoles, Inc. is an exclusive licensee, though not a sole licensee. The fact that a prior bare license was granted by Hawkinson Company to General Tire and Rubber Company does not render Tiresoles, Inc. any less an exclusive licensee."); Ortho Pharmaceutical Corp. v. Genetics Institute, Inc., 52 F.3d 1026, 1031(Fed. Cir. 1995) ("A license may amount to no more than a covenant by the patentee not to sue the licensee for making, using or selling the patented invention, the patentee reserving the right to grant others the same right. A holder of such a nonexclusive license suffers no legal injury from infringement and, thus, has no standing to bring suit or even join in a suit with the patentee"); Ropak Corp. v. Plastican, Inc., 2005 WL 2420384 (N.D. Ill. Sept. 30, 2005) (Coar, J.) ("Defendant is incorrect that co-plaintiff standing requires that Plaintiff be able to exclude all others from making, using, or selling the patented technology. The case law requires that Plaintiff only be able to exclude "others," not *all* others) (emphasis in original); Cook, Inc. v. Boston Scientific Corp., 208 F. Supp. 2d 874, 880 (N.D. Ill. 2002) (Kocoras, J.) (patentee's license to two licensees was an "exclusive" license because "[t]he license granted is exclusive to Cook and Boston, meaning that [the licensor] cannot later license the same rights to other parties"), Great Lakes Intellectual Property, Ltd. v. Sakar Int'l, Inc., 516 F. Supp. 2d 880, 891 (W.D. Mich. 2007) (even though licensee did not get rights to exclude the patentee, two other previous licensees, or their sublicensees, licensee was still "exclusive licensee" with standing to sue because licensee did receive some portion of patentee's "bundle of rights to exclude

others."); Sigma-Aldrich Inc. v. Open Biosystems, Inc., 2007 WL 1993439 (E.D. Miss. July 3, 2007) (even though license agreement was subject to pre-existing outstanding nonexclusive license, and even though patentee retained certain rights for itself, licensee was still "exclusive" licensee with standing to sue); Chirco v. Gateway Oak, LLC, 2005 WL 2284218 (E.D. Mich. 2005) (rejecting copyright defendant's claim that copyright owner's grant of a license to more than one individual destroys the exclusivity of any one license such that each licensee lacks standing to sue, explaining that such a holding would "fly in the face of case law affirming the Copyright Act's recognition of joint ownership of exclusive rights."); Hill Phoenix, Inc. v. Systematic Refrigeration, Inc., 117 F. Supp. 2d 508, 512 (E.D. Va. 2000) ("What confers standing is the right to prevent others from using the patented technology. The Federal Circuit has never stated that the licensee must have the right to exclude *all* others.") (emphasis in original).

## B.    The Exclusivity Granted To HQ Is Quite Broad.

The exclusivity granted to HQ in the Software License Agreement is quite broad – granting HQ the right to exclude all others from, among other things, reproducing, preparing derivative works based upon, distributing, displaying or sub-licensing – with only two very limited exceptions. Software License Agreement ¶¶ 2(a) and (b). The only exceptions to HQ's ability to exclude all others from every aspect of use of the eDoc software are set forth in Paragraph 2(b) of the Software License Agreement. Those exceptions are: (i) Safelite "shall have the right to use the eDoc Software and may license the eDoc Software to third parties solely for purpose of testing or development"; and (ii) HQ's acknowledgment of the pre-existing, nonexclusive, outstanding license to N'Site and HQ's acknowledgment of ongoing negotiations for a possible revised license between N'Site and Safelite.

- 6 -

Accordingly, under the terms of the Software License Agreement, HQ has the ability to exclude all others from every aspect of use of the eDoc Software, except HQ cannot exclude: (i) Safelite; and (ii) N'Site (to the extent that N'Site is acting within the scope and term of its rights under the original license or any revised license with Safelite). In contrast, HQ does have the ability to exclude all other third parties from any aspect of use of the eDoc Software, as well as the ability to exclude Safelite and N'Site from using the eDoc Software outside the scope of their respective rights. HQ cannot be characterized as a nonexclusive licensee that received nothing more than permission from Safelite to use the eDoc Software. As an owner of exclusive rights, HQ has standing to bring an infringement action for infringement of those rights.

**C.     HQ Did Not Contract Away Its Ability To Enforce Its Exclusive Rights.**

Despite Defendants' arguments to the contrary, HQ did not contract away its ability to enforce its exclusive rights vis-à-vis N'Site (or anybody else). Defendants rely on selected language from one sentence in Paragraph 2(b) of the Software License Agreement in support of their argument that HQ and Safelite agreed that only Safelite would have the right to bring an infringement action against N'Site. Defendants' position cannot be reconciled with either the actual language of the sentence upon which they rely or the main substantive provision of the agreement – the grant of an exclusive license in the eDoc Software to HQ.

N'Site and Unitrin argue that the contract between Safelite and HQ states that Safelite "retained" "sole discretion" to "enforce the copyright against N'Site" and/or "bring suit for copyright infringement." See, e.g., Defendants' Memorandum at 5; N'Site Reply at 2-3; and Unitrin Reply at 3. This is a gross mischaracterization of the actual language of the agreement:

> Safelite covenants to HQ that prior to April 1, 2006, Safelite shall notify
> N'Site in writing of Safelite's intention to terminate the Original License
> and/or the revised license in accordance with their respective terms and
> further covenants to take whatever action (if any) Safelite deems

- 7 -

> appropriate (1) to enforce its rights under the License and/or Revised
> License and (2) to terminate the License and/or Revised License.

Safelite/HQ Exclusive License at ¶ 2(b) (emphasis added). Read in accordance with the ordinary meaning of the words used, Safelite was not "retaining" anything. Safelite was "covenant[ing]" or "promising" to take certain action. See Bourke v. Dun & Bradstreet Corp., 159 F.3d 1032, 1038 (7th Cir. 1998) (contractual language "will be interpreted according to its plain, ordinary and popular meaning"). Safelite was undertaking an affirmative obligation to HQ – not "retaining" any rights. That obligation was to take "whatever action (if any) Safelite deems appropriate" to enforce Safelite's "rights under the License." This language clearly refers to Safelite's contractual rights – not the right to enforce the copyright in the eDoc Software. For example, under the N'Site License, Safelite had the contractual right to terminate the license in advance of April 1, 2006, if N'Site defaulted on the payment of license fees. N'Site License at ¶ 9.

        This distinction between contractual rights ("rights under the License") and other rights that Safelite and/or HQ may have had under the Copyright Act is significant. Safelite continued to have contractual privity with N'Site. As explained in the Hogan Declaration, it was important to HQ that if N'Site was in breach of the N'Site License (or any revised license) prior to April 1, 2006, that HQ could be assured that Safelite would strictly enforce its contractual rights. Hogan Declaration at ¶ 13. The language in Paragraph 2(b) was included in response to HQ's request for such language. At no time in the negotiations between HQ and Safelite, did Safelite request, or HQ agree to give to Safelite, rights to pursue infringement actions against N'Site or any other potential infringer of the exclusive rights in the eDoc software which were being granted to HQ. Hogan Declaration at ¶ 14. Defendants' argument that Paragraph 2(b) actually limits HQ's rights contradicts the intentions of the contracting parties. Id. at ¶¶ 13-14.

In addition, the sentence upon which Defendants rely must be read in the context of the entire agreement – and specifically in the context of Paragraphs 2(a) and (b). Bourke, 159 F.3d at 1038 (courts examine contracts "as a whole, giving effect, to the extent possible, to all contractual provisions"). Paragraphs 2(a) and (b) clearly set forth the broad scope of the grant of exclusive rights to HQ and set forth the applicable limited exceptions. It does not make sense to interpret the sentence upon which Defendants rely as somehow taking away from HQ the ability to enforce the exclusive rights for which it had negotiated. Id.

Moreover, even if the language specified that Safelite covenanted to take "whatever action it deemed appropriate" to bring an action for infringement against N'Site, that does not mean (as Defendants argue) that HQ would not also have standing to sue N'Site for infringement. As between copyright owner and exclusive licensee, standing is not necessarily the either/or proposition that Defendants claim. For example, there can be no dispute that under the Copyright Act both the "beneficial" and "legal" owner of an exclusive right have standing to sue. 17 U.S.C. §501(b). It is also clear that a "beneficial owner" of an exclusive right includes a copyright owner that has a royalty interest pursuant to the terms of an exclusive license. 3 *Nimmer on Copyright* § 12.02[C] at 12-62 (citing legislative history and cases). Notably, in this case, Paragraph 2(d) of the Software License Agreement provides for certain royalty rights for Safelite. Accordingly, even if Safelite promised to take whatever action it deemed appropriate to bring an infringement action against N'Site, that does not mean that HQ somehow gave up any of its own rights as an exclusive licensee to bring an infringement action.[2]

---

[2]     It should also be noted that, although there is some authority for the proposition that (absent a beneficial/legal owner situation as discussed above) once a copyright owner grants an exclusive license of particular rights, the copyright owner may no longer have standing to bring an infringement claim, see, e.g., Althin CD Medical v. West Suburban Kidney Center, S.C., 874 F. Supp. 837, 842 (N.D. Ill. 1995) (Alesia, J.), that rule is not (continue)

-9-

When the sentence at issue is interpreted in accordance with the ordinary meaning of its words and consistent with the provisions of the whole agreement, it is clear that HQ did not contract away its right to enforce its exclusive rights vis-à-vis N'Site or anyone else. It is certainly impossible to conclude from the language that HQ and Safelite unambiguously agreed that Safelite retained all rights to bring an infringement action against N'Site (or anyone else). At best for Defendants, there is some ambiguity in the language pursuant to which a factfinder could conclude that the parties might have intended that only Safelite would be permitted to sue N'Site. If this Court were to find that such a reading is possible, on a motion to dismiss pursuant to Rule 12(b)(1), all doubts must be resolved in favor of HQ. Marcavage v. City of Chicago, 467 F. Supp. 2d 823, 825 (N.D. Ill. 2006) (Shadur, J.).

To the extent that this Court finds that Defendants' interpretation is plausible, this Court should consider extrinsic evidence regarding the parties' intent. Camico Mutual Ins. Co. v. Citizens Bank, 474 F.3d 989, 993 (7th Cir. 2007) ("if the contract's language is susceptible to more than one interpretation...parol evidence [is] admissible to explain and determine the intent of the parties.") HQ has already submitted the declaration of the principal negotiator of the Software License Agreement for HQ. This evidence confirms that the language at issue was included for purposes of ensuring that Safelite was undertaking certain affirmative obligations. Hogan Declaration at ¶13. The language at issue was not included for purposes of reserving for Safelite the sole right to bring an infringement action against N'Site or anybody else. Id. at ¶ 14.

_____

(continued)

nearly as well-settled as N'Site and Unitrin suggest. See 3 *Nimmer on Copyright* § 12.02[B] at 12-58 (citing only limited and conflicting authority).

**D.    HQ Has Standing To Sue N'Site Even If The N'Site License Has Not Been Terminated Because HQ Has Alleged (And N'Site Has Not Denied) That N'Site Does Not Currently Have Any Rights To The eDoc Software.**

HQ has standing to sue N'Site even if the N'Site License has not been terminated because HQ has alleged – and N'Site has not denied – that N'Site currently has no right to use, display, reproduce, distribute or create derivative works based upon the eDoc Software. Notably, HQ alleged (and N'Site has not denied) that N'Site never had rights to use the software for anything other than its own use; that N'Site never had the right to distribute the software in any manner to third parties; and that N'Site never had the right to modify or create derivative works based upon the eDoc Software without Quivox's prior written consent. Complaint at ¶11.

Moreover, HQ alleged (and N'Site has not denied) that as a result of Safelite's October 1, 2003 notice of breach, N'Site had no right to use the eDoc Express software in any way for any purpose after October 1, 2003. Id. at ¶25. In fact, the terms of the N'Site License specifically provide that in the event of N'Site's unauthorized use or payment default, N'Site is obligated to stop using the eDoc Software immediately. See N'Site License at ¶9. Safelite made quite clear to N'Site in 2003 that it believed N'Site was using the eDoc Software and therefore owed Safelite money pursuant to the N'Site License, but N'Site informed Safelite that it was not using the eDoc Software "to process any claims for customers or for any other purpose" because the software was "obsolete and antiquated technology that does not have the necessary functionality." See October 1, 2003 Letter from Tim Clark to James Bolduc and December 6, 2004 Email from Laura Bertin to Mark Smolik, attached hereto as Group Exhibit A. It would be highly improper for N'Site to persuade Safelite not to terminate the N'Site License by telling Safelite in crystal clear terms that N'Site was not using the eDoc Software and never again intended to do so, then argue to this Court that N'Site nevertheless might still be using the eDoc Software and has the right to do so under the license it previously disclaimed. Accordingly, even

- 11 -

if Safelite had sent no notice of termination prior to April 1, 2006, that does not mean that N'Site currently enjoys the right to use the eDoc Software in any way. And, even if N'Site still enjoys the limited right to use the eDoc Software as set forth in the N'Site License, N'Site never had the right to distribute or create derivative works based upon the eDoc Software, and is therefore operating outside the scope of the license.

## III.  HQ HAS COMPLETE EXCLUSIVITY VIS-À-VIS UNITRIN

HQ has complete exclusivity vis-à-vis Unitrin. Unitrin's principal argument to the contrary – for which it cites *absolutely no authority* – is that if "Safelite retained the right to sue N'Site" HQ cannot be deemed an "exclusive licensee." Unitrin also raises a handful of other arguments, all of which stem from its mistaken belief that an "exclusive licensee" must be a "sole licensee." As discussed in more detail below, each of these arguments fails.

### A.  HQ Never Contracted Away Its Rights To Bring Infringement Actions Against Third-Party Infringers Such As Unitrin.

Unitrin can point to nothing in the Software License Agreement that can even arguably be interpreted to mean that HQ contracted away its rights to bring infringement actions against third-party infringers such as Unitrin. The Software License Agreement clearly grants to HQ the right to exclude all third parties – the only exceptions being Safelite and N'Site (to the extent that N'Site acted within the scope of its rights). There is no exception to HQ's ability to exclude use of the eDoc software whatsoever by any others such as Unitrin.

Nonetheless, Unitrin argues that "Safelite retained the right to sue N'Site" and that "necessarily means that HyperQuest does not own the exclusive right to bring suit for copyright infringement," because "the license that [Safelite] granted to [HQ] was not an exclusive license." Unitrin Reply at 3. Unitrin cites no authority for these statements. Moreover, there is no such thing as an "exclusive right to bring suit for copyright infringement."

Instead, Section 106 of the Copyright Act lists the exclusive rights of a copyright owner. 17 U.S.C. § 106. The right to bring suit for violation of one of those rights is granted to all holders of any particular exclusive right – including any subdivision thereof – pursuant to Section 201(d) of the Copyright Act. 17 U.S.C. §201(d).

In addition, Unitrin's argument that if HQ cannot sue N'Site for infringement it necessarily cannot sue Unitrin is based on a misunderstanding of the nature of an exclusive license. Even if HQ had contractually given up the right to sue N'Site and, therefore, given away its ability to "exclude" N'Site from using the eDoc software outside the scope and term of its license, that does not mean that HQ also gave up its ability to exclude others from infringing its rights. A licensee need not enjoy the ability to exclude all others from using the protected material in order to be considered an "exclusive licensee." See Section II.A., above.

**B.     Unitrin's Additional Arguments Are Unpersuasive.**

Unitrin raises a handful of other unpersuasive arguments in its reply. Unitrin first argues that HQ cannot be an "exclusive licensee" because Safelite and N'Site both have certain limited rights to reproduce, prepare derivative works based upon, and distribute the eDoc Software. As discussed above, the fact that HQ was not the "sole" user of the eDoc software does not destroy the "exclusive" nature of the license because Safelite promised HQ that it would not grant the same permission to others.

In addition, Unitrin's description of the scope of Safelite's rights in Paragraph 2(b) of the Software License Agreement and N'Site's rights as set forth in N'Site License is misleading. See Unitrin Reply at 4-6. For example, Unitrin argues that Safelite and N'Site had the right to "distribute" the eDoc Software. There is no support for such a statement and such a position is contrary to the express language of both of the relevant agreements. Safelite's limited rights to use the eDoc Software and to license the software "solely for purposes of testing and

- 13 -

development" did not include the right to "distribute to the public." N'Site's lack of any right to distribute the eDoc Software is expressly stated: "Customer may not sell, market or in any other manner distribute to any third party or to any location, the Licensed Product or any information contained in or derived from the Licensed Product." (N'Site License ¶ 4.4.)

Similarly, Unitrin argues that N'Site has the right to create derivative works. Again, the clear language of the N'Site License is to the contrary: "Customer agrees not to make any modifications to the Licensed Product and agrees not to create any derivative of the Licensed Product without the prior written consent of [Licensor]…" (N'Site License ¶ 4.10.) Nonetheless, Unitrin argues at some length that N'Site acquired rights in the eDoc source code and thereby gained the right to create derivative works. Unitrin, however, cites no pleadings, evidence, or any legal authority in support of these assertions.

Unitrin's arguments are not only contrary to the allegations in the Complaint, but also not supported by N'Site's responses to discovery in this case. HQ served discovery on N'Site asking if N'Site contended that at any time after April 1, 2001, N'Site had rights to distribute, create derivative works based upon, or sub-license the eDoc Software. N'Site refused to answer those interrogatories at this time. See N'Site's Answers to Plaintiff's Interrogatories and Response to Request for Production, is attached hereto as Exhibit B, p. 3. Accordingly, at this stage of the proceedings, taking all allegations as true and drawing all reasonable inferences in favor of HQ, this Court must assume that N'Site has never had the right to distribute, create derivative works based upon, or sub-license the eDoc Software. Marcavage, 467 F. Supp. 2d at 825. The issue, therefore, is whether HQ has standing to sue N'Site if, as HQ alleges, N'Site is acting outside the scope of its license. The issue of whether N'Site has acted outside the scope of its license is a factual issue that cannot be resolved on a 12(b)(1) motion.

Unitrin also argues, again without citing authority, that HQ is not an exclusive licensee because there are certain restrictions on HQ's ability to sublicense the software to third parties. Unitrin Reply at 7-8. There is simply no support for the proposition that a license is not exclusive if the licensee does not obtain the ability to sublicense the protected material. In fact, at least one court has expressly held that an exclusive licensee does not get the ability to freely transfer (or sublicense) its exclusive rights to another. Gardner v. Nike, Inc., 279 F.3d 774, 780-81 (9th Cir. 2002) (exclusive licensee does not have freely transferable rights).

Finally, Unitrin argues that certain language in Paragraph 3 of the Software License Agreement "confirms" that HQ was not granted any exclusive rights. Unitrin Reply at 8-9. The language referenced by Unitrin regarding ownership of the software, however, was clearly intended to address title ownership of the copyright, not to undo HQ's grant of exclusivity. Safelite was not making an outright assignment of its copyright in the software to HQ. It remained the title owner of the copyright and granted to HQ certain exclusive rights.

## IV.   CONCLUSION

For these reasons, as well as those stated in HyperQuest's initial opposition brief, Defendants' motion to dismiss for lack of subject matter jurisdiction should be denied.

Dated: April 10, 2008                 Respectfully submitted,

**HYPERQUEST, INC.**

By: /s/ Deborah Rzasnicki Hogan
One of Its Attorneys

Deborah Rzasnicki Hogan
Chad A. Blumenfield
GOLDBERG, KOHN, BELL, BLACK,
  ROSENBLOOM & MORITZ, LTD.
55 East Monroe, Suite 3300
Chicago, Illinois 60603
(312) 201-4000

- 15 -

# EXHIBIT A



Safelite Glass Corp.
P.O. Box 182000
Columbus, OH 43218-2000
www.safelite.com

614.710.9000

October 1, 2003

Mr. James R.Buldoc
Vice President
JPB Enterprises
8820 Columbia 100 Parkway, Suite 400
Columbia, Maryland 21405

Dear Mr. Buldoc,

Since writing to you in April of this year, there has been little progress towards resolving n'Site's unauthorized use of software owned by Safelite. Prior to contacting you, I was corresponding and speaking with Mr. Jim Norman; however since, his departure from n'Site, I have been attempting to initiate dialogue with you about this issue.. After leaving several messages for you, I believe it necessary to formally ask for your response to Safelite's position that n'Site is using Safelite's eDoc software without license or authorization.

Jim Norman acknowledged Safelite's ownership of the eDoc software and indicated his willingness to enter into a licensing agreement to use the same. After I met with Mr. Norman at the n'Site office on May 5th, Safelite sent to him a proposed license agreement under cover of letter dated May 20, 2003.. Mr. Norman subsequently asked for proof that Safelite acquired the eDoc software. I promptly sent to him a copy of the relevant legal documents verifying our ownership of the software.. During several telephone conversations between me and Mr. Norman, Jim repeatedly promised to respond to Safelite's proposed license agreement. To date, we have not received such response.

I learned in August that Mr. Norman was no longer employed by n'Site. Brian Mcnamara suggested I contact you.

In an effort to set the stage for resolving this issue amicably, I left several messages for you at your office but have not received a return call. I acknowledge, of course, your voice mail to me of a week ago wherein you indicated you were dialing the incorrect telephone number in an attempt to reach me. I assume you have my correct telephone number as you were able to reach my voice mail acknowledging my earlier calls.

It is our understanding that n'Site is currently using Safelite's eDoc software, in whole or in part, without authorization.. It is imperative we meet with you to discuss this important matter. In an effort to facilitate an amicable resolution of this matter without the need to resort to litigation. I am willing to meet with you in your office

Our strong preference is to work through the licensing issue with you and ask for your response within 10 days of this letter. Please call me at 614-210-9459 to set up a mutually convenient meeting time.

Sincerely

Tim Clark, CPCU
Vice President
Claims Management Solutions

From:       DiMasi, Brian
Sent:       Thursday, March 03, 2005 4:19 PM
To:         'laurab@summitlaw.com'
Subject:    N'Site/Safelite dispute

Laura:

As I indicated in my voice mail message to you, Mark Smolik has transitioned the N'Site file to me. I now head up our IP/IT divisions here at Safelite. I would like to speak with you about the unresolved dispute involving Quivox.

In reviewing the file, it appears that the last substantive communication is the e-mail exchange below. Based on your client's representations as to the functionality of the software, as well as N'Site's representation that it is not using any of the technology or software, Safelite would respectfully request the opportunity to confirm the same by having our representatives visit your facility at the earliest opportunity to examine the technology and software. If it is true that no Quivox technology or software is being utilized, then I see no reason why this request would not be granted. We will certainly enter into any additional non-disclosure or confidentiality agreements as you may require to accomplish the same.

If it is determined by our representatives that no Quivox software or technologies are being utilized by N'Site, it will go a long way in bringing this matter to a prompt conclusion. I look forward to your reply and I remain,

Very truly yours,

Brian M. DiMasi
Corporate Counsel

-----Original Message-----
From: Laura Bertin [mailto:laurab@SummitLaw.com]
Sent: Monday, December 06, 2004 10:20 AM
To: Smolik, Mark
Subject: RE: N'Site Solutions

Mark -- Thank you for your email. It does appear that there has been a misunderstanding. I want to make it absolutely clear that N'Site is not using any of the technology or software delivered to N'Site by Quivox to process any claims for any customers or for any other purpose.

N'Site has informed me that the software received from Quivox is an obsolete and antiquated technology that does not have the necessary functionality. Any enhancements or modifications developed by N'Site for the software were simply "stop gap" measures until the development of N'Site's new platform was complete. Today, N'Site is, and has been for quite some time, using a completely different .net platform exclusively for all of its transactions.

As a result, N'Site is not interested in entering into a licensing arrangement with Safelite because there will be no future use of the software, and, therefore, no royalty payments will be due. Rather, as detailed in my prior email, solely in an effort to resolve the outstanding issues relating to past use, N'Site is willing to enter into a settlement agreement with Safelite. Pursuant to the terms of the settlement agreement, N'Site would make a lump sum payment in the amount of $15,000, with no ongoing royalty or future payments to be made by either party. As part of the settlement, N'Site would return to Safelite all copies of the released source code and modified modules, as contemplated in the current draft of the agreement, and there would be mutual releases by the parties.

Finally, with respect to your Item #4, N'Site is an independent provider of claims services and is not willing to compromise this position by agreeing to any exclusive vendor relationship.

I hope that this information clears up any misunderstandings and enables the parties to quickly settle the open

1

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                    SL00040

issues. I would like to also reiterate that this offer is for settlement purposes only and should not be construed as an admission of any liability or wrongdoing by N'Site.

Please let me know how you'd like to proceed.

Thanks,

Laura

**From:** Smolik, Mark [mailto:Mark.Smolik@safelite.com]
**Sent:** Thursday, December 02, 2004 2:30 PM
**To:** Laura Bertin
**Subject:** RE: N'Site Solutions

Laura: This message follows my voice mail to you of yesterday. I apologize for the "telephone tag".

Our position is that your client has used, and continues to use, software owned by Safelite. I understand your client does not dispute this position. If I am incorrect in this regard, please let me know. Although your client may believe it does not owes any royalties to Safelite, or that Safelite has any valid claims against it, it remains clear to us your client is using our software without paying for it.

We are willing to enter into a settlement agreement to resolve our differences. However, we require that any settlement agreement be accompanied by a license agreement along the lines of what I have been discussing with you for quite some time. My notes indicate that, but for the royalty issue, the terms of the license have been largely agreed.

Our settlement terms are as follows:

1. The parties enter into a settlement agreement resolving all issues regarding past use of the software. The settlement will provide for no back royalties to be paid and the parties to mutually release each other from any and all liabilities, claims, damages, etc. that either of them may have incurred or have against the other.

2. A license agreement is executed. Since we have already exchanged drafts we believe we have reached agreement on most points, except for the royalty.

3. n'Site to pay to Safelite a royalty in the amount of $3.00 for each transaction performed or conducted by n'Site using all or any part of the licensed software.

4. n'Site is to position Safelite as their exclusive automotive glass provider for non-preference glass claims.

Please let me know your thoughts in this regard.

Mark Smolik

-----Original Message-----
**From:** Laura Bertin [<mailto:laurab@SummitLaw.com>]
**Sent:** Monday, November 22, 2004 5:45 PM
**To:** Smolik, Mark
**Subject:** N'Site Solutions

Mark --

I have spoken with my client regarding the situation with Safelite. As you know, N'Site continues to dispute that it owes any royalties to Safelite or that Safelite has any valid claims against N'Site. However, solely in an effort to resolve this matter, N'Site has been willing to discuss a potential settlement arrangement with Safelite. The proposed terms currently provide for a lump-sum payment and ongoing royalty

2

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

SL00041

payments for the length of the agreement. Based on our prior discussions, it is my understanding that Safelite has tied the amount of the lump-sum payment to the royalty amount.

After numerous internal discussions, N'Site has elected to revise its offer as follows. Rather than enter into a license agreement, N'Site and Safelite will enter into a settlement agreement to resolve the outstanding issues. The consideration will be in the form of a lump sum payment in the amount of $15,000, with no ongoing royalty or future payments to be made by either party. As part of the settlement, N'Site will return to Safelite all copies of the released source code and modified modules, as contemplated in the current draft of the agreement, and there will be mutual releases by the parties.

N'Site believes that this represents a fair resolution of the issue. And, as with all of our ongoing discussions, this offer is for settlement purposes only and should not be construed as an admission of any liability or wrongdoing by N'Site.

Please give me a call or email when you've had an opportunity to discuss this proposal with the members of your team.

Thanks,

Laura

Laura A. Bertin
Summit Law Group, PLLC
315 Fifth Ave. S. Suite 1000
Seattle, WA 98104
Direct: 206-676-7016
Fax: 206-676-7017
laurab@summitlaw.com

———————————— Summit Law Group ————————————

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at the above e-mail address.
**************************************************************
This message, including any attachments, may contain confidential information intended for a specific individual and purpose, and may be protected by law. If you are not the intended recipient, please notify the sender by e-mail or telephone immediately, and then immediately delete this message. Any disclosure, copying or distribution of this message, or the taking of any action based on it, by any unintended recipient is strictly prohibited.

Checked by the Safelite e-mail scanner which may have resulted in the attachments being modified or removed.
------------------------- Summit Law Group -------------------------
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in

3

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# EXHIBIT B

UNITED STATE DISTRICT COURT
NORTHERN DISTRICT ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HYPERQUEST, INC. | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 08 C 483 |
| N'Site Solutions, Inc., et al., | ) | **Honorable Milton I. Shadur** |
| Defendants. | ) | **Magistrate Judge Michael T. Mason** |

### DEFENDANT N'SITE'S ANSWERS TO PLAINTIFF'S
### INTERROGATORIES AND RESPONSE TO REQUEST FOR PRODUCTION

Defendant N'Site Solutions, Inc. n/k/a ClaimHub, Inc. answers the Plaintiff's
Interrogatories and Request for Production of Documents and says:

**General Objections**

a.    The information supplied in these answers is not based solely upon the
knowledge of the executing party, but includes the knowledge of the party's
agents, representatives, and attorneys, unless privileged.

b.    The word usage and sentence structure is that of the attorneys who in fact
prepared these answers and language does not purport to be the exact language of
the executing party.

c.    The interrogatories and requests have been interpreted and answered in
accordance with the Federal Rules of Procedure, applicable Local Rules, plain
English usage, and to the extent not specifically challenged by objection, the
definitions and instructions included with the interrogatories and requests.

d.    The executing party reserves the right to supplement these answers to
interrogatories and responses to requests.

e.    The executing party objects to the interrogatories and requests to the extent that
they seek information that is irrelevant or not reasonably calculated to lead to the
discovery of admissible evidence.

1

f.   The executing party objects to the interrogatories and requests to the extent that they seek information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege.

g.   The executing party objects to the extent that the interrogatories and requests purport to compel the executing party to take any action or do anything no required by the Federal Rules of Civil Procedure or applicable Local Rules.

h.   The executing party objects to the extent that the interrogatories and requests seek information beyond the scope of discovery as limited by Court order.

## INTERROGATORIES

**Interrogatory No. 1.**   Does N' Site contend that the Quivox/N' Site Limited Use License is currently in effect?

Answer:  Yes.

**Interrogatory No. 2.**   If N'Site's answer to interrogatory No. I was anything other than an unqualified "no," state the basis for that contention.

Answer:  The license has never been terminated pursuant to the terms thereof. Moreover, Quivox breached its agreement with N'Site and also assigned its right to Safelite in violation of Quivox's contract with N'Site.

**Interrogatory No. 3.**   If N'Site's answer to interrogatory No. I was an unqualified "no," when does N' Site contend that the Quivox/N'Site Limited Use License ceased to be in effect?

Answer:  No answer required.

**Interrogatory No. 4.**   Does N'Site acknowledge that the rights of Quivox under the Quivox/N'Site Limited Use License were assigned to Safelite in or about May 2003?

Answer:  Defendant objects because the question exceeds the scope of discovery as limited by the Court.  Without waiving any objection, no.

**Interrogatory No. 5.**   If N'Site's answer to interrogatory No. 4 was anything other than an unqualified "yes," state the basis for that contention.

Answer:  N'Site objects in that it has not made any such contention.  It was asked if it acknowledges a point.  It does not acknowledge that point.  Moreover, Defendant objects because the question exceeds the scope of discovery as limited by the Court.  Without waiving

2

that objection, N'Site has not reviewed all of the documents between Quivox and Safelite in their entirety. Also, Quivox and Safelite violated N'Site's agreement with Quivox.

*Interrogatory No. 6.* Does N'Site contend that at any time between April 1 2001 and the present N'Site had the right to distribute the eDoc software?

Answer: Defendant objects because the question exceeds the scope of discovery as limited by the Court.

*Interrogatory No. 7.* If N'Site's answer to interrogatory No. 6 was anything other than an unqualified "no," state the basis for that contention and state the period of time during which N' Site contends it had the right to distribute the eDoc software.

Answer: The Defendant did not respond to the prior objectionable question.

*Interrogatory No. 8.* Does N'Site contend that at any time between April 1, 2001 and the present N 'Site had the right to create derivative works based upon the eDocs software?

Answer: Defendant objects because the question exceeds the scope of discovery as limited by the Court.

*Interrogatory No. 9.* If N'Site's answer to interrogatory No. 8 was anything other than an unqualified "no," state the basis for that contention and state the period of time during which N' Site contends it had the right to create derivative works based upon the eDoc software.

Answer: The Defendant did not respond to the prior objectionable question.

*Interrogatory No. 10.* Does N'Site contend that at any time between April 1, 2001 and the present N'Site had the right to sub-license N'Site's rights in the eDoc software?

Answer: Defendant objects because the question exceeds the scope of discovery as limited by the Court.

*Interrogatory No. 11.* If N'Site's answer to interrogatory No. 10 was anything other than an unqualified "no" state the basis for that contention and state the period of time during which N' Site contends it had the right to sub-license N' Site's rights in the eDoc software.

Answer: The Defendant did not respond to the prior objectionable question.

*Interrogatory No. 12.* Identify all communications between N'Site and any third party in any way relating to: (i) whether the Quivox/N'Site Limited Use License was ever terminated or revised; (ii) whether the Quivox/N'Site Limited Use License is currently in effect in whole or in part; or (iii) whether the Quivox/N'Site Limited Use License has been continuously in effect from April 1, 2001 through the present.

3

Answer: N'Site objects because the term "third party", as used in the interrogatory, is vague, ambiguous and undefined. Without waiving this or any general objection, N'Site states that it is aware of no communications relating to any of the topics set forth in the interrogatory, except internal questions to employees confirming that, in fact, no such termination or revision was received.

*Interrogatory No. 13.* Identify all persons whom N'Site believes to have any information or knowledge, or claim to have the same, in any way relating to: (i) whether the Quivox N'Site Limited Use License was ever terminated or revised; (ii) whether the Quivox/N'Site Limited Use License is currently in effect in whole or in part; or (iii) whether the Quivox/N' Site Limited Use License has been continuously in effect from April 1, 2001 through the present, and summarize the information or knowledge N' Site believes such persons to have.

Answer: N'Site's management has asked several of its employees if they had any documents regarding Quivox and/or Safelite. N'Site also has asked if anyone recalls receiving a termination notice or alteration of the license. The responses were all negative so N'Site does not believe any of its employees have responsive information. James R. Bolduc was the N'Site representative that discussed Safelite's position with Safelite. He is a Maryland resident and may be contacted through undersigned counsel. Others in N'Site's management team have no knowledge regarding any revision or termination.

## REQUESTS

*Request No. 1* All documents in any way reflecting communications between N'Site and Safelite in any *way* relating to the Quivox/N 'Site Limited Use License or the eDoc software.

Response: Defendant objects because the request exceeds the scope of discovery as limited by the Court. Without waiving any objection, all responsive documents will be produced as they are maintained in the ordinary course of business for review and inspection-related activities at the offices of JPB Enterprises, Inc., 8820 Columbia 100 Parkway, Suite 400, Columbia, Maryland 21045.

*Request No. 2.* All documents in any way reflecting communications between N' Site and Safelite in any way relating to any draft or proposed revised license terms between N' Site and Safelite.

Response. Defendant objects because the request exceeds the scope of discovery as limited by the Court. Without waiving any objection, all responsive documents will be produced as they are maintained in the ordinary course of business for review and inspection-related activities at the offices of JPB Enterprises, Inc., 8820 Columbia 100 Parkway, Suite 400, Columbia, Maryland 21045.

*Request No. 3.* All documents in any way reflecting communications between N' Site and Quivox in any way relating to the Quivox/N'Site Limited Use License.

Response: Defendant objects because the request exceeds the scope of discovery as limited by the Court. Without waiving any objection, all responsive documents will be produced as they are maintained in the ordinary course of business for review and inspection-related activities at the offices of JPB Enterprises, Inc., 8820 Columbia 100 Parkway, Suite 400, Columbia, Maryland 21045.

4

*Request No. 4.* All documents in any way relating to: (i) whether the Quivox/'N' Site Limited Use License was ever terminated or revised; (ii) whether the Quivox/N'Site Limited Use License is currently in effect in whole or in part; or (iii) whether the Quivox/N'Site Limited Use License has been continuously in effect from April 1, 2001 through the present.

Response: All responsive documents will be produced as they are maintained in the ordinary course of business for review and inspection-related activities at the offices of JPB Enterprises, Inc., 8820 Columbia 100 Parkway, Suite 400, Columbia, Maryland 21045.

**I, James R. Bolduc,** in my capacity as an officer of Defendant N'Site Solutions, Inc., **SOLEMNLY AFFIRM** under the penalties of perjury that the foregoing Answers to Interrogatories are true to the best of my knowledge, information and belief.

For:  N'Site Solutions, Inc.

James R. Bolduc
Secretary

As to the objections and document responses,

Steven L. Friedmann, Esquire
8820 Columbia 100 Parkway, Suite 400
Columbia, MD 21045
410-884-1960
410-884-1457 (fax)

5

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY**, that on this $\not{H}$ day of March, 2008 a copy of the foregoing Answers to Interrogatories and Response to Document Requests was sent via facsimile transmission and first-class mail to:

Deborah Rzasnicki Hogan, Esq.
Goldberg, Kohn
55 East Monroe Street, Suite 3300
Chicago, IL 60603
312-332-2196 (fax)

Paul R. Kitch, Esq.
Nixon Peabody LLP
161 N. Clark Street
48th Floor
Chicago, IL 60601
312-425-3909

Steven L. Tiedemann

6

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HYPERQUEST, INC.,                        ) DOCKET NO. 08 C 483
                                         )
                       Plaintiff,)
                                         )
     vs.                                 )
                                         )
N'SITE SOLUTIONS, INC., et al.,          ) Chicago, Illinois
                                         ) February 27, 2008
                       Defendants.) 9:00 o'clock a.m.


        TRANSCRIPT OF PROCEEDINGS BEFORE THE HONORABLE
                   MILTON I. SHADUR, Judge

APPEARANCES:

For the Plaintiff:
                   MS. DEBORAH R. HOGAN

For the Defendants:
                   MR. STEVEN L. TIEDEMANN AND
                   MR. PAUL R. KITCH


                         JESSE ANDREWS
        Official Court Reporter - U. S. District Court
                     219 S. Dearborn Street
                    Chicago, Illinois   60604
                        (312) 435-6899

            *      *      *      *      *      *

2

1          THE CLERK:  08 C 483, Hyperquest vs. N'Site.

2          MS. HOGAN:  Good morning, your Honor.  Deborah Hogan

3 on behalf of Hyperquest.

4          MR. TIEDEMANN:  Good morning, your Honor.  Steve

5 Tiedemann for N'Site Solutions.  T-i-e-d-e-m-a-n-n.

6          MR. KITCH:  Paul Kitch for Unitrin Direct Insurance

7 Company.

8          THE COURT:  Mr. Tiedemann, I just received, and I

9 assume counsel did as well, a reply memorandum.  Did I either

10 order or grant leave to file that?

11         MR. TIEDEMANN:  No, sir.

12         THE COURT:  I did not, right?

13         MR. TIEDEMANN:  No, sir, you did not.

14         THE COURT:  Well, as you know for many years I

15 automatically on motions used to set a 1-2-3 schedule.  But

16 experience has showed that often that was really not necessary

17 because of the fact that the parties had essentially

18 encountered each other fully in the first two.  And so I

19 shifted to a practice of the type that I have here, in which I

20 set two, and I set a short status date right after that so

21 that we could talk about whether a reply was called for.

22         Now it's your responsibility if you are seeking

23 leave to file something to ask leave to file.  And I recognize

24 that in practical terms in real world terms what happens when

25 you ask a judge, "Do I have leave to file a memorandum," and

3

1 attach the memorandum, you have accomplished the goal because
2 the judge always has to read it you know in order to decide I
3 am not going to grant leave to file. But that really doesn't
4 alter I think the lawyer responsibility. So it seems to me
5 that you ought to keep that mind for the next time around.
6         Having said that, I must say that I found the reply
7 useful and therefore you know, it's sort of a no harm no harm
8 foul, but it does not represent good practice.
9         MR. TIEDEMANN: Your Honor, I certainly apologize
10 for that. And I can tell you that it wasn't any attempt to
11 get over on anything. I was practicing based upon my
12 experience in another district. And I certainly apologize for
13 that to the Court. It's not an attempt to get over and make
14 you read something without granting leave.
15         THE COURT: Well, I had occasion in the -- I think
16 it was either in the bench trial criminal trial that I just
17 concluded or maybe in one of the motions that I was
18 considering doing it, that I view the old base canard that
19 says that women always want to have the last word. That's
20 just that, a base canard. And that ought to be modified to
21 lawyers always want to have the last word.
22         MR. TIEDEMANN: That's accurate, your Honor.
23 .         THE CLERK: But in event, we are here, and I have
24 read this one. And it seems to me that the reply as I said is
25 indeed of value. What it makes clear is that the arguments

4

1 that Hyperquest has advanced would have a great deal more
2 force if the party that you were suing for claimed copyright
3 infringement were somebody other than N'Site.

4        Now the reason that I say that, of course, is that
5 if you look at section 2(b) of the Software License Agreement
6 between HQ and the Safelite Group of course, and you knowledge
7 this, it expressly makes an exception to exclusivity the
8 outstanding license from Safelite to N'Site.  Not only that,
9 but it also makes it very plain that Safelite retained the
10 power to enforce that license, although of course it did
11 covenant that it would notify N'Site of its intention to
12 terminate the license.

13        Now according to the memorandum that's been filed by
14 Hyperquest over here on page 5, Safelite didn't do what it
15 promised to do.  That is it did not apparently negotiate and
16 execute a revised license.  And it did not, at least according
17 to what is presented to me, terminate the license to N'Site.
18 And I look back at the N'Site document, and what it had was a
19 five-year term with a provision for automatic renewal on a
20 year-to-year basis if it was not terminated.  And so the
21 posture that we have here is one in which it's Safelite and
22 not Hyperquest that has the power of enforcement for breach
23 against N'Site.

24         And I think, although it's not -- it's an unusual
25 situation (I think that may be an understatement), but N'Site

5

1 correctly argues I find that Hyperquest may well have a claim

2 against Safelite for breach of contract.  You know then you

3 say, "Of course you promised to do this for us, you didn't."

4 But that does not entitle, as I perceive it, Hyperquest to

5 say, "We stand in the shoes of Safelite for purposes of

6 enforcement."

7          Now before I ask Hyperquest to comment, I want to

8 ask Mr. Kitch something -- and that is, nobody in this current

9 motion has spoken directly to the question whether the action

10 as against Unitrin may stand in a different posture.  And

11 maybe you can fill me in a little on that.

12          MR. KITCH:  Right.  Well, I think that in N'Site's

13 brief it is an issue that apply to all of the defendants.

14          THE CLERK:  I know you've said that.  But I would

15 like to hear from you because you are representing Unitrin.

16          MR. KITCH:  Right.  Certainly we would join in that

17 reply brief and agree with that.

18          THE COURT:  But that would result in the dismissal

19 of N'Site.  I am not sure that it would result in the

20 dismissal of Unitrin.  Because although Unitrin I gather was

21 operating under what was thought the authority of N'Site,

22 still vis-à-vis Hyperquest it could be in a situation in which

23 it's violating a copyright, and that presents I think maybe a

24 different about exclusivity.

25          MR. KITCH:  Well, certainly we would like the

6

1 opportunity to respond and present argument as to why we think
2 it should apply to us as well.
3          THE COURT:  Okay.  Now let me turn to Hyperquest's
4 counsel.
5          MS. HOGAN:  Yes, Your Honor.  With respect to your
6 comments about section 2(b) of the License Agreement between
7 Hyperquest and N'Site --
8          THE CLERK:  Yes.
9          MS. HOGAN:  -- your Honor made a comment that
10 perhaps Safelite did not do what it promised to do, negotiate
11 a revised license.
12          THE CLERK:  And terminate, which was one of the
13 things that it also promised to do.
14          MS. HOGAN:  Right.  In terms of the language of 2(b)
15 though, I don't believe there is anything in that section
16 whereby Safelite promised to negotiate a Revised License.
17          THE CLERK:  Wait just a minute.
18          MS. HOGAN:  Okay.
19          THE COURT:  It says -- I mean I am not sure whether
20 this federally links up with this one.  But what it says
21 literally is:
22          "Safelite covenants to HQ that prior to
23          April 1, 2006, Safelite shall notify
24          N'Site in writing of Safelite's intention
25          to terminate the Original License and/or

7

1           the Revised License in accordance with

2           their respective terms and further

3           covenants to take whatever action (if any)

4           Safelite deems appropriate (1) to enforce

5           its rights under the License and/or

6           Revised License and (2) to terminate the

7           license and/or Revised License."

8               So what it does is to confirm in that sentence that

9    it has retained the power of enforcement vis-à-vis N'Site.

10   And it covenants that it's going to do something to change

11   that posture, and then it didn't.

12               MS. HOGAN:  Your Honor, if I may.  It's Hyperquest's

13   position that that language that says that Safelite covenant

14   to enforce its right under the license -- and/or Revised

15   License, so to the extent there is a Revised License it would

16   apply.  Our argue is that the language contemplated that a

17   Revised License may or may not be --

18               THE CLERK:  That's true.

19               MS. HOGAN:  It's either going to be the Original or

20   potentially a Revised License.

21               THE CLERK:  That's right.  And the existing one.

22   And that means that there is no Revised License.  The existing

23   one was the one that would be looked at.  And the existing one

24   had a provision, as I say, for automatic renewal.

25               MS. HOGAN:  I understand, your Honor.  And as we

8

1 said in our brief, we have alleged and we have good faith

2 basis for alleging that the license was terminated, we don't

3 have the ability to prove that without discovery.  So to the

4 extent that's a crucial issue, we would ask for the right to

5 conduct discovery on that.  I like to say my own, I think it

6 is a crucial issue in order to resolve this standing point.

7          THE COURT:  That's what makes horse races and

8 lawsuits.

9          MS. HOGAN:  Okay.

10          THE COURT:  If you want the opportunity to find

11 out -- if you are saying you don't know whether it was

12 terminated, because of what you do cover in you memorandum is

13 to say specifically that their Revised Agreement was entered

14 into.  And I took that to indicate that the entire situation

15 with vis-à-vis Safelite and N'Site, which you know your

16 Complaint sets out resulted in a claim of breach on the part

17 of Safelite, followed by the parties undertaking to negotiate,

18 and then entering into the negotiations.

19          So I recognize that you did not say that it was

20 terminated.  But I think that that's something that unless you

21 can demonstrate that your claim, if any, is against Safelite.

22          MS. HOGAN:  Okay.  Your Honor if I may, so that I

23 understand your ruling.  Because with respect to the language

24 to enforce its rights under the license, it's Hyperquest's

25 view that that language is referring to Safelite's rights.

9

1  When it says "Safelite"--

2          THE COURT:  Of course.

3          MS. HOGAN:  Okay.  So Safelite's rights under the

4  license.

5          THE COURT:  Right.

6          MS. HOGAN:  It's Hyperquest's view that means their

7  contractual rights.  But it's not talking about any right they

8  may or my not have under the Copyright Act to bring a

9  statutory cause of action for infringement.  But even to the

10 extent that it is, even if it's read more broadly to refer to

11 Safelite's rights under the copyright laws as well, then

12 whatever Safelite's right are or are not to bring an

13 infringement action under the copyright laws, they are and

14 Safelite is covenanted to enforce those rights, that doesn't

15 alter whatever Hyperquest's right may be under the copyright

16 laws.

17         THE COURT:  Expect for one thing -- and that is, it

18 seems to me that you really cannot essentially make that

19 argument in light of the nonexclusivity situation that you

20 have acknowledged takes place by entering into section 2(b).

21 You can't say, "Oh, well, you know maybe that's an exception

22 in terms of our exclusivity, but we are the ones who have the

23 power to go after somebody when the contractual arrangement

24 clearly contemplated otherwise."  Clearly.

25         MS. HOGAN:  Your Honor, I would disagree to the

10

1  extent that a carve out for the N'Site Original License

2  somehow means that Hyperquest is a nonexclusive licensee.

3          THE COURT: It is to some at least to a limited

4  extent.  I think it poses an interesting problem.  And that's

5  the reason that I said that you might stand in a different

6  stead.  You have talked about the fact that rights under

7  copyright law are divisible.  True enough.  But the

8  enforcement that we are talking about here vis-à-vis N'Site

9  does not come within that.

10          It's possible, although I am not suggesting a ruling

11 on this one, because I haven't gotten the input about Unitrin,

12 and I except I will get that both from you and from Unitrin's

13 counsel, that Unitrin may perhaps stand in a different stead.

14 That you can take advantage of the doctrine that says -- that

15 talks about the divisibility of rights, and that therefore

16 that enables you to sue.  I don't know the answer to that one,

17 and that will be a function of what you come out with.

18          So what I am going to do then is this.  I am going

19 to give you where I am coming from.  I will give you an

20 opportunity to engage in limited discovery to determine

21 whether the N'Site Agreement was in fact terminated if it was

22 not, than I have already told you what my ruling is going to

23 be vis-à-vis N'Site.

24          I will except that it probably makes sense to have

25 Mr. Kitch on behalf of his client to file something in the

11

1 interim to at least to make clear the extent to which you

2 believe you stand on exactly the same footing as N'Site, and

3 explaining you know why you believe that's so, so that that

4 issue becomes closer to being ripe.

5          Now how long would you need to take this limited

6 discovery?

7          MS. HOGAN:  Well, your Honor, it will necessarily

8 involve us serving a subpoena on Safelite as well.  So at

9 least 60 days, your Honor.  Unless we can get Safelite to

10 respond to the subpoena.

11          THE COURT:  What snails do you have serving

12 subpoena?  What do you need 60 days for?

13          MS. HOGAN:  Well, I am concerned, your Honor, that

14 we will serve a subpoena on Safelite.  And unless we do in

15 fact get prompt responses to the subpoena, including documents

16 requested and all of that in 30 days -- I mean I am fine with

17 the shorter deadline provided that if we issue in getting what

18 we need in response to the subpoena from Safelite.

19          THE COURT:  If you need more me time than I am going

20 to give you, then come in and ask for it.

21          MS. HOGAN:  Fine, your Honor.

22          THE COURT:  But 60 days really should not be

23 necessary.

24          MS. HOGAN:  Your Honor, we would want it to move

25 more quickly as well.

12

1          THE COURT:  What I will do is I will give you four

2  weeks.  That puts us to March 26th.  And then suppose that I

3  give you a status maybe Monday, March 31st, when we can find

4  out where you stand.

5          In the meantime if for some reason you are delayed

6  and you know can't get information on it, and you want to file

7  a motion in the meantime, I will take a look at it, and you

8  probably want have to appear, but just to get a handle on what

9  kind of time frame we are looking at.

10         MS. HOGAN:  Certainly, your Honor.  To the extent

11  that we serve discovery requests on N'Site as well for

12  information, I would ask that they not have a full 30 days to

13  respond.

14         THE COURT:  Yes.  I would think that N'Site should

15  be able to give you that information very promptly.  And

16  counsel, you don't have a problem with that.

17         MR. TIEDEMANN:  I do not have a problem with that.

18  We should be able to respond to any -- in fact we can do it

19  informally, but counsel may want to do it formally, but we can

20  respond in seven business days, 10 business days --

21         THE COURT:  Yes.

22         MR. TIEDEMANN:  -- something like that.

23         THE COURT:  So you should have no difficulty with

24  that.

25         Now Mr. Kitch, what kind of time frame would you

13

1  like to file whatever you plan to file?

2          MR. KITCH:  Could I have a week?

3          THE CLERK:  Well, why kill yourself?  Suppose that

4  give you a week from Friday, which is March 7th?  Okay.

5          MR. KITCH:  March 7th.

6          THE COURT:  Right.  And so we are set then for march

7  31st at 9 o'clock.  Can everybody make that?  That's a Monday?

8          MS. HOGAN:  Yes, your Honor.

9          MR. TIEDEMANN:  Yes, your Honor.

10          THE COURT:  All right.  Status then March 31st at

11  9 o'clock.

12          MS. HOGAN:  Your Honor, if I may ask one more

13  question so that I fully understand --

14          THE COURT:  Sure.

15          MS. HOGAN:  -- your ruling with respect to the

16  N'Site issue?  To the extent there is a carve out for N'Site

17  with respect to the Original License, the Original License

18  permitted them limited rights to use.  So the extent that

19  Safelite retained the right to enforce that copyright

20  ownership interest.

21          THE COURT:  It's up to Safelite not up to you

22  unless -- because now you know I don't know what may be

23  standing in the way inquiring whatever Safelite's rights are,

24  I suppose you can do that and sort of obviate the problem.

25  But as the thing stands now it's, really only Safelite that

14

1 has enforcement right vis-à-vis N'Site.

2          MS. HOGAN: But your Honor, I guess what I am I
3 trying to understand is, does your Honor view that the same
4 with respect to tall of all different copyright rights under
5 Rule 106?

6          THE CLERK: True.

7          MS. HOGAN: For example, Safelite did not retain the
8 right -- Safelite gave Hyperquest the exclusive right to
9 distribute. There is no question about that. There wasn't
10 even a carve out for N'Site with respect to that right. There
11 was no carve out that N'Site could distribute. Hyperquest was
12 given that right, nobody else. Hyperquest was given the right
13 to exclude everybody else from distributing Edoc software. So
14 our view of the case law on that is that Hyperquest therefore
15 were the exclusive licensee with standing to enforce that
16 particular right.

17          THE COURT: I think that kind of divisibility I am
18 not sure stands under what is really an odd posture in this
19 case. And so if you want to take that position, I will
20 certainly look at that.

21          MS. HOGAN: Okay.

22          THE COURT: But meanwhile -- by the way, we
23 originally had a March 11th status date on this one. That's
24 going to get vacated of course. It's going to be replaced by
25 the March 31st. Okay.

15

1          Thank you all.

2          MS. HOGAN:  Yes, your Honor.  Thank you, your Honor.

3          MR. TIEDEMANN:  Thank you, your Honor.

4          (WHICH WERE ALL OF THE PROCEEDINGS HAD AT THE HEARING OF
           THE ABOVE-ENTITLED CAUSE ON THE DAY AND DATE AFORESAID.)

5
                        C E R T I F I C A T E

6
       I HEREBY CERTIFY that the foregoing is a true and correct
7      transcript from the report of proceedings in the
       above-entitled cause.

8

9      JESSE ANDREWS, CSR
       OFFICIAL COURT REPORTER
10     UNITED STATES DISTRICT COURT
       NORTHERN DISTRICT OF ILLINOIS
11     EASTERN DIVISION
       DATED: February 28, 2007
12

13

14

15

16

17

18

19

20

21

22

23

24

25