**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **HYPERQUEST, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 08 C 485** |
| | ) | |
| **v.** | ) | **Judge Charles R. Norgle** |
| | ) | **Magistrate Judge Cole** |
| **NUGEN I.T., INC., and DAYLE PHILLIPS** | ) | |
| | ) | **JURY DEMAND** |
| **Defendants.** | ) | |
| | ) | |

**HYPERQUEST'S OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

Plaintiff, HyperQuest, Inc. ("HQ"), by and through its undersigned counsel, hereby respectfully submits its brief in opposition to the motion of Defendants NuGen I.T., Inc. ("NuGen") and Dayle Phillips ("Phillips") (collectively "Defendants") requesting that this Court dismiss this action pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction.

## I. INTRODUCTION

HQ is an exclusive licensee with standing to sue for infringement of HQ's exclusive rights in the eDoc software. In July 2004, HQ was granted completely exclusive rights to the eDoc software with only two very limited exceptions – neither of which is applicable here. Under the Copyright Act, rights are divisible and owners of exclusive rights (including any subdivision thereof) have standing to bring an infringement action to enforce that right. Accordingly, as the owner of exclusive rights, HQ has standing to sue NuGen and Phillips – neither of whom has any rights to the software at issue.

The ruling of Judge Shadur in the matter of HyperQuest, Inc. v. N'Site Solutions, Inc. and Unitrin Direct Auto Insurance, Case No. 08 C 483 (the "N'Site Action") is based on a misunderstanding of applicable law and a misreading of the relevant documents. This Court should not adopt the ruling or the reasoning set forth therein. For example, Judge Shadur appears to have adopted the view that in order to be an exclusive licensee with standing to sue, one must be the sole person or entity with any right to exploit the subject work. That is wrong. Judge Shadur also apparently believes that retention of rights by the copyright owner destroys the exclusive nature of the license granted. Again, Judge Shadur's view is contrary to applicable law.

Moreover, even if Judge Shadur's view on these issues was correct (which it is not), his ruling is still erroneous. Judge Shadur's ruling fails to fully recognize the divisible nature of exclusive rights under the Copyright Act. In particular, Judge Shadur's ruling fails to recognize that *HQ is the only entity that has any right to sell the software at issue, to the exclusion of all others*. The right to distribute copies of the software to the public by sale is an exclusive and divisible right under the Copyright Act. 17 U.S.C. §106(3). No one other than HQ has that right – not NuGen or Phillips, not N'Site Solutions, Inc. ("N'Site") or Unitrin Direct Insurance Company ("Unitrin"), and not even Safelite Group Inc. f/k/a Safelite Glass Corp. ("Safelite") (the copyright owner). Accordingly, HyperQuest is not only the owner of the exclusive right to sell the eDoc software, HQ is the "sole licensee" with that right.

As the defendants in the N'Site Action conceded, there is no dispute that an exclusive licensee has standing to sue for copyright infringement under the Copyright Act. There is simply no doubt that HQ was granted the right to exclude every other person – including the copyright owner – from selling the software at issue to anyone, at anytime, at any place, in any manner, anywhere in the world for the duration of the Software License Agreement between HQ and Safelite. Neither N'Site nor Unitrin ever argued to the contrary, nor did Judge Shadur find to the contrary (nor could he). In fact, the pre-existing, non-exclusive license granted to N'Site *expressly prohibited* N'Site from selling or distributing the eDoc software in any manner. And there is certainly no argument that either NuGen or Phillips has the right to sell or distribute the eDoc software. Accordingly, HQ is an exclusive licensee with standing to sue NuGen and Phillips for selling an infringing software product in violation of HQ's rights. While this alone is sufficient to grant HQ standing in this case, HQ also has standing for numerous other reasons.

For these reasons, explained in more detail below, the motion of NuGen and Phillips to dismiss for lack of subject-matter jurisdiction should be denied.

## II. FACTUAL BACKGROUND

### A. HQ's Exclusive Rights in the eDoc Software

On July 6, 2004, Safelite granted to HQ a perpetual, worldwide, exclusive license to use, develop, modify, enhance, copy, reproduce, make, have made, store, demonstrate, market, promote, display, give access to, transmit, communicate, perform, adapt, modify, prepare derivative works based upon, develop, import, rent, lease and/or sub-license the eDoc software. See Complaint for Injunctive Relief and Damages ("Complaint"), ¶ 31-32 and Software License Agreement, dated July 6, 2004 ("Software License Agreement"), attached as Exhibit A thereto,

¶ 2. The exclusivity granted to HQ in the Software License Agreement is quite broad – granting HQ the right to exclude all others from, among other things, reproducing, preparing derivative works based upon, distributing, displaying or sub-licensing – with only two very limited exceptions. Software License Agreement ¶¶ 2(a) and (b).

The only exceptions to HQ's ability to exclude all others from every aspect of use of the eDoc software are set forth in Paragraph 2(b) of the Software License Agreement. Those exceptions are: (i) Safelite "shall have the right to use the eDoc Software and may license the eDoc Software to third parties solely for purpose of testing or development"; and (ii) HQ's acknowledgment of a pre-existing, nonexclusive, outstanding license to N'Site and HQ's acknowledgment of ongoing negotiations for a possible revised license between N'Site and Safelite.

**B. The Initial Development of the eDoc Software and the Pre-Existing Non-Exclusive License between N'Site and Quivox**

Quivox Systems Incorporated ("Quivox") completed development of the eDoc software in or about 2001. Complaint ¶ 10. On or about April 1, 2001, N'Site entered into a Software Application Services and Integration Agreement with Quivox (the "Quivox/N'Site License"), pursuant to which Quivox agreed, among other things, to give N'Site a limited non-exclusive license to use and display the eDoc software developed by Quivox. See Complaint for Injunctive Relief and Damages filed in the N'Site Action (the "HQ/N'Site Complaint") ¶ 7, and Quivox/N'Site License, attached thereto as Exhibit A, ¶ 4.[1] Shortly thereafter, however, Quivox ceased operations. Complaint ¶ 14.

**C. Safelite's Acquisition of the eDoc Software**

Eventually, on or about May 9, 2003, Quivox assigned all rights, title and interest in the eDoc software to Safelite. Complaint ¶ 20. Quivox also assigned to Safelite all licenses pursuant to which the eDoc software had been licensed for use by third parties, including the Quivox/N'Site License. HQ/N'Site Complaint ¶ 16.

**D. HQ Learns of Infringing Activities and Files Copyright Infringement Actions**

In or about October 2007, HQ learned that Phillips (a former Quivox and former Safelite employee who, among other things, had been intimately involved in the transition of the eDoc software from Safelite to HQ) was working with NuGen, and that NuGen was marketing

[1] A copy of the HQ/N'Site Complaint is attached as Exhibit 1 to the Memorandum of Law in Support of Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction filed by NuGen and Phillips ("Defendants' Memorandum").

and selling an infringing software product to insurance companies and others in the property and casualty insurance industry. Complaint ¶¶ 33-35. Accordingly, HQ filed this action for copyright infringement.

HQ also learned that, among other things, in violation of the terms of the Quivox/N'Site License, N'Site had created a derivative work based upon the eDoc software and was marketing and selling it to third parties. HQ/N'Site Complaint ¶¶ 27-31. In particular, HQ learned that in or about the summer of 2006, N'Site had sold its infringing software to Unitrin for over $700,000. HQ/N'Site Complaint ¶ 29. Accordingly, HQ filed a separate copyright infringement action against N'Site and Unitrin.

## III. PROCEDURAL BACKGOUND

### A. HQ v. NuGen and Phillips

The Complaint in this action was filed on January 22, 2008. On March 4, 2008, NuGen and Phillips filed a motion to dismiss for lack of personal jurisdiction. That motion has been fully briefed since April 14, 2008.

On or about May 12, 2008, NuGen and Phillips learned of the May 1, 2008 ruling by Judge Shadur and decided to file their own motion to dismiss for lack of subject matter jurisdiction, urging this Court to adopt the reasoning of Judge Shadur's ruling in the N'Site case.

### B. HQ v. N'Site and Unitrin

On February 13, 2008, N'Site and Unitrin filed a joint motion to dismiss for lack of subject matter jurisdiction arguing primarily that HQ had contractually agreed that it would not have the right to bring an infringement action against N'Site and that only Safelite would have that right. Thereafter, there was significant additional briefing addressing several additional arguments. Ultimately, upon completion of the briefing, and after two interim status hearings, on May 1, 2008, Judge Shadur issued his Memorandum Order granting the motion of N'Site and Unitrin to dismiss for lack of subject matter jurisdiction. See Memorandum Order, attached as Exhibit 7 to Defendants' Memorandum.

Judge Shadur's Memorandum Order does not engage in a detailed analysis of the issues. Instead, Judge Shadur essentially adopts all of the arguments set forth in Unitrin's reply, Unitrin's supplemental reply, and N'Site's supplemental reply. Id. at 3-4. (stating "this Court finds it unnecessary to reiterate the analysis there piece by piece – instead it simply adopts

Unitrin's presentation as proffered in the Reply" and "simply refer[ing] to and adopt[ing]" the supplemental reply briefs of Unitrin and N'Site).[2]

HQ will not repeat here all of the arguments set forth in its initial opposition brief or in its supplemental memorandum filed in the N'Site Action, given that those briefs were attached as exhibits to Defendants' Memorandum in this action as well. Instead, HQ incorporates such arguments as if fully set forth herein. Nonetheless, HQ addresses below some of the most problematic and erroneous aspects of Judge Shadur's opinion.

## IV. ARGUMENT

NuGen and Phillips are marketing and selling infringing software even though they have no such rights. Complaint ¶ 33-35. HQ is the only entity with any right to sell the eDoc software. See Software License Agreement, ¶ 2 (granting exclusive rights to HQ to, among other things, market and sell, with no exceptions to such exclusivity). Accordingly, HQ, as the "legal or beneficial owner of an exclusive right," has standing to sue NuGen and Phillips for copyright infringement. Judge Shadur's ruling fails to recognize the divisible nature of exclusive rights; misreads the relevant documents; and misunderstands the nature of exclusive rights.

### A. HQ is an exclusive licensee because HQ is the only entity with the right to sell the eDoc software.

The clearest example of error in Judge Shadur's ruling may be Judge Shadur's failure to recognize that HQ is the only entity with the right to sell the eDoc software. Judge Shadur's ruling in this regard fails to fully recognize the divisible nature of exclusive rights. Exclusive rights, "including any subdivision of any of the rights specified in section 106 may be transferred … and owned separately." 17 U.S.C. § 201(d)(2). The exclusive rights set forth in Section 106 may be subdivided indefinitely. Id. See also Notes of Committee on the Judiciary, House Report No. 94-1476 ("Each of the five enumerated rights may be subdivided indefinitely and, as discussed below in connection with section 201, each subdivision of an exclusive right may be owned and enforced separately."); 3 *Nimmer on Copyright* § 10.02[A] (discussing the legislative history and explaining that "there would appear to no limit on how narrow the scope of the licensed rights may be and still constitute a "transfer" of ownership, as long as the rights thus licensed are "exclusive"). Accordingly, the legal or beneficial owner of an exclusive right

[2] Most of the briefs on this issue filed in the N'Site Action are attached as exhibits to Defendants' Memorandum. For the sake of completeness, HQ has also attached hereto the transcripts of the status hearings held before Judge Shadur on February 27 and April 14 as Exhibits A and B, respectively.

(or any subdivision thereof) is entitled, to the extent of that right, to bring an action for copyright infringement.

There can be no doubt that the right to sell a copyrighted work is one of the rights that comprises the "bundle of rights" that is a copyright. Section 106 specifically states, in relevant part:

> Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
>
> ***
>
> (3) *to distribute* copies or phonorecords of the copyrighted work to the public *by sale* or other transfer of ownership, or by rental, lease, or lending;

17 U.S.C. § 106. Accordingly, HQ is the sole entity with the exclusive right to sell the software and HQ has standing to bring an action for infringement of that right.

**B. HQ is an exclusive licensee because HQ is the only entity with the right to publicly distribute the eDoc software in any manner (whether by sale or otherwise).**

HQ is the only entity with the ability to distribute the eDoc software in any manner. The exclusive right to distribute is the right to distribute "to the public." Id. In accepting Unitrin's argument that N'Site and Safelite had rights to "distribute," Judge Shadur failed to recognize that the exclusive right to "distribute" as described in Section 106(3) is a right of *public* distribution. There can be no argument that either Safelite or N'Site has any right to distribute copies of the eDoc software *to the public*.

The only basis for Unitrin's argument (and Judge Shadur's ruling) that Safelite had the right to "distribute" is the language in the Software License Agreement that provides "Safelite shall have the right to use the eDoc Software and may license the eDoc Software to third parties solely for purposes of testing and development." Software License Agreement ¶2 (b). The limited right to provide access to the eDoc software to third parties hired by Safelite solely for purposes of providing testing and development of the eDoc software for Safelite is not a right to "distribute copies" of the software to the public.

The only basis for Unitrin's argument (and Judge Shadur's ruling) that N'Site had the right to "distribute" is language in the Quivox/N'Site License which provided that while the license was in effect, N'Site could "[i]nstall the Licensed Product only in its own facility(s) at location(s) specified by Customer in writing and approved by Quivox;" and language which

provided that "Quivox hereby grants to Customer … the limited right to assign this Agreement with its rights to use the Licensed Product … to any business entity of which Customer is and continues to be a controlling partner or majority shareholder …" These limited rights that N'Site had to install the software only at its own facilities and to assign its rights of use to any business entity of which N'Site was or continued to be a controlling partner of majority shareholder are neither *public* nor do they constitute the distribution of copies of a work envisioned in Section 106(3). Moreover, any conclusion that N'Site ever had the right to "distribute" the eDoc software ignores express language in the Quivox/N'Site License which specifically states that "Customer may not sell, market or in any other manner distribute to any third party or to any location, the Licensed Product or any information contained in or derived from the Licensed Product." Quivox/N'Site Limited Use License ¶ 4.4 (emphasis added).

In addition, such an argument assumes that N'Site *still* has rights under the Quivox/N'Site License. At this stage of the proceedings in the N'Site Action, the Court should have assumed that N'Site no longer has *any* rights to the eDoc software because HQ has alleged (and N'Site has not denied) that N'Site currently has no rights to use, display, reproduce, distribute or create derivative works based upon the eDoc software. See HyperQuest's Supplemental Memorandum in Opposition to Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction ("HQ Supplemental Memorandum") filed in the N'Site Action, attached as Exhibit 5 to Defendants' Memorandum, at 11-12.

Moreover, on April 30, 2008, Safelite sent to N'Site a letter stating that N'Site had previously repudiated and terminated the Quivox/N'Site License. See April 30, 2008 letter attached hereto as Exhibit C. Nonetheless, Safelite had learned that N'Site had recently taken the position that the Quivox/N'Site License had never been terminated. Id. Safelite, therefore, reiterated its understanding that the Quivox/N'Site License had previously been terminated and "provide[d] further notice of such termination." Id. Accordingly, there is no doubt that N'Site no longer has any rights with respect to the eDoc software.

**C. HQ is an exclusive licensee because HQ is the only entity with the right to reproduce the eDoc software or create derivative works.**

Similarly, HQ is the only entity with the right to reproduce the eDoc software or create derivative works. Unitrin argued (and Judge Shadur accepted) that under the terms of the relevant agreements both Safelite and N'Site had rights to reproduce the eDoc software and create derivative works based upon the eDoc software. There is no basis for such a conclusion. Such a conclusion is contrary to the express terms of the relevant agreements and misunderstands

the nature of the exclusive right to "reproduce" and create "derivative works" in the context of computer software.

Again, with respect to Safelite, the only basis for Unitrin's argument (and Judge Shadur's ruling) that Safelite had the right to "reproduce" and "create derivative works" is the language in the Software License Agreement that provides "Safelite shall have the right to use the eDoc Software and may license the eDoc Software to third parties solely for purposes of testing and development." Software License Agreement ¶2 (b). Unitrin argued that "Safelite's right to license necessarily gives it the right to make copies of the eDoc Software and distribute them to its licensees" and that "'testing and development' necessarily indicates that Safelite has the right to modify and make derivative works of the eDoc Software." See Unitrin's Reply, attached as Exhibit 4 to Defendants' Memorandum, at 4. Unitrin's conclusory statements are without any support. Safelite's right to "license" means only that Safelite had the right to permit certain parties to *use* the software. I.A.E. Inc. v. Shaver, 74 F.3d 768, 775 n. 7 (7th Cir. 1996) ("[I]n its simplest form, a license means only leave to do a thing which the licensor would otherwise have a right to prevent.") (quoting Western Elec. Co. v. Pacent Reproducer Corp., 42 F.2d 116, 118 (2d Cir. 1930)).

Nor is Safelite's right to allow third parties to use the software "solely for purposes of testing and development" equivalent to a right to create derivative works. If the parties intended for Safelite to have the right to create derivative works the parties would have included such language in the description of rights retained by Safelite, as they did in the exclusive grant to HQ. See Coolsaet Const. Co. v. Local 250, Int'l Union of Operating Eng'rs, 177 F.3d 648, 659 (7th. Cir. 1999) ("The doctrine of expressio est exclusio alterius instructs that when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded"). Moreover, a "derivative work" is defined as "a work based upon one or more preexisting works, … or any other form in which a work may be recast, transformed, or adapted. A work consisting of … modifications which, as a whole, represent an original work of authorship, is a 'derivative work.'" 17 U.S.C. §101.

Also, in the context of computer software, there are important limitations on the exclusive rights set forth in Section 106. 17 U.S.C. §117. Among other things, it is not infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided that such new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a

machine and that it is used in no other manner. Id. Accordingly, anyone who rightfully owns a copy of the eDoc software for its own use (such as Safelite) is permitted to make copies or adaptations and to authorize the making of copies or adaptations of that program if necessary for use of the computer program without regard to the exclusive rights set forth in Section 106. Id. Accordingly, to the extent that Safelite was permitted to make copies and/or authorize third parties to "test" and "develop" the eDoc software, such activities are carved out of the exclusive rights enumerated in Section 106 in the context of computer programs in Section 117. Id. See also Krause v. Titleserv, Inc., 402 F.3d 119, 125-29 (2d Cir. 2005) (under Section 117, modifications which fix bugs, change the source code to add new customers and perform other tasks necessary to keep programs up-to-date and maintain their usefulness, incorporate the programs into new systems, and add functionality which make the programs more responsive to the company's business needs are all permitted activities which are carved out of the exclusive right to create derivative works); Aymes v. Bonelli, 47 F.3d 23, 25-27 (2d. Cir. 1995) (modifications to computer programs did not infringe exclusive right to create derivative works because modifications were within the scope of permitted activities under Section 117); Stuart Weitzman v. Microcomputer Resources, Inc., 510 F. Supp. 2d 1098, 1109 (S.D. Fla. 2007) (owner of copy of computer program had right to modify and add features to software for own internal business purposes under Section 117).

With respect to N'Site, again there is absolutely no basis upon which to conclude that N'Site *ever* had the right to reproduce or create derivative works based upon the eDoc Software, let alone to conclude that N'Site *currently* has any such rights. The Quivox/N'Site License specifically granted to N'Site "a non-exclusive nontransferable right *to use and display* the Licensed Product." Quivox/N'Site License ¶ 4 (emphasis added). The Quivox/N'Site License further states that "Quivox reserves all rights relating to the Licensed Product not expressly granted to Customer." Id. Thus, Quivox expressly reserved, among other things, all rights to reproduce or create derivative works. Id. There is also a specific prohibition on N'Site's ability to create derivative works: "Customer agrees not to make any modifications to the Licensed Product and agrees not to create any derivative of the Licensed Product without the prior written consent of Quivox, which may be withheld in its sole and absolute discretion except as specified in Section 11 of the Agreement." Id. at ¶ 4.10.

Unitrin argues that because N'Site had the right to install the software only at its own facilities at locations specified in writing and approved, N'Site necessarily had the right to

"reproduce" the software. Again, this argument misunderstands the nature of the exclusive right to "reproduce" in the context of computer programs – the right to make copies as an essential step in the utilization of the computer program is not part of the exclusive rights set forth in Section 106 – it is a limitation on such rights.

Notably, Unitrin also argued that because Section 117 gives N'Site the right to reproduce the software for archival purposes, that also supports a conclusion that N'Site had rights to reproduce the software such that HQ is not the owner of that exclusive right. See Unitrin Reply at 6. Unitrin's logic on this point would mean that as soon as a copyright owner sells a single copy of software, the copyright owner would no longer have the exclusive right to reproduce its own software because any rightful owner of a copy of a computer program has the right under Section 117 to make a copy for archival purposes. That is simply not the case – the rights of owners of copies of computer programs to make archival copies (and other copies or adaptations of computer programs) under Section 117 do not destroy the nature of the exclusive rights of the copyright owner. As stated in the statute itself, the rights granted to others under Section 117 are limitations on the nature of the exclusive rights set forth in Section 106.

**D. HQ is an exclusive licensee because retention of rights by a copyright owner does not destroy the exclusive nature of the license.**

HQ is also an exclusive licensee despite Safelite's retention of certain rights to use the eDoc software and to license the software to third parties solely for purposes of testing and development. Unitrin argued (and Judge Shadur accepted) that retention of rights by a copyright owner is "antithetical to the grant of an exclusive license." See Unitrin Reply at 5. It may be true that *unless the relevant license specifies otherwise*, a copyright owner that grants an exclusive license in a copyrighted work to another will no longer have rights to use the work itself and may be liable to its exclusive licensee for infringement if the licensor infringes on the exclusive rights granted. See, e.g., Davis v. Blige, 505 F.3d 90, 101 (2d Cir. 2007) (citing U.S. Naval Institute v. Charter Communications, Inc., 936 F.2d 692, 695 (2d Cir. 1991) (citing 3 *Nimmer on Copyright* §12.02)). Nonetheless, parties can certainly agree otherwise without destroying the exclusive nature of the license. See, e.g., Kepner-Tregoe, Inc. v. Vroom, 186 F.3d 283 (2d Cir. 1999) (author of executive leadership training materials granted exclusive license to management training company but retained rights to use materials for his own teaching and private consultation work). See also Nimmer and Dodd, *Modern Licensing Law* § 5:18 (2007-2008 ed.) ("Clearly, copyright law does not preclude a licensor from granting an exclusive license while reserving a personal right to use the copyrighted work. Whether a particular

license does so depends on the agreement. … Even if one treats an exclusive licensee as the owner of the licensed rights, however, this does not preclude a reservation of rights in the licensor as a form of license back from the exclusive licensee to the licensor.").

**E. HQ is an exclusive licensee because nothing in the Copyright Act requires that an "exclusive licensee" be the "sole licensee" in order to have standing to sue.**

Judge Shadur's ruling is based on a fundamental misunderstanding of the nature of an "exclusive license." As explained in HQ's Supplemental Memorandum, a license is exclusive if it conveys the right to exclude others, even if it does not covey the right to exclude *all* others. See HQ Supplemental Memorandum at 3-6. Unitrin and Judge Shadur dismiss HQ's explanation of the fundamental difference between an exclusive license (which grants an ability to "exclude" others) and a bare or non-exclusive license (with no express or implied promise that others will not be given the same permission) on the grounds that it is founded upon principles of patent law. This essential distinction between an exclusive license and non-exclusive license, however, cannot be so easily dismissed. The primary case decided by the Court of Appeals for the Seventh Circuit upon which Unitrin and Judge Shadur rely – I.A.E., Inc. v. Shaver, 74 F.3d 768 (7th Cir. 1996) – is a copyright case in which the Seventh Circuit relied upon a leading patent case from the Court of Appeals for the Second Circuit – Western Elec. Co v. Pacent Reproducer Corp., 42 F.2d 116 (2d Cir. 1930) – for its own explanation of the nature of an exclusive license. Moreover, it is well-recognized not just by our own Court of Appeals but by the United States Supreme Court and other Courts of Appeal as well that patent cases often provide useful guidance in the copyright context. See Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 439 (1984) (referring to "historic kinship between patent law and copyright law" when looking at patent law to understand vicarious liability in copyright); Davis v. Blige, 505 F.3d 90, 104 (2d Cir. 2007) ("Although patent and copyright law function somewhat differently, courts considering one have historically looked to the other for guidance where precedent is lacking."); Silvers v. Sony Pictures Entertainment, 402 F.3d 881, 887 (9th Cir. 2005) ("We have long noted the strong connection between copyright and patent law: 'Where precedent in copyright cases is lacking, it is appropriate to look for guidance to patent law 'because of the historic kinship between patent law and copyright law.'"). The reasons proffered by Unitrin for rejecting Western Electric and its progeny as applicable guidance in the copyright context even though Western Electric itself was cited favorably by our own Court of Appeals for its definition of an exclusive license in a copyright case are not persuasive.

**F. HQ is an exclusive licensee because there is no requirement that an exclusive licensee have the unlimited ability to sublicense the copyrighted work or that an exclusive licensee have an unrestricted ability to sell the copyrighted work.**

HQ has the exclusive right to distribute the eDoc software to the public even though there are certain restrictions on HQ's ability to sublicense the software. There is simply no support for the proposition that a license is not exclusive if the licensee does not obtain the ability to sublicense the protected material – let alone the unrestricted ability to sublicense the protected material. In fact, as explained in HQ's Supplemental Memorandum, at least one court has expressly held that an exclusive licensee does not get the ability to freely transfer (or sublicense) its exclusive rights to another. Gardner v. Nike, Inc., 279 F.3d 774, 780-81 (9th Cir. 2002) (exclusive licensee does not have freely transferable rights). See HQ Supplemental Memorandum at 15.

In this regard, it should be emphasized that the "restrictions" at issue are: (i) if HQ were to sublicense the eDoc Software to a third party, the sublicense agreement must include certain agreed-upon terms; and (ii) HQ is required to get Safelite's consent, which shall not be unreasonably withheld, in the event that HQ wants to rent, sell, lease, transfer or sublicense the eDoc software to a direct competitor of Safelite. Software License Agreement ¶ 2(a). HQ still has the ability to sublicense the eDoc software (a right that is not required in order for a party to have standing – especially in light of the unlimited divisibility of the exclusive rights enumerated in Section 106) and HQ still has the right to distribute to the public. Notably, given the unlimited divisibility of the right to distribute, HQ would still have standing to sue as an exclusive licensee if it only had the right to distribute to entities located in Illinois, or if it could only distribute to entities in the insurance business. There is no support for the position that because HQ could not distribute to competitors of Safelite in the auto-glass industry without Safelite's consent, HQ is therefore not the owner of the exclusive right to distribute the software with standing to sue for infringement of that right. Such a position is directly contrary to the divisible nature of exclusive rights as set forth in the Copyright Act and should be rejected.

**G. HQ is an exclusive licensee because the language in the Software License Agreement addressing Safelite's ownership of the eDoc software cannot reasonably be interpreted as intending to undue the nature of the grant of exclusive rights which was the primary purpose of the agreement.**

It is evident that the primary purpose of the Software License Agreement between Safelite and HQ was the grant of an exclusive license to HQ with only two limited exceptions to

HQ's exclusivity. The first substantive paragraph after the definitional section is the "License Grant" to HQ. The primary goal in interpreting a software license agreement, as with any other contract, is to effectuate the intent of the parties. See Foskett v. Great Wolf Resorts, Inc., 518 F.3d 518, 522 (7th Cir. 2008).

Unitrin argued (and Judge Shadur accepted) that certain language in the Software License Agreement "confirms" that HQ is not an exclusive licensee. See Unitrin Reply at 8. In particular, Unitrin relied upon language which states: "Subject to Section 3(b) below, all right, title and interest in and to the eDoc Software (including, but not limited to, all Intellectual Property Rights) will remain the exclusive property of Safelite." Id. (quoting the Software License Agreement, ¶ 3(a)).

There is no conflict between the language cited by Unitrin and the grant of exclusive rights to HQ. Safelite remains the "owner" while HQ is the "exclusive licensee." As an exclusive licensee, however, HQ is *treated* as an owner of exclusive rights under the Copyright Act because a "transfer of ownership" includes, among other things, an "exclusive license." 17 U.S.C. §101. In this regard, it is worth noting that a "transfer of ownership" also includes a "mortgage." Id. Accordingly, the owner of a copyright can borrow money; secure repayment of that money with a security interest in his copyright; and the mortgagor will be treated as having received a "transfer of ownership" in the copyright, even though the copyright owner remains the true "owner" of the copyright at issue. Id. In addition, when an exclusive licensee records its interest in a copyright with the copyright office, the exclusive licensee is listed as the exclusive licensee, but the title owner of the copyright is still listed as the owner of the copyright and all exclusive rights therein. See, e.g., Circular 12 of the United States Copyright Office (providing guidance on the recordation of transfers and other documents).

Moreover, interpreting the language regarding "ownership" upon which Unitrin relies to mean that the parties therefore did not really intend for HQ to be granted any exclusive rights stretches the boundaries of credulity and violates almost every applicable canon of contract interpretation. The contract must be interpreted as a whole. Beanstalk Group. Inc. v. AM General Corp., 283 F.3d 856, 860 (7th Cir. 2002). A court must construe a contract as a whole to give effect to each part if reasonably possible. Foskett, 518 F.3d at 522. Each part of a contract should be interpreted to carry out the agreement's general purpose. Id.

Two canons demonstrate most clearly why Unitrin's logic must fail. The first is that general terms are restricted in meaning by more specific terms. See Shelby County State

Bank v. Van Diest Supply Co., 303 F.3d 832, 836 (7th Cir. 2002). Despite the general language Unitrin cited, the parties made specific reference to their expressed intention that Safelite was granting an exclusive license to HQ. See Software License Agreement, ¶ 2(a) ("Safelite grants to HQ a perpetual . . . exclusive . . . license"). The argument that Safelite did not intend to grant HQ an exclusive license founders on the express statement in the Software License Agreement to the contrary. The other highly relevant canon of construction that defeats Unitrin's argument is the notion that contracts must be interpreted in accordance with relevant concepts of commercial reasonableness. Sutter Ins. Co. v. Applied Systems, Inc., 393 F.3d 722, 726 (7th Cir. 2004) ("The presumption in commercial contracts is that the parties were trying to accomplish something rational."); Beanstalk Group. Inc. v. AM General Corp., 283 F.3d 856, 860 (7th Cir. 2002) ("There is a long tradition in contract law of reading contracts sensibly; contracts - certainly business contracts of the kind involved here - are not parlor games but the means of getting the world's work done."). At the time that HQ entered into the exclusive license with Safelite, HQ granted to Safelite shares of stock equivalent to 15% of the pro forma common stock of HQ at the time. See Declaration of Jeffrey J. Hogan, ¶ 6, attached as Exhibit A to HQ's initial opposition brief in the N'Site Action, attached as Exhibit 3 to Defendants' Memorandum. One of the principal aspects of consideration HQ received in exchange for that grant of stock was the exclusive license to the eDoc software. Id. The notion that HQ would pledge 15% of its stock in exchange for nothing more than a non-exclusive license is commercially unreasonable, and contrary to the parties' intention at the time.

There is only one reasonable interpretation. The language referenced by Unitrin was clearly intended to address ownership of title to the copyright, making clear that Safelite retained actual title ownership despite its grant of an exclusive license to HyperQuest. Safelite was not making an outright assignment of its copyright in the software to HQ; rather, it remained the title owner of the copyright and granted to HQ certain exclusive rights. This interpretation conforms to the parties' clearly expressed agreement and commercial reasonableness, granting both parties to the agreement what they negotiated to receive. Unitrin's interpretation, by contrast, contradicts both commercial reasonableness and the plain language of the agreement that grants HyperQuest an exclusive license and must be rejected. Nothing in Paragraph 3 of the Software License Agreement destroys the grant of exclusive rights set forth in Paragraph 2. HQ has exclusive rights in the eDoc software and, therefore, has standing to bring this action for copyright infringement against NuGen and Phillips.

## V. CONCLUSION

For these reasons, Defendants' motion to dismiss for lack of subject-matter jurisdiction should be denied.

Dated: May 30, 2008

Respectfully submitted,

**HYPERQUEST, INC.**

By: /s/ Deborah Rzasnicki Hogan
One of Its Attorneys

Deborah Rzasnicki Hogan
Chad A. Blumenfield
GOLDBERG, KOHN, BELL, BLACK,
ROSENBLOOM & MORITZ, LTD.
55 East Monroe, Suite 3300
Chicago, Illinois 60603
(312) 201-4000

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on May 30, 2008, she caused a copy of the attached **HYPERQUEST'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION** to be served via the Court's electronic notification system upon:

Monte L. Mann
Kristen Werries Collier
Novack and Macey LLP
100 North Riverside Plaza
Chicago, IL 60606

Mark J. Peterson
Nora M. Kane
Stinson Morrison Hecker LLP
1299 Farnam Street, 15th Floor
Omaha, Nebraska 68102-1818

By: /s/ Deborah Rzasnicki Hogan