**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HYPERQUEST, INC.,                    ) DOCKET NO. 08 C 483
                                     )
                        Plaintiff,)
                                     )
      vs.                            )
                                     )
N'SITE SOLUTIONS, INC., et al.,      ) Chicago, Illinois
                                     ) February 27, 2008
                        Defendants.) 9:00 o'clock a.m.


TRANSCRIPT OF PROCEEDINGS BEFORE THE HONORABLE
MILTON I. SHADUR, Judge

APPEARANCES:

For the Plaintiff:
                   MS. DEBORAH R. HOGAN

For the Defendants:
                   MR. STEVEN L. TIEDEMANN AND
                   MR. PAUL R. KITCH


JESSE ANDREWS
Official Court Reporter - U. S. District Court
219 S. Dearborn Street
Chicago, Illinois  60604
(312) 435-6899

*     *     *     *     *     *     *

2

1          THE CLERK:  08 C 483, Hyperquest vs. N'Site.

2          MS. HOGAN:  Good morning, your Honor.  Deborah Hogan

3 on behalf of Hyperquest.

4          MR. TIEDEMANN:  Good morning, your Honor.  Steve

5 Tiedemann for N'Site Solutions.  T-i-e-d-e-m-a-n-n.

6          MR. KITCH:  Paul Kitch for Unitrin Direct Insurance

7 Company.

8          THE COURT:  Mr.  Tiedemann, I just received, and I

9 assume counsel did as well, a reply memorandum.  Did I either

10 order or grant leave to file that?

11          MR. TIEDEMANN:  No, sir.

12          THE COURT:  I did not, right?

13          MR. TIEDEMANN:  No, sir, you did not.

14          THE COURT:  Well, as you know for many years I

15 automatically on motions used to set a 1-2-3 schedule.  But

16 experience has showed that often that was really not necessary

17 because of the fact that the parties had essentially

18 encountered each other fully in the first two.  And so I

19 shifted to a practice of the type that I have here, in which I

20 set two, and I set a short status date right after that so

21 that we could talk about whether a rely was called for.

22          Now it's your responsibility if you are seeking

23 leave to file something to ask leave to file.  And I recognize

24 that in practical terms in real world terms what happens when

25 you ask a judge, "Do I have leave to file a memorandum," and

*3*

1 attach the memorandum, you have accomplished the goal because

2 the judge always has to read it you know in order to decide I

3 am not going to grant leave to file. But that really doesn't

4 alter I think the lawyer responsibility. So it seems to me

5 that you ought to keep that mind for the next time around.

6       Having said that, I must say that I found the reply

7 useful and therefore you know, it's sort of a no harm no harm

8 foul, but it does not represent good practice.

9       MR. TIEDEMANN: Your Honor, I certainly apologize

10 for that. And I can tell you that it wasn't any attempt to

11 get over on anything. I was practicing based upon my

12 experience in another district. And I certainly apologize for

13 that to the Court. It's not an attempt to get over and make

14 you read something without granting leave.

15       THE COURT: Well, I had occasion in the -- I think

16 it was either in the bench trial criminal trial that I just

17 concluded or maybe in one of the motions that I was

18 considering doing it, that I view the old base canard that

19 says that women always want to have the last word. That's

20 just that, a base canard. And that ought to be modified to

21 lawyers always want to have the last word.

22       MR. TIEDEMANN: That's accurate, your Honor.

23 .       THE CLERK: But in event, we are here, and I have

24 read this one. And it seems to me that the reply as I said is

25 indeed of value. What it makes clear is that the arguments

4

1  that Hyperquest has advanced would have a great deal more

2  force if the party that you were suing for claimed copyright

3  infringement were somebody other than N'Site.

4         Now the reason that I say that, of course, is that

5  if you look at section 2(b) of the Software License Agreement

6  between HQ and the Safelite Group of course, and you knowledge

7  this, it expressly makes an exception to exclusivity the

8  outstanding license from Safelite to N'Site.  Not only that,

9  but it also makes it very plain that Safelite retained the

10 power to enforce that license, although of course it did

11 covenant that it would notify N'Site of its intention to

12 terminate the license.

13        Now according to the memorandum that's been filed by

14 Hyperquest over here on page 5, Safelite didn't do what it

15 promised to do.  That is it did not apparently negotiate and

16 execute a revised license.  And it did not, at least according

17 to what is presented to me, terminate the license to N'Site.

18 And I look back at the N'Site document, and what it had was a

19 five-year term with a provision for automatic renewal on a

20 year-to-year basis if it was not terminated.  And so the

21 posture that we have here is one in which it's Safelite and

22 not Hyperquest that has the power of enforcement for breach

23 against N'Site.

24        And I think, although it's not -- it's an unusual

25 situation (I think that may be an understatement), but N'Site

5

1  correctly argues I find that Hyperquest may well have a claim

2  against Safelite for breach of contract.  You know then you

3  say, "Of course you promised to do this for us, you didn't."

4  But that does not entitle, as I perceive it, Hyperquest to

5  say, "We stand in the shoes of Safelite for purposes of

6  enforcement."

7          Now before I ask Hyperquest to comment, I want to

8  ask Mr. Kitch something -- and that is, nobody in this current

9  motion has spoken directly to the question whether the action

10  as against Unitrin may stand in a different posture.  And

11  maybe you can fill me in a little on that.

12          MR. KITCH:  Right.  Well, I think that in N'Site's

13  brief it is an issue that apply to all of the defendants.

14          THE CLERK:  I know you've said that.  But I would

15  like to hear from you because you are representing Unitrin.

16          MR. KITCH:  Right.  Certainly we would join in that

17  reply brief and agree with that.

18          THE COURT:  But that would result in the dismissal

19  of N'Site.  I am not sure that it would result in the

20  dismissal of Unitrin.  Because although Unitrin I gather was

21  operating under what was thought the authority of N'Site,

22  still vis-à-vis Hyperquest it could be in a situation in which

23  it's violating a copyright, and that presents I think maybe a

24  different about exclusivity.

25          MR. KITCH:  Well, certainly we would like the

6

1   opportunity to respond and present argument as to why we think

2   it should apply to us as well.

3            THE COURT:  Okay.  Now let me turn to Hyperquest's

4   counsel.

5            MS. HOGAN:  Yes, Your Honor.  With respect to your

6   comments about section 2(b) of the License Agreement between

7   Hyperquest and N'Site --

8            THE CLERK:  Yes.

9            MS. HOGAN:  -- your Honor made a comment that

10  perhaps Safelite did not do what it promised to do, negotiate

11  a revised license.

12           THE CLERK:  And terminate, which was one of the

13  things that it also promised to do.

14           MS. HOGAN:  Right.  In terms of the language of 2(b)

15  though, I don't believe there is anything in that section

16  whereby Safelite promised to negotiate a Revised License.

17           THE CLERK:  Wait just a minute.

18           MS. HOGAN:  Okay.

19           THE COURT:  It says -- I mean I am not sure whether

20  this federally links up with this one.  But what it says

21  literally is:

22           "Safelite covenants to HQ that prior to

23           April 1, 2006, Safelite shall notify

24           N'Site in writing of Safelite's intention

25           to terminate the Original License and/or

7

1          the Revised License in accordance with

2          their respective terms and further

3          covenants to take whatever action (if any)

4          Safelite deems appropriate (1) to enforce

5          its rights under the License and/or

6          Revised License and (2) to terminate the

7          license and/or Revised License."

8          So what it does is to confirm in that sentence that

9  it has retained the power of enforcement vis-à-vis N'Site.

10  And it covenants that it's going to do something to change

11  that posture, and then it didn't.

12          MS. HOGAN:  Your Honor, if I may.  It's Hyperquest's

13  position that that language that says that Safelite covenant

14  to enforce its right under the license -- and/or Revised

15  License, so to the extent there is a Revised License it would

16  apply.  Our argue is that the language contemplated that a

17  Revised License may or may not be --

18          THE CLERK:  That's true.

19          MS. HOGAN:  It's either going to be the Original or

20  potentially a Revised License.

21          THE CLERK:  That's right.  And the existing one.

22  And that means that there is no Revised License.  The existing

23  one was the one that would be looked at.  And the existing one

24  had a provision, as I say, for automatic renewal.

25          MS. HOGAN:  I understand, your Honor.  And as we

8

1  said in our brief, we have alleged and we have good faith

2  basis for alleging that the license was terminated, we don't

3  have the ability to prove that without discovery.  So to the

4  extent that's a crucial issue, we would ask for the right to

5  conduct discovery on that.  I like to say my own, I think it

6  is a crucial issue in order to resolve this standing point.

7          THE COURT:  That's what makes horse races and

8  lawsuits.

9          MS. HOGAN:  Okay.

10         THE COURT:  If you want the opportunity to find

11 out -- if you are saying you don't know whether it was

12 terminated, because of what you do cover in you memorandum is

13 to say specifically that their Revised Agreement was entered

14 into.  And I took that to indicate that the entire situation

15 with vis-à-vis Safelite and N'Site, which you know your

16 Complaint sets out resulted in a claim of breach on the part

17 of Safelite, followed by the parties undertaking to negotiate,

18 and then entering into the negotiations.

19         So I recognize that you did not say that it was

20 terminated.  But I think that that's something that unless you

21 can demonstrate that your claim, if any, is against Safelite.

22         MS. HOGAN:  Okay.  Your Honor if I may, so that I

23 understand your ruling.  Because with respect to the language

24 to enforce its rights under the license, it's Hyperquest's

25 view that that language is referring to Safelite's rights.

9

1  When it says "Safelite"--

2          THE COURT:  Of course.

3          MS. HOGAN:  Okay.  So Safelite's rights under the

4  license.

5          THE COURT:  Right.

6          MS. HOGAN:  It's Hyperquest's view that means their

7  contractual rights.  But it's not talking about any right they

8  may or my not have under the Copyright Act to bring a

9  statutory cause of action for infringement.  But even to the

10 extent that it is, even if it's read more broadly to refer to

11 Safelite's rights under the copyright laws as well, then

12 whatever Safelite's right are or are not to bring an

13 infringement action under the copyright laws, they are and

14 Safelite is covenanted to enforce those rights, that doesn't

15 alter whatever Hyperquest's right may be under the copyright

16 laws.

17         THE COURT:  Expect for one thing -- and that is, it

18 seems to me that you really cannot essentially make that

19 argument in light of the nonexclusivity situation that you

20 have acknowledged takes place by entering into section 2(b).

21 You can't say, "Oh, well, you know maybe that's an exception

22 in terms of our exclusivity, but we are the ones who have the

23 power to go after somebody when the contractual arrangement

24 clearly contemplated otherwise."  Clearly.

25         MS. HOGAN:  Your Honor, I would disagree to the

10

1 extent that a carve out for the N'Site Original License

2 somehow means that Hyperquest is a nonexclusive licensee.

3          THE COURT:  It is to some at least to a limited

4 extent.  I think it poses an interesting problem.  And that's

5 the reason that I said that you might stand in a different

6 stead.  You have talked about the fact that rights under

7 copyright law are divisible.  True enough.  But the

8 enforcement that we are talking about here vis-à-vis N'Site

9 does not come within that.

10          It's possible, although I am not suggesting a ruling

11 on this one, because I haven't gotten the input about Unitrin,

12 and I except I will get that both from you and from Unitrin's

13 counsel, that Unintrin may perhaps stand in a different stead.

14 That you can take advantage of the doctrine that says -- that

15 talks about the divisibility of rights, and that therefore

16 that enables you to sue.  I don't know the answer to that one,

17 and that will be a function of what you come out with.

18          So what I am going to do then is this.  I am going

19 to give you where I am coming from.  I will give you an

20 opportunity to engage in limited discovery to determine

21 whether the N'Site Agreement was in fact terminated if it was

22 not, then I have already told you what my ruling is going to

23 be vis-à-vis N'Site.

24          I will except that it probably makes sense to have

25 Mr. Kitch on behalf of his client to file something in the

11

1 interim to at least to make clear the extent to which you

2 believe you stand on exactly the same footing as N'Site, and

3 explaining you know why you believe that's so, so that that

4 issue becomes closer to being ripe.

5          Now how long would you need to take this limited

6 discovery?

7          MS. HOGAN:  Well, your Honor, it will necessarily

8 involve us serving a subpoena on Safelite as well.  So at

9 least 60 days, your Honor.  Unless we can get Safelite to

10 respond to the subpoena.

11          THE COURT:  What snails do you have serving

12 subpoena?  What do you need 60 days for?

13          MS. HOGAN:  Well, I am concerned, your Honor, that

14 we will serve a subpoena on Safelite.  And unless we do in

15 fact get prompt responses to the subpoena, including documents

16 requested and all of that in 30 days -- I mean I am fine with

17 the shorter deadline provided that if we issue in getting what

18 we need in response to the subpoena from Safelite.

19          THE COURT:  If you need more me time than I am going

20 to give you, then come in and ask for it.

21          MS. HOGAN:  Fine, your Honor.

22          THE COURT:  But 60 days really should not be

23 necessary.

24          MS. HOGAN:  Your Honor, we would want it to move

25 more quickly as well.

12

1          THE COURT:  What I will do is I will give you four

2    weeks.  That puts us to March 26th.  And then suppose that I

3    give you a status maybe Monday, March 31st, when we can find

4    out where you stand.

5          In the meantime if for some reason you are delayed

6    and you know can't get information on it, and you want to file

7    a motion in the meantime, I will take a look at it, and you

8    probably want have to appear, but just to get a handle on what

9    kind of time frame we are looking at.

10          MS. HOGAN:  Certainly, your Honor.  To the extent

11    that we serve discovery requests on N'Site as well for

12    information, I would ask that they not have a full 30 days to

13    respond.

14          THE COURT:  Yes.  I would think that N'Site should

15    be able to give you that information very promptly.  And

16    counsel, you don't have a problem with that.

17          MR. TIEDEMANN:  I do not have a problem with that.

18    We should be able to respond to any -- in fact we can do it

19    informally, but counsel may want to do it formally, but we can

20    respond in seven business days, 10 business days --

21          THE COURT:  Yes.

22          MR. TIEDEMANN:  -- something like that.

23          THE COURT:  So you should have no difficulty with

24    that.

25          Now Mr. Kitch, what kind of time frame would you

13

1 | like to file whatever you plan to file?

2 |         MR. KITCH:  Could I have a week?

3 |         THE CLERK:  Well, why kill yourself?  Suppose that

4 | give you a week from Friday, which is March 7th?  Okay.

5 |         MR. KITCH:  March 7th.

6 |         THE COURT:  Right.  And so we are set then for march

7 | 31st at 9 o'clock.  Can everybody make that?  That's a Monday?

8 |         MS. HOGAN:  Yes, your Honor.

9 |         MR. TIEDEMANN:  Yes, your Honor.

10 |         THE COURT:  All right.  Status then March 31st at

11 | 9 o'clock.

12 |         MS. HOGAN:  Your Honor, if I may ask one more

13 | question so that I fully understand --

14 |         THE COURT:  Sure.

15 |         MS. HOGAN:  -- your ruling with respect to the

16 | N'Site issue?  To the extent there is a carve out for N'Site

17 | with respect to the Original License, the Original License

18 | permitted them limited rights to use.  So the extent that

19 | Safelite retained the right to enforce that copyright

20 | ownership interest.

21 |         THE COURT:  It's up to Safelite not up to you

22 | unless -- because now you know I don't know what may be

23 | standing in the way inquiring whatever Safelite's rights are,

24 | I suppose you can do that and sort of obviate the problem.

25 | But as the thing stands now it's, really only Safelite that

1 has enforcement right vis-à-vis N'Site.

2          MS. HOGAN:  But your Honor, I guess what I am I

3 trying to understand is, does your Honor view that the same

4 with respect to tall of all different copyright rights under

5 Rule 106?

6          THE CLERK:  True.

7          MS. HOGAN:  For example, Safelite did not retain the

8 right -- Safelite gave Hyperquest the exclusive right to

9 distribute.  There is no question about that.  There wasn't

10 even a carve out for N'Site with respect to that right.  There

11 was no carve out that N'Site could distribute.  Hyperquest was

12 given that right, nobody else.  Hyperquest was given the right

13 to exclude everybody else from distributing Edoc software.  So

14 our view of the case law on that is that Hyperquest therefore

15 were the exclusive licensee with standing to enforce that

16 particular right.

17          THE COURT:  I think that kind of divisibility I am

18 not sure stands under what is really an odd posture in this

19 case.  And so if you want to take that position, I will

20 certainly look at that.

21          MS. HOGAN:  Okay.

22          THE COURT:  But meanwhile -- by the way, we

23 originally had a March 11th status date on this one.  That's

24 going to get vacated of course.  It's going to be replaced by

25 the March 31st.  Okay.

15

1          Thank you all.

2          MS. HOGAN:  Yes, your Honor.  Thank you, your Honor.

3          MR. TIEDEMANN:  Thank you, your Honor.

4       (WHICH WERE ALL OF THE PROCEEDINGS HAD AT THE HEARING OF
        THE ABOVE-ENTITLED CAUSE ON THE DAY AND DATE AFORESAID.)

5                        C E R T I F I C A T E

6

  I HEREBY CERTIFY that the foregoing is a true and correct
7 transcript from the report of proceedings in the
  above-entitled cause.

8

9 _____
  JESSE ANDREWS, CSR
  OFFICIAL COURT REPORTER
10 UNITED STATES DISTRICT COURT
  NORTHERN DISTRICT OF ILLINOIS
11 EASTERN DIVISION
  DATED: February 28, 2007
12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT B**

1

1

2                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
3                           EASTERN DIVISION

4
HYPERQUEST, INC.,                    ) DOCKET NO. 08 C 483
5                                    )
                            Plaintiff,)
6                                    )
       vs.                           )
7                                    )
N'SITE SOLUTIONS, INC., et al.,      ) Chicago, Illinois
8                                    ) April 14, 2008
                         Defendants.) 9:00 o'clock a.m.
9

10

11          TRANSCRIPT OF PROCEEDINGS BEFORE THE HONORABLE
                    MILTON I. SHADUR, Judge
12
APPEARANCES:
13
For the Plaintiff:
14                       MS. DEBORAH R. HOGAN and
                         MR. CHAD BLUMENFIELD
15

16 For the Defendants:
                         MR. STEVEN L. TIEDEMANN AND
17                       MR. PAUL R. KITCH

18

19                       JESSE ANDREWS
        Official Court Reporter - U. S. District Court
20                   219 S. Dearborn Street
                    Chicago, Illinois  60604
21                       (312) 435-6899

22              *     *     *     *     *     *

23

24

25

2

1          THE CLERK:  08 C 438, Hyperquest vs. N'Site.

2          MS. HOGAN:  Good morning, your Honor.  Deborah Hogan

3  and Chad Blumenfield on behalf of Hyperquest.

4          MR. TIDERMANN:  Steven Tidderman for defendant

5  N'Site Solutions.

6          MR. KITCH:  Paul Kitch for Unitrin Insurance

7  Company.

8          THE COURT:  Good morning.

9          I received, and I assume that defense counsel also

10  received the filing or the request for leave to file by

11  Hyperquest of the supplemental memorandum.  Now I never have a

12  problem with granting leave to file anything.  It always

13  accomplishes its purpose, because it gets read in order to see

14  whether you are going to grant leave.  So there is certainly

15  no point in saying "No" for that purpose.

16          I do have a couple of question, though.  One is,

17  because of what has been said in part makes a possible

18  distinction between N'Site's position and Unitrin's

19  position -- or it's position, rather -- it seems to me that

20  something that I had not been having to focus on, which was

21  Unitrin's claim of inappropriate service of process maybe

22  needs a decision.  Because even if Hyperquest might have the

23  opportunity to pursue it, if it doesn't have it in place as a

24  defendant, that wouldn't do much good, because it has to be in

25  a different form.  So my question on that -- I hadn't had a

3

1   chance to go back -- but my question is, is that something to

2   which Hyperquest had directed itself, or were you focusing

3   primarily on the standing issuing because I had asked you to?

4           MS. HOGAN:  Your Honor, we were primarily focused on

5   the standing issue.

6           THE COURT:  Yes.

7           MS. HOGAN:  We had some preliminary discussion at

8   our initial about hearing about that motion.

9           THE COURT:  Yes.

10          MS. HOGAN:  And your Honor had indicated --

11          THE COURT:  Right.

12          MS. HOGAN:  -- you weren't sure it was a real world

13  issue, but if you had to decide it, perhaps you would.

14          THE COURT:  So I guess my question on that score is

15  whether you have a position that you would like to set out in

16  writing and how short a time frame you might need for that?

17          MS. HOGAN:  Short, your Honor.  If we could have 14

18  days, your Honor, given some other commitments that I have, 14

19  days, please.

20          THE COURT:  Okay.  And I am not going to call for a

21  reply.  We will see what it looks like.  And so that would be

22  by April 28th.

23          The second question that I have has to do with

24  whether either of the defendants believe that there is

25  anything new in the Hyperquest submission that you haven't had

4

1   an adequate chance to address?  I should say, by the way,

2   up-front I find, for example, troublesome the section of

3   Hyperquest's memorandum in which it says that "It did not

4   contract away its ability to enforce its exclusive rights,"

5   because that makes a presumption that it had such exclusive

6   rights, when in fact if you look at the Agreement, what the

7   Agreement talks about is what Safelite had as reserved to

8   itself.  And I don't see in that a notion that somehow what

9   was done was to grant Hyperquest something, and then say, "But

10  not withstanding that, we, Safelite, want to preserve our

11  rights to do something."  That's frankly not how the document

12  reads.  But I will deal with that, you know, when it comes to

13  the issue.  My question is whether you feel that you need to

14  tender something else because of the supplemental memorandum

15  or are the parties really at issue on that whole thing?

16            MR. KITCH:  We would request an opportunity to

17  respond in writing or at least respond today.

18            THE COURT:  Okay.  Well, since I am going to get

19  briefing on the 28th, I will give you the same two weeks for

20  that.

21            MR. KITCH:  Okay.

22            THE COURT:  So whatever you want to do.  Now don't

23  reargue the same stuff, you know because I have had it on the

24  earlier submissions.  But if there is anything that is really

25  new that you view in the presentation, I will expect that on

5

1 the 28th, and then I'll deal with the motion in their

2 totality.

3          MR. TIDERMANN:  Your Honor --

4          THE COURT:  Yes.

5          MR. TIDERMANN:  -- N-Site doesn't believe that's it

6 going to have anything to add to that, but I would still like

7 to have the opportunity to think about it and potentially join

8 in.

9          THE COURT:  All right.  If I don't see anything on

10 the 28th, I am going to think that you are satisfied --

11          MR. TIDERMANN:  I understand, your Honor.  The last

12 time I filed without leave.  And so I just want to be sure not

13 to incur the wrath of the Court again.

14          THE COURT:  No wrath.

15          MR. TIDERMANN:  Well, minimal wrath.

16          THE COURT:  Okay.  All right.

17          Thank you all.

18          MS. HOGAN:  Thank you, your Honor.

19          MR. TIDERMANN:  Thank you, Judge.

20     (WHICH WERE ALL OF THE PROCEEDINGS HAD AT THE HEARING OF
       THE ABOVE-ENTITLED CAUSE ON THE DAY AND DATE AFORESAID.)

21

22

23

24

25

6

1

2                    C E R T I F I C A T E

3

   I HEREBY CERTIFY that the foregoing is a true and correct
4  transcript from the report of proceedings in the
   above-entitled cause.
5

6  JESSE ANDREWS, CSR
   OFFICIAL COURT REPORTER
7  UNITED STATES DISTRICT COURT
   NORTHERN DISTRICT OF ILLINOIS
8  EASTERN DIVISION
   DATED: March 14, 2008
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT C**



**BELRON**
U S

PO Box 182000
Columbus, OH 43218-2000

April 30, 2008

VIA EXPRESS MAIL & EMAIL

N'Site Solutions, Inc.
c/o Mr. Steven L. Tiedeman, Esq.
Vice President, General Counsel
JBP Enterprises, Inc.
8820 Columbia 100 Parkway
Columbia, Maryland
20145

   Re: Quivox Systems, Inc. Software Agreement

Dear Mr. Tiedemann:

   It has come to our attention that your client, N'Site Solutions, Inc. ("N'Site"), has recently taken the position that the software license agreement between N'Site and Quivox Systems, Inc. ("the Agreement") is still in effect and has never been terminated.

   It is our understanding from past communications from N'Site, or its representatives, that N'Site denies it is using the software that is the subject of the Agreement. We have been informed via written communication from N'Site's counsel that "N'Site is not using any of the technology or software delivered to N'Site by Quivox to process any claims for any customers or for any other purpose". N'Site's counsel has further informed us "N'Site is not interested in entering into a license arrangement with Safelite because there will be no future use of the software, and, therefore no royalty payments will be due".

   Based on these representation, as well as the denial by N'Site's that it has any responsibility to pay royalties or otherwise comply with the terms of the Agreement, we have viewed, and continue to view, N'Site's activities and positions as a repudiation of the Agreement, i.e., N'Site has terminated the Agreement. While we believe the Agreement has been terminated, we reiterate our understanding and provide further notice of such termination.

       Sincerely,

       Mark A. Smolik
       Senior Vice President, General Counsel & Secretary