UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HYPERQUEST, INC., ) | |
| ) | |
| Plaintiff, ) | Case No. 08 C 485 |
| ) | |
| v. ) | Judge Charles R. Norgle |
| ) | Magistrate Judge Cole |
| NUGEN I.T., INC., and DAYLE PHILLIPS ) | |
| ) | JURY DEMAND |
| Defendants. ) | |

## HYPERQUEST'S OPPOSITION TO DEFENDANTS' MOTION TO DISQUALIFY

Plaintiff, HyperQuest, Inc. ("HQ"), by and through its undersigned counsel, hereby respectfully submits its brief in opposition to the motion of Defendants NuGen I.T., Inc. ("NuGen") and Dayle Phillips ("Phillips") (collectively "Defendants") in which Defendants seek an order disqualifying HQ's current outside counsel in this matter.

### I.   INTRODUCTION

The title of Defendants' motion (which Defendants refer to as a "Renewed Motion for Protective Order") is a misnomer.  Defendants do not seek a protective order; they seek disqualification.  *See* Defendants' Memorandum of Law in Support of Its Motion for Protective Order ("Disqualification Memorandum") at p. 1 ("A protective order is insufficient…the unique facts of this case merit [Ms. Hogan's] disqualification.") and p. 8 (requesting that this Court grant Defendants' "Motion to Disqualify").

HQ raises this concern at the outset of its opposition because Defendants are improperly attempting to engraft the protective order analysis onto the motion to disqualify context.  Defendants begin with a discussion of disqualification cases in Section I of their brief, but Sections II and III -- where Defendants make their substantive arguments in favor of disqualification -- only discuss cases dealing with protective orders, not disqualification.

Defendants do not point to a single case in which an attorney was disqualified from a matter because of a close relationship with the party he or she represented, and do not point to any compelling reason to justify the disqualification of Ms. Hogan or her law firm from this case. Moreover, perhaps recognizing that they cannot satisfy the applicable standard for disqualification (which requires an ethical violation to have occurred), Defendants rely on the outdated and inapplicable "appearance of impropriety" standard.

In addition, even if Defendants were seeking less drastic relief in the form of a protective order which would restrict Ms. Hogan's access to the highly confidential documents, such relief is unwarranted. Accordingly, as explained in more detail below, neither disqualification nor a restrictive protective order should be granted.

## II. THERE IS NO BASIS FOR DISQUALIFICATION BECAUSE NO ETHICAL VIOLATION HAS OCCURRED.

### A. Defendants' Motion Does Not Allege That Ms. Hogan Has Committed Any Ethical Violation, and Defendants Cannot Justify the "Drastic Measure" of Disqualification.

Disqualification motions require a two-step analysis. The court must consider (1) whether an ethical violation has actually occurred, and (2) if disqualification is the appropriate remedy. *Reuben H. Donnelley Corp. v. Sprint Publ'g & Adver. Inc.*, No. 95 C 5825, 1996 WL 99902, at *2 n. 1 (N.D. Ill. Feb. 29, 1996) (citing *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 721 (7th Cir. 1982). *See also Guillen v. City of Chicago*, 956 F. Supp. 1416, 1421 (N.D. Ill. 1997) (noting the two-step analysis and discussing an observation that "the Seventh Circuit considers the right of a party to select counsel of his choice to be a matter of significant importance, which will not be disturbed unless a specifically identifiable impropriety *has occurred*.") (emphasis in original). In addition, the burden is on the moving party to produce facts requiring that counsel be disqualified. *Lanigan v. Resolution Trust Corp.*, No. 91 C 7216,

1992 WL 350688, at *1 (N.D. Ill. Nov. 23, 1992); *see also Evans v. Artek Sys. Corp.*, 715 F.2d 788, 794 (2d Cir.1983) (noting that the movant "bears a heavy burden of proving facts required for disqualification").

Importantly, disqualification is disfavored because it can both deprive a party of its chosen counsel and create unnecessary delay. *Guillen*, 956 F. Supp. at 1421. Motions for disqualification "should be viewed with extreme caution for they can be misused as techniques of harassment." *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 722 (7th Cir. 1982). The Seventh Circuit has relatedly observed that "disqualification is 'a drastic measure which courts should hesitate to impose except when absolutely necessary.'" *Owen v. Wangerin*, 985 F.2d 312, 317 (7th Cir. 1993) (quoting *Schiessle v. Stephens*, 717 F.2d 417-419 (7th Cir.1983)). *See also* 8 Fed. Proc. §20:221 (motions to disqualify should be viewed with extreme caution to avoid misuse as an instrument of harassment, and the court must maintain a balance between the right of the client to retain counsel of his or her free choice and the necessity that ethical standards by upheld).

Defendants never assert that Ms. Hogan or her firm has committed an ethical violation; they merely argue that she may commit one in the future. Notably, the fact that a lawyer is related by marriage or otherwise to a principal of a client is not grounds for disqualification. *See, e.g.*, 8 Fed. Proc. §20:221 (discussing various grounds for disqualification). Because Defendants cannot establish that any ethical violation has occurred, there is no basis for disqualification.

    **B.**    **Defendants' Reliance on The Outdated and Inapplicable "Appearance of Impropriety" Standard is Misplaced.**

The "appearance of impropriety" standard upon which Defendants rely is outdated and inapplicable. The "appearance of impropriety" standard for disqualification was based upon

Canon 9 of the Code of Professional Responsibility, which declared that a "lawyer should avoid even the appearance of professional impropriety."

Continued reliance on Canon 9 is misplaced.  In 1983, the ABA Model Rules superseded the Model Code, such that the Code's provisions "are now extinct in Illinois state courts as well as the Northern District." *See Lawline v. American Bar Ass'n*, 956 F.2d 1378, 1381 n. 1 (7th Cir. 1992).  *See also Mustang Enterprises, Inc. v. Plug-In Storage Systems, Inc.*, 874 F. Supp. 881, 883 (N.D. Ill. 1995) ("Since November 12, 1991 a version of the Rules of Professional Conduct … has been in effect in this District Court."); *Indeck Power Equipment Co. v. Del Monico*, No. 03 C 8433, 2004 WL 2032122, at *2 (N.D. Ill. Aug. 20, 2004) ("an attorney should not be disqualified from representing a client whose interests are adverse to a former client solely on the basis that the subsequent representation may create the appearance of impropriety."); *Schwartz v. Cortelloni*, 177 Ill.2d 166, 179 (Ill. 1997) ("We adhere to the ABA's recommendation that an attorney should not be disqualified from representing a client whose interests are adverse to a former client solely on the basis that the subsequent representation may create the appearance of impropriety.").

Model Rule 1.9 (as adopted by the Northern District of Illinois and set forth in LR 83.51.9) is one of the primary rules governing disqualification of counsel.  The ABA comment to Model Rule 1.9 specifically rejects the "appearance of impropriety standard" in Canon 9 as the basis for disqualifying counsel.  *Schwartz*, 177 Ill.2d at 179.  Specifically, the commentary (which has also been adopted by the Northern District of Illinois) explains:

> <u>The other rubric formerly used for dealing with disqualification is the appearance of impropriety</u> proscribed in Canon 9 of the ABA Model Code of Professional Responsibility.  This rubric has a twofold problem.  First, the appearance of impropriety can be taken to include any new client-lawyer relationship that might make a former client feel anxious.  If that meaning were adopted, disqualification would become little more than a question of subjective judgment by the former client.  Second, <u>since

-4-

> "impropriety" is undefined, the term appearance of impropriety is question-begging. It therefore has to be recognized that the problem of disqualification cannot be properly resolved . . . by the very general concept of appearance of impropriety.

Commentary to Rule 1.9 of ABA Model Rules of Professional Conduct (emphasis added).[1]

Even if the appearance of impropriety standard were the governing standard in this case, there is no reason why this case would give rise to such an appearance. There is nothing untoward about a lawyer representing a spouse or other family member in a court proceeding; such arrangements are not uncommon and hardly forbidden in the legal community. Plaintiff's counsel has an ethical obligation to zealously represent her client with undivided loyalty, just as does Defendants' counsel and every other attorney representing a client. Defendants' argument -- that Ms. Hogan will represent her client too zealously and ignore her ethical obligations as a member of the bar -- falls flat. Ms. Hogan will abide by her ethical standards as an officer of the court, just as she has always done.

### C. Defendants' Argument That There Would Be No Impact On HQ If Its Lead Outside Counsel Were Disqualified Is Disingenuous.

Defendants also make a disingenuous argument that "the impact of a protective order on HyperQuest's ability to prove its case" also supports its desired result because "there really would be no impact. Ms. Hogan serves only as outside litigation counsel; therefore, obtaining substitute counsel at this early stage of this litigation would neither be difficult nor

---

[1] Notably, while the appearance of impropriety standard is no longer applicable when determining whether disqualification of a lawyer is appropriate, the phrase is often used in the context of addressing whether recusal of a judge is appropriate. See 28 U.S.C. § 455(a) ("Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."). Of course, the rationale for disqualifying a judge -- that there may be reason to question his or her impartiality -- is very different from that involved in disqualifying counsel. Counsel is *expected* to be partial to the client she represents; indeed, any reasonable client would immediately seek new counsel upon learning that its current counsel *was* impartial.

unduly prejudicial." Disqualification Memorandum at 7.  This is untrue.  Ms. Hogan and her law firm have done a very substantial amount of investigation into the infringing conduct alleged in the complaint, and now have a wealth of institutional knowledge that would take a significant amount of time to re-create.  *See* Supplemental Declaration of Deborah Rzasnicki Hogan, attached hereto as Exhibit A, ¶ 2 (Ms. Hogan and others at her law firm have collectively billed over 200 hours in connection with this matter).  These considerations are so substantial that in *SWS Financial Fund A v. Salomon Bros. Inc.*, 790 F. Supp. 1392, 1400 (N.D. Ill. 1992), the court declined to disqualify counsel even after finding the existence of an ethical violation, in light of the "delay, inconvenience and expense" that the client would encounter if its counsel were disqualified.  The court poignantly observed that "[w]hen disqualification is granted, sometimes the new attorney may find it difficult to master fully the subtle legal and factual nuances of a complex case (like this one), actually impairing the adversarial process." *Id.*  Likewise, disqualifying Ms. Hogan would impose substantial costs on HQ, both in terms of money to prepare new counsel to move the case forward and in terms of time while HQ is forced to compete with an infringing product in the marketplace.  This factor clearly cuts against Defendants.

        In sum, Defendants do not allege that any ethical violation has actually occurred.  This should be determinative in light of the governing two-step disqualification process.  Moreover, even if the appearance of impropriety standard were the governing standard, there is no impropriety and there is no basis for disqualification, which is a drastic measure that should not be imposed except as a measure of last resort.

III. **EVEN INTERPRETING DEFENDANTS' REQUEST AS A REQUEST FOR A PROTECTIVE ORDER RESTRICTING MS. HOGAN'S ACCESS TO CONFIDENTIAL INFORMATION, THAT REQUEST SHOULD BE DENIED AS WELL.**

Defendants do not ask this court for a protective order permitting Ms. Hogan to remain in the case but restricting her access to confidential information. Nonetheless, all of the cases Defendants cite pertaining to inadvertent disclosure address that point, and Defendants have requested that relief in the past. HQ accordingly responds to that argument as well.

A. **Defendants Have Not Pointed to Any Case in Any Jurisdiction That Restricted Counsel's Access to Confidential Information Because Outside Counsel Was Related to His Or Her Client.**

The burden is on Defendants to show good cause for the protection that they are requesting. Fed. R. Civ. P. 26(c)(1)(G). Defendants have not directed this Court's attention to a single case in which a party's counsel was prevented from viewing confidential information because she was related to the party she represented. This issue was addressed, however, in *American Hardware Manufacturers Ass'n v. Reed Elsevier, Inc.*, No. 03 C 9421, 2004 WL 2108403 (N.D. Ill. September 21, 2004), which the Court brought to the parties' attention. In *American Hardware*, Judge Moran analyzed facts quite similar to those at issue here and held that counsel should have access to confidential information relating to the case. *Id.* at *1. In response to a motion to compel, defendants filed a motion to try to prevent one of plaintiff's lawyers from viewing the confidential information. *Id.* The attorney defendants sought to preclude from having access was the son of a high-ranking board member and past president and CEO of the plaintiff corporation, as well as the brother of the current president and CEO. *Id.* The Court rejected defendants' request to prevent the attorney from having access to confidential documents, explaining, "we do not believe attorney Farrell should be precluded from access. He is an officer of the court, subject to the court's orders, and we have no reason to believe he would

violate his professional obligations." *Id.* Defendants do not explain why the Court should trust Ms. Hogan, also an officer of the Court subject to the Court's orders, any less than Judge Moran trusted plaintiff's counsel in *American Hardware*.

> **B.     The Primary Factor In Determining Whether There Is a Risk of Inadvertent Disclosure That Would Justify a Protective Order is Whether Counsel Is Involved in Competitive Decision-Making.  Ms. Hogan Plays No Role in HQ's Competitive Decision-Making.**

Defendants' principal argument relies on the notion that there is a risk of inadvertent disclosure if Ms. Hogan is permitted to view Defendants' confidential materials. The primary factor courts consider in determining whether counsel should be permitted to view confidential information is whether counsel is involved in "competitive decision-making." *See Nazomi Communications, Inc. v. Arm Holdings PLC*, No. 02-2521, 2002 WL 32831822, at *3 (N.D. Cal. Oct. 11, 2002) ("A protective order barring attorneys who are not competitive decisionmakers from accessing confidential information would require a departure from the analysis set forth in *U.S. Steel* and *Brown Bag Software*").

As this Court explained in *Autotech Technologies Limited Partnership v. AutomationDirect.com, Inc.*, 237 F.R.D 405, 408-09 (N.D. Ill. 2006), the analysis starts with a presumption that all lawyers (whether in-house or outside counsel) will endeavor to abide by any attorneys'-eyes-only protective order that is entered. "The issue concerns not good faith but risk of inadvertent disclosure." *Id.* at 408 (quoting *FTC v. Exxon Corp.*, 636 F.2d at 1350. *See also Nazomi Communications, Inc.,* 2002 WL 32831822, at *3 ("leading cases in this area . . . presuppose fidelity to ethical duties and bar access only when there is a significant risk of inadvertent disclosure"). Accordingly, when a party seeks to restrict access of specific lawyers to "highly confidential" documents, courts generally examine the factual circumstances of the counsel's relationship to the party and the risk of inadvertent disclosure.

> **1.    Because of Ms. Hogan's lack of involvement in HQ's competitive decision-making, keeping Defendants' confidential information from her client will not require complicated "compartmentalization."**

The reason involvement in competitive decision-making is the primary factor in evaluating the risk of inadvertent disclosure is that courts consider it impractical to ask someone involved in decision-making for a company to simply ignore information he or she knows about a competitor that could guide that decision-making. The concern is that it is not practical to expect counsel to compartmentalize information in a way that enables them to willfully ignore valuable information that they could use in competitive decision-making simply because they are allowed to know it for some purposes but not for others. *Autotech*, 237 F.R.D. at 408 (referring to such compartmentalization as "a feat beyond the compass of ordinary minds"); *Intel Corp. v. VIA Technologies, Inc.*, 198 F.R.D. 525, 531 (N.D. Cal. 2000) (counsel cannot be expected to "lock-up trade secrets" in her mind).

The factual circumstances at issue here demonstrate that Ms. Hogan should not be restricted from viewing Defendants' confidential information because she does not have a role in competitive decision-making. As described in Ms. Hogan's previously-filed declaration, Ms. Hogan is generally not involved in HQ's business. Declaration of Deborah Rzasnicki Hogan, attached hereto as Exhibit B, at ¶¶2-6. Ms. Hogan has only recently started representing HQ in litigation matters; Ms. Hogan does not provide legal advice to HQ regarding transactional or general corporate matters; Ms. Hogan is not a shareholder of HQ; and Ms. Hogan is not involved in any "competitive decision-making" at HQ or any other decision-making at HQ, except in her role as outside litigation counsel. *Id*.

## 2. Defendants' arguments that Ms. Hogan would violate her obligations have no basis and lack support in the relevant cases.

Given Ms. Hogan's lack of involvement in HQ's business, there is no risk of inadvertent disclosure. Defendants argue that protective orders may be appropriate where an attorney involved in competitive decision-making for her client would be placed in an "untenable" position of choosing between advising her client based upon confidential information covered by the protective order and obeying the protective order. Disqualification Memorandum at 6. But in every case governed by a protective order in which outside counsel represent corporate clients, outside counsel are expected to keep certain information from their clients, while using that same information to vigorously pursue their client's litigation strategy as appropriate. This does not work an excessive burden on counsel and does not do so here, particularly because, as discussed above, Ms. Hogan is not involved in competitive decision-making for HQ.

Instead, Defendants' concern about Ms. Hogan's access to "highly confidential" documents appears to be based on an unsupported and unsupportable assumption that Ms. Hogan would be willing to violate her ethical obligations simply because she is married to one of the principals of the client and she has an indirect financial interest in the company. But the case law is clear: counsel's access to "highly confidential" documents will not be restricted based on unsupported assumptions that a lawyer will violate his or her ethical obligations. *See, e.g., Autotech*, 237 F.R.D. at 408-09 (citing cases). Even crediting Defendants' argument that Ms. Hogan has a marital interest in HQ's stock, Defendants do not cite any case -- and HQ is not aware of any -- restricting counsel's access to confidential information solely because counsel has a financial interest in his or her client.

Recognizing that competitive decision-making is a primary factor in evaluating the risk of inadvertent disclosure, Defendants make two arguments: (i) that Ms. Hogan may someday be involved in HQ's competitive decision-making, and (ii) that Ms. Hogan is actually involved in HQ's competitive decision-making now because of her role in this litigation. Disqualification Memorandum at 7. Both arguments are baseless. First, Ms. Hogan has no intention of taking on any role for HQ beyond that of outside litigation counsel. Supplemental Declaration of Deborah Rzasnicki Hogan, ¶ 3. Furthermore, Defendants do not cite any authority to support an argument that this Court should base its decision on speculation about what counsel's future role could be, particularly speculation that has no basis in fact. Ms. Hogan's access to confidential information should not be restricted simply because of Defendants' unfounded and baseless speculation about Ms. Hogan's potential future role in the company. Second, Defendants' argument that Ms. Hogan is currently involved in competitive decision-making for HQ -- Defendants refer to this as their "best evidence" in support of such a claim -- is that Ms. Hogan is playing a central role in this litigation. This is circular logic; if participating in a case constituted involvement in a company's competitive decision-making, this would compel the desired restriction in any case. No cases cited by Defendants make any suggestion that involvement in litigation on behalf of a client equates to competitive decision-making, and this contention is at odds with the definition of competitive decision-in the applicable case law. *Autotech*, 237 F.R.D. at 407 (citing *U.S. Steel*, 730 F.2d at 1468 n.3).

**C.  The *Autotech* Decision Engages in a Helpful Analysis of the Relevant Law, But Its Holding Is Distinguishable Because of the Unique Facts in That Case.**

In *Autotech*, this Court granted the motion to enter a protective order to prevent in-house counsel from viewing confidential documents. *Autotech* was a unique case that differed from this one in numerous important respects. First, *Autotech* presented enormous

"compartmentalization" concerns that are not present in this case. In *Autotech*, Autotech proposed that Mr. Kumar, Autotech's president, would receive redacted versions of the confidential documents, while in-house counsel would receive unredacted versions. *Autotech*, 237 F.R.D. at 410. This Court observed that "[i]n light of Mr. Kumar's pervasive participation in the case, it cannot be doubted that there will be discussions about the redacted documents…," and during those conversations, "[c]ompartmentalization would be exceedingly difficult, if not impossible, and thus the risk of inadvertent disclosure would be heightened to an unacceptable degree." *Id.* This case does not involve any reasonable analogy. HQ does not request that it be given redacted versions of confidential information; it is content to have its outside counsel review the information in unredacted form and handle it as they deem appropriate for the litigation.

Second, one could hardly imagine a case in which a company's leader took a more direct involvement in a case than Mr. Kumar did in Autotech. Mr. Kumar attended every deposition and court appearance, and the Court's description of his involvement in the case indicates something bordering on obsession with the case. *Id.* at 409-10. Mr. Kumar was overseeing the litigation to such a degree that the Court observed, "Mr. Kumar's dominant and pervasive role in both Autotech and this litigation cannot be overstated." *Id.* at 409. This Court understandably concluded that under the circumstances at issue in that case, it was unreasonable to expect Mr. Kumar's in-house legal team to keep information from him. *Id.* at 410 ("In light of Mr. Kumar's pervasive participation in the case, it cannot be doubted that there will be discussions about the redacted documents…Compartmentalization would be exceedingly difficult, if not impossible…"); *Id.* at 411 ("the nature of this case and Autotech's emphasis on its severe financial predicament and Mr. Kumar's all-purpose role in the company, make litigation

decision-making and competitive decision-making blend imperceptibly together."). The extreme concerns involved in that case simply are not present here.[2]

Finally, this case would present a much greater prejudice to HQ if Ms. Hogan or other members of her firm could not view the confidential material than was presented by *Autotech*. In *Autotech*, this Court analyzed the impact that restricted access would have on Autotech's ability to pursue its claims. *Autotech*, 237 F.R.D. at 412-13. It concluded that Autotech would not be prejudiced in large part because Autotech's outside counsel was serving as lead counsel on the case, such that restricting access to Autotech's inside counsel would not substantially impair Autotech's ability to litigate the case. *Id*. The inside counsel who the Court prevented from accessing the confidential material were essentially the outside counsel's associates, supervised by the outside counsel. *Id.* at 413. This case presents a very different set of circumstances. HQ does not have any inside counsel, and restricting the access of Ms. Hogan and her firm to the confidential materials would mean that no one representing HQ would have access to materials that could be critical to the case. As this is a copyright infringement case, NuGen's source code is arguably the most relevant evidence. Yet Defendants wish to prevent Ms. Hogan and her firm, HQ's only counsel in the case, from reviewing this critical evidence. This would have a devastating impact on HQ's ability to prosecute its claims.[3]

---

[2] Contrary to Defendants' characterization of HQ as a "family-run business," HQ is controlled to a large degree by outside directors. Declaration of Jeffrey J. Hogan, attached hereto as Exhibit C, at ¶¶ 6-9. The roles of Mr. Hogan's father and father-in-law are described in ¶¶ 10-11.

[3] As HQ explained in its motion to compel, it is quite difficult to imagine how disclosure of NuGen's source code to Ms. Hogan could raise a risk of inadvertent disclosure. Ms. Hogan has no background in computer programming, and could not disclose any information about NuGen's source code to HQ that would give HQ a competitive advantage without blatantly violating the protective order and delivering the source code to HQ. As for Defendants' concerns regarding their customer information, Ms. Hogan is not involved with HQ's customers, marketing, or any other strategic decision-making, so it is similarly difficult to view the possibility of "inadvertent disclosure" as a legitimate concern.

## IV.  CONCLUSION

There is no basis for either: (i) disqualification, or (ii) entry of a protective order restricting Ms. Hogan or her law firm from access to confidential documents.  Defendants do not argue that any ethical violation has occurred, nor is there any basis to presume an ethical violation is likely to occur.  A restrictive protective order would only be appropriate if there were an "unacceptable risk of inadvertent disclosure."  No such risk exists here because of Ms. Hogan's limited role as outside counsel who is not involved in HQ's competitive decision-making or in HQ's business generally.  Under these circumstances, there is no risk of "inadvertent disclosure" which would warrant imposition of a protective order restricting Ms. Hogan's access to certain confidential documents.

For these reasons, HQ respectfully requests that this Court enter an order denying Defendants' "Renewed Motion for Protective Order."

DATED:  June 10, 2008

                                              Respectfully submitted,

                                              HYPERQUEST, INC.

                                              By  /s/ Deborah R. Hogan
                                                   One of Its Attorneys

Deborah Rzasnicki Hogan
Chad A. Blumenfield
GOLDBERG KOHN BELL BLACK
 ROSENBLOOM & MORITZ, LTD.
55 East Monroe Street, Suite 3300
Chicago, Illinois  60603
(312) 201-4000

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on June 10, 2008, he caused a copy of the attached **HYPERQUEST'S OPPOSITION TO DEFENDANTS' MOTION TO DISQUALIFY** to be served via the Court's electronic notification system upon:

> Monte L. Mann
> Kristen Werries Collier
> Novack and Macey LLP
> 100 North Riverside Plaza
> Chicago, IL 60606
>
> Mark J. Peterson
> Nora M. Kane
> Stinson Morrison Hecker LLP
> 1299 Farnam Street, 15th Floor
> Omaha, Nebraska 68102-1818

By:  /s/ Chad A. Blumenfield